THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE LITTLE TIKES COMPANY,<br>an Ohio corporation, | ) ) ) | **FILED: APRIL 3, 2008**<br>Case No. <u>08CV1935    RCC</u> |
| Plaintiffs, | ) ) | JUDGE GOTTSCHALL<br>MAGISTRATE JUDGE NOLAN |
| v. | ) ) ) | |
| KID STATION TOYS, LTD.,<br>a Florida corporation, | ) ) ) | **Jury Trial Demanded** |
| KIDS STATION TOYS, LTD.,<br>a Hong Kong corporation, | ) ) ) | |
| KIDS STATION (U.S.) INCORPORATED,<br>a Florida corporation, | ) ) ) | |
| KIDS STATION TOYS<br>    INTERNATIONAL, LTD.,<br>a Bermuda corporation, | ) ) ) ) | |
| KIDS STATION TOYS INTERNATIONAL<br>    HOLDING, GmbH<br>a Switzerland corporation, and | ) ) ) ) | |
| MR. ELLIOT S. NEWMAN<br>an individual, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

The Little Tikes Company ("Little Tikes"), for its Complaint against defendants Kid Station Toys, Ltd., a Florida corporation, Kids Station Toys, Ltd., a Hong Kong corporation, Kids Station (U.S.) Incorporated, a Florida corporation, Kids Station Toys International, Ltd., a Bermuda corporation, Kids Station Toys International Holding, GmbH and Mr. Elliot S. Newman, alleges as follows:

## THE PARTIES

1.      Plaintiff Little Tikes is a corporation organized under the laws of Ohio, and maintains its principal place of business at 2180 Barlow, Hudson, Ohio, 44232.

2.      Defendant Kid Station Toys, Ltd. is, on information and belief, a corporation organized under the laws of Florida, and maintains a mailing address at P.O. Box 694660, Miami, Florida 33268-4660 (referred to hereinafter as "Kid Station (Florida)").

3.      Defendant Kids Station Toys, Ltd. is, on information and belief, a corporation organized under the laws of Hong Kong, China, has a registered agent at Rm 804 8/F Empire Ctr., 68 Mody Rd., Tsim Sha Tsui East, Kowloon, Hong Kong, and maintains a principal place of business in Miami, Florida (referred to hereinafter as "Kids Station (HK)").

4.      Defendant Kids Station (U.S.) Incorporated is, on information and belief, a corporation organized under the laws of Florida, and maintains its principal place of business at 1160 NW 163rd Drive, Miami Gardens, Florida, 33169-5816 (referred to hereinafter as "Kids Station (U.S.)").

5.      Defendant Kids Station Toys International, Ltd. is, on information and belief, a corporation organized under the laws of Bermuda having a registered agent at c/o Alexander Management, Ltd., 48 Par-La-Ville Road, Suite 1461, Hamilton, Pembroke, Bermuda (referred to hereinafter as "Kids Station (Bermuda)").  It is unknown where Kids Station (Bermuda)'s principal place of business is, but it is believed to be in or near Miami, Florida.

6.      Kids Station Toys International Holding, GmbH is, on information and belief, a corporation organized under the laws of Switzerland having a registered agent at c/o Oliver Cornelis Gugelot, Treichlerstrasse 7, 8032 Zurich ZH, Switzerland (referred to hereinafter as "Kids Station (International)").  It is unknown where Kids Station (International)'s principal place of business is, but it is believed to be in or near Miami, Florida.

2

7.    Elliot S. Newman is an individual who, on information and belief, resides at 355 Ocean Blvd., Golden Beach, Florida, 33160, and is the owner of each of the Kids Station Entities identified in Paragraphs 2 – 6 (collectively referred to as the "Kids Station Entities") and is responsible for controlling the operation of each Kids Station Entity.

8.    On information and belief, Mr. Newman and each Kids Station Entity identified above has participated, on some level, in the manufacturing, transportation, distribution or sale of products bearing the LITTLE TIKES trademark and will be referred to collectively as "Defendants." There may be additional persons or entities liable for the activities which form the basis for this Complaint. Plaintiffs will explore this on discovery and, if necessary, amend this Complaint to add such persons or entities as parties.

## NATURE AND STATUTORY BASIS OF ACTION

9.    This is an action seeking remedy for (i) piercing the corporate veil; (ii) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); (iii) dilution by tarnishment under 15 U.S.C. § 1125(c); (iv) false representation under 15 U.S.C. § 1125(a); (v) unfair competition; and (vi) breach of contract.

10.    This Court has jurisdiction over the Trademark infringement, false representation and dilution counts pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 (a) in that they involve actions arising under the Lanham Act. This Court has jurisdiction and supplemental jurisdiction over the remaining counts pursuant to 28 U.S.C. § 1367, 28 U.S.C. § 1338(b), and 28 U.S.C. § 1332, as there is complete diversity between the parties and the matter in controversy exceeds the sum of $75,000.

11.    Personal jurisdiction and venue are proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) and (c) with respect to Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Mr. Newman as a substantial part of the events giving rise to the claims

occurred in this District and these Defendants have, by contract with Little Tikes or affirmatively alleging to have contracted with Little Tikes, agreed to jurisdiction here. Personal jurisdiction and venue are proper in this Court under 28 U.S.C. § 1391 (b), (c) and (d) with respect to all other Defendants because they are alien corporations, have continuous and substantial contacts with this District, are doing business in this District, and are currently selling or marketing products under Plaintiff's trademarks in this District.

## NATURE OF THE CASE

12.     Little Tikes bring this action in response to Defendants' willfully-infringing conduct and to protect and prevent the destruction of the goodwill and consumer recognition Plaintiff has worked hard to secure over the years.

## COMMON ALLEGATIONS

### A.     Little Tikes and its Trademarks

13.     For nearly 40 years, since being founded in 1970, Little Tikes has been a manufacturer and marketer of high-quality, innovative children's products. Little Tikes products are known worldwide for providing durable, imaginative and active fun. Its products are manufactured and sold under the famous "LITTLE TIKES" trademark. The products are produced in a wide variety of categories for young children, including infant toys, popular sports, play trucks, ride-on toys, sandboxes, activity gyms and climbers, slides, pre-school development, role-play toys, creative arts and juvenile furniture.

14.     As a result of its long use, worldwide advertising and quality products, Little Tikes' trademarks are famous and instantly recognizable throughout the world, particularly its famous, federally registered LITTLE TIKES and Design mark:



U.S. Reg. No. 1,145,515 (the "LITTLE TIKES mark").

15.    By way of example, Little Tikes' red and yellow Cozy Coupe® Car, an international icon in toys, celebrated its 25th anniversary in 2004, with more than 6 million units sold since its creation.  Little Tikes' goal is to create and supply innovative products to customers and consumers around the world.  To reach that goal, Little Tikes' associates' actions are guided by the principles of Customer Satisfaction, Teamwork, Innovation, Marketing and Continuous Improvement.

16.    Because of and Little Tikes' innovation and commitment to quality and safety, Plaintiff's products have won numerous awards and its LITTLE TIKES trademark is instantly recognizable throughout the world.  This instant recognition and the exceedingly valuable goodwill associated with Little Tikes' trademarks are among Plaintiff's most valuable assets, and have been developed over numerous years and at great effort and expense by Little Tikes.

**B.    The Kid Station (Florida) License Agreement**

17.    On December 8, 2003, Little Tikes, at that time wholly-owned by Newell Rubbermaid, Inc., located near Chicago, Illinois, and Kid Station (Florida), entered into a written License Agreement, (the "Agreement"), which granted Kid Station (Florida) the exclusive right to use the valuable LITTLE TIKES and Design mark in connection with certain categories of children toys.  A copy of the Agreement is attached hereto as Exhibit A.  The Agreement includes, among other provisions, a specific forum selection clause, designating the present

Court as the forum of choice for any court actions, and Illinois law as the controlling law of the Agreement.

18.     Under the Agreement, Kid Station (Florida) had no right to sublicense any of the rights licensed to it under the Agreement. Ex. A, § 2.2. Additionally, according to Article XIX, the rights granted to Kid Station (Florida) under the Agreement were personal in nature, and Kid Station (Florida) agreed that it could not sell, transfer, lease or assign the Agreement or the rights granted thereunder, or any part thereof, without the prior written consent of Little Tikes. Little Tikes has never given any such consent.

19.     Because of the exclusivity of the trademark license granted by the Agreement, the fact that Kid Station (Florida) would be making and selling products to small children and the value of the Little Tikes' trademarks, the 36-page Agreement stressed quality control. Some of its quality control provisions include:

- Kid Station (Florida) was only licensed to use Little Tikes' trademarks on products that were of at least the same quality as those sold by Little Tikes. Ex. A, § 6.8.

- Kid Station (Florida) was only licensed to manufacture products in accordance to approved designs. *Id.*

- Kid Station (Florida) represented that its products would be free from defects and would be in compliance with all standards and regulations. *Id.* at § 7.2.

- Kid Station (Florida) was required to provide a toll-free customer support service call-in service, and to provide Little Tikes regular reports detailing the customer service activities on a quarterly basis. *Id.* at §§ 8.1 and 8.2.

- Kid Station (Florida) was required to submit design proposals to Little Tikes for approval. *Id.* at § 9.1

- Kid Station (Florida) agreed that it would ensure that all of the products complied with the various laws and standards, whether voluntary or mandatory, of the various Federal Agencies, including the U.S. Consumers Products Safety Commission, the Federal Trade Commission, Underwriters Laboratory, and the Canadian Standards Association. *Id.* at § 11.

20.     Additionally, the Agreement included a provision that required Kid Station (Florida) to use the LITTLE TIKES mark on products of a certain quality, and permitted Little Tikes, in its sole discretion, to terminate the Agreement if such quality standards were not satisfied. *Id.* at § 6.8. This provision was vital to preserving and protecting the immeasurable goodwill that Little Tikes had garnered in its trademark among consumers for nearly forty years.

21.     On January 1, 2006, Little Tikes and an entity again purporting to be Kid Station (Florida) entered an amendment to the Agreement ("the Addendum") to expand the types of products that the original license covered. See Ex. A, Addendum.

22.     In late 2006, MGA Entertainment, Inc. ("MGA"), a California corporation, bought Little Tikes from Newell Rubbermaid, Inc.  Neither MGA nor Newell Rubbermaid, Inc. is a party to the Agreement.  However, pursuant to the Agreement's Notice Provision (Ex. A, § 20), Newell Rubbermaid, Inc.'s Legal Department, located in Oak Brook, Illinois, was to receive a copy of all notices.

23.     Prior to the sale of Little Tikes to MGA, Little Tikes had begun to discover quality problems with the goods manufactured and sold by Kid Station (Florida) under Little Tikes' trademarks.  In fact, Little Tikes had become aware of several consumer complaints over the quality of toys sold under Little Tikes' trademarks that were being made and sold by Kid Station (Florida).  Little Tikes became increasingly concerned with protecting its valuable trademarks in the face of these quality complaints.

24.     After MGA acquired Little Tikes, MGA and Little Tikes received numerous customer and government complaints about Little Tikes products made by Kid Station (Florida), including complaints that certain products posed serious injury hazards to small children.  In addition, Little Tikes found that Kid Station (Florida) was not fulfilling numerous critical

7

obligations required under the Agreement. As a result, MGA, on behalf of Little Tikes held a meeting with Mr. Newman and his legal counsel in May 2007 to address these concerns and other issues of Kid Station (Florida)'s non-compliance with the Agreement. Despite meeting with Mr. Newman, the purported president of Kid Station (Florida), as well as his counsel Charles Leuin, and subsequent written correspondence insisting upon compliance by Kid Station (Florida) with its obligations, Kid Station (Florida) continued, and still continues, to ignore such obligations.

### C.    Defendants' Breaches of the Agreement

25.    On April 30, 2007, Little Tikes received a report from the U.S. Consumers Product Safety Commission (the "CPSC"), describing a potential choking hazard associated with one of the licensed products made by Defendants, namely, the Little Tikes Play Cell Phone, product number KSL8033 (the "Unapproved Cell Phone"). A copy of the report is attached hereto as Exhibit B.

26.    Little Tikes, through its parent MGA, met with Mr. Newman, the president of Kid Station (Florida), as well as his counsel Charles Leuin, Esq. of Greenberg Traurig - Chicago, in Los Angeles in May of 2007 to discuss the April 30 CPSC report, as well as other concerns. As a result of the meeting, Kid Station (Florida) agreed to modify the design of the Unapproved Cell Phone.

27.    Defendants finally claimed to have modified the Unapproved Cell Phone in September 2007. However, Defendants failed to remove the prior version of the Unapproved Cell Phone from retailers' shelves, and complaints continued. On January 30, 2008, concerned with protecting the goodwill in the LITTLE TIKES mark, MGA sent a letter to Kid Station (Florida) on behalf of Little Tikes detailing a new consumer complaint reporting a potential choking hazard related to the Unapproved Cell Phone, and requesting that Kid Station (Florida)

8

immediately cease selling the KSL8033 product. A copy of the January 30 letter is attached as Exhibit C.

28.    Despite the CPSC report indicating that the Unapproved Cell Phone created a choking hazard, and despite assurances by Defendants that a modified Cell Phone, one with a screw in the hinge, had been manufactured since September of 2007, Little Tikes discovered that Defendants still had never recalled the unmodified KLS8033 product identified in the CPSC report from their retailers, nor had Defendants asked the retailers to stop selling the Unapproved Cell Phone.

29.    Once Defendants finally started selling the modified cell phone, Defendants sold both the original Unapproved Cell Phone and the modified cell phone under the same SKU number. As such, it would be impossible for retailers to tell the difference between the two phones unless they physically examined each individual product. Indeed, as detailed below, Little Tikes came to learn in February of 2008 that consumers could still purchase the Unapproved Cell Phone from retailers, such as Wal-Mart.

30.    On January 31, 2008, Channel KTTC in Rochester, Minnesota reported yet another choking incident involving a mother who had found a broken piece of the Unapproved Cell Phone in her child's mouth, but was able to retrieve the piece before he could swallow it. Detrimentally to Little Tikes, the report only identified the product as "a Little Tikes Toy," thereby leading the general public to believe that Little Tikes, rather than Defendants, was solely responsible for the problem.

31.    Additionally, despite assurances from Kid Station (Florida) that the design of the Unapproved Cell Phone had been modified in September of 2007, MGA purchased a Unapproved Cell Phone from a Wal-Mart store on February 1, 2008. Incredibly, stickers on the

purchased phone indicated that the manufacture date of the product was September of 2007. Moreover, there were multiple Unapproved Cell Phones on the shelf, each having stickers with the same date of manufacture.

32.     On February 5, 2008, due to the danger of grave and irreparable damage to its reputation and goodwill, and based on the continuing and inexplicable sale of products that were, by definition, unapproved under the Agreement, MGA sent, on behalf of Little Tikes, a letter to Defendants, terminating the Agreement. The February 5 letter is attached hereto as Exhibit C.

33.     In addition, Plaintiff's letter of February 5 identified numerous additional breaches of the Agreement, and served as Plaintiff's written notice of those material breaches of the Agreement pursuant to paragraph 14.1 of the Agreement. According to that paragraph, Defendants had thirty (30) days from the time of notice to cure the additional breaches.[1] As of March 6, 2008, Defendants had taken no actions to cure the numerous breaches identified in the February 5 letter. Indeed, Defendants have still taken no actions in an attempt to cure any of the breaches identified in the February 5 letter.

### D.    Defendants' Actions Since Termination

34.     On February 19, 2008, Defendant, Kids Station (HK), not Kid Station (Florida), the purported Florida corporation that is the named party in the Agreement, filed suit in the Southern District of Florida. On March 17, 2008, Kids Station (HK) amended its complaint, which included counts for a declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, tortuous interference with contract, and civil conspiracy. *See* Amended Complaint, attached hereto as Exhibit E. Kids Station (HK) also filed a motion for

---

[1] According to § 14.2, Little Tikes could immediately terminate the Agreement if Kid Station (Florida), among other events, sold any Licensed Products that had not been approved pursuant to Article IX. According to § 14.1, Little Tikes could terminate the Agreement for other material breaches upon thirty (30) days written notice, and provided the breaches were not cured within that thirty day period.

Temporary Restraining Order seeking, among other remedies, to enjoin MGA and Little Tikes from terminating the Agreement.

35.    In its Amended Complaint, Kid Station (HK) alleged that it, not Kid Station (Florida), has been the sole and exclusive party with whom Little Tikes entered the Agreement. Ex. E, ¶¶ 4, 14. This allegation comes despite the fact that the company description on the website located at the domain name <www.kidsstationtoys.com/homepage.php> states, "Kids Station Toys International, Ltd, which started in 1999...has forged relationships with some of the biggest companies in the toy industry, including...Little Tikes....." A printout of this website is attached hereto as Exhibit F.

36.    Based on these statements, and on information and belief, Defendant Newman is playing a shell game with the various entities that he controls. Plaintiff believes that Mr. Newman is a principal officer or shareholder of each of the Kids Station Entities. The Kids Station Entities are scattered across the globe, but each has some role in or responsibility for the actions complained of herein. The relationship between these different entities remains unclear.

37.    In response to the original and Amended Complaints, MGA and Little Tikes filed motions to dismiss, or in the alternative, to transfer jurisdiction. On April 2, 2008, the Florida Court dismissed the action with prejudice to re-file in Florida, and denied all pending motions as moot. A copy of the Florida Court's April 2 order is attached hereto as Exhibit G.

38.    On March 11, 2008, while the Florida matter was still pending, Plaintiffs sent a third letter to Defendants, a copy of which is attached hereto as Exhibit H. The March 11 letter referenced a recent customer complaint to Kids Station (HK) regarding a battery found on the Unapproved Cell Phone that leaked battery acid. Additionally, the March 11 letter once again informed Defendants that the Agreement had been terminated under the immediate termination

clause and, as a result, Defendants no longer were permitted to sell products bearing Little Tikes' trademarks. Therefore, because of the lack of a license, as well as the potential damage to Plaintiff's valuable goodwill, Plaintiffs further demanded that Defendants remove all of Defendants' products bearing Little Tikes trademarks from retailers' shelves.

39.    Defendants have not responded to the specific demands of the March 11 letter and, on information and belief, are continuing to sell products bearing Plaintiff's marks.

40.    On March 14, 2008, the CPSC sent a new letter to Little Tikes regarding the Unapproved Cell Phone. A copy of the March 14 letter is attached hereto as Exhibit I. In the March 14 letter, the CPSC referenced the hinge cover of the Unapproved Cell Phone. The March 14 letter states that the Unapproved Cell Phone is "a hazardous substance as defined in section 2(f)(1)(D) of the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261.2(f)(1)(D), and the regulations at 16 C.F.R. § 1501.18(a)(9), and is a banned hazardous substance under section 2(q)(1)(A) of the FHSA...." The report states that the hinge cover is hazardous, and that "[b]ecause of the potential risk of injury to children, the staff requests that you stop sale and withhold distribution of any inventory of the [Unapproved Cell Phone]."

41.    Plaintiff received the March 14 letter on March 18, 2008. On March 19, 2008, MGA and Plaintiff sent a copy of this letter to Defendant Newman and again demanded that Defendants immediately cease the sale of this Unapproved Cell Phone, and all other products bearing the LITTLE TIKES mark.

42.    The Unapproved Cell Phone contains a legend which states, "Designed and Licensed by *Kids Station Toys International Ltd.*" (emphasis added). Plaintiff is uncertain whether this refers to Defendant Kids Station (Bermuda) or Defendant Kids Station (International). Regardless of the Defendant to which the notice refers, neither is a party to the

Agreement, neither is authorized to use the LITTLE TIKES mark, and therefore, distribution by either is an infringement of Plaintiff's trademark rights.

43.     Because of the apparent interchangeability of the various Defendants, it appears that Mr. Newman is using these various entities in an attempt to avoid liability, and that he, individually, is responsible for the actions of the various Defendants.

## COUNT I

## PIERCING THE CORPORATE VEIL

### (NEWMAN)

44.     Plaintiff realleges and incorporates herein paragraphs 1 through 43 of this Complaint.

45.     There is a unity of interest between Defendant Newman and each of the Kids Station Entities named as Defendants.  On information and belief, Defendant Newman is the president and primary shareholder of each Kids Station Entity and exercises total dominion and control over the finances and business operations of each Kids Station Entity.

46.     Based on information and belief, since the respective formations of the Kids Station Entities:

a)      none of the Kids Station Entities have observed corporate formalities;

b)      Newman did not maintain separate finances for the Kids Station Entities and commingled their funds and shifted funds among the various Defendants; and

c)      Newman has not maintained separate places of business for each of the Kids Station Entities.  Indeed, each lists, at one time or another, a place of business or operation at P.O. Box 694660 in Miami, Florida.

47.     On information and belief, there is a unity of interest and ownership among the various Kids Station Entities and Newman.

48.     On information and belief, Kid Station (Florida), Kids Station (HK), Kids Station (U.S.), Kids Station (Bermuda) and Kids Station (International) were and are corporations in name only, and their primary equity holder and principal, Newman, is and has been the real party in interest who used the various Kids Station Entities as his alter ego to shield him from personal liability for the obligations he has incurred.

49.     The various Kids Station Entities are mere instrumentalities and alter egos of Newman who has defrauded Plaintiff by hiding behind the veil of the alleged separate existence of the various Kids Station Entities. Each of the various Kids Station Entities and Mr. Newman are, therefore, individually and jointly liable for the infringements of Little Tikes' trademarks.

50.     Allowing Newman to continue to perpetrate these activities permits him to be unjustly enriched and deprives Plaintiffs of the opportunity to defend and control the valuable goodwill associated with its trademarks.

51.     Unless the corporate identities of the various Kids Station Entities are disregarded, Plaintiff will have no remedy for the breach of contract or trademark infringement stated above.   Under the circumstances, observance of the fiction of the separate corporate existence of the various Kids Station Entities would sanction fraud and promote injustice. The purported corporate existence of the various Kids Station Entities should be disregarded, and liability should be imposed on Newman personally.

**COUNT II**

**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. 1114(a))**

**(ALL DEFENDANTS)**

52.     Plaintiff realleges and incorporates herein paragraphs 1 through 51 of this Complaint.

    A.   *Against Kids Station (Bermuda), Kids Station (International) and Newman*

53.    These Defendants had constructive knowledge of Little Tikes' ownership of and rights in its federally-registered mark pursuant to 15 U.S.C. § 1072, long prior to these Defendants' unauthorized distribution of goods under the Little Tikes mark.    Furthermore, because of the lack of corporate formalities and the relatedness of these Defendants to the purported named party of the Agreement, these Defendants and their agents also had actual knowledge of Little Tikes' ownership of and rights in its federally-registered mark long prior to these Defendants' unauthorized conduct complained of herein.

54.    These Defendants have deliberately and willfully distributed and sold products bearing the LITTLE TIKES mark in an attempt to trade upon the enormous goodwill, reputation, and selling power established by Little Tikes under its mark, and to pass their goods off as Little Tikes' goods.

55.    Little Tikes has not consented to these Defendants' use of the LITTLE TIKES mark on the products distributed by these Defendants.

56.    These Defendants' unauthorized use of the LITTLE TIKES mark in connection with Defendants' promotion and provision of their goods has caused, is currently causing, and is likely to continue to cause, confusion, mistake or deception as to the affiliation, connection or association of these Defendants with Little Tikes in violation of 15 U.S.C. § 1114.

57.    The blatantly intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

58.    As a result of these Defendants' aforesaid conduct, Little Tikes has suffered substantial damage and irreparable harm constituting an injury for which Little Tikes has no adequate remedy at law.    Unless this Court enjoins these Defendants' conduct, Little Tikes will continue to suffer irreparable harm.

B.    *Against Kid Station (Florida), Kids Station (HK), Kids Station (U.S.) and Mr. Newman*

59.    Defendant Kids Station (HK) has alleged in the Florida action that one of these Defendants was a party to the Agreement.  Because of the relatedness of the Defendants, it is unclear which Defendant was actually the party to the Agreement.  Each of these Defendants had actual knowledge of Little Tikes' ownership of and rights in its federally-registered mark long prior to these Defendants' unauthorized use of the Little Tikes mark.

60.    These Defendants have deliberately and willfully distributed and sold products bearing the LITTLE TIKES mark after the February 5, 2008 termination of the Agreement, in an attempt to trade upon the enormous goodwill, reputation, and selling power established by Little Tikes under its mark, and to pass their goods off as Little Tikes' goods.

61.    Little Tikes has not consented to these Defendants' continued use of the LITTLE TIKES mark on the products distributed by these Defendants.

62.    These Defendants' unauthorized use of the LITTLE TIKES mark in connection with the promotion and provision of their goods has caused, is currently causing, and is likely to continue to cause in the future, confusion, mistake or deception as to the affiliation, connection or association of these Defendants with Little Tikes in violation of 15 U.S.C. § 1114.

63.    The intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

64.    As a result of these Defendants' aforesaid conduct, Little Tikes has suffered substantial damage and irreparable harm constituting an injury for which Little Tikes has no adequate remedy at law.  Unless this Court enjoins these Defendants' conduct, Little Tikes will continue to suffer irreparable harm

## COUNT III

## FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125 (a))

### (ALL DEFENDANTS)

65.    Plaintiff realleges and incorporates herein paragraphs 1 through 64 of this Complaint.

        *A.    Against Kids Station (Bermuda), Kids Station (International) and Newman*

66.    Defendants Kids Station (Bermuda), Kids Station (International) and Newman have deliberately and willfully sold, and are currently selling, products under the Little Tikes trademarks, despite the fact that none of Kids Station (Bermuda), Kids Station (International) or Newman was ever a party to the Agreement, in an attempt to trade on the long-standing and hard-earned goodwill, reputation and selling power established by Little Tikes in connection with its products, and in order to confuse consumers as to the origin and sponsorship of the Little Tikes branded products.

67.    The unauthorized and tortious conduct of Kids Station (Bermuda), Kids Station (International) and Newman has also deprived and will continue to deprive Plaintiffs of the ability to control the consumer perception of its goods marketed under the Little Tikes trademarks, placing the valuable reputation and goodwill of Plaintiffs in the hands of Kids Station (Bermuda), Kids Station (International) and Newman, over whom Plaintiffs have no control.

68.    The conduct of Kids Station (Bermuda), Kids Station (International) and Newman constitutes a false representation or description of the goods, which is likely to cause, and indeed, already has caused, confusion, mistake or deception as to the affiliation, connection or association of Kids Station (Bermuda), Kids Station (International) and Newman with Plaintiffs, and as to the origin, sponsorship or approval of Kids Station (Bermuda), Kids Station

(International) and Newman and their goods, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

69.     The blatantly intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

70.     As a result of Kids Station (Bermuda)'s, Kids Station (International)'s and Newman's aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting an injury for which it has no adequate remedy at law. Plaintiff will continue to suffer irreparable harm unless this Court enjoins this conduct.

        B.     *Against Kid Station (Florida), Kids Station (HK), Kids Station (U.S.) and Newman*

71.     Defendants Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman have deliberately and willfully sold, and are currently selling, products under the Little Tikes trademarks subsequent to the termination of the Agreement in an attempt to trade on the long-standing and hard-earned goodwill, reputation and selling power established by Little Tikes in connection with its products, and in order to confuse consumers as to the origin and sponsorship of the Little Tikes branded products.

72.     The unauthorized and tortious conduct of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman has also deprived and will continue to deprive Plaintiff of the ability to control the consumer perception of its goods marketed under the Little Tikes trademarks, placing the valuable reputation and goodwill of Plaintiff in the hands of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman, over whom Plaintiff has no control.

73.     The conduct of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman constitutes a false representation or description of the goods, which is likely to cause,

and indeed, already has caused, confusion, mistake or deception as to the affiliation, connection or association of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman with Plaintiff, and as to the origin, sponsorship or approval of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman and their goods, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

74.    The intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

75.    As a result of Kid Station (Florida)'s, Kids Station (U.S.)'s, Kids Station (HK)'s and Newman's aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting an injury for which it has no adequate remedy at law.  Plaintiff will continue to suffer irreparable harm unless this Court enjoins this conduct.

## COUNT IV

### VIOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS 510/1 *et seq.*)

### (ALL DEFENDANTS)

76.    Plaintiff realleges and incorporates herein paragraphs 1 through 75 of this Complaint.

77.    The actions of each of the Defendants complained of herein constitute deceptive trade practices in violation of 815 ILCS 510/2 in that they are likely to cause confusion or misunderstanding as to source, sponsorship or approval of the Defendants' products sold under the Little Tikes trademark.  Defendants' deceptive conduct also creates a likelihood of confusion as to the affiliation, connection or association of its goods with Plaintiffs' well-known marks. Furthermore, Defendants' conduct creates false or misleading representations of fact as to Plaintiff's connection to Defendants' sub-standard products.

19

78.     Because Defendants' had notice of Plaintiff's prior use of and rights in the Little Tikes trademarks, Defendants willfully engaged in deceptive trade practices in violation of Illinois law.

79.     As a result of Defendants' willful and malicious conduct, Plaintiff is likely to suffer, and has in fact already suffered, irreparable harm for which it has no adequate remedy at law.  Unless this Court enjoins Defendants' conduct, Plaintiff will continue to suffer irreparable harm.

## COUNT V

## FEDERAL TRADEMARK DILUTION (15 U.S.C. § 1125 (c)

### (ALL DEFENDANTS)

80.     Plaintiff realleges and incorporates herein paragraphs 1 through 79 of this Complaint.

81.     Defendants' use of Plaintiff's distinctive and famous "LITTLE TIKES" trademark without Plaintiff's consent is likely to dilute the distinctive quality of the "LITTLE TIKES" mark in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

82.     Defendants' acts complained of herein, specifically Defendants' use of Plaintiff's "LITTLE TIKES" trademarks, will tarnish, and indeed, already have tarnished, the reputation of Plaintiff's "LITTLE TIKES" mark in the market place.  Defendants' acts have greatly damaged Plaintiff and, unless restrained and enjoined, will continue to damage Plaintiff.  Plaintiff does not have an adequate remedy at law.

## COUNT VI

## COMMON LAW UNFAIR COMPETITION

### (ALL DEFENDANTS)

83.     Plaintiff realleges and incorporates herein paragraphs 1 through 82 of this Complaint.

84.     The aforesaid conduct of each of the Defendants constitutes unfair competition in that such conduct is likely to cause members of the public and trade, and actual or potential customers of Plaintiff, to believe that Defendants and their goods are in some way sponsored by, affiliated with or otherwise connected to Plaintiff, when in fact they are not.  These actions enable Defendants to trade on and deprive Plaintiff of the benefit of the goodwill in the "LITTLE TIKES" trademark.

85.     Defendants' acts described above constitute unfair competition in violation of Illinois common law, as the aforementioned acts amount to an intentional misappropriation of Plaintiff's trademarks, reputation and commercial advantage.  As a result of their wrongful actions, Defendants will be unjustly enriched.

86.     As a result of Defendants' aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting and injury for which Plaintiff has no adequate remedy at law.  Unless this Court enjoins Defendants' conduct, Plaintiff will continue to suffer irreparable harm.

## COUNT VII

## BREACH OF CONTRACT

### (KID STATION (FLORIDA), KIDS STATION (U.S.), KIDS STATION (HK), NEWMAN)

87.    Plaintiff realleges and incorporates herein paragraphs 1 through 84 of this Complaint.

88.    Plaintiff Little Tikes entered into the Agreement with Kid Station (Florida). The Agreement was signed and executed on behalf of Kid Station (Florida) by Newman. While it is unclear if Kid Station (Florida) currently exists, or ever has existed, Little Tikes has, at all times, performed its obligations under the Agreement.

89.    Newman and Kid Station (Florida), or whatever purported entity actually entered into the Agreement, has, however, knowingly and intentionally breached its obligations under the Agreement by, among other things:

a)    Continuing to sell, and failing to remove from retailers' shelves, Licensed Products under the Agreement that were, by definition, unapproved because they do not comply with safety standards of the CPSC. Specifically, Defendants sold and are continuing to sell the Unapproved Cell Phone, which was defined by the CPSC as a hazardous substance under the Federal Hazardous Substances Act, 15 U.S.C. § 1261.2(f)(1)(D).

b)    Failing to comply repeated requests to provide, under Section 3.1 of the Agreement, samples of each Licensed Product to Little Tikes. Despite these repeated requests, Kid Station (Florida) has failed to provide samples of each Licensed Product. While MGA and Little Tikes have received samples of a few products, neither MGA nor Little Tikes has received samples of all products, nor

22

in the quantities of samples required by the Agreement or within the mandated time frames.

c)   Failing to provide any of the documents specified under Sections 4.8 or 4.9 of the Agreement.   Specifically, Kid Station (Florida) has not provided certain distribution reports, which are required to include, at the very least, Kid Station (Florida)'s product development plans, advertising and merchandising and promotional activities.  Kid Station (Florida) has also not provided a report of actual unit sales by individual retail account for the previous calendar year. Finally, Kid Station (Florida) has not provided a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter.

d)   Failing to submit new products designs for 2008 pursuant to its obligations under Section 5.3 of the Agreement.   Specifically, Kid Station (Florida) has not introduced at least three (3) different SKUs of Licensed Products, the majority of which are required to contain new aesthetic or functional features.

e)   Failing to meet its obligations to maintain an adequate telephone support service under Section 8.1 of the Agreement.  The reports MGA and Little Tikes have received, reviewed and analyzed from Kid Station (Florida) deviate substantially from the standards set forth in the Agreement.  For a large portion of the calls, no individual name was filled in and no information about the complaints was filled in, so MGA and Little Tikes could not determine the nature of the call.  The gaps in information lead to the logical conclusion that Kid Station (Florida) is not providing a comparable level of service offered by Little Tikes, in direct violation

of the terms set forth in Section 8.1. Additionally, the voluminous amount of calls Little Tikes' own Consumer Service has received regarding the lack of response from Kid Station (Florida)'s customer service confirm Kid Station (Florida)'s failure to comply with this provision of the Agreement.

f)    Failing to provide testing reports for Kid Station (Florida)'s Little Tikes products pursuant to Section 9.2 of the Agreement as repeatedly requested by the Quality Assurance divisions of both MGA and Little Tikes. Given current public perceptions of problems in the toy industry, it is of vital importance to both MGA and Little Tikes that the Licensed Products are safe for children. Kid Station (Florida) has failed to consistently provide testing reports.

g)    Failing to provide either MGA or Little Tikes with its marketing plan for 2008, in direct violation of Kid Station (Florida)'s obligations under Section 12.2 of the Agreement.

h)    Failing, under Exhibit A of the Agreement, to provide either MGA or Little Tikes with written meeting reports following any meeting between Kid Station (Florida) and a buyer at the following retailers: Wal-Mart, Kmart, Target, Toys R Us, Kay Bee Toys or FAO Schwarz. Kid Station (Florida) has repeatedly failed to provide these reports on a consistent basis.

i)    Selling Licensed Products outside the Territory as defined in section 1.7 of the Agreement. Specifically, Defendants' sold and marketed the Licensed Products in Puerto Rico.

As a result of Defendants' willful breach of the Agreement, Little Tikes has suffered substantial damage in an amount to be proven at trial.

24

## PRAYER FOR RELIEF

WHEREFORE, as to the count of piercing the corporate veil, Plaintiff prays that this Court enter judgment in its favor and against Defendants, disregarding and piercing the corporate veil of the various Kids Station Entities, holding Elliot Newman personally liable for any judgment entered by this Court, awarding Plaintiff its costs, expenses and attorney fees, and awarding Plaintiff such other and further relief as the Court may deem just and proper.

WHEREFORE, as to all Counts of this Complaint, Plaintiff requests that this Court enter a judgment in favor of Plaintiff as follows:

a)    Preliminarily and permanently enjoining and restraining each Defendant, its parents, subsidiaries, holding companies, licensees, owners, directors, officers, partners, assigns, related entities, affiliates, predecessors, successors, employees, representatives, trustees, receivers, agents, customers, heirs and any other persons or entities acting on behalf of Defendants or with Defendants' authority, from:

(1)    using, selling, offering for sale, holding for sale, advertising or promoting any product or service under the "LITTLE TIKES" trademark; or

(2)    doing any act or thing that is likely to induce the belief that Defendants' products, services or activities are in some way connected with Plaintiff, or that is likely to injure or damage Plaintiff's marks or business; and

b)    Requiring that Defendants be ordered to recall from all customers and all channels of trade any and all products, packaging, advertising and promotional material sold or distributed by Defendants or their affiliates that bear the "LITTLE TIKES" mark or any other term or appearance confusingly similar thereto;

c)    Requiring that Defendants immediately provide Plaintiff and its auditors access to all of Defendants written and electronic documents, records and files to determine all royalties

due Plaintiff for sales of all products bearing the LITTLE TIKES trademark and pay such amount as may be determined to Plaintiff with any penalties provided under the Agreement;

d)      Requiring that Defendants: 1) reimburse Plaintiff for all damages they have suffered by reason of Defendants' acts in an amount to be determined at trial, but not less than seventy-five thousand dollars ($75,000); 2) account for and pay over to Plaintiff all profits derived by reason of Defendants' acts of infringement, deceptive trade practices, dilution and unfair competition; and, 3) remit to Plaintiff exemplary, treble damages as provided for in 15 U.S.C. § 1117.

e)      Finding that this case constitutes an exceptional case and awarding Plaintiff its reasonable attorneys' fees and disbursements, as well as the costs it has incurred in bringing this action, pursuant to 15 U.S.C. § 1117 and 815 ILCS 510/3;

g)      Requiring that Defendants deliver up and destroy all labels, signs, prints, packages, wrappers, receptacles and advertisements in its possession bearing the "LITTLE TIKES" Mark, or any marks or trade dress that are confusingly similar thereto and all plates and other means of making the same, pursuant to 15 U.S.C. § 1118; and

h)    Requiring that Plaintiff be awarded such other and further relief as this Court may

deem equitable.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES.

Dated:  April 4, 2008                              Respectfully Submitted,

By:  s/ Robert E. Browne
     One of the Attorneys for Plaintiff,
     The Little Tikes Company

     Robert E. Browne (ARDC# 032 1761)
     Michael G. Kelber (ARDC# 623 1033)
     Lara V. Hirshfeld (ARDC# 627 7477)
     Maurice E. Finnegan, III (ARDC# 628 1387)
     NEAL, GERBER & EISENBERG LLP
     Two North LaSalle Street
     Suite 2200
     Chicago, Illinois  60602
     Telephone:  (312) 269-8000
     Facsimile:  (312) 269-1747

*Of Counsel*
Jeanine Pisoni
General Counsel
MGA Entertainment, Inc.
16300 Roscoe Blvd
Suite 150
Van Nuys, California  91406

NGEDOCS: 1517764.2

# EXHIBIT A

## LICENSE AGREEMENT

This Agreement is effective as of this 8th day of December, 2003, by and between The Little Tikes Company, an Ohio corporation, having a principal place of business at 29 East Stephenson Street, Freeport, Illinois 61032 (hereinafter referred to as "Little Tikes") and Kid Station Toys Ltd., a Florida corporation, having its principal place of business at P.O. Box 694660, Miami, FL 33268-4660 (hereinafter referred to as "User").

## RECITALS

WHEREAS, Little Tikes has used and is the owner of the famous, distinctive and valuable trademark LITTLE TIKES (with and without an associated logo) (the "Trademarks," as defined below) known throughout the world for high quality consumer and commercial products that are used in a variety of environments; and

WHEREAS, User is desirous of manufacturing and selling Electronic Audio, Video and MusicToys ("Product") in the Territory (as defined below) using the Trademarks, and is desirous of acquiring a license with respect to such rights;

NOW, THEREFORE, the parties hereto, in consideration of the mutual agreements herein contained and promises herein expressed and for other good consideration acknowledged by each of them to be satisfactory and adequate, do hereby agree as follows:

1

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

## ARTICLE I. DEFINITIONS

The following terms shall have the following meanings when used in this Agreement and the schedules attached hereto:

1.1 "Authorized Channels" means all Mass Market; Electronic Specialty, Discount and Warehouse Clubs, Toy Specialty, Drug, Mid-Tier, Department Stores, Grocery, Internet and Catalog in the Territory.

1.2 "Core Target Market" means the market for Products directed principally to children under the age of ten (10).

1.3 "Licensed Products" means the Products specified in Exhibit A designed for children in the Core Target Market. The Licensed Products shall be designed and made available in accordance with the product specification attached as Exhibit A (as may be amended from time to time by agreement of the parties).

1.4 "Trademarks" means the trademarks owned or controlled by Little Tikes as are specifically detailed in Exhibit B; i.e., "LITTLE TIKES" and the "LITTLE TIKES" logo, and any other trademark specifically designated in writing by Little Tikes for use on or in connection with the Licensed Products.

1.5 "Licensed Rights" means all intellectual property, including titles, personae, places, props, materials, copyrights and derivative works, patents, designs, trademarks, trade dress,

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

2

and other intellectual property in and/or relating to the Licensed Products that have been designed or prepared for or by User for use in connection with the Licensed Products, as well as the Trademarks.

1.6     "Term" means the term as defined in Article V.

1.7     "Territory" means the United States, Canada, and Mexico.

1.8     "Net Sales Price" shall mean the gross selling price of Licensed Products sold by User, less a flat twelve percent (12%) deduction to cover any and all of the amount of credits or other terms allowed by User to its customers relating to all freight, insurance, transportation charges, trade discounts, advertising allowances, sales taxes and other usual deductions, charges, discounts, returns, allowances, credits or adjustments to the gross selling price.   The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first.

1.9     "Shipping Date" shall mean the date no earlier than the date of execution of this Agreement and no later than October 1, 2004.

## ARTICLE II. GRANT

2.1     License.   Subject to the terms and conditions hereof, Little Tikes hereby grants to User, for the Term, in the Territory and through the Authorized Channels, an exclusive,

royalty-bearing license to utilize the Licensed Rights solely on or in connection with the manufacture, marketing, sale and distribution of the Licensed Products.

2.2     No Sublicensing. User shall have no right to sublicense any of the rights which are licensed under this Agreement.

2.3     Limited License. User agrees that the license granted hereunder applies only to the use of the Licensed Rights in connection with the Licensed Products sold through Authorized Channels in the Territory, and that this license does not extend to any other trade name, trademark, or other intellectual property that Little Tikes or its affiliates may own or use, or to the use of the Licensed Rights on products other than Licensed Products, or outside of the Authorized Channels, or outside of the Territory. Little Tikes does not grant any right to use all or any part of the Trademarks in the name or style of User or of any subsidiary, division or subdivision of User, or of any corporation or other business entity, shop or establishment. User agrees that it will not incorporate or use the Trademarks or similar words thereto in conjunction with its company name or as a trademark or as a generic name during or after the period of this Agreement.  User agrees not to register or use any of the Trademarks or any parts thereof or terms confusingly similar thereto as part of an Internet or website address, a Universal Resource Locator ("URL"), or as a domain name.

2.4     Best Efforts: No Competition. User shall use its reasonable best efforts to market, sell, and distribute Licensed Products according to the terms and subject to the conditions hereunder. User shall not develop, manufacture, sell, supply, or market products to be sold

under major toy brands (e.g., without limitation, Fisher-Price, Playskool, Leap Frog, etc.) that directly compete with the Licensed Products, unless otherwise approved in writing by Little Tikes, which approval shall not be unreasonably withheld

### ARTICLE III. SAMPLES; SALES TO LITTLE TIKES

3.1     User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start. No royalty shall be payable as to these free samples. In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.

3.2     User shall sell Licensed Products to Little Tikes, at the lowest price offered by User to other third parties, for distribution by Little Tikes through Little Tikes-owned retail stores and for sales to Little Tikes and Newell employees. No royalty shall be payable as to these sales.

### ARTICLE IV. REPORTS AND PAYMENTS

4.1     _Running Royalties._ As consideration for the licenses granted herein, User shall pay during the Term of this Agreement the earned, running royalties ("Running Royalties") at the rate of five percent (5%) of the Net Sales Price for domestic and FOB sales for Category

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

I (as set forth in Exhibit A) based upon sales of Licensed Products by User; three percent (3%) of the Net Sales Price for domestic and FOB sales for Category II (as set forth in Exhibit A) based upon sales of Licensed Products by User and for Category III (as set forth in Exhibit A): five percent (5%) of Net Sales for domestic and FOB sales or seven percent (7%) of Net Sales for domestic and FOB sales if a Licensed Product originated from or is designed and/or engineered in whole by Little Tikes.   The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first.   All sales by User of Licensed Products to any of its affiliates or to any entity or person associated with User, including all inter-company transactions, shall be carried on User's books of account at the full regular wholesale price charged to unrelated third parties, and User shall account for and pay Running Royalties to Little Tikes on all such sales as if they occurred on an arms-length basis to an unrelated wholesale account.

4.2     Guaranteed Annual Royalty Payment. In accordance with the following schedule, User shall pay to Little Tikes in U.S. dollars a minimum guaranteed annual royalty payment (the "Guaranteed Annual Royalty Payment") regardless of the sales levels of the Licensed Products as follows:

| Due Date | Amount Due | Applicable Calendar Year |
|---|---|---|
| Category I and II: | | |
| Upon Signing | $25,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $35,000.00 | October 1, 2003 – June 30, 2005 |
| September 15, 2005 | $20,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $45,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $20,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $55,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $20,000.00 | July 1, 2007 – June 30, 2008 if Renewal Term |

is exercised by User pursuant to paragraph 5.2 hereunder

March 15, 2008        $55,000.00        July 1, 2007 – June 30, 2008 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008    $20,000.00        July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009        $55,000.00        July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder

Category III:

| | | |
|---|---|---|
| Upon Signing | $50,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $25,000.00 | October 1, 2003 – June 30, 2005 |
| September 15, 2005 | $25,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $50,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $25,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $75,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $25,000.00 | July 1, 2007 – June 30, 2008 if |

Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2008        $75,000.00        July 1, 2007 – June 30, 2008 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008    $25,000.00        July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009        $75,000.00        July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder


Running Royalties shall be credited against Guaranteed Annual Royalty Payments, so that

the amount of Guaranteed Annual Royalty Payment due and payable is reduced by the

amount of the Running Royalties paid to Little Tikes.   If Running Royalties in a calendar

year exceed the Guaranteed Annual Royalty Payment for that calendar year, then no payment

is due under Section 4.2.  Guaranteed Annual Royalty Payments may only be applied against

the calendar year that they relate to and may not be applied to any other calendar year.

Guaranteed Annual Royalty Payments for Category I and Category II may not be applied to

Category III and Guaranteed Annual Royalty Payments for Category III may not be applied

to Category I and Category II.

4.3     Advance Payments.  User shall pay to The Beanstalk Group, LLC, 28 East 28th Street, 15th Floor, New York, NY 10016 ("Beanstalk"), on behalf of Little Tikes, a non-refundable advance payment of Twenty Five Thousand Dollars ($25,000.00) for Categories I and II; and Fifty Thousand Dollars ($50,000.00) for Category III (together, the "Advance") upon signing of this Agreement.  This Advance shall be credited against User's Running Royalty Payment for the year commencing October 1, 2003 and ending June 30, 2005.

4.4     Quarterly Report and Payment.  Within thirty (30) days following the end of each calendar quarter, starting with the month following the quarter in which sales of the Licensed Products commence, User shall submit to Beanstalk (with a copy to Little Tikes), a statement, certified by an officer of User to be accurate, showing separately for each of the Licensed Products, on a country-by-country basis, the number, description and sales price for each Stock Keeping Unit ("SKU") of each Licensed Product sold by User during the preceding calendar quarter, and the calculation of Running Royalties due Little Tikes for such calendar quarter.  User shall transmit to Beanstalk, on behalf of Little Tikes, payment of the amounts due under this Agreement concurrently with the rendering of the statement for the period.  If Little Tikes at any time so requests, User's reports shall be made in the form set forth in Exhibit C attached hereto or in another form to be provided by Little Tikes to User in the future.  A copy of the reports and a copy of the check in Little Tikes' favor shall be delivered to The Little Tikes Company, Attention:  Director of Licensing, 2180 Barlow Road, Hudson, Ohio 44236.

4.5    Annual Report and Payment.  Together with the quarterly royalty report provided for sales occurring during the fourth calendar quarter of each calendar year during the Term, User shall provide Beanstalk (with a copy to Little Tikes) with a year end report showing separately for each SKU of each Licensed Product, on a country-by-country basis, the number, description and sales price for each Licensed Product sold by User during the preceding calendar year, and the calculation of Running Royalties due Little Tikes hereunder. This report shall be accompanied by payment to Beanstalk, on behalf of Little Tikes, of any Guaranteed Annual Royalty Payment that is due.

4.6    Record Keeping. User shall keep full and accurate books of account, records, data, and memoranda respecting the manufacture and sale of the Licensed Products in sufficient detail to enable the payments hereunder to Little Tikes to be determined. Little Tikes, at its sole cost and expense, shall have the right to conduct examinations of the books and records pertaining to such statement for a period of two (2) years from the date on which such report is furnished to Beanstalk and Little Tikes for the purpose of verifying the reports provided for in this Agreement. Such examinations shall be conducted by an independent auditor or representative of Little Tikes, upon prior written notice of at least seven (7) days and not more often than once in any calendar year (unless Little Tikes discovers a discrepancy requiring additional audits), and in such manner as to not unduly interfere with the business of User. Each examination shall be at the expense of Little Tikes unless the examination discloses a discrepancy in favor of User exceeding by more than five percent (5%) of the total amounts paid to Little Tikes during the period covered by the examination, in which case, User shall pay Little Tikes for all the direct and verifiable expenses of that

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

9

examination. Payments found to be due Little Tikes as a result of an examination and the applicable interest shall be paid immediately as set forth herein.

4.7     Payments and Calculations in U.S. Dollars; Interest on Past Due Payments; Tax Payments. All Running Royalties shall be paid in U.S. dollars on the day payment is due, except that any past due payment shall be at the rate prevailing when such payment became due. Sales made in currency other than U.S. Dollars shall be converted to U.S. Dollars, at Licensee's sole expense, as of the date that Running Royalties on those sales are due. It is further understood and agreed that User shall pay interest to Little Tikes upon any and all Running Royalties that are at any time overdue, said interest to be computed at the rate of two percent (2%) per annum over the prime interest rate charged by Chase Manhattan Bank in New York from the date when such Running Royalties are due and payable as provided herein to the date of payment.

User shall withhold as taxes on all payments to be made to Little Tikes only such amounts as are absolutely required to be withheld by law in the country from which payment is being made. User shall submit to Little Tikes originals of the remittance voucher and the official receipt evidencing the payment of the corresponding taxes. User shall fully cooperate with Little Tikes and provide such information and records as Little Tikes may require in connection with any application by Little Tikes to the tax authorities in any country of the Territory and/or the United States of America including but not limited to, the obtaining of a credit for any withholding tax paid in the Territory or any country from which Running Royalties and any other payments are being made by User to Little Tikes pursuant to this Agreement.

P:\Legal\Private\Little Tikes\Little Tikes – Kid Station #964598   2003-12-01.doc

4.8    Distribution Report.    User agrees to provide to Little Tikes, on or before April 30 of each calendar year during the Term, a distribution and sales plan (including, but not limited to, User's product development plans, advertising, and merchandising and promotional activities) for the remainder of that calendar year.    User also agrees to provide to Little Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit sales by individual retail account for the previous calendar year.

4.9    Forecast Report.    Each calendar quarter, User agrees to provide Little Tikes, with a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter. These forecast reports are estimates only and are not binding on User.

ARTICLE V. TERM OF THE AGREEMENT

5.1    Initial Term.    The initial term of the license granted herein shall be from the date of execution of this Agreement until June 30, 2007 (the "Initial Term"), subject to any earlier termination or extension of this Agreement.

5.2.    Renewals.

(a)    User shall have the right to extend the Agreement for Categories I and II only beyond the Initial Term for an additional two year term commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $200,000.00 in Running Royalties for Categories I and II combined by

December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term.

(b)    User shall have the right to extend the Agreement for Category III only beyond the Initial Term for an additional two year term commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $250,000.00 in Running Royalties for Category III by December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term

5.3.    Minimum Number of Product Introductions. During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain new aesthetic or functional features.


## ARTICLE VI. INTELLECTUAL PROPERTY

6.1    Ownership of the Licensed Rights. User acknowledges that Little Tikes is the sole owner of all right, title and interest in and to the Licensed Rights and Trademarks in any form or embodiment thereof, in the Territory, and is also the sole owner of the goodwill attached or which shall become attached to the Licensed Rights and Trademarks in connection with the business and goods in relation to which the same has been, is, or shall be used.

6.2   Exclusive Rights.  All Licensed Rights developed by User for use in or in connection with the Licensed Products shall be the sole and exclusive property of, and title shall vest in, Little Tikes or its nominee, from and after the time it is created, and User shall cooperate with Little Tikes, at the sole expense of Little Tikes, to secure and perfect such Licensed Rights in the name of Little Tikes as Little Tikes' sole and exclusive property.

6.3   Work Made for Hire.  To the extent that any of the Licensed Rights is specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, the parties agree that the Licensed Rights shall be considered a "work made for hire" under 17 U.S.C. § 101 owned by Little Tikes.  For the avoidance of doubt, User acknowledges that the copyrights and all other proprietary rights in and to the Licensed Rights and any derivatives thereof are exclusively owned and reserved to Little Tikes.  User shall neither acquire nor assert copyright ownership or any other proprietary rights in and to the Licensed Rights or any derivatives thereof.

6.4   Assignment.  With respect to any rights in the Licensed Rights other than the rights described in Section 6.3, above, User agrees to assign and hereby assigns to Little Tikes or its nominee, the sole and exclusive right, title and interest in the United States and all foreign countries, in and to the Licensed Rights, including without limitation any and all related patent, copyright, trade secret, trade dress, trademark, design, and other relevant proprietary

rights of any nature whatsoever, as well as the right of priority, and all applications for trademark registration, copyright registration, mask work protection, design registration, or other protection. Little Tikes has the sole discretion as to when and in which countries to file for intellectual property registrations (including patents, trademarks, and copyrights) relating to any and all Licensed Rights.

6.5   Patent Prosecution and Related Activities. Little Tikes or its nominee, at its sole cost and expense, shall have the sole right to file and prosecute applications for letters patent, trademark registrations, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights. In the event that Little Tikes declines, after notice from User, to file and prosecute applications for letters patent, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights (but excluding the Trademarks), User may, with the prior written approval of Little Tikes, file and prosecute said applications and registrations in the name of User. In the event that User files and prosecutes said applications, User shall bear any and all costs, including reasonable attorney's fees, associated with User's filing and prosecuting said applications. In no event shall User file any applications for trademark registration or any other type of intellectual property protection covering the Trademarks.

6.6   Cooperation. User shall, at Little Tikes' request and at Little Tikes' expense, assist Little Tikes to obtain, maintain and protect the rights of Little Tikes in the Licensed Rights and Trademarks. User warrants and agrees to execute and deliver to Little Tikes, and to cause its employees, its subcontractors and their respective employees to execute and deliver

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc
14

to Little Tikes, any and all documents that Little Tikes may reasonably request to convey to Little Tikes any interest User, its subcontractors or their respective employees may have in any Licensed Rights or Trademarks, or that are otherwise necessary to protect and perfect Little Tikes' interest in such Licensed Rights. User further warrants and agrees to take and cause its employees, its contractors and their respective employees to take such other actions as Little Tikes may reasonably request to protect and perfect Little Tikes' interest in any Licensed Rights and Trademarks.

6.7    Use Inures to Little Tikes. Any use of the Trademarks by User shall inure to the benefit of Little Tikes. On Licensed Products, Licensed Product packaging and advertisements, User will clearly disclose Little Tikes' ownership of the Trademarks in the form prescribed in Exhibit B. User will not, at any time, do or suffer to be done any act or thing which may in any way adversely affect any rights of Little Tikes in and to the Trademarks or any registrations thereof.

6.8    Use of the Trademarks on Quality Licensed Products . User may use the Trademarks only on those Licensed Products the quality of which is in all respects at least equal to products sold by Little Tikes. User shall manufacture the Licensed Products in accordance with the approved designs, materials, tolerances of manufacture and assembly, testing and packaging specifications approved by Little Tikes. All uses of the Trademarks must be in conformance with Little Tikes' guidelines for the use thereof, which guidelines shall be provided by Little Tikes. User shall not deviate substantially from such specifications without written approval from Little Tikes. If at any time Little Tikes, at its sole discretion,

determines that any of the Licensed Products manufactured or sold by User do not conform to the previously approved production sample, then upon written notice by Little Tikes, permission to use the Trademarks as set forth herein may be immediately withdrawn, and User hereby covenants and agrees that it will cease and desist any and all such use, either directly or indirectly, immediately upon such notice until notified in writing by Little Tikes that use may be resumed.  User agrees that Little Tikes may supplement the above identified specifications at any time, and User agrees to manufacture Licensed Products which will conform to any supplemental specifications within agreed upon time tables.

6.9     Protecting the Licensed Rights.  User shall cooperate fully and in good faith with Little Tikes for the purpose of securing, preserving and protecting Little Tikes' rights in and to the Licensed Rights.

6.10    Compliance with Legal Requirements. User will use the Licensed Rights in the Territory strictly in compliance with the legal requirements applicable therein.  Whenever User uses any of the Licensed Rights which are registered on any Licensed Product, packaging, labeling, or in any advertisement, it must be marked to indicate ownership and registration in accordance with applicable law.  Upon expiration or termination of this Agreement for any reason whatsoever, User will execute and file any and all documents required by Little Tikes terminating any and all ownership rights which User may have acquired in the Trademarks and in the Licensed Rights.

35 of 61

6.11    Notice of Infringement.  User shall promptly notify Little Tikes in writing of any third party infringement or imitation of the Licensed Rights or any of them, when the same comes to its attention. Upon receipt of such notice, Little Tikes may, in its sole discretion, take such action against third parties it considers advisable for the protection of the Licensed Rights.  In no event may User initiate any action or proceeding against such third parties.

6.12    Enforcement Actions.  At Little Tikes' discretion, User may join or be joined as interested parties in any action that may be brought for infringement by others of the Licensed Rights, and participate and share the cost of such suits and any recoveries therein to an equal extent.

6.13    No Transfer of User's Pre-Existing Intellectual Property.  Nothing herein shall be construed to transfer ownership of any of User's pre-existing proprietary rights incorporated in Licensed Products.   The parties understand and agree that technology that is incorporated into Licensed Products is the sole property of User, and that all other property rights incorporated into Licensed Products are the sole property of Little Tikes, and each party agrees to take such actions as are reasonably required by the other party to secure and perfect these proprietary rights in the respective parties.

## VII. REPRESENTATIONS AND WARRANTIES, INDEMNITY AND INSURANCE

7.1    Representations and Warranties of Little Tikes.  Little Tikes represents and warrants to User the following: (a) Little Tikes is the sole and exclusive owner of all rights to the Trademarks and has the right to grant the licenses and rights granted in Article II with

respect to the Trademarks; (b) Little Tikes has full power and authority to enter into and perform this Agreement; (c) there is no claim, action, suit or proceeding relating to this Agreement or the Trademarks pending or threatened before any court that would impair User's right to use the Trademarks; (d) any and all information or materials developed by Little Tikes shall be the original work of Little Tikes (except for materials in the public domain) and Little Tikes shall not use any information or materials which are not original unless it has obtained such information or materials from User or has received specific authorization in writing from the owner of such information and materials to use them; (e) to the best of Little Tikes' knowledge, after due inquiry has been made, no information or materials furnished to User by Little Tikes infringes on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and no such information is defamatory or constitutes a violation of the right of privacy or publicity of any third party; and (f) so long as this Agreement is in effect, Little Tikes shall not commit any act or enter into any agreement which could adversely affect User's entitlement to enjoy the full benefit of the rights, title, and interests herein granted.

7.2    <u>Representations and Warranties of User</u>.  User represents and warrants to Little Tikes the following: (a) User has full power and authority to enter into and perform this Agreement; (b) User shall create the Licensed Products as original works of authorship and shall design, manufacture, and sell them without violating the rights of third parties; and (c) to the best of its knowledge, after due inquiry has been made, the Licensed Products shall not infringe on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation

of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely affect Little Tike's exclusive rights in and to the Licensed Rights, including the Trademarks; and (f) Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.

7.3     Indemnification by User. User shall defend, indemnify and hold Little Tikes, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by User of any of the warranties, representations or agreements made by User hereunder, and from actions of User in this Agreement not authorized by Little Tikes, from product liability claims arising from the Licensed Products, including those claims that may be attributable to any defect in the Licensed Products regardless of when such defect shall be discovered, and from intellectual property claims by third parties (except those claims arising from User's approved use of the Licensed Rights) arising from the Licensed Products.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by User of any warranty, undertaking, representation or

7.5    <u>Indemnification by Little Tikes.</u>  Little Tikes shall defend, indemnify and hold User, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by Little Tikes of any of the warranties, representations or agreements made by Little Tikes hereunder.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by Little Tikes of any warranty, undertaking, representation or agreement entered into herein or hereunder, User shall give prompt written notice of such claim to Little Tikes.  Little Tikes shall have the right to assume the defense of such claim at Little Tikes' sole cost and expense by furnishing User with written notice of same.  Little Tikes shall be liable for all losses, costs, expenses, damages, recoveries (including without limitation, amounts paid in settlement and reasonable attorney's fees based on such claim) suffered, made or incurred by either Little Tikes or User.

7.6    <u>Limitation of Liability.</u>  Under no circumstances shall either party be entitled to recover from the other party any consequential, incidental, indirect, special or punitive damages, excluding claims made under Sections 7.3 or 7.5, whether in contract or in tort, including claims for negligence, even if the party has been advised of the possibility of such damages.  Each party acknowledges that the foregoing waiver serves as a material inducement for it to enter into this Agreement.

## ARTICLE VIII. CONSUMER SERVICE

8.1     Telephone Support.  User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products.  The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following: (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 a.m. to 5 p.m. Monday through Friday, Eastern Standard Time);  (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products;  and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.

8.2     Reporting.  Within thirty (30) days after the end of each calendar quarter, User agrees to provide a report to Little Tikes, attention Director of Marketing – Licensing, detailing the consumer service activities of User for the Licensed Products for the preceding quarter.

8.3     Responsible Persons.  User agrees to provide to Little Tikes, Manager of Consumer Service, the names of at least two (2) employees of User responsible for consumer service activities relating to the Licensed Products and to update Little Tikes Manager of Consumer Service when any changes are made concerning those employees of User that are responsible for such consumer service.

8.4.    Warranty.  All Licensed Products shall be accompanied by a written document that clearly describes the product warranty period (which period shall be no less than ninety (90) days) and the procedure to make a warranty claim.

## ARTICLE IX. APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES

9.1    Submission for Approval.  User is responsible for the developing, designing and engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products.  Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3.  User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

- Design Concept (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1st annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

- Decorated Prototype Sample, (consisting of, but not limited to, a painted three-dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

- **Pre-production Parts Samples** (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any case at least two (2) months prior to the intended commercial production of the Licensed Product;

- **Pre-Production Product Samples** (consisting of Product samples from the pre-production run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product, and

- **First Production Run Samples** (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes

including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.

9.2    Compliance Samples. User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.

9.3    Modification of Production Units. No modification of an approved production sample of a Licensed Product shall be made without Little Tikes' further prior written approval. If, in Little Tikes' sole judgment, the quality of a previously approved Licensed Product has deteriorated in later production runs, or if the Licensed Product otherwise has been altered, Little Tikes may, in addition to other remedies available to Little Tikes, by written notice require such Licensed Product to be immediately withdrawn from the market.

<u>ARTICLE X. APPROVAL OF PACKAGING, PROMOTIONAL MATERIALS, AND
ADVERTISING.</u>

10.1    All containers, packaging, hang tags, promotional material, catalogs, advertising

materials and display material for Licensed Products must be developed and funded by User,

and submitted to Little Tikes with a Product Submission Approval Form (Exhibit D) for

review and written approval. Little Tikes' approval thereof should be procured when such is

still in rough format and in final format. Little Tikes' approval in each instance shall be

deemed withheld if Little Tikes does not respond in writing within ten (10) business days

after Little Tikes' receipt of User's submission of materials for approval. Approval or

disapproval shall lie in Little Tikes' sole discretion, and the use of unapproved packaging,

hang tags and display material is prohibited. The parties agree that Little Tikes may be

irreparably harmed by the use of unapproved packaging, hang tags and display material, and

Little Tikes shall be entitled to injunctive judicial relief to enforce the provision herein. In

addition, User may not place or use any of its own marketing, advertising, catalogs,

promotional materials, or any other materials in connection with Licensed Products or their

packaging without the prior approval of Little Tikes.


10.2    If Little Tikes has supplied User with forms, such as Exhibit D, for use in applying

for approval of artwork, photographs, models, pre-production and production samples of

Licensed Products, User shall use such forms when submitting anything for Little Tikes'

approval. However, User may use altered forms as User reasonably deems necessary if

Little Tikes has pre-approved the altered forms in writing.

10.3    All packaging, display material, promotional material, catalogs and advertising for Licensed Products shall comply with all applicable laws and regulations for each country in the Territory where the Licensed Products are sold or used.  In addition, each Licensed Product and its packaging shall incorporate "date codes" signifying the date of production of each Licensed Product.

10.4    Packaging for Licensed Products to be distributed in the United States shall be printed with English language only.  Packaging for Licensed Products shall be printed in such languages, including multi languages, as are necessary to comply with laws and regulations governing the distribution of Licensed Products in the Territory.

## ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS

Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA).  User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards.  Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped.  User shall follow

reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures. Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.

Notwithstanding anything to the contrary herein, in the event that Little Tikes may, in its sole discretion, allow User to subcontract the manufacture of Licensed Products to third party manufacturers, provided that (a) User has given prior written notice of such proposed subcontract arrangement to Little Tikes, including the name, address and such other information concerning the proposed manufacturer as may be requested by Little Tikes; (b) each such manufacturer shall be otherwise subject to inspection by Little Tikes and the quality control procedures set forth herein; (c) the Licensed Products and/or any elements of any Licensed Products made by such manufacturer meet the quality standards set forth in this Agreement; and (d) each such manufacturer executes an agreement with both User and Little Tikes, such agreement to be in a form approved by Little Tikes.

## ARTICLE XII. ADDITIONAL COVENANTS OF USER

12.1    User shall ship the initial Licensed Product to retail stores in the United States for display and for consumer purchase no later than the Shipping Date. The failure to ship the initial Licensed Product by the Shipping Date as required by this paragraph shall be deemed a material breach of this Agreement.

12.2    User agrees to submit an Annual Marketing Plan for review by the Director of Licensing, within sixty (60) days before the start of each calendar year, using the Annual

Marketing Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.

12.4   If it becomes so, User shall notify Little Tikes that more than three percent (3%) of Licensed Products sold by User during the Initial Term, and two percent (2%) of Licensed Products sold by User during each additional Term, have been returned by consumers to User as defective.  User shall provide such notice within ten (10) days of such condition occurring, and shall transmit with that notice a written plan outlining the steps to be taken to reduce the incidence of defects and a schedule for implementing such steps.

12.5   The rights granted hereunder do not permit the sale of "seconds" or "irregulars."  All Licensed Products not approved under Article IX or failing subsequently to conform to the approved standard shall be destroyed by User.

ARTICLE XIII. USER NAME AND ADDRESS ON ARTICLES

User's name and address (at least city and state) will appear on permanently affixed labeling on each Licensed Product, or if that is not practicable, then on approved packaging therefor.

ARTICLE XIV. TERMINATION

14.1   This Agreement may be terminated prior to the end of the Term:

   (a)   at any time upon mutual agreement of the parties;

(b)    by either party giving the other party thirty (30) days' written notice of a material breach of this Agreement, provided that such breach is not cured within thirty (30) days following notice to the other party.

14.2    Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials that have not been approved, or have been disapproved, pursuant to Article IX. User acknowledges that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes.

14.3    This Agreement will terminate automatically upon the filing of a voluntary petition in bankruptcy by either party; the execution by either party of an assignment for the benefit of creditors; the filing of a petition to have either party declared bankrupt, provided it is not vacated within sixty (60) days from the date of filing; or the appointment of a receiver or trustee for either party.

14.4    Upon termination of this Agreement other than pursuant to Section 14.2, User shall have the right to complete the manufacture of Licensed Products then on order, and User shall further be permitted to sell such Licensed Products which have been ordered, manufactured or are still in stock on the date of termination for a period of time not to exceed three (3) months in duration, subject to the payment of Royalties specified herein

14.5   Subject to the sale of the Licensed Products on order or in stock pursuant to Section 14.4, upon termination of this Agreement, User shall immediately discontinue use of the Trademarks and shall immediately remove all reference to the Trademarks from any printed or other material distributed or disseminated by User. User shall no longer use the Trademarks in any variation, imitation or simulation thereof, or any marks similar thereto.

14.6.   Upon the termination of this Agreement, User shall promptly provide Little Tikes, at no cost to Little Tikes, with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives to its 800 phone number.

## ARTICLE XV. BENEFIT

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

## ARTICLE XVI. AMENDMENT

This Agreement may not be amended or modified, except by a written document signed by both parties hereto.

## ARTICLE XVII. CONFIDENTIALITY

17.1   General Obligation of Confidence.   Little Tikes and User agree that during the term of this Agreement and for a period of five years after termination of this Agreement not to

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

reveal to any person (unless authorized in writing by the other party) any confidential or proprietary information regarding the other party's products, developments, processes, and know-how. The parties further agree that they will not disclose to anyone not authorized by the other party to receive same, the contents of any report, record, drawing, data, correspondence, or any other subject, material or information which is not generally available to the trade or public. Little Tikes and User acknowledge recognizing and agreeing that by virtue of this Agreement they may acquire information regarding matters of a confidential business nature regarding the other party, its affiliates, its parent, and its parent's subsidiaries, which it agrees not to disclose to third parties nor use in competition, such as, but not limited to, sales know-how, future plans, costs, prices, profits and losses, markets, suppliers, customers, and other information not generally available to the public. This Section shall survive termination of this Agreement, regardless of the reason for termination.

17.2    <u>Definition of Information Subject to Section 17.1</u>.  The parties agree to treat all information and data furnished by the other party pursuant to this Agreement as confidential and proprietary, and such information and data shall be used solely for the purposes stated herein. The obligations of confidentiality under this Agreement shall not apply to such information and data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can prove was owned by the receiving party prior to the other party's disclosure, or (c) that is derived from any third party having the right to make such disclosure, or (d) the disclosure of which is compelled by a court of

competent jurisdiction and only after notice to the disclosing party and opportunity for the disclosing party to prevent disclosure.

## ARTICLE XVIII. NON-WAIVER

The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. No waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent therein set forth.

## ARTICLE XIX. ASSIGNMENT

The license and rights granted to User hereunder are personal in nature, and User shall not sell, transfer, lease or assign this Agreement or its rights and interests hereunder, or any part hereof, by operation of law or otherwise, without the prior written consent of Little Tikes, which consent shall not be unreasonably withheld.

## ARTICLE XX. NOTICE

Notices to be given under this Agreement shall be deemed sufficiently served when reduced to writing in English and deposited in the mail, postage prepaid for Certified Mail or sent by prepaid overnight express delivery (with a copy simultaneously sent by fax), to:

If to User:

    Kid Station Toys Ltd.
    P.O. Box 694660
    Miami, FL  33268-4660
    Attn:  Elliot Newman

If to Little Tikes:

    The Little Tikes Company
    Director of Licensing
    2180 Barlow Road
    Hudson, Ohio 44236

With a copy to:

    Stuart I. Graff, Esq.
    Newell Rubbermaid Inc.
    Legal Department
    6833 Stalter Drive, Suite 101
    Rockford, IL  61108

## ARTICLE XXI. JURISDICTION

This Agreement shall be interpreted in all respects in accordance with the laws of the State of Illinois. Any dispute relating to the making or the interpretation of this Agreement, or the performance or nonperformance by any party of its obligations hereunder, shall be litigated only in the state or federal courts located within Cook County, Illinois. User consents to personal jurisdiction in said courts and shall not seek to transfer or change the venue of any action brought in compliance with this Paragraph.

## ARTICLE XXII. OTHER PROVISIONS

22.1   Pronouns; Gender. Whenever the pronoun "it", "its" or "his" may be used, it is understood by the parties to this Agreement that such usage shall include both singular and

plural, masculine, feminine and neuter genders and refer in appropriate cases to individuals as well as to corporations and businesses.

22.2    Nature of Relationship.  Nothing herein contained shall be construed to place Little Tikes and User in the relationship of partners, joint ventures, or agents and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

22.3    Force Majeure.   In the event either party to this Agreement is unable to carry out its obligations under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitation, acts of God, fire, flood, strikes, lockouts, war, or civil commotion, then upon giving prompt notice of force majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligations is prevented by circumstances of force majeure.

22.4    Headings.  The headings of the articles and sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

ARTICLE XXIII. ENTIRE AGREEMENT

This Agreement may be executed in duplicate, each of which shall be considered original for all purposes.  This instrument contains the entire Agreement between the parties and neither

it nor any of its provisions may be changed, waived or terminated, except as herein expressly provided, or in a written instrument signed by the parties.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

THE LITTLE TIKES COMPANY

By: _____

Title: _UP marketing_____

Date: _12/16/03_____

KID STATION TOYS LTD.

By: _Elliot Neuman_____

Title: _President_____

Date: _12/8/03_____

EXHIBIT A

**Category I:** Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-along players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately; Youth designed telephones

**Category II:** VCR players; DVD players, 2" – 19" black and white and color TV's with or without DVD and VCR players

**Category III:** Electronic Youth "Real Music", including: Electronic Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone. "Real Music" shall be defined as musical instruments directed for distribution and merchandising within the "Electronics or Music" section or aisle at retail and not the "Pre-school" section or aisle at retail, if such sections or aisles are separate

User shall use its best efforts to place the Licensed Products within the "Electronics or Music" section or aisle and not within the core Little Tikes or "Pre-school" section or aisle at retail, if such sections or aisles are separate.

Little Tikes acknowledges that User can not dictate retail merchandising and that individual retailers and retail chains maintain the right to merchandise purchased product in the manner they see fit; however, User shall use its best efforts to ensure that the Licensed Products are placed in accordance with this Agreement.

User shall use its best efforts to inform a Little Tikes representative of any meeting with a "pre-school" buyer.

User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers: Walmart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed. Such report shall contain the participants attending the meeting, place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.

EXHIBIT D



## Addendum to License Agreement

This Addendum dated January 1, 2006 (the "Effective Date") is an addendum to the License Agreement dated December 8, 2003 (the "License Agreement") by and between The Little Tikes Company ("Licensor"), an Ohio corporation ("Purchaser"), and Kid Station Toys Ltd., a Florida corporation ("Licensee").

### Recitals

Licensor and Licensee are parties to the License Agreement pursuant to which Licensor grants to Licensee the right to use the LITTLE TIKES trademark as set forth in that agreement. The purpose of this Addendum is to revise the License Agreement to include an additional category of Licensed Products. The Addendum also sets forth the Guaranteed Annual Royalty Payment for this new category of Licensed Products.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1.  The definition of Licensed Products in Exhibit A of the License Agreement is amended to add the following:

    Category IV: Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats.

    Licensee agrees that it shall use its best efforts to cause the retailer of the Licensed Products to display the Licensed Products in the electronics area of the retailer, rather than in toy area of the retailer.

2.  The parties agree that the Term of the license granted under Section 2.1 of the license Agreement with respect to the Category IV products shall commence on the Effective Date and end on December 31, 2008.

3.  Section 4.2 of the License Agreement is amended to add the following language at the end of the Section:

<u>Category IV:</u>

| | |
|---|---|
| Period 1: | January 1, 2006 – December 31, 2006 |
| January 1, 2006: | $6,768.00 |
| March 15, 2006: | $6,768.00 |
| June 15, 2006: | $6,768.00 |
| September 15, 2006: | $6,768.00 |
| December 15, 2006: | $6,768.00 |
| | |
| Period 2: | January 1, 2007 – December 31, 2007 |
| January 1, 2007: | $6,768.00 |
| March 15, 2007: | $6,768.00 |
| June 15, 2007: | $6,768.00 |
| September 15, 2007: | $6,768.00 |
| December 15, 2007: | $6,768.00 |
| | |
| Period 3: | January 1, 2008 – December 31, 2008 |
| January 1, 2008: | $6,768.00 |
| March 15, 2008: | $6,768.00 |
| June 15, 2008: | $6,768.00 |

The Guaranteed Annual Royalty Payments shall be made quarterly

Guaranteed Annual Royalty Payments for Category I, Category II, Category III may not be applied to Category IV. Guaranteed Annual Royalty Payments for Category II, Category III, Category IV may not be applied to Category I. Guaranteed Annual Royalty Payments for Category I, Category III, Category IV may not be applied to Category II. Guaranteed Annual Royalty Payments for Category I, Category II, Category IV may not be applied to Category III. The parties acknowledge and agree that the term "annual" as used in the term Guaranteed Annual Royalty Payments with respect to the Products in Category IV shall refer to the "Periods" defined above.

4.    The royalty rate for Category IV Licensed Products is five percent (5%) of the Net Sales Price for domestic and FOB Sales.

5.    Except as expressly set forth in the Addendum, the provisions of the License Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned parties have caused this Addendum to be signed on the day and year above written.

**LICENSOR**

THE LITTLE TIKES COMPANY

By: _____

Name: _Brian Kirkendahl_____

Title: _VP Marketing_____


**LICENSEE**

Kid Station Toys Ltd.

By: _____

Name: _Ell.d Num_____

Title: _President_____

08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT B



## U.S. CONSUMER PRODUCT SAFETY COMMISSION
BETHESDA, MD 20814

April 30, 2007

PRESIDENT                                      RE: 070124CWE5708   070208CNE1940
MGA ENTERTAINMENT                                  I0710301A
16300 ROSCOE BLVD                                  I0710509A
VAN NUYS, CA  91406

Dear PRESIDENT:

Enclosed is information concerning one of your company's products.  <u>Please read this cover letter carefully because it contains important guidance about your rights and obligations regarding the enclosed information.</u>

The U.S. Consumer Product Safety Commission (CPSC) provides firms with consumer complaints and reports of CPSC in-depth investigations concerning injuries or incidents associated with products within the Commission's jurisdiction that the firms manufacture or private label.  To assure that these firms have access to information CPSC receives, we send all complaints and investigation reports we receive, whether or not the reported problem appears to be safety-related or the product appears to be at fault.  We provide these reports to firms because they often provide an early warning of potential safety problems.

I have also enclosed a fact sheet that describes the Commission's information disclosure procedures under section 6(b) of the Consumer Product Safety Act that apply to the enclosed report(s).  Even though the Commission has not yet received a request for public disclosure of the report(s), this letter provides you with the opportunity to comment on the information in the report(s), pursuant to section 6(b).  You are not required to comment; however, if you do, please submit your comments to me within 23 days.  If you feel that an extension of time is needed to respond to the Commission, please e-mail your request to <u>clearinghouse@cpsc.gov.</u>  Include the document number and the name of the product in all correspondence.  If, in your comments, you tell us that:

    1) you believe that the information in the enclosed report(s) is inaccurate, or
    2) you want to be notified if the Commission receives a request, for example, under
       the Freedom of Information Act, for disclosure of the information,

the Commission will notify you when we receive such a request.  In that case, the Commission will not release the information to the public until at least 10 days after the date of the notification.  **We will not, however, provide you with an additional free copy of the report(s).**  If, at that time, you want additional copies, please request them from the Commission's Office of the Secretary.  Your request will be treated as a Freedom of Information Act inquiry and you will be charged fees for the copies in accordance with 16 C.F.R. 1015.9(e).

Page 2

The reports we have provided you may – either alone or with other information you now have or may later receive – reasonably support a conclusion that the product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of death or serious injury. If so, you are required under section 15(b) of the CPSA, 15 U.S.C.2064(b), to notify the Office of Compliance at the CPSC.

For more information on reporting under section 15(b) of the CPSA, please call Marc J. Schoem at (301) 504-7520 or visit CPSC's website at www.cpsc.gov and click on Report Unsafe Products or write to the U.S. Consumer Product Safety Commission, Recalls and Compliance Division, Office of Compliance, 4330 East West Highway, Bethesda, MD 20814.

If you have any questions regarding this letter, please email us at clearinghouse@cpsc.gov. We can process your reply more quickly if we receive it only once. You may write to us at U.S. Consumer Product Safety Commission, National Injury Information Clearinghouse, 4330 East West Hwy., Room 504, Bethesda, MD 20814 or fax your reply to (301) 504-0025. If you want to email your reply, please address it to clearinghouse@cpsc.gov.

It's most helpful if you include the incident or investigation report number(s) with your response. It is not necessary to send a copy of the report itself.

In the interest of improving product safety, we will continue to provide these types of reports to your firm. In addition, if any of the information used to address this letter to you requires updating, please note the necessary changes on the bottom of this letter and return it to me.

Pamela McDonald
Lead, Technical Information Specialist
National Injury Information Clearinghouse
Division of Information Management
Office of Information and Technology Services
301-504-7921

Contact Name: _____ Title: _____

Company Name: _____

Address: _____

City: _____ State: _____ Zip: _____

Phone Number: _____

Fax: _____ Email: _____



# U.S. CONSUMER PRODUCT SAFETY COMMISSION
### 4330 East West Highway
### Bethesda, MD 20814

## CPSA Section 6(b) FACT SHEET

The Consumer Product Safety Commission (Commission) has unique restrictions that govern its public disclosure of information. This fact sheet summarizes these unique restrictions. Our rules, which you can find at 16 C.F.R. § 1101 or § 1015, provide more information. If you have questions about these restrictions, call (301) 504-7923, or facsimile (301) 504-0127.

1. What are the restrictions on the disclosure of information by the Commission?

Section 6(b), 15 U.S.C. § 2055(b), a provision of the Consumer Product Safety Act (CPSA), establishes procedures for and restrictions on the Commission's public disclosure of information. The Commission rule interpreting the requirements of section 6(b) is published in Title 16 of the Code of Federal Regulations in Part 1101 (16 C.F.R. § 1101). In addition, Section 6(a) of the CPSA prohibits the Commission from disclosing confidential business information.

2. To what information does Section 6(b) apply?

Section 6(b) applies to any information from which the public can readily ascertain the identity of a manufacturer or private labeler of a consumer product.

3. What are the requirements and prohibitions of Section 6(b)?

Section 6(b) prohibits the Commission from disclosing information about a consumer product that identifies a manufacturer or private labeler unless the Commission has taken "reasonable steps" to assure 1) that the information is accurate, 2) that disclosure of the information is fair in the circumstances, and 3) that disclosure of the information is reasonably related to effectuating the purposes of the CPSA and of the other laws administered by the Commission. Before disclosure of such information, the Commission must provide the manufacturer or private labeler with an opportunity to comment on the accuracy of the information. The Commission may not disclose such information for at least thirty days after sending it to the company for comment.

4. What happens when a firm submits comments on information that the Commission proposes to disclose?

The Commission must review and analyze the information in light of the comments received. The weight given to the comments and the degree of review by the Commission depends on the specificity, completeness, and credibility of the comments and any supporting documentation. Based on the comments, the Commission will decide whether to release the information.

*3 -1-07*

| 1. Task Number 070208CNE1940 | 2. Investigator's ID 8577 | EPIDEMIOLOGIC INVESTIGATION REPORT |
|---|---|---|
| 3. Office Code 810 | 4. Date of Accident YR MO DAY 2007 01 01 | 5. Date Initiated YR MO DAY 2007 02 14 | |

**6. Synopsis of Accident or Complaint**          **UPC**

The complainant bought her 1-year-old grandson a toy key chain with a cell phone. The plastic key chain came loose and one of the keys became lodged in his throat. The boy's grandfather removed the key and the 1-year-old boy sustained a scratched throat. The boy has recovered from his injury.

| 7. Location (Home, School, etc) 1 - HOME | 8. City RAVENNA | 9. State OH |
|---|---|---|

| 10A. First Product 5004 - Toys, Not Elsewhere Classifi | 10B. Trade/Brand Name TOY KEY CHAIN WITH CELL PHONE | 10C. Model Number KSL8003 |
|---|---|---|

**10D. Manufacturer Name and Address**
THE LITTLE TIKES COMPANY
2180 Barlow Road
Hudson, OH  44236

*M G A*

| 11A. Second Product 0 | 11B. Trade/Brand Name NONE | 11C. Model Number NONE |
|---|---|---|

**11D. Manufacturer Name and Address**
NONE

| 12. Age of Victim 212 | 13. Sex 1 - Male | 14. Disposition 1 - Injured, not Hosp. | 15. Injury Diagnosis 59 - Laceration |
|---|---|---|---|
| 16. Body Part(s) Involved 89 - NECK | 17. Respondent 1 - Victim/Complainant | 18. Type of Investigation 1 - On-Site | 19. Time Spent (Operational) / Travel 11 / 2 |

| 20. Attachment(s) 9 - Multiple Attachments | 21. Case Source 07 - Consumer Complaint | 22. Sample Collection Number |
|---|---|---|

**23. Permission to Disclose Name (Non NEISS Cases Only)**
◉ Yes          ○ No          ○ Verbal

| 24. Review Date 02/27/2007 | 25. Reviewed By 9071 | 26. Regional Office Director Eric B. Ault |
|---|---|---|
| 27. Distribution Manley, Carolyn | | 28. Source Document Number H0710275A |

CPSC FORM 182 (12/96) Approved for use through 09/30/2006 OMB NO. 30410029

1

070208CNE1940

The information obtained in this report was provided by the grandmother of the infant. The key became lodged in the infants' mouth and he had a scratch to his throat. He has recovered without any problems.

The grandmother of the 1-year-old male, who weighed 24 lbs and was 32" tall at the time of the incident, stated that her grandson was in his playpen playing that afternoon with the key chain when she noticed that his eyes appeared to be in a state of panic. The grandmother stated that she was sitting at the dining room table and the playpen is about a foot away from her when she noticed there was a problem. The grandmother stated that that one of the three keys was missing from the others that were inside the playpen. She stated that she opened her grandsons' mouth and she saw the plastic top of the key chain and it was lodged inside his mouth. She stated that she called to her husband and that she held her grandson upside down while her husband reached inside his mouth and he grabbed the plastic part of the key and pulled it out. The grandmother of the 1-year-old male infant stated that her husband had a hard time pulling it out because the toy key, which measures 2 ½ "long was tightly lodged in the infants' mouth. She stated that her 1-year-old male grandson had started turning blue in the face. She said he sustained a scratch to his throat, but he was not taken to the hospital or the doctor.

The grandmother of the 1-year-old male stated that she purchased the toy for his birthday which was December 28, 2006. There are three pieces to the toy, a plastic key chain with three keys, a play cell phone and a round toy which makes different noises. She stated that it became his favorite toy because of the keys and the sound of the other toy. She stated that he had played with the toy daily since she gave it to him on his birthday. She stated that half of the key is made of plastic and the other half looks like metal. The plastic key chain loops through a hole found at the top of the key. The grandmother of the 1-year-old male stated that she contacted Little Tykes the next day by phone and spoke with a representative about the incident. The representative who took the complaint stated that she would write up a report and the report would be transferred to their corporate office and that her supervisor would contact her later that day. She stated that she did not receive a call. The complainant stated that she called back a few days later and spoke with another representative who did not know what had happened to the report. She took another report and stated that someone would call her back that afternoon. She stated that she did not receive a call. In January, 2007 the complainant stated that she called back and spoke with someone else and they told her to hold the phone and they would fax the complaint to their corporate office, and send a memo to her supervisor. She was told again that her supervisor would call her back that day and she has not received a phone call.

The toy key chain with cell phone, model # KSL8033, Serial # CT060800120897, date of manufacture 06/2006. The toy was manufactured by Little Tykes, 2180 Barlow Road, Hudson, Ohio 44236-4108, the product was purchased at Toys-R-Us, Akron, Ohio. MADE IN CHINA

2

070208CNE1940

The following is on pack of the phone:

POWER SOURCE
DC 3 V
2x1.5 v size AAA/UAM4

2006 THE LITTLE TIKES COMPANY
DESIGNED & LICENSED BY
KIDS STATION TOYS INTERNATIONAL LTD
ALL RIGHTS RESERVED
MADE IN CHINA

The grandmother of the 1-year-old male did not have any instructions with the toy.

3

070208CNE1940

Exhibits

Exhibit # 1 – Contact Sheet
Exhibit # 2 – Photographs - 4
Exhibit # 3 – Authorization for Release of Name

4

070208CNE1940

Exhibit # 1

Contact Sheet

1.  Cheryl Lash, 5362 Fairhill Drive, Ravenna, Ohio 44266, 330-297-9967

5

070208CNE1940

Exhibit # 2

Photographs



Photograph of toy set

6

070208CNE1940

Exhibit # 2

Photographs



Photograph of key "chain" which came apart

7

070208CNE1940

Exhibit # 2

Photographs



Photograph of key "chain" and key. Shows how it became loose

8

07028CNE1940

Exhibit # 2

Photographs



Photograph of keys on chain

Exhibit #3    @ 0208CUE1940 Page1

## U.S. CONSUMER PRODUCT SAFETY COMMISSION
### WASHINGTON, DC 20207

---

## U. S. CONSUMER PRODUCT SAFETY COMMISSION

---

## AUTHORIZATION FOR RELEASE OF NAME

---

Thank you for assisting us in collecting information on a potential product safety problem. The U. S. Consumer Product Safety Commission depends on concerned people to share product safety information with us. We maintain a record of this information, and use it to assist us in identifying and resolving product safety problems.

We routinely forward this information to manufacturers and distributors to inform them of the involvement of their product in an incident situation. We also give the information to others requesting information about specific products or hazards. Manufacturers may need the individual's name so that they can obtain additional information on the product or incident situation.

Would you please indicate on the bottom of this page whether you will allow us to disclose your name. If you request that your name remain confidential, we will of course, honor that request. After you have indicated your preference, please sign your name and date the document on the lines provided.

---

☒ YES          ○ NO

_____          2/21/07
(Signature)                        (Date)

CONSUMER PRODUCT INCIDENT REPORT                    Region: EASTERN

| 1.NAME OF RESPONDENT Cheryl Lash | 2.PHONE NO. (HOME) 330-297-9967 | (WORK) unknown | | |
|---|---|---|---|---|
| 3.STREET ADDRESS 5362 Fairhill Drive | 4.CITY Ravenna | | ST OH | ZIPCODE 44266 |
| 4a.EMAIL ADDRESS unknown | 4b.INCIDENT CITY Ravenna | | ST OH | ZIPCODE 44266 |

5.DESCRIBE INCIDENT OR HAZARD, INCLUDING DATA ON INJURIES
The toy key chain has 5 small push buttons, which each make a different sound, and holds a set of 3 keys.  Half of the key has - cont -

| 6. DATE OF INCIDENT(S) 01/01/2007 | 7.IF INJURY OR NEAR MISS, OBTAIN AGE/SEX  1 Y/M AND DESCRIBE INJURY near choking | 8.IF VICTIM DIFFERENT FROM RESPONDENT, PROVIDE NAME Matthew Shuman RELATIONSHIP grandson |
|---|---|---|

| 9.DESCRIPTION OF PRODUCT toy key chain w/cell phone | 10.BRAND NAME Little Tikes |
|---|---|

| 11.MFR/DISTRIBUTOR NAME, ADDR. & PHONE Little Tikes (made in China) unknown unknown 888-321-7191 unknown       ISSUE 18        02/01/2007. | 12.MODEL, SERIAL #'s, DATE OF MFR M# KSL8033 DOM 06/2006 |
|---|---|
| | 13.DEALER'S NAME, ADDRESS & PHONE Toys R Us unknown Akron, OH unknown |

| 14.WAS THE PRODUCT DAMAGED, REPAIRED OR MODIFIED? NO IF YES, BEFORE OR AFTER THE INCIDENT? DESCRIBE: | 15.PRODUCT PURCHASED NEW DATE PURCHASED  12/28/2007  AGE 1 M |
|---|---|
| | 16.DOES PRODUCT HAVE WARNING LABELS? IF SO, NOTE: age recommendation: "6 months to 18 months." |

| 17.HAVE YOU CONTACTED THE MANUFACTURER? YES IF NOT, DO YOU PLAN TO CONTACT THEM? | 18.IS THE PRODUCT STILL AVAILABLE? YES IF NOT, ITS DISPOSITION | 19.MAY WE USE YOUR NAME WITH THIS REPORT? YES |
|---|---|---|

FOR ADMINISTRATION USE

| 20.DATE RECEIVED 01/31/2007 | 21.RECEIVED BY (NAME & OFFICE) myg/HL | 22.DOCUMENT NO. H0710275A |
|---|---|---|
| 23.FOLLOW-UP ACTION | | 24.PRODUCT CODE(S) 5004 |
| 25.DISTRIBUTION | 26.ENDORSER'S NAME & TITLE myg 01/31/2007 | |

CPSC FORM 175 (03/2004)                                          OMB 3041-0029

CONSUMER PRODUCT INCIDENT REPORT                    Region: EASTERN

H0710275A

**Narrative Continued**

plastic and the other half has metal and loops through a hole
found at the top of the key, supported by a plastic ring.

24 lb., 32" tall, (height unknown) Grandson was playing the
keychain inside playpen, when consumer could see his eyes
appeared to be in a state of panic.  Consumer noticed 1 out of
the 3 keys were missing.  Consumer found 2 of the toy keys was
lying in the playpen.  Consumer immediately opened grandson's
mouth, and could see the plastic top part of the key chain was
lodged inside his mouth.  As consumer held grandson upside down,
husband reached inside his mouth where he caught a grip of the
plastic part of the toy key.  Husband began pulling out the
2-1/2" long, toy key, which was tightly wedged, out of his mouth.
Consumer said grandson had started to turn blue in the face.
Grandson sustained a scratch to his throat.  No Rx needed.

The following day, consumer called and explained incident to mfr.
rep. (name unknown) who said she would write up a report and have
the report transferred to their corporate office and her
supervisor.  Rep. stated someone will contact consumer later that
day.  Consumer did not receive a return call.

(date unknown) Consumer called back and spoke with rep. (name
unknown) who said she did not know what may have happened to the
report.  Rep. took another report and also indicated that someone
will contact consumer that same day.  Consumer did not receive a
return call.

1/2007 Consumer called back and spoke with mfr. rep. (name
unknown), who requested consumer hold on the phone while they fax
the report to their corporate office, and send a memo to her
supervisor.  Rep. also said that someone will contact her back
the same day.  Consumer did not receive a return call.

Consumer feels the toy key's can detach from its chain presenting
a choking hazard.

Item# X8T060800120897

Distributor Phone #:

CPSC Source: DIRECTORY

H0710275A

If you have any changes, additions, or comments you wish to make concerning your attached report, please make them in the space below.

I confirm that the information in the attached report (including any changes, additions, or comments I have made) is accurate to the best of my knowledge and belief.

_____    _2/3/07_
Signature                          Date

☐   I request that you do not release my name.

☐   You may release my name to the manufacturer but
     I request that you not release it to the general public.

☒   You may release my name to the manufacturer and to
     the public.

08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT C



**Corporate Office**

16380 Roscoe Blvd.
Van Nuys, CA 91406
USA

Phone: 818.894.2525
Fax:    818.895.0771



January 30, 2008

<u>VIA COURIER</u>

Mr. Elliot S. Newman
President
Kids Station Toys
1160 NW 163 Drive
Miami, FL 33169

     Re:   <u>KSL 8033-Little Tikes Play Cell Phone</u>

Dear Mr. Newman:

     Attached please find details of a recent consumer complaint with regard to the above-referenced product, the Little Tikes Play Cell Phone (the "Product"). Please handle this matter promptly and appropriately.

     The nature of the complaint appears to be identical to a complaint made to the Consumer Products Safety Commission ("CPSC") dated June 14, 2007. Paul Bachman, of The Little Tikes Company, informed you of CPSC Incident Report 070523CWE5930 in a letter dated September 17, 2007. Oscar Radillo responded to the CPSC on behalf of Kids Station and informed the CPSC that the tooling on the Product had been modified to allow a screw to properly secure the hinge cover.

     While you advised MGA that Kids Station would redesign the Product, we are concerned about remaining inventory of the older Product. We have had MGA's internal Quality Assurance team review the complaint and the Product, and they believe that it should be the subject of a voluntary recall, given the serious nature of the potential harm involved. The consumer in the instant complaint purchased the Product at a Wal-Mart and it appears that older inventory is still on retail shelves, notwithstanding the design modification for newer models.

     Please note that Article IX of the Agreement dated December 8, 2003 between Kids Station and Little Tikes (the "Agreement") provides that Licensed

Products that do not comply with all applicable laws shall be deemed unapproved.

Section 14.2 further provides that:

> *Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials which have not been approved, or have been disapproved, pursuant to Article IX.*

Therefore, please advise us of the total quantity of inventory of the old Product line, along with what steps you have taken to properly dispose of this inventory and replace it with modified Products. If Kids Station continues to sell the old Product line, MGA may exercise its termination rights under Section 14.2 as set forth above.

Very truly yours,

David G. Oakes,
Senior Counsel



Little Tikes Intranet: Incident Details

**Customer Information**

| | | | |
|---|---|---|---|
| Customer #: | 541762 | Address 1: | 2108 North Napa Court |
| Customer Type: | Consumer | Suite/Apt #: | -- |
| Company: | -- | City: | Hanford |
| First Name: | Angela | State/Province: | CA |
| Last Name: | Quick | Zip: | 93230 |
| Email: | | Country/Region: | USA |
| Day Phone: | 559-589-1914 | | |

**Incident # 71218**

| | |
|---|---|
| Type: | Injury/Immediate Attention |
| Product: | DiscoverSounds Camera Phone (152V) |
| Contact Method: | Phone |
| Created By: | info17 |
| Status: | Closed |
| Created By/Date: | info17 - 01/17/2008 |
| Modified By/Date: | lbaiano - 1/22/2008 |
| Resolved By/Date: | rgutknecht - 1/18/2008 |

**Incident Details**

consumer purchased product from walmart 3-4 months ago but it is cell phone w/keys she called to report choking hazard because piece of plastic where phone folds broke off and he choked on it i asked if ok and she said yes she is not sure how it came off as to if he banged it around or just broke off the item# she gave me is KSL8033 do we even manufacture? please provide info pcp 01-17-08

**Resolution Details**

Child is 10 months old. Call tag 997393750047096 issued. CS ordered item 1693 Discover Sounds Boom Box as replacement. 1/18/08 rg

CS spoke with Customer again. This appears to be a licensed product number KSL8033. Customer stated that her son had the piece that broke off the toy in his mouth and he started making a noise. The mother was immediately able to remove the item from his mouth and there were no injuries. No medical attention was required. Customer stated that she is not sure how the piece broke off, but she wanted us to be aware. 1/21/8 lb

08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT D



**Corporate Office**

16380 Roscoe Blvd.
Van Nuys, CA 91406
USA

Phone: 818.894.2525
Fax:    818.895.0771



<u>VIA EMAIL, FAX AND OVERNIGHT EXPRESS DELIVERY</u>

February 5, 2008

Elliot S. Newman, President
Kids Station Toys Ltd.
1160 NW 163 Drive
Miami, FL 33169

     Re:    **Notice of Immediate Termination**

Dear Mr. Newman:

     This letter shall serve as Little Tikes' <u>notice of immediate termination</u> of the Agreement Between Kids Station Toys, Ltd. ("Kids Station") and The Little Tikes Company ("Little Tikes") dated December 8, 2003 and Addendum dated January 1, 2006 (the "Agreement") under Articles IX, XI and XIV, for the following reasons:

<u>KSL8033 Little Tikes Play Cell Phone and Electronic Light N' Sounds Key Ring</u>

     As you are aware a prior version of the KSL 8033, the Little Tikes Play Cell Phone and Electronic Light N' Sounds Key Ring (the "Product"), poses a significant danger to children as the hinge on the phone can easily be broken off and shatter into small sharp pieces. We have received no response from you to our letter dated January 30, 2008 in which we notified you of a new consumer complaint, raised our concerns that the Product continues to be sold and advised Kids Station that it should implement a voluntary recall of all old units.

     On January 31, 2008, Channel KTTC in Rochester, Minnesota reported another incident about a mother finding a broken piece of the Product in her child's mouth. Fortunately, the mother was able to retrieve the piece before her child could swallow it. (This report is attached for your reference.) We are extremely concerned that the report only identifies that the Product is a *Little Tikes Toy*, thereby leading the general public to believe that Little Tikes is the manufacturer, not Kids Station. The damage such misinformation causes the Little Tikes name and brand is immediate and incalculable.

     While Kids Station has led us to believe that the Product was modified in September, 2007 by adding a screw to keep the hinge on the cell phone from breaking, I went to the Wal-Mart store in Panorama City, California on February 1, 2008 and found at least ten (10) or more units of the old unmodified Product on shelf, with stickers stating "Manufactured Sep. 07" "KST070900528402". It is inconceivable that Kids Station continues to sell old unmodified Product and has made no effort to destroy or recall all old unsafe units.

We have reviewed Kids Station's Customer Service Call log for the time period of 10/01/07-12/31/07, and during that period, Kids Station's call logs note at least thirteen (13) choking hazard or broken pieces complaints reported about the Product. The call log had one-hundred fifty-two (152) complaints about the Product; however the records of those complaints do not have any description at all about the Customer's complaint or any resolution provided by Kids Station. As a result, we cannot begin to assess how many actual reports there were with regard to injuries or potential injuries to children. (As more fully set forth below, this log is not in compliance with the requirements of Article VII.)

In addition, we contacted Kids Station's Customer Service number, posing as a consumer, and were told by your customer service representative that Kids Station had never heard of any issue relating to the Product, nor received any complaints about it. This statement is deliberately false and intentionally misleading if made to concerned costumers.

Kids Station's continuing sales of the Product (which Little Tikes has disapproved), knowingly making false statements to consumers, and failing to notify the CPSC and voluntarily recall all old units of the Product, causes Kids Station to be in breach of the following provisions of the Agreement:

*ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS*

***Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA). User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards.*** *Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped.* ***User shall follow reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures. Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.*** ,

*ARTICLE IX. APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES*

9.1    *Submission for Approval.* *User is responsible for the developing, designing and*

engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products. Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3. User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

**Design Concept** (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1St annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

**Decorated Prototype Sample**, (consisting of, but not limited to, a painted three dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

**Pre-production Parts Samples** (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any ease at least two (2) months prior to the intended commercial production of the Licensed Product;

**Pre-Production Product** Samples (consisting of Product samples from the preproduction run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product; and

First **Production Rim Samples** (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. **If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.**

3

*ARTICLE XIV. TERMINATION*

*14.2 Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials that have not been approved, or have been disapproved, pursuant to Article IX. User acknowledges that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes.*

In addition to the foregoing, following are further ***material*** breaches of specific provisions of the Agreement:

1.        *ARTICLE VI. INTELLECTUAL PROPERTY*

*6.8   Use of the Trademarks on Quality Licensed Products. User may use the Trademarks only on licensed Products the quality of which is in all respects at least equal to products sold by Little Tikes.*

The quality of KSL8033 is far below the level of quality and safety that consumers expect from Little Tikes.

2.        *ARTICLE VII. REPRESENATATIONS AND WARRANTIES, INDEMNITY AND INSURANCE*

*7.2     Representations and Warranties of Use. User represents and warrants to Little Tikes the following: (a) User has full power and authority to enter into and perform this Agreement; (b) User shall create the Licensed Products as original works of authorship and shall design, manufacture, and sell them without violating the rights of third parties; and (c) to the best of its knowledge, after due inquiry has been made, the Licensed Products shall not infringe on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely affect Little Tike's exclusive rights in and to the*

4

*Licensed Rights, including the Trademarks; and **(f) Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.***

Kids Station's continued sale of the unmodified and unapproved Product is a material breach of its representations and warranties that Licensed Products shall be free from defects.

3.        ARTICLE III. SAMPLES; SALES TO LITTLE TIKES

*3.1 User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start. No royalty shall be payable as to these free samples. In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.*

Despite our repeated requests, Kids Station has failed to provide samples of each Licensed Product to Little Tikes. While we have received samples of a few products, we have not received samples of all products and not in the quantities required by the Agreement or within the mandated time frames.

4.        ARTICLE IV. REPORTS AND PAYMENTS

*4.8     Distribution Report. User agrees to provide to Little Tikes, on or before April 30 of each calendar year during the Term, a distribution and sales plan (including, but not limited to, User's product development plans, advertising, and merchandising and promotional activities) for the remainder of that calendar year. User also agrees to provide to Little Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit sales by individual retail account for the previous calendar year.*

*4.9 Forecast Report. Each calendar quarter, User agrees to provide Little Tikes with a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter. These forecast reports are estimates only and are not binding on User.*

5

Kids Station has failed to provide any of these documents.

5.       *ARTICLE V. TERM OF THE AGREEMENT*

> *5.3    Minimum Number of product introductions.  During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain **new aesthetic or functional features.***

Kids Station has failed to submit new product designs for 2008.  The Agreement calls for "new" products, not old products with nothing more than a color change.  We have seen very little from Kids Station overall which contains **new aesthetic or functional features.**

6.       *ARTICLE VIII. CONSUMER SERVICE*

> *8.1    Telephone Support.  User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products. The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following: (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 am. to 5 p.m. Monday through Friday, Eastern Standard Time); (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products; and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.*

The reports we have received, reviewed and analyzed from Kids Station, deviate substantially from the standards set forth above. For a large portion of the calls, no individual name was filled in and no information about these complaints was filled in so we could determine their nature. How can we properly evaluate the calls if the information is incomplete? These gaps in information lead us to conclude that Kids Station is not providing a comparable level of service offered by Little Tikes. Furthermore, the number of calls Little Tikes Consumer Service receives at its own customer service call center about lack of response from Kids Station customer service, as well as specific complaints we have previously reported to you, confirms Kids Station's failure to comply with this provision.

7.       *9.2         Compliance Samples.  User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with*

6

> *applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.*

MGA/Little Tikes Quality assurance has repeatedly requested testing reports for Kids Station's Little Tikes products. Given current events in the toy industry it is vital that we have documentation that products bearing the Little Tikes' name are safe for children. Kids Station has failed to provide any testing reports to date.

8.      *12.2 User agrees to submit an Annual Marketing Plan for review by the Director of Licensing, within sixty (60) days before the start of each calendar year, using the Annual Marketing , Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.*

To date, we have not received Kids Stations' Marketing Plan for 2008.

9.      *Exhibit A*

> *User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers: Wal-Mart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed. Such report shall contain the participants attending the meeting, the place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.*

Kids Station has failed to provide these reports on a consistent basis.

For the foregoing breaches, Little Tikes must terminate the Agreement with immediate effect without waiving any of Kids Stations' obligations following termination as provided therein. If Kids Station fails to comply with the provisions and mandates of termination, Little Tikes will pursue all remedies available to it, both legal and equitable and with the appropriate State and Federal regulatory agencies.

The foregoing is not intended to be, nor may be construed to be, a full and complete statement of Little Tikes' legal or equitable rights and remedies in this matter, all of which are hereby expressly reserved.

Very truly yours,

David G. Oakes
Senior Counsel

attachment

cc:    Janet Han
       Spencer Woodman
       Ninette Pembleton
       Ed Gonzalez
       Charles Leuin, Esq.

8



 

Friday 01st of February 2008

Home | News | Weather | Sports | Community | Contests | eAlerts | Blogs | Politics

**3-2-1 Deal**
$3 off any FAMILY size pizza
$2 off any LARGE pizza
$1 off any MEDIUM pizza

Not valid with other offers. One coupon per visit, please. Expires 2/25/08

## Never Too Careful

Crystal Oko
KTTC-TV

ROCHESTER, MN – It was a close call for one Rochester parent. Her child almost choked on a small piece that popped off her toy.

No matter how hard parents try to watch their kids, they're bound to get into something they shouldn't be into. And with recent toy recalls, parents not only have keep their eyes on their playing children but the toys they're buying.

Mother Heidi Lather knows this too well. "I know every time I hear stuff about a recall I check the toys, check the numbers on them just to be sure. I'm very careful about that kind of thing."

Lather, mother of Paige, had the scare of her life when she found Paige with a small plastic part in her mouth.

"I took it out before she swallowed it. And later realized it was part of the toy she had gotten for Christmas, which was age-appropriate for her. So it really surprised me that it was such a tiny part that came off of the toy", says Lather.

The toy was this Little Tikes cell phone.

"It's about the size of a Tootsie Roll, kind of cut in half, and it just pops right off. She was able to get it off with no trouble at all."

Heidi immediately emailed the manufacturing company, explaining to them what happened. She hasn't heard anything back from them but wants parents to heed her warning.

"If they have a toy similar to the one she's got or other toys that may have small pieces that could come off, just to be extra careful and check them, and check them again before you give them to them and always watch them when they're playing."

The cell phone and key ring set were manufactured by Little Tikes last July.

Heidi hopes to get a reply back from the company soon.

Updated: January 31, 2008 3:07 pm

E-mail This Story   Print This Story

More Headlines

**More Headlines**
» NewsCenter Extra Part Two: Gang Violence
» Court Won't Reconsider Guantanamo Ruling
» Blind Woman Makes Second Bid For State Acupuncture License
» "Entertainment Tonight" Won't Show Video Of Ledger At Drug Party
» Keys, Sparks, Petty Ready For Big Game
» Super Bowl and the Heart
» Britney Spears' Strange Behavior Now in the Hands of Doctors
» Storms Dump More Snow on Much of Nation
» Obama Races to Trim Clinton's Lead Among Latinos
» Microsoft Offers More Than 44 Billion for Yahoo
» Deadra Dixed in Bomb Attacks in Baghdad
» Cold Causes Pipes to Burst
» Man Dies in Logging Accident
» Checking Phone Bits
» Gerlach Gives Guilty Plea
» Suicide Rates Spike
» H&R Block Job Cuts
» Hollywood Walk of Fame-Suzanne Pleshette
» Alabama Execution
» Romney Says McCain Tactics Are Like Nixon's

Contact Us | NewsTeam | Sales Team | Advertise With Us | Privacy Policy | Terms of Use | FCC Info | Job Opportunities | Viewer Survey
Content Copyright KTTC TV 2008 ©
Digital Ink CW
6301 Bandel Road NW
Rochester, MN 55901-8805
Phone: (507) 288-4444
Fax: (507) 288-6294
Email: kttc@kttc.com

    

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-20393-CIV-KING/GARBER

| | |
|---|---|
| KIDS STATION TOYS LTD., <br> a Hong Kong corporation, <br><br> Plaintiff, <br><br> v. <br><br> THE LITTLE TIKES COMPANY, <br> an Ohio corporation, and MGA <br> ENTERTAINMENT, INC., a <br> California corporation, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff KIDS STATION TOYS LTD. ("Kids Station"), through its undersigned attorneys, and for its Amended Verified Complaint against defendants THE LITTLE TIKES COMPANY ("Little Tikes") and MGA ENTERTAINMENT, INC. ("MGA" and, along with Little Tikes and Kids Station, the "Parties"), states as follows:

### Nature of the Case

1.     This action arises out of a wrongful scheme devised and carried out by Little Tikes and its parent company, MGA, to attempt to improperly terminate an exclusive license agreement between Kids Station and Little Tikes in order to eliminate Kids Station as a Little Tikes licensee and retain all of the profits generated from the sale of Little Tikes products subject to the license agreement rather than having to share those profits with Kids Station.

2.     At the time the license agreement was executed, Little Tikes was owned by Newell Rubbermaid Inc. ("Rubbermaid"), which had extensive experience designing and

manufacturing the molded plastic toys for which Little Tikes had become known. However, Rubbermaid did not have similar experience producing electronic toys. Kids Station had extensive experience with electronic toys. Consequently, Rubbermaid licensed to Kids Station the exclusive right to manufacture and sell electronic toys bearing the Little Tikes name, including audio, video, music and roleplay toys. Kids Station and Little Tikes operated under the license agreement profitably and without any material disputes.

3.      In early 2007, MGA assumed control of Little Tikes after having purchased the company from Rubbermaid. Unlike Rubbermaid, MGA has significant experience producing electronic toys. Rather than viewing Kids Station as a valued partner, as Rubbermaid had, MGA viewed Kids Station as an unwanted competitor. From the moment that MGA took over management of Little Tikes, MGA manufactured a series of baseless complaints about Kids Station and its Little Tikes products in an attempt to justify early termination of the exclusive license that Kids Station possesses to produce Little Tikes electronic toys. MGA's first baseless attack occurred in March 2007 and involved a royalty audit report claiming that Kids Station owed Little Tikes $13.5 million in unpaid royalties. In fact, Kids Station had promptly and fully paid those royalties, owed nothing, and MGA abandoned its efforts to use the audit report as a means to terminate the license. Undaunted, MGA continued to manufacture issues regarding Kids Station's performance under the license agreement throughout the remainder of 2007 and 2008, culminating with MGA's purported termination of the license agreement on February 5, 2008. There are no legitimate grounds for termination of the license and this action challenges the wrongful and ineffective attempt to terminate the license and other misconduct perpetrated by Little Tikes/MGA pursuant to its scheme. It is upon those facts, as described in more detail below, that Kids Station seeks a declaration that Little Tikes' purported termination of the

license agreement is invalid and of no effect, an injunction against any attempts to enforce the termination, and a determination that Little Tikes has breached the Parties' agreement in numerous material respects.

## The Parties

4.    Plaintiff Kids Station, although erroneously identified by Little Tikes in the parties' agreement as a Florida corporation, is a Hong Kong corporation with its principal place of business in Miami, Florida and, as such, is a citizen of Hong Kong and Florida for diversity of citizenship purposes.  As set forth in greater detail herein, plaintiff Kids Station has been the sole and exclusive party with whom Little Tikes contracted and with whom it has done business throughout the parties' agreement, is the party that has suffered injury as a result of defendants' wrongful conduct and is the party whose injury will be redressed by a favorable outcome in this suit.

5.    Kids Station is engaged in the business of designing, manufacturing and distributing a wide variety of electronic children's toys.

6.    Defendant Little Tikes is an Ohio corporation with its principal place of business, upon information and belief, in Hudson, Ohio and, as such, is a citizen of Ohio for diversity of citizenship purposes.

7.    Little Tikes is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers to produce toys under the Little Tikes name.

8.    Defendant MGA is a California corporation with its principal place of business in Van Nuys, California and, as such, is a citizen of California for diversity of citizenship purposes. MGA owns and operates Little Tikes and has done so since at least February 2007.

9.    MGA is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers.

## Jurisdiction and Venue

10.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c) because Little Tikes and MGA are subject to personal jurisdiction in this district, because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district and/or because a substantial part of the property that is the subject of the action is situated in this district. While the Agreement (as defined below) provides that disputes between Kids Station and Little Tikes are to be resolved in state or federal courts located in Cook County, Illinois, that location no longer bears any relationship to any of the Parties and none of the facts in dispute in this matter are connected to Illinois. That provision was included in the Agreement because, at the time the Agreement was executed, Rubbermaid, Little Tikes' owner, was headquartered in Illinois. As referenced herein, in 2007, Little Tikes was sold to MGA. When that occurred, any connection between the Agreement and Illinois was extinguished and no basis for litigation in that forum currently exists either with respect to the Parties or the claims here involved. In addition, MGA is not a party to the Agreement, had no relationship to Little Tikes at the time of entry into the Agreement and has no rights under the Agreement relating to any designated forum.

12.    Little Tikes and MGA are engaged in substantial and not isolated activity within the state of Florida or otherwise have submitted themselves to the jurisdiction of the courts of the

state of Florida and have sufficient contacts with the state to satisfy due process standards for being amenable to jurisdiction in this state.

### The Parties' License Agreement

13.     On or about December 8, 2003, Little Tikes and Kids Station entered into a License Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 1 and incorporated by reference herein. The Agreement was drafted by Little Tikes and provided to Kids Station to execute.

14.     The parties to the Agreement are Little Tikes and Kids Station. In the version of the Agreement prepared by or on behalf of Little Tikes and provided to Kids Station for its signature, Little Tikes erroneously identified Kids Station as "Kid Station Toys Ltd., a Florida corporation." There is no corporation affiliated with Kids Station named "Kid Station Toys Ltd." and Kids Station is aware of no Florida corporation by that name. Kids Station, as defined herein, was incorporated in Hong Kong and has its principal place of business in Miami, Florida. Kids Station is the party with whom Little Tikes entered into the Agreement. For over four years, since the execution of the Agreement in 2003, plaintiff Kids Station has performed all obligations of the "User," as defined in the Agreement, including but not limited to paying royalties to Little Tikes. For over four years, Little Tikes has accepted the benefit of Kids Station's performance under the Agreement.

15.     Under the Agreement, Little Tikes granted Kids Station an *exclusive* license to manufacture, market, sell and distribute certain electronic audio, video and music toys directed principally to children under the age of ten (10). *See* Ex. 1, § 2.1. Under the terms of the Agreement, Little Tikes is excluded from the manufacture and sale of Little Tikes products that have been licensed to Kids Station.

16.     Rubbermaid, the parent company of Little Tikes at the time the Agreement was signed, was well known for its molded plastic products and had significant experience producing such products for the toy market (as did Little Tikes itself). However, neither Rubbermaid nor Little Tikes had expertise in designing or producing consumer electronics. Kids Station possesses substantial expertise in developing and producing consumer electronic toys. For that reason, Little Tikes granted Kids Station an exclusive license for a broad variety of consumer electronic toys.

17.     The specific "Licensed Products" covered by the Agreement are described in Exhibit A to the Agreement. As set forth therein, the Agreement grants Kids Station the exclusive right to manufacture, market, sell and distribute products falling into any of the following descriptive categories:

> **Category I:** Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-long players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately, Youth designed telephones;
>
> **Category II:** VCR players; DVD players, 2" - 19" black and white and color TV's with or without DVD and VCR players; and
>
> **Category III:** Electronic Youth "Real Music," including: Electric Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone.

Ex. 1 at Ex. A.

18.     On or about January 1, 2006, the Parties entered into an Addendum to the License Agreement (the "Addendum") adding a fourth category of products to the exclusive license. That fourth category of products is defined as:

**Category IV:** Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats

Ex. 1 at Addendum.

19.    "Roleplay" electronic toys are designed for young children and do not actually function as the electronic device after which they are styled. For example, a roleplay cell phone is a toy that looks like a cell phone but that does not actually function as one. Instead, the keys of the roleplay cell phone would produce various sounds and entertainment functions when depressed to entertain and educate a small child.

**The Parties' Mutual Satisfaction Under the Agreement
Prior to MGA's Purchase of Little Tikes**

20.    Throughout 2004 and 2005, Kids Station operated as Little Tikes' licensee under the Agreement to the mutual satisfaction of the Parties. Kids Station developed a successful line of electronic toys that were sold in major retailers, including Wal-mart and Toys "R" Us. Little Tikes and Kids Station operated without any material disputes for the benefit of both companies. In fact, Kids Station was recognized as an outstanding Little Tikes licensee on more than one occasion. In 2004, Kids Station received the Little Tikes Licensee of the Year Award. Kids Station also has been nominated for the Licensing Industry Merchandisers Association award for Best Corporate Brand Licensee of the Year for its efforts as a licensee of Little Tikes.

21.    Kids Station's success under the Agreement and Little Tikes' satisfaction with Kids Station's performance is further demonstrated by their agreement to the Addendum in January 2006, which broadened the scope of electronic products licensed to Kids Station. The 2006 selling season was a successful one, just like the seasons which had preceded it.

7

22.    Each year, Kids Station markets its line of products to retailers in order to generate sales. The critical part of that process begins in the final months of the preceding calendar year and continues through beginning of the year. In January and February, Toy Fairs take place in various locations around the world. Each year during which the Agreement has been in effect, Kids Station has attended one or more of those Toy Fairs and marketed its products to major retailers. These efforts are critical to generating sales for the products subject to the license.

23.    During Rubbermaid's ownership of Little Tikes, Kids Station and Little Tikes developed an effective, agreed upon, and mutually satisfactory course of performance under the Agreement to implement its provisions relating to matters such as product approval and reporting.

### MGA Purchases Little Tikes and Begins
### <u>Its Wrongful Efforts to Terminate the Agreement</u>

24.    On or about September 11, 2006, MGA announced it had entered into an agreement to purchase Little Tikes from Rubbermaid. Unlike Rubbermaid, MGA is directly and significantly involved in the design and manufacture of consumer electronic products, including toys, a fact acknowledged in the press release announcing MGA's acquisition of Little Tikes.

25.    MGA acquired Little Tikes in early 2007, following the completion of the holiday selling season in 2006. As with every prior year that the Agreement had been in effect, Little Tikes and Kids Station had a cooperative and mutually successful year in 2006.

26.    Immediately upon the transfer of control of Little Tikes to MGA, Kids Station was warned by at least one former Little Tikes' employee that MGA intended to take back the electronic toy license represented by the Agreement by any means necessary.

27.    MGA did not wait long to implement its wrongful scheme.  On March 13, 2007, just weeks after Kids Station learned that MGA had completed its acquisition of Little Tikes, Kids Station was presented with a royalty audit report claiming that Kids Station owed Little Tikes in excess of $13.5 million in unpaid royalties.  Despite the fact that Little Tikes had possessed the audit report (which was prepared by a third party) since July 24, 2006, it never had been mentioned previously to Kids Station, upon information and belief because Little Tikes knew the contents of the audit report were without merit.

28.    Kids Station responded point by point to the issues raised in the audit report, showing each to be completely baseless.  Little Tikes eventually acknowledged that the vast majority of the claims in the audit report were without merit, but continued to assert that more than $2 million in additional royalties were owed.  When presented with irrefutable evidence showing that Little Tikes' "fallback" position was equally untenable, Little Tikes completely abandoned its unsupportable claim that Kids Station had failed to pay royalties due under the Agreement.  The reason for that outcome is simple:  throughout the term of the Agreement, Kids Station has paid Little Tikes every cent of royalties owed.

29.    Little Tikes, through its new owner MGA, also adopted other tactics to interfere with Kids Station's operation under the Agreement.  One such tactic involved the product approval process provided for in the Agreement.  Little Tikes retracted approvals for several previously approved products and demanded modifications to numerous others, threatening disapproval of the products, despite the fact that once a product was approved by Little Tikes, the Agreement contemplates that it remains approved throughout the term of the Agreement.

30.    In one particularly egregious case, Little Tikes gave approval for a digital camera designed by Kids Station, but then retracted it.  Little Tikes initially approved that product for

inclusion in Kids Station's 2007 product line. However, after granting product approval, Little Tikes retracted its approval and prohibited Kids Station from selling the digital camera, claiming that it did not fall within the electronic audio, video and music toys licensed under the Agreement. After retracting its approval, Little Tikes developed and sold a similar digital camera. Upon information and belief, Little Tikes targeted Kids Station's customers for purchase of the digital camera. The digital camera was a successful product for Little Tikes and, upon information and belief, encouraged Little Tikes and MGA to more aggressively seek to eliminate Kids Station as a licensee.

31.    Since MGA's acquisition, Little Tikes has acted in bad faith to unreasonably withhold approval of Kids Station products and packaging in an attempt to force Kids Station to incur unnecessary expense redesigning previously approved products and packaging. Little Tikes even interfered with Kids Station's publication of a catalog of its 2008 products, claiming that previously approved products had to be redesigned in order to be included in the catalog.

32.    Little Tikes also has invoked phony "product quality" issues in improper attempts to terminate the Agreement.

33.    Since MGA took control, Little Tikes has asserted that Kids Station products suffer from quality problems, generally without providing specific information to enable Kids Station to meaningfully address those concerns. With respect to two products, Little Tikes attempted to retract previous approvals based on alleged quality concerns, although Little Tikes refused to specifically identify those concerns and failed to identify any problems, even after sample testing and review.

34.    In claiming Kids Station product quality problems, Little Tikes frequently has focused on either isolated and anecdotal customer product reviews on websites such as

Amazon.com or customer service calls to either Little Tikes' or Kids Station's customer service centers. Little Tikes ignores that fact that Kids Station has millions of satisfied customers of its Little Tikes products. There will always be a small number of complaints about any product, even one that conforms to all specifications and requirements.

### Little Tikes' Sale of Products in Violation of Kids Station's Exclusive License

35.     Little Tikes has repeatedly sold products in violation of Kids Station's rights under its exclusive license.

36.     For example, while roleplay cellphones are expressly within Kids Station's exclusive license, Little Tikes has sold several lines of roleplay cell phones in direct competition with Kids Station. Kids Station has objected to those sales, only to be told that Little Tikes would continue to sell the products.

37.     Little Tikes also has sold one or more models of electronic roleplay laptops and "boom boxes" that infringe on the exclusive license to Kids Station of products in that category. Again, Kids Station objected to this conduct, only to have its objections disregarded by Little Tikes. Similarly, Little Tikes has marketed and sold electronic keyboard products that infringe on the exclusive license to Kids Station of products in that category.

### Little Tikes' Wrongful Purported Termination of the Agreement

38.     On February 5, 2008, Little Tikes sent a letter to Kids Station purporting to immediately terminate the Agreement (the "Purported Termination Letter"). The grounds articulated in the Purported Termination Letter are not supported by the facts and, even if they were, are not a basis for immediate termination.

39.     The main issue Little Tikes raises in the Purported Termination Letter relates to a cellphone product known as the KSL8033 (the "8033"). The 8033 was originally approved by

11

Little Tikes in 2006 and also approved by Little Tikes in 2007. It also was tested and approved by Bureau Veritas, one of the foremost toy safety testing agencies. There is no factual basis for Little Tikes' assertion that any issue with respect to the 8033 justifies the Purported Termination Letter.

40.    In late September 2007, in response to a consumer contact with the CPSC regarding the product, Kids Station voluntarily proposed certain modifications to the 8033. Those proposed modifications were communicated to both the CPSC and to MGA and Kids Station implemented them in October 2007. After the modifications, Little Tikes approved the 8033, as did Bureau Veritas.

41.    The CPSC never has indicated that it believed it necessary or appropriate for Kids Station to take any action to prevent retailers from selling 8033s purchased prior to the modifications implemented in October 2007. In addition, prior to January 30, 2008, when Little Tikes sent a self-serving letter to lay the groundwork for its purported termination, neither Little Tikes nor MGA ever had indicated they believed it was necessary for Kids Station to take any action with respect to the 8033 other than the modifications that Kids Station had communicated to Little Tikes. Once the tooling was created to implement the modifications to the 8033, which occurred in October 2007, all 8033s shipped by Kids Station included those modifications.

42.    The other issues Little Tikes raises in the Purported Termination Letter are similarly pretextual and none of them constitutes grounds for immediate termination. In fact, the Agreement only permits immediate termination in one circumstance clearly not found here: the sale by Kids Station of disapproved products.

**Little Tikes' and MGA's Continued Attempts to Interfere
with Kids Station's Operation Under the Agreement**

43.    Since sending the Purported Termination Letter, Little Tikes and MGA continue
to interfere with Kids Station's exercise of its rights under the Agreement.

44.    On March 11, 2008, MGA and Little Tikes improperly and unjustifiably
demanded that Kids Station cease selling or offering to sell all products manufactured under the
Agreement. MGA and Little Tikes also improperly and unjustifiably demanded that Kids Station
cause all of its retailer-customers to remove from the retailer-customers' shelves all Little Tikes-
branded products purchased from Kids Station.

45.    MGA and Little Tikes identified no provision of the Agreement that permits them
to make the demands contained in their March 11, 2008 letter or that would require Kids Station
to comply with any such demands, including but not limited to the commercially unreasonable
demand that Kids Station seek to have retailers remove from their shelves all Little Tikes-
branded products that those retailers purchased from Kids Station.

46.    MGA and Little Tikes also demanded that Kids Station provide Little Tikes one
hundred units of each licensed item under the Agreement. However, because the Agreement has
not been effectively terminated, there is no justification for that demand nor is Kids Station
required to comply.

**COUNT I
Declaratory Judgment
(Against Little Tikes)**

47.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth
herein.

48.    In the Purported Termination Letter, Little Tikes claims that grounds exist for
immediate termination of the Agreement.

49.    Kids Station denies that it has committed any material breach of the Agreement and denies that Little Tikes possesses valid grounds for immediate termination of the Agreement. Little Tikes' purported termination is the culmination of Little Tikes' and MGA's campaign to manufacture a basis to terminate the Agreement so that Little Tikes can itself sell the products subject to the exclusive license.  Upon information and belief, the timing of Little Tikes' purported termination is intended both to cause Kids Station maximum harm and to allow Little Tikes to appropriate for itself the right to sell classes of Little Tikes products which are subject to Kids Station's exclusive license for the balance of this calendar year.

50.    There is a real, substantial and immediate controversy regarding Kids Station's exclusive license that requires adjudication by the Court.

51.    Kids Station seeks a declaration that there is no lawful basis for Little Tikes' purported termination of the Agreement and that the Agreement remains in effect as a binding and enforceable contract according to its terms.

52.    Kids Station will be irreparably harmed if the purported termination is permitted to take effect.  That irreparable harm will include Kids Station's loss of business and the total destruction of the significant goodwill Kids Station has created with its customers through years of work and investment of substantial monies.

### COUNT II
### Declaratory Judgment
### (Against Little Tikes and MGA)

53.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

CASE NO. 08-20393-CIV-KING/GARBER

54.     On March 11, 2008, MGA and Little Tikes sent a letter to Kids Station containing demands which were factually unsupported and in derogation of Kids Station's rights under the Agreement.  Those demands included:

- that Kids Station cease selling or offering for sale all products manufactured under the Agreement;

- that Kids Station cause all retailers remove from their shelves all Little Tikes-branded products manufactured by Kids Station under the Agreement; and

- that Kids Station provide Little Tikes one hundred units of each licensed item under the Agreement.

55.     Kids Station denies that MGA or Little Tikes possesses any valid grounds for the demands set forth in MGA and Little Tikes' March 11, 2008 letter.

56.     There is a real, substantial and immediate controversy regarding the demands made by MGA and Little Tikes purportedly pursuant to the Agreement.

57.     Kids Station seeks a declaration that there is no lawful basis under the Agreement for MGA's or Little Tikes' demands as referred to in this Count and that Kids Station need not comply with such groundless demands.

### COUNT III
### Breach of Contract
### (Against Little Tikes)

58.     Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

59.     The Agreement is a valid and enforceable contract.

60.     Kids Station has performed all of its obligations to Little Tikes under the terms of the Agreement.

61.     Little Tikes has materially breached the Agreement by:

15

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

62.    Kids Station has sustained damages as a result of Little Tikes' breaches of the Agreement.

63.    Kids Station will be irreparably harmed by Little Tikes' continued violation of the Agreement, including through lost sales and injury to its goodwill.

## COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Little Tikes)

64.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

65.    In addition to its express terms, the Agreement includes an implied covenant of good faith and fair dealing between Little Tikes and Kids Station.

66.    Little Tikes' conduct as described herein violates the implied covenant of good faith and fair dealing.  The conduct of Little Tikes which violates the covenant of good faith and fair dealing includes:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

67.    Little Tikes also violated the covenant of good faith and fair dealing by purporting to act under the terms of the Agreement arbitrarily and for pretextual reasons.

68.    Little Tikes also violated the covenant of good faith and fair dealing by improperly and wrongfully purporting to terminate the Agreement in violation of its terms and without just cause.

69.    Kids Station has sustained damages as a result of Little Tikes' breaches of the covenant of good faith and fair dealing between the Parties.

## COUNT V
### Tortious Interference with Contract
### (Against MGA)

70.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

71.    The Agreement represents a valid and enforceable contract between Kids Station and Little Tikes.

72.    Since its acquisition of Little Tikes, MGA always has been aware of the Agreement.

73.    MGA has intentionally and unjustifiably through the conduct described herein induced Little Tikes to materially breach the Agreement by:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

74.     Kids Station has sustained damages as a result of MGA's actions and Little Tikes' breaches of the Agreement.

75.     Kids Station will be irreparably harmed by MGA's continued actions and Little Tikes' continued violation of the Agreement, including through lost sales and injury to its goodwill.

## COUNT VI
### Civil Conspiracy
### (Against Little Tikes and MGA)

76.     Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

77.     As alleged in the foregoing paragraphs, MGA and Little Tikes have acted in concert and in consultation with each other for the purpose of interfering with and violating Kids Station's rights and entitlements under the Agreement.

78.     Specifically, MGA and Little Tikes, acting in concert, have intentionally and unjustifiably through the conduct described herein interfered with and violated Kids Station's rights by:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

79.     As a result of the foregoing, Kids Station has sustained damages, and MGA and Little Tikes are jointly and severally liable for those damages, resulting from MGA's actions and Little Tikes' breaches of the Agreement.

80.    Kids Station will be irreparably harmed by MGA's and Little Tikes continued course of conduct and violation of the Agreement, including through lost sales and injury to its goodwill.

WHEREFORE, Plaintiff Kids Station Toys Ltd. respectfully requests that this Court enter judgment in its favor and against Defendants The Little Tikes Company and MGA Entertainment, Inc. and respectfully requests the following relief:

i)    A declaration that no grounds exist for Little Tikes' purported termination of the Agreement and that the Agreement remains in effect as a binding and enforceable contract according to its terms;

ii)    A declaration that no grounds exist for MGA's and Little Tikes' demands, including those set forth in their March 11, 2008 letter, that Kids Station cease selling or offering for sale all products manufactured under the Agreement, that Kids Station cause all retailers to remove from their shelves all products manufactured by Kids Station under the Agreement, and that Kids Station provide to Little Tikes one hundred units of each licensed item under the Agreement;

iii)    A temporary restraining order and preliminary and permanent injunction against Little Tikes and MGA preserving the status quo by requiring Little Tikes to continue operating under the terms of the Agreement until its conclusion and prohibiting Little Tikes from claiming that the Agreement has been terminated;

iv)    An award of all damages sustained by Kids Station as a result of Little Tikes' and MGA's wrongful conduct; and,

v)    An award of any and all further relief that the Court deems necessary and just.

Respectfully submitted,

MARLENE K. SILVERMAN
Florida Bar No. 0226947
LORI A. SOCHIN
Florida Bar No. 0013048
**GREENBERG TRAURIG, P.A.**
*Counsel for Kids Station Toys Ltd.*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
E-mail: silvermanm@gtlaw.com
E-mail: sochinl@gtlaw.com


_____/s/ Marlene K. Silverman_____
MARLENE K. SILVERMAN

Of Counsel:
Paul T. Fox (ARDC No. 3121741)
Charles B. Leuin (ARDC No. 6225447)
Paul J. Ferak (ARDC No. 6272208)
Jason B. Elster (ARDC No. 6289434)
GREENBERG TRAURIG LLP
77 W. Wacker Drive, Suite 2500
Chicago, IL 60601
(312) 456-8400
*Attorneys for Plaintiff*
*Kids Station Toys Ltd.*

Dated:  March 14, 2008

## **VERIFICATION**

I verify under penalty of perjury under the laws of the United States of America that the factual allegations contained in the foregoing are true and correct to the best of my knowledge, except as to those allegations made on information and belief, all of which allegations I believe to be true. Executed on March 14, 2008.

Elliot S. Newman

CASE NO. 08-20393-CIV-KING/GARBER

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 14th day of March, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties listed on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Marlene K. Silverman

MARLENE K. SILVERMAN

21

08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT F



08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## 08-20393-CIV-KING

KIDS STATION TOYS, LTD.
A Hong Kong corporation,

      Plaintiff,

v.

THE LITTLE TIKES COMPANY,
an Ohio corporation,
MGA ENTERTAINMENT, INC.,
A California corporation,

      Defendants.

_____/

## FINAL ORDER OF DISMISSAL

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss

Amended Complaint, or, in the Alternative, to Transfer Venue (D.E. #s52 & 58), filed

March 27, 2008 and March 31, 2008, respectively.

Plaintiff's Complaint was filed February 15, 2008. On the same day, Plaintiff also

filed a Motion for Temporary Restraining Order (D.E. #2). In its Complaint, Plaintiff, a

Hong Kong corporation, seeks to enforce a licencing agreement entered into between Kid

Station, Ltd.., and Little Tikes Company, an Ohio corporation, on December 8, 2003.

As is the Court's custom, on March 10, 2008, the Court promptly set an

Evidentiary Preliminary Injunction hearing on Plaintiff's Motion for Temporary

1

Restraining Order for May 12, 2008.

On March 14, 2008, Plaintiff filed an Amended Complaint. Defendants filed their

Motion to Dismiss Amended Complaint, or, in the Alternative, Transfer Venue (D.E. #s

52 & 58) on March 27, 2008, and March 31, 2008, respectively.. In the instant motions,

Defendants argue that Plaintiff, a Hong Kong corporation, is not a party to the licensing

agreement. In support, Defendants point to the Agreement, which states:

> "This Agreement is effective as of this 8[th] day of December, 2003, by and between
> The Little Tykes Company, an Ohio corporation,......and Kid Station Toys, Ltd., a
> Florida corporation...."

In addition, Defendant directs the Court to the forum selection clause of the Agreement,

which states that:

> "any dispute relating to the mistake or interpretation of this Agreement, or the
> performance or nonperformance by any party of its obligations hereunder, shall be
> litigated only in the state or federal courts located within Cook County, Illinois."

Defendant requests that the Court either dismiss the action because Plaintiff Hong

Kong corporation is not a real party in interest, or enforce the forum selection clause of

the Agreement.

Plaintiff argues that the designation of Kids Station Toys, Ltd. as a Florida

corporation in the parties' agreement was erroneous, and it is the proper party. Plaintiff

concedes that the Agreement provides that disputes between Kids Station and Little Tikes

are to be resolved in state or federal courts located within Cook County, Illinois, but

argues that the location no longer bears any relationship to any of the parties and none of

2

the facts in dispute in this matter are connected to Illinois, and therefore the forum

selection clause is not applicable. Plaintiff further argues that Defendant MGA "is not a

party to the Agreement, had no relationship to Little Tikes at the time of entry into the

Agreement, and has no rights under the Agreement relating to any designated forum."

(Amended Complaint, pg. 4, ¶11).

In summary, Plaintiff seeks to enforce the Agreement entered into between Kid

Station and Little Tikes against both Little Tikes and MGA, and then not only states that

MGA has no rights under the Agreement relating to the designated forum, but argues that

the forum selection provision of the contract should be voided, and the rest of the

Agreement should be enforced against the two defendants.

The Court finds that the parties do not dispute the language of the forum selection

clause in the Agreement, and finds Plaintiff's arguments regarding inapplicability of the

Agreement's forum selection clause to be unpersuasive.

Accordingly, after a careful review of the record and the Court being otherwise

fully advised, it is

ORDERED and ADJUDGED that Defendants' Motion to Dismiss Amended

Complaint, or, in the Alternative, to Transfer Venue (**D.E. #52 & 58**) be, and the same are

hereby **GRANTED**. The above-styled action is **DISMISSED** with prejudice to re-file in

Florida, but without prejudice to re-file according to the forum selection clause of the

parties' Agreement. The Clerk of Court shall CLOSE this case. All pending Motions:

3

Plaintiff's Motion for Temporary Restraining Order (**D.E. #2**), Defendant's Motion for

Hearing (**D.E. #12**), Defendants' First Motion to Dismiss (**D.E. #18**), Plaintiff's Motions

to Strike (**D.E. #s 44 & 50**), and Defendants' Motion for Clarification (**D.E. #60**) be, and

the same are hereby **DENIED as MOOT.**

DONE and ORDERED in chambers at the James Lawrence King Federal Justice

Building and United States Courthouse, Miami, Florida, this 2nd day of April, 2008.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

4

Copies furnished to:

**Counsel for Plaintiff:**
Charles B. Leuin, Esq.
Jason B. Elster, Esq.
Lori Anne Sochin, Esq.
Marlene K. Silverman, Esq.
Frank J. Ferak, Esq.
Paul T. Fox, Esq.
GREENBERG TRAURIG LLP
77 West Wacker Drive
Suite 2400
Chicago, IL 60601-1732
Facsimile: (312) 456-8400


**Counsel for Defendants:**
Judith M. Korchin, Esq.
HOLLAND & KNIGHT
701 Brickell Avenue
Suite 3000
Miami, Florida 33131

Lara Hirshfeld, Esq.
Michael G. Kelber, Esq.
Robert E. Brown, Esq.
NEIL GERBER & EISENBERGLLP
2 N. LaSalle Street
Suite 2200
Chicago, IL 6062

5

08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT H



**Corporate Office:**

16300 Roscoe Boulevard
Van Nuys, CA 91406
Phone: 818/894-2525 (main)
Phone: 818/221-4571 (direct)
Fax:    818/895-0771
Writer's E-mail:
doakes@mgae.com

**VIA FEDERAL EXPRESS AND EMAIL**

March 11, 2008

Kid Station Toys Ltd.
1160 NW 163 Drive
Miami, Florida 33169
Attn: Elliot Newman

Re:    Little Tikes Products

Dear Mr. Newman:

We are addressing this letter to you pursuant to the notice provision in Article XX of the December 8, 2003 License Agreement between The Little Tikes Company and Kid Station Toys Ltd. (the "Agreement"), this is the address required for all notices. In view of the pending litigation between Kids Station Toys Ltd. of Hong Kong and Little Tikes and MGA Entertainment, Inc., Mr. Charles Leuin is, as a courtesy, being copied on this letter.

As you are aware, The Little Tikes Company, has received numerous reports related to the safety of a toy cell phone, model number KSL8033, manufactured by Kid Station under the Agreement. In addition to the reports set forth in my January 30 and February 5, 2008 letters, Little Tikes and its parent, MGA Entertainment, Inc., have recently become aware of a complaint brought by Mr. James Ferris related to the battery pack sold with the KSL8033 model number cell phone, which apparently leaked battery acid. Enclosed are email correspondences between Mr. Ferris and Oscar Radillo and Nicole Spain, both of Kid Station, regarding this subject.

Kid Station was aware of the potential choking hazard described above at least as early as May of 2007. Kid Station was also aware of the potential leaking battery issue as early as January 15, 2008. As you are also aware, MGA's investigation has confirmed that this product is still being offered for sale.

On February 5, 2008, Little Tikes terminated the Agreement pursuant to Section 14.2. Termination under Section 14.2 does not allow for any continued use of the LITTLE TIKES trademarks. The continuing sale of any products manufactured by Kid Station bearing the LITTLE TIKES trademarks, particularly the KSL8033 model toy cell phone, is causing, and is

likely to continue to cause, irreparable injury to the Little Tikes brand name under both the Trademark law and Section 14.2 of the Agreement.

Therefore, we demand that Kid Station immediately cease the sale or offering for sale of all products manufactured under the Agreement. Additionally, we demand that Kid Station immediately request all retailers stocking Kid Station's Little Tikes products to remove from their shelves all products manufactured by Kid Station, or any of its affiliates, bearing the LITTLE TIKES trademarks. Immediate termination of the Agreement under Section 14.2, as in the present situation, precludes any right of Kid Station to sell off products under Section 14.4. We likewise demand that Kid Station comply with its remaining obligations under the Agreement that survive termination, including, but not limited to, Kid Station's obligation under Section 14.6 to provide Little Tikes with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives, as well as Kid Station's obligations of confidentiality under Section 17.1.

Please confirm by March 14, 2008 that Kid Station has requested the immediate removal of its products bearing the LITTLE TIKES trademarks from all retail shelves, and that it will comply with its remaining obligations under the Agreement. If we do not hear from you by that date, we will assume that Kid Station does not intend to comply with its obligations, and we will be forced to seek removal of these products by other lawful means.

Very truly yours,

David G. Oakes

Enc.

cc:   Charles B. Leuin, Esq. (all w/e)
      Robert E. Browne, Esq.
      Jeanine Pisoni

## David Oakes

| | |
|---|---|
| **From:** | Ninette Pembleton |
| **Sent:** | Friday, March 07, 2008 11:25 AM |
| **To:** | David Oakes |
| **Subject:** | Kid Station |
| **Attachments:** | DSC_1957.JPG; DSC_1955.JPG; DSC_1956.JPG |

**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, March 07, 2008 11:15 AM
**To:** Ninette Pembleton
**Subject:** Fw: Replacements?

FYI     Ms Pembleton and thanks again for your quick response
I included pics of the toy phone I had sent to Ms Spain and Mr Radillo

----- Original Message -----
**From:** Oscar Radillo
**To:** 'Jim Ferris'
**Cc:** nspain@kidsstationtoys.com
**Sent:** Friday, February 15, 2008 9:47 AM
**Subject:** RE: Replacements?

Mr. Ferris:
I am sorry for the experience you had with Kids Station.
Under FedEx ground with tracking number 236269310094595, we are shipping today one KSL8033 and one
KSL2021.
Also, we have addressed your safety concerns.

Oscar Radillo

        -----Original Message-----
        **From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
        **Sent:** Thursday, February 14, 2008 8:48 PM
        **To:** oradillo@craigelectronics.com
        **Cc:** nspain@kidsstationtoys.com
        **Subject:** Fw: Replacements?

        Mr Radillo

        I forward this series of emails for the purpose of alerting you to processes and
        personnel within your organization that need your attention. My first contact with
        Ms Spain was on January 15.

        I have received two phone calls from Ms Spain and both were very unprofessional.
        I was made to feel as if I was a liar and that customer satisfaction and safety was
        of absolutely no concern to her.

This whole "mess" revolves around two inexpensive toys that were found to be defective and presented a hazard to children. Ms Spain's callous disregard and complete lack of empathy astounded me. The disappointment of two grandchildren having toys taken away on Christmas day ...... at least someone could have said "I'm sorry that happened" or "I sure am glad the acid didn't hurt your grandchildren". Any competent, caring person would have said I'm sorry but not Ms Spain. Contempt was more her style.

Based on Ms Spain's latest email, the toys have yet to be replaced. Should it take this long to replace two inexpensive toys? Is this what your company endorses as customer satisfaction?

I have complied immediately with her every directive.  I submitted pictures of the defective toys on January 16. I received absolutely no response.

Upon sending a followup email on January 30th requesting an update, all I received was excuses about how busy she was and how many defective toys Kids Station Toys was replacing.  She issued a FedEx pickup request for the next day. I packaged and labeled it for FedEx. Her emails below speak for themselves..... Excuses!

Mr. Radillo, I didn't threaten law suits, I didn't ask for medical assistance, I didn't go to the Better Business Bureau - I only asked for replacement of defective toys and for Kids Stations Toys / Little Tykes to address the safety issue.

Would you please replace my defective toys immediately?

More importantly, what assurances do I have that the safety issue is being addressed and is not just sitting in Ms Spain's inbox?

I do not wish and I will not accept any future calls from Ms Spain! I'm not interested in hearing any more about the internal issues within your organization or her tremendous workload. I want my toys immediately and I want assurance your quality control has addressed these safety issues.

Sincerely
James Ferris

---- Original Message ----
**From:** Nicole Spain
**To:** 'Jim Ferris'
**Sent:** Tuesday, February 12, 2008 8:44 AM
**Subject:** RE: Replacements?

Mr. Ferris: I processed your information on yesterday. Next step it goes to the warehouse. Once it get package it take 2-3weeks to ship. Or within that time frame.


Nicole Spain
Kids Station
Tel : 305-622-9505 ext 226
Fax: 305-622-9641

-----Original Message-----
**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, February 08, 2008 5:48 PM
**To:** Nicole Spain
**Cc:** oradillo@craigelectronics.com
**Subject:** Re: Replacements?

Thanks for the quick response - I did just as YOU ADVISED - I packaged it, labeled it with the address you gave me and put it outside my door. FEDEX called to confirm, picked it up and left the following "call tag receipt" 9973302 50082462

For something that began as a email from me reporting a safety issue with your manufacturing/distribution process and a request for replacements for inexpensive defective toys, this has become a very troublesome matter to me. As I explained, these were Christmas presents and it is now February.


Please replace the defective toys as soon as possible.


----- Original Message -----
**From:** Nicole Spain
**To:** 'Jim Ferris'
**Sent:** Friday, February 08, 2008 3:25 PM
**Subject:** RE: Replacements?

Mr. Ferris: It was a mis-understanding on your behalf. In order for to send out a replacement part. we must receive the defective unit back from fedex. Normally when fedex deliver's returned unit's. It goes directly to the warehouse. ANd the warehouse manager will send me the paper work inside of the box. So that i can processed the inform,ation. Or contact the consumer about a replacement option. I have not sill received anything. Do you have that tracking # so that I can track it down.

Please be advised.

Nicole Spain
Kids Station
Tel : 305-622-9505 ext 226
Fax: 305-622-9641

-----Original Message-----
**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, February 08, 2008 11:02 AM
**To:** nspain@kidsstationtoys.com
**Cc:** oradillo@craigelectronics.com
**Subject:** Replacements?

Good morning Ms Spain

Upon your directions, I returned the defective toy phone to you.
During our last conversation I thought I understood that you would
send out replacement toys as soon as that day - easily could have been
a misunderstanding on my part and if so, I apologize.

I have yet to receive a confirmation  from you about your receipt of
the defective toy and have not received the replacements.

Could you please update me?

Jim Ferris
770-487-3234







08CV1935
JUDGE GOTTSCHALL
MAGISTRATE JUDGE NOLAN

# EXHIBIT I



## U.S. CONSUMER PRODUCT SAFETY COMMISSION
### WASHINGTON, DC 20207

Keysha L. Watson
Compliance Officer
Recalls and Compliance Division
Office of Compliance & Field Operations

MAR 1 4 2008

Tel: 301-504-6820
Fax: 301-504-0359
Email: kwatson@cpsc.gov

**Certified Mail/Telecopy**
(330) 650-3221

Rory Leyden
Chief Executive Officer
Little Tikes Company
2180 Barlow Road
Hudson, OH 44236

Re: Little Tikes Play Cell Phone and Electronic
Light N' Sounds Key Ring, Model No. KSL8033
CPSC Sample No. 07-840-7134

Dear Mr. Leyden:

The U.S. Consumer Product Safety Commission (CPSC) staff collected the sample referenced above at a Wal-mart retail store located on 600 Showers Drive, Mountain View, California. The toy was collected following a consumer complaint which indicated a small part detached from the cell phone. (See attached In-Depth Investigation 070523CWE5930).

The toy was age graded by the Commission's staff for children under three years of age and tested the sample by the method described in 16 C.F.R. § 1500.52(b)(e) and (f). The test results determined that the product failed to meet the small parts requirement under 16 C.F.R. Part 1501 (see attached test results and photos). The toy contains small parts as defined under 16 C.F.R. § 1501.4 and is considered banned under 16 C.F.R. § 1501.18(a)(9).

This toy is a hazardous substance as defined in section 2(f)(1)(D) of the Federal Hazardous Substances Act (FHSA), 15 U.S.C. § 1261.2(f)(1)(D), and the regulations at 16 C.F.R. § 1501.18(a)(9) and is a banned hazardous substance under section 2(q)(1)(A) of the FHSA, 15 U.S.C. § 1261.2(q)(1)(A). It is prohibited under section 4(a) of the FHSA, 15 U.S.C. § 1263, to market this toy and to do so may subject your firm to civil penalties under section 5 of the FHSA.

**Because of the potential risk of injury to children, the staff requests that you stop sale and withhold distribution of any inventory of the toy.**

As a result of these violations your firm could be subject to fines of up to $1.825 million and/or imprisonment for not more than one year, or both. Please review Chapter 1 of the enclosed Regulated Products Handbook (Handbook) for details of the penalties. If you disagree with the Commission staff's

Gord
Page 2

finding that this product does not comply with the mandatory requirements, Chapter 2 of the enclosed Handbook describes the procedures for presenting your views and any supporting evidence to the staff. You may export this toy or destroy it. See Chapter 6 for procedures regarding exportation of noncomplying products.

Sections 15 and 37 of the Consumer Product Safety Act contain requirements for reporting to the Commission information on certain products you manufacture, import, or distribute. Chapter 4 of the Handbook describes the reporting requirements applicable to your firm. To assure you of the confidential treatment of information you submit, please review Chapter 7 of the Handbook. In addition, there is a reporting requirement for choking incidents under 16 C.F.R. Part 1117.

Please respond in writing within two weeks from the date you receive this letter outlining the specific corrective actions you plan to take to address the sale of this product and any other products subject to the mandatory requirements. Please direct your response to me at Office of Compliance, U.S. Consumer Product Safety Commission, Room 613, 4330 East West Highway, Bethesda, MD 20814-4408. The Office of Compliance telefax number is (301) 504-0359.

We appreciate your cooperation.

Sincerely,

Keysha L. Watson
Compliance Officer
Recalls and Compliance Division

Cc:

Kyle Holifield – Via U.S. Mail/Telecopy (479) 273-8860
Wal-mart Stores, Inc.
508 SW 8th Street
Bentonville, AR 72716

Enclosures:

Test reports and photos
In-Depth Investigation Report
Regulations
Regulated Products Handbook

# Impact Test

Impact Test Page 1 of 1

1a. AGE LABELING ON PRODUCT (IF NO AGE LABELING, WRITE 'N/A' ): +1 1/2/years

1b. CPSC AGE DETERMINATION: < 3 YEARS: 19-35 MONTHS

2. SAMPLE NUMBER: 07-840-7134

3. ASSEMBLY INSTRUCTIONS FOR ADULTS: NO

4. TESTED IN UNASSEMBLED CONDITION: NO

5. LABEL INDICATING SHARP POINT/EDGES: NO

6. TEST CATEGORY: OVER 18 MONTHS THRU 36 MONTHS; <4 LBS; HEIGHT 2 FT. 11 1/2 IN.; 4 DROPS; [16 C.F.R. 1500.52 (b)]

| | Drop 1 | Drop 2 | Drop 3 | Drop 4 |
|---|---|---|---|---|
| Sub 7 | 4 | 4 | 4 | 4 |
| Sub 8 | 4 | 4 | 1 battery | |
| Sub 9 | 4 | 4 | 4 | 1 battery |
| Sub 10 | 4 | 4 | 4 | 4 |
| Sub 11 | 4 | 4 | 4 | 4 |
| Sub 12 | 4 | 4 | 4 | 4 |

RECORD A DESCRIPTION OF THE SMALL PART(S) IN THE BLOCK THAT CORRESPOND(S) TO THE PROPER DROP. USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH DROP IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS

Comments:

1a. AGE LABELING ON PRODUCT (IF NO AGE LABELING, WRITE 'N/A' ): **+1 1/2years**

1b. CPSC AGE DETERMINATION: < 3 YEARS; 19-35 MONTHS

2. SAMPLE NUMBER: **07-840-7134**

3. ASSEMBLY INSTRUCTIONS FOR ADULTS: **NO**

4. TESTED IN UNASSEMBLED CONDITION: **NO**

5. LABEL INDICATING SHARP POINT/EDGES: **NO**

6. TEST CATEGORY: OVER 18 MONTHS THRU 36 MONTHS; <4 LBS; HEIGHT 2 FT. 11 1/2 IN.; 4 DROPS; [16 C.F.R. 1500.52 (b)]

## Impact Test

Impact Test Page 1 of 1

| | Drop 1 | Drop 2 | Drop 3 | Drop 4 |
|---|---|---|---|---|
| Sub 7 | 4 | 4 | 4 | 4 |
| Sub 8 | 4 | 4 | 1 battery | 1 battery |
| Sub 9 | 4 | 4 | 4 | 4 |
| Sub 10 | 4 | 4 | 4 | 4 |
| Sub 11 | 4 | 4 | 4 | 4 |
| Sub 12 | 4 | 4 | 4 | 4 |

RECORD A DESCRIPTION OF THE SMALL PART(S) IN THE BLOCK THAT CORRESPOND(S) TO THE PROPER DROP. USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH DROP IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS

Comments:

1a. AGE LABELING ON PRODUCT
( IF NO AGE LABELING, WRITE 'N/A' ) :　　(

+1 1/2years

1b. CPSC AGE DETERMINATION:
< 3 YEARS: 19-35 MONT...

2. SAMPLE NUMBER:　**07-840-7134**

3. ASSEMBLY INSTRUCTIONS FOR ADULTS:　NO

5. LABEL INDICATING SHARP POINT/EDGES:　NO

4. TESTED IN UNASSEMBLED CONDITION:　NO

# TENSION TEST

6. TEST CATEGORY:
OVER 18 MONTHS THRU 36 MONTHS; [14.5 POUNDS/10 SECONDS]; [16 C.F.R. 1500.52(f)]

Tension Test Page 1 of 1

| | Component: Phone Clip | | Component: Key Ring | | Component: | | Component: | |
|---|---|---|---|---|---|---|---|---|
| TENSION = ( LBS ) / TIME ( SEC ) | | | | | | | | |
| | Parallel | Perpendicular | Parallel | Perpendicular | Parallel | Perpendicular | Parallel | Perpendicular |
| Sub 1 | 1 fourteen.five/ three | na | 4 | 4 | | | | |
| Sub 2 | 4 | 4 | 4 | 4 | | | | |
| Sub 3 | 1 eleven/four | 4 | 4 | 4 | | | | |
| Sub 4 | 1 twelve/four | na | 4 | 4 | | | | |
| Sub 5 | 4 | 4 | 4 | 4 | | | | |
| Sub 6 | 4 | 4 | 4 | 4 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH TEST IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS.

Comments:

1a. AGE LABELING ON PRODUCT
( IF NO AGE LABELING, WRITE 'N/A' ) :

+1 1/2years

1b. CPSC AGE DETERMINATION:
< 3 YEARS: 19-35 MONT

2. SAMPLE NUMBER:  **07-840-7134**

3. ASSEMBLY INSTRUCTIONS FOR ADULTS:  NO

4. TESTED IN UNASSEMBLED CONDITION:  NO

5. LABEL INDICATING SHARP POINT/EDGES:  NO

# TENSION TEST

6. TEST CATEGORY:
OVER 18 MONTHS THRU 36 MONTHS; [14.5 POUNDS/10 SECONDS]; [16 C.F.R. 1500.52(f)]

Tension Test Page 1 of 1

| | Component: Phone Clip | | Component: Key Ring | | Component: | | Component: | |
|---|---|---|---|---|---|---|---|---|
| | TENSION = ( LBS ) / TIME ( SEC ) | | | | | | | |
| | Parallel | Perpendicular | Parallel | Perpendicular | Parallel | Perpendicular | Parallel | Perpendicular |
| Sub 1 | 1 fourteen.five/ three | na | 4 | 4 | | | | |
| Sub 2 | 4 | 4 | 4 | 4 | | | | |
| Sub 3 | 1 eleven/four | 4 | 4 | 4 | | | | |
| Sub 4 | 1 twelve/four | na | 4 | 4 | | | | |
| Sub 5 | 4 | 4 | 4 | 4 | | | | |
| Sub 6 | 4 | 4 | 4 | 4 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH TEST IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS.

Comments:

1a. AGE LABELING ON PRODUCT
( IF NO AGE LABELING, WRITE 'N/A' ) :

+1 1/2years

1b. CPSC AGE DETERMINATION:

< 3 YEARS: 19-35 MONTHS

2. SAMPLE NUMBER:    **07-840-7134**

3. ASSEMBLY INSTRUCTIONS FOR ADULTS:    NO

4. TESTED IN UNASSEMBLED CONDITION:    NO

5. LABEL INDICATING SHARP POINT/EDGES:    NO

## TORQUE TEST

6. TEST CATEGORY:

OVER 18 MONTHS THRU 36 MONTHS; [2.8 INCH-POUNDS/10 SECONDS]; [16 C.F.R.1500.52(e)]

Torque Test Page 1 of 1

| | Component: Phone Clip | | Component: Key Ring | | Component: | | Component: | |
|---|---|---|---|---|---|---|---|---|
| | TORQUE = ( IN / LBS ) / TIME ( SEC ) | | | | | | | |
| | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise |
| Sub 1 | 4 | 4 | 4 | 4 | | | | |
| Sub 2 | 4 | 4 | 4 | 4 | | | | |
| Sub 3 | 4 | 4 | 4 | 4 | | | | |
| Sub 4 | 4 | 4 | 4 | 4 | | | | |
| Sub 5 | 4 | 4 | 4 | 4 | | | | |
| Sub 6 | 4 | 4 | 4 | 4 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

** ROTATION TO 180 DEGREES

USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH TEST IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS.

Comments:

1a. AGE LABELING ON PRODUCT
( IF NO AGE LABELING, WRITE 'N/A' ) :

+1 1/2years

1b. CPSC AGE DETERMINATION:

< 3 YEARS: 19-35 MONTHS

2. SAMPLE NUMBER:    **07-840-7134**

3. ASSEMBLY INSTRUCTIONS FOR ADULTS:    NO

4. TESTED IN UNASSEMBLED CONDITION:    NO

5. LABEL INDICATING SHARP POINT/EDGES:    NO

# TORQUE TEST

6. TEST CATEGORY:

OVER 18 MONTHS THRU 36 MONTHS; [2.8 INCH-POUNDS/10 SECONDS]; [16 C.F.R.1500.52(e)]

Torque Test Page 1 of 1

| | Component: Phone Clip | | Component: Key Ring | | Component: | | Component: | |
|---|---|---|---|---|---|---|---|---|
| | TORQUE = ( IN / LBS ) / TIME ( SEC ) | | | | | | | |
| | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise | Clockwise | Counter Clockwise |
| Sub 1 | 4 | 4 | 4 | 4 | | | | |
| Sub 2 | 4 | 4 | 4 | 4 | | | | |
| Sub 3 | 4 | 4 | 4 | 4 | | | | |
| Sub 4 | 4 | 4 | 4 | 4 | | | | |
| Sub 5 | 4 | 4 | 4 | 4 | | | | |
| Sub 6 | 4 | 4 | 4 | 4 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

** ROTATION TO 180 DEGREES

USE THE FOLLOWING NUMBERS TO DESCRIBE THE RESULTS OF EACH TEST IN THE APPROPRIATE BLOCK: 1=SMALL PART(S) THAT FIT INTO TEST CYLINDER; 2=SHARP POINT(S); 3=SHARP EDGE(S); 4=PASS.

Comments:



07-840-7134



07-840-7134

| 1. Task Number 070523CWE5930 | | 2. Investigator's ID 2157 | | **EPIDEMIOLOGIC INVESTIGATION REPORT** |
|---|---|---|---|---|
| 3. Office Code 840 | 4. Date of Accident YR MO DAY 2007 05 01 | 5. Date Initiated YR MO DAY 2007 06 14 | | |

| 6. Synopsis of Accident or Complaint | UPC 050743 |
|---|---|

An 18-month-old male toddler was plying with a toy, flip-phone-style, cellular phone when a plastic component covering part of the hinge became dislodged. The toddler child had been playing with the toy regularly for two months. The child's mother became concerned about a choking hazard and purchased a replacement toy. The same part came off the replacement toy after approximately one week of use. The company that designed the toy told the complainant to take the problematic part off of the phone and return it to her child for play.

| 7. Location (Home, School, etc) 1 - HOME | | 8. City SAN LEANDRO | 9. State CA |
|---|---|---|---|
| 10A. First Product 5004 - Toys, Not Elsewhere Classifi | 10B. Trade/Brand Name LITTLE TIKES PLAY CELL PHONE AND | | 10C. Model Number KSL8033 |
| 10D. Manufacturer Name and Address THE LITTLE TIKES COMPANY 2180 Barlow Road Hudson, OH  44236 | | | |
| 11A. Second Product 0 | 11B. Trade/Brand Name NONE | | 11C. Model Number NONE |
| 11D. Manufacturer Name and Address NONE | | | |

| 12. Age of Victim 218 | 13. Sex 1 - Male | 14. Disposition 0 - No Injury | 15. Injury Diagnosis 70 - No Injury |
|---|---|---|---|
| 16. Body Part(s) Involved 99 - NO INJURY | 17. Respondent 1 - Victim/Complainant | 18. Type of Investigation 1 - On-Site | 19. Time Spent (Operational / Travel) 24 / 2 |
| 20. Attachment(s) 9 - Multiple Attachments | 21. Case Source 07 - Consumer Complaint | | 22. Sample Collection Number 078407133 |

| 23. Permission to Disclose Name (Non NEISS Cases Only) ● Yes    ○ No    ○ Verbal | | |
|---|---|---|
| 24. Review Date 07/05/2007 | 25. Reviewed By 9021 | 26. Regional Office Director Frank J. Nava |
| 27. Distribution Watson, Keysha | | 28. Source Document Number I0750374A |

CPSC FORM 182 (12/96) Approved for use through 01/31/2010 OMB NO. 30410029

070523CWE5930

This In Depth Investigation (IDI) was initiated in response to a consumer complaint received via the CPSC website on 05/21/2007. In the initial complaint the consumer wrote that a small piece had fallen off a toy cell phone, recommended for children 18 months and older that her son had been playing with. The consumer reported that she exchanged the toy for a new one and the same part fell off. The complainant opined that the piece was "definitely small enough to cause a choking hazard."

### Incident Information

The complainant is a 32 year old female who lives in a single family home in a residential neighborhood of a small city that is part of a larger metropolitan area. She lives with her husband, age 36. The child who played with the incident toy was a boy born on 09/29/2005. The complainant had a second child on 06/05/2007 that did not interact with the incident product. There are no other members of the household. The family had lived in the residence for approximately 3 ½ years at the time of the investigation. An onsite interview was conducted on 06/18/2007.

The incident product is a toy cellular phone, made to resemble a functional "flip phone" style cellular phone. It is sold as part of a set along with a second toy, a key ring with an oversized fob attached to three blank plastic keys with a plastic ring. Both components of the set emit noises when various buttons are pressed by the user. The set's packaging indicates that is intended for children "+1 ½" years of age. The complainant purchased one of the products approximately three months before the time of the interview, at a store in a large national retail chain, just after her child turned 18 months old.

The 18 month old boy played with the product on a very regular basis. The complainant stated that he played with the cell phone almost every time he rode in the family vehicle and that he went out in the vehicle at least five times a week. At this time, the complainant was babysitting a 3 ½ year old female who also played with the phone occasionally. According the complainant, the phone was never subjected to any significant abuse or damage. However her son did play with it with a roughness and lack of dexterity which she described as normal for a child of about 2 years of age. The phone also did experience some non-negligible heat as it was left locked in the passenger compartment of the family vehicle on multiple occasions. However, this heat is unlikely to have been extreme as temperatures in the area where the family lives were relatively moderate during the time period in question. After the complainant's son had had the toy for approximately 2 months, the complainant noticed that a small part had detached from the cell phone component of toy. This piece covers part of the inside of the phone's hinge. (See Exhibit 1, Photograph 1). The complainant found the piece in her son's car seat and concluded that it presented a choking hazard. She then took the toy away from her son and placed it out of his reach.

1

070523CWE5930

Shortly thereafter, she purchased an identical toy set from the same retail store and gave it to her son, now approximately 20 months old. The complainant stated that approximately a week later she noticed that the same piece had detached from the cell phone component of the toy set. To the best of the complainant's knowledge, the second phone did not experience any particular abuse or damage during the week her child had access to it. No other children had access to the toy during this week.

The complainant stated that her son had a regular medical checkup at about the time he turned 18 months old. No problems were detected at that time and complainant stated that her son has never been diagnosed with any chronic medical conditions or developmental abnormalities. He walked unassisted at 11 months, began to say single words between 8 and 12 months, and began to use recognizable sentences at 18 months.

Within several days of the time when the second, identical piece popped out of the second cell phone toy, the complainant contacted the manufacturer/importer of the toy set. She does not remember the name of the individual with whom she spoke. The manufacturer advised her to contact the toy's designer, which apparently licensed the design of the toy to the manufacturer/importer. (See Exhibit 1, Photograph 10) The complainant contacted the firm that designed the toy through a toll-free customer service number. The individual that she spoke with offered to send her a free replacement toy. The complainant told the designer company's representative that a free replacement did not appear to be an appropriate response to the situation as two identical toys had failed in identical ways within a period of approximately 3 months. The designer's representative then told the complainant to simply remove the problematic part (See Exhibit 1, Photographs 1 and 5) from the toy and return the toy to her son. The complainant stated that she manipulated the toy set with the problematic hinge cover removed and could not identify any other small parts which seemed likely to detach during normal play at the hands of a 2 year old child, or other hazards. She then returned the second toy set to her son for continued play. The phone calls to the manufacturer and designer occurred on 05/21/2007, the same day the complainant contacted CPSC. No further incidents had occurred with the second toy set as of the time of the interview.

The first toy set, the one purchased shortly after the incident child turned 18 months old, was collected by the Investigator as Sample number 07-840-7133, along with the hinge cover from the toy set that was purchased later. The Investigator notes that the complainant had "popped" the problematic piece into "place" on the first incident phone before the interview. The first toy set had been stored by the complainant from the time of the product failure to the time of the interview. The complainant did not have purchase receipts, or any original packaging, from either toy set.

2

070523CWE5930

Product Information

The incident product is a **LITTLE TIKES** Play Cell Phone and Electronic Light N' Sounds Key Ring, Model No. KSL8033. The toy set was apparently designed by **Kids Station Toys International Ltd.**, which licensed the design to Little Tikes. (Exhibit 1, Photograph 10) The cell phone resembles a "flip phone" style functional cellular phone and has a ten key numeric pad and three buttons with pictures of animals on them. All these buttons emit sounds when pressed by the user. The key fob on the key ring is disc shaped, approximately 3" in diameter, and has a speaker in the center of its front face. The speaker is surrounded by five buttons which emit travel-related sounds, such as a starting engine and a car horn, when pressed. A sixth button turns on a very small flashlight. Both devices are powered by 2 AAA batteries.

Kids Station's address is:

P.O. Box 694660
Miami, FL 33269
1-888-321-7191

LITTLE TIKES customer service is located at:

2180 Barlow Road
Hudson, OH 44236
1-800-321-0183

Both toy sets bought by the complainant were purchased at the Wal-Mart store located in San Leandro, California:

1919 Davis Street
San Leandro, CA 94577
510-569-0200

A sticker on the top of the collected incident phone reads: Manufactured: Nov., 06 KTS061000541962. A sticker on the back of the collected incident key fob bears model number KSL8033. Below this is labeling regarding the use of AAA batteries in the product.

The Investigator purchased 14 exemplar products for testing and evaluation from Wal-Mart stores located in Mountain View and Union City, California.

Labeling on the back of the packaging of the exemplar products is as follow:

[an ovoid logo reading "little tikes"]

[a "tab" at the upper right corner reads "+1 ½ years"]

3

070523CWE5930

Play Cell Phone and Electronic Light N' Sounds Key Ring

Play Cell Phone
- 3 animal sound effects with 3 melodies
- Pretend Stylin' mirror
- Number pad features realistic sounds and play functions.
- Belt Clip Included

Batteries Included
Replace with 2 AAA (3 Volts) alkaline batteries (not included)

[an oval logo states "2-In-1 combo set"]

Electronic Light N' Sounds Key Ring
- Realistic, easy to handle car keys with five cool sound effects
- Flashlight

Batteries Included
Replace with 2 "AAA" (3 Volts) alkaline batteries (not included)

[At the bottom right corner of the package is a white square barcode. Above the barcode is the notation: "Model KSL8033"]

[The barcode number reads: 3139808033]

[Below the barcode is the notation: "Printed in China"]

The following labeling appears next to the barcode:

© 2006 The Little Tikes Company
LITTLE TIKES is a trademark of
The Little Tikes Company,
used with permission.

Designed and Licensed by
Kids Station International Ltd
P.O. Box 694660
Miami, FL 33269-4660

Kids Station Toys International
All Rights Reserved
Made in China

**To Obtain Service on your Product**
Please call: 1-888-321-7191 or
Email: service@kidsstationtoys.com

070523CWE5930

The following labeling appears to the right of the labeling about the manufacturer:

Product and Colors may vary

Do not mix different types of batteries together (e.g. alkaline and carbon-zinc) or old batteries with fresh ones. Do not dispose of batteries in fire. Batteries may explode or leak.

The batteries included in this toy are for in-store demonstration purposes only.

[Labeling on other portions of the box is completely duplicative of the above.]

070523CWE5930

Attachments:

Exhibit 1, Photographs of the incident product and the packaging of an exemplar product, all taken by the Investigator, 10 pages.
Exhibit 2, CPSC form No. 163, Receipt for Samples, signed by complainant, 1 page.
Exhibit 3, CPSC form 322, Authorization for Release of Name, signed by complainant, 1 page.
Exhibit 4, Affidavit of Store Manager of retail location where 9 of 14 exemplar samples were purchased, 2 pages.
Exhibit 5, CPSC form No. 163, Receipt for Samples, signed by Store Manager of retail location where 9 of 14 exemplar samples were purchased, 1 page.
Exhibit 6, Affidavit of Store Manager of retail location where 5 of 14 exemplar samples were purchased, 2 pages.
Exhibit 7, CPSC form No. 163, Receipt for Samples, signed by Store Manager of retail location where 5 of 14 exemplar samples were purchased, 1 page.
Exhibit 8, Government Purchase Card receipts for exemplar samples from two different retail stores on 06/27/2007 and 06/28/2007.
Exhibit 9, CPSC Sample Collection Report Number 07-840-7133, 2 pages.
Exhibit 10, CPSC Sample Collection Report Number 07-840-7134, 2 pages.

6

070523CWE5930

Contact Information:

The complainant contacted The Little Tikes Company and Kids Station by telephone on 05/21/2007. She did not have the names of the persons with whom she spoke available at the time of the interview.

The complainant, Julia Kary, was interviewed by CPSC in her home on 06/18/2006.

2172 Buena Vista Ave.
San Leandro, CA
510-352-0509

The Investigator purchased samples at a Wal-Mart in Redwood City, California on 06/27/2007. The Investigator dealt with Store Manager Casey Wiseman.

600 Showers Drive
Mountain View, CA 94040
650-917-0796

The Investigator purchased samples at a Wal-Mart in Union City, California on 06/28/2007. The investigator dealt with Store Manager Jody Stowers.

30600 Dyer Street
Union City, CA 94587
510-475-5915

7

Exhibit 1 – Page 1 of 10 – 070523CWE5930



Photograph 1: The incident product, including both the "key ring" and the "flip phone." The small plastic piece in between the two, indicated by the green arrow, is the small part which detached from an identical toy set used by the consumer's child. This piece covers part of the inside of the hinge of the cell phone; the location of the identical piece on the sample cell phone is indicated by the red arrow.

Exhibit 1 – Page 2 of 10 – 070523CWE5930



Photograph 2: A sticker located on the "upper" end, directly under the hinge, of the cell phone component of the incident toy sample.

Exhibit 1 – Page 3 of 10 – 070523CWE5930



Photograph 3: Text located on the bottom of the fob of the incident sample toy's key ring. It reads: © 2006 THE LITTLE TIKES COMPANY DESIGNED AND LICENSED BY KIDS STATION TOYS INTERNATIONAL LIMITED LTD. MADE IN CHINA

Exhibit 1 – Page 4 of 10 – 070523CWE5930



Photograph 4: A close up of the red label visible at the bottom of photograph 3 above. The label is located on the outside of the unit's battery compartment. The text on the plastic below reads in part "DC 3V...2X1.5 ... AAA" and appears to describe the toy's battery requirements in several different regional formats.

Exhibit 1 – Page 5 of 10 – 070523CWE5930



Photograph 5: A close up of the underside of the small part which came off the cell phone of an identical toy set used by the complainant's child. The top side of the analogue of this component, in place on the incident toy, is indicated by the red arrow in photograph 1. The piece is approximately 21 mm long and 9 mm wide.

Exhibit 1 – Page 6 of 10 – 070523CWE5930



Photograph 6: The front of the packaging of an exemplar product collected for testing purposes at a Wal-Mart store in either Mountain View or Union City, California.  Note that the "age recommendation" in the upper right corner indicates "+1 ½ years."

Exhibit 1 – Page 7 of 10 – 070523CWE5930



Photograph 7:  The top of the same sample shown in Photograph 6 above.  Note again the age recommendation on the right.

Exhibit 1 – Page 8 of 10 – 070523CWE5930



Photograph 8: The back of the package of the exemplar sample shown above.

Exhibit 1 – Page 9 of 10 – 070523CWE5930



Photograph 9:  A close-up of the bar code in the lower left corner of photograph 8 above.  Note the model number KSL8033.

Exhibit 1 – Page 10 of 10 – 070523CWE5930



Photograph 10: A detailed view of the labeling located immediately to the right of the barcode seen in photograph 8 and 9 above.

**U.S. Consumer Product Safety Commission**

Exhibit 3 -- page 1 of 1 -- 070523CWE5930

## AUTHORIZATION FOR RELEASE OF NAME

Thank you for assisting us in collecting information on a potential product safety problem.    The Consumer Product Safety Commission depends on concerned people to share product safety information with us.  We maintain a record of this information, and use it to assist us in identifying and resolving product safety concerns.

We routinely forward this information to manufacturers and private labelers to inform them of the involvement of their product in an accident situation.  We also give the information to others requesting information about specific products.    Manufacturers need the individual's name so that they can obtain additional information on the product or accident situation.

Would you please indicate on the bottom of this page whether you will allow us to disclose your name.    If you request that your name remain confidential, we will of course, honor that request.  After you have indicated your preference, please sign your name and date the document on the lines provided.

___X___    You are hereby authorized to disclose my name and address with the information collected on this case

_____    My identity is to remain confidential

_____        6/18/07

(Signature)                                                (Date)

CPSC Form 322 (7/83)