**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE LITTLE TIKES COMPANY,<br>an Ohio corporation, | ) <br> ) | |
| | ) | Case No. 1:08-cv-1935 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KID STATION TOYS, LTD.,<br>a Florida corporation, | ) <br> ) | **Jury Trial Demanded** |
| | ) | |
| KIDS STATION TOYS, LTD.,<br>a Hong Kong corporation, | ) <br> ) | |
| | ) | |
| KIDS STATION (U.S.) INCORPORATED,<br>a Florida corporation, | ) <br> ) | |
| | ) | |
| KIDS STATION TOYS<br>    INTERNATIONAL, LTD.,<br>a Bermuda corporation, | ) <br> ) <br> ) | |
| | ) | |
| KIDS STATION TOYS INTERNATIONAL<br>    HOLDING, GmbH<br>a Switzerland corporation, and | ) <br> ) <br> ) | |
| | ) | |
| MR. ELLIOT S. NEWMAN<br>an individual, | ) <br> ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**<u>TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 3

II.   BACKGROUND ......................................................................................................... 4

    A.    Little Tikes .......................................................................................................... 4

    B.    The Agreement and Defendants ......................................................................... 5

    C.    Defendants' Breaches of the Agreement ........................................................... 9

    D.    Defendants' Behavior Since Termination of the Agreement ........................... 11

III.  DEFENDANTS SHOULD BE IMMEDIATELY ENJOINED FROM USING
     LITTLE TIKES' TRADEMARK IN CONNECTION WITH ELECTRONIC
     PRODUCTS FOR CHILDREN ................................................................................ 12

    A.    The Standard for Issuance of a Temporary Restraining Order ......................... 12

    B.    Little Tikes Will Succeed on the Merits of Its Claims ..................................... 13

         1.    Little Tikes Has Valid Trademarks In Its LITTLE TIKES
             Trademarks ............................................................................................ 14

         2.    Defendants' Use of Little Tikes' Trademarks Creates a Likelihood
             of Confusion ......................................................................................... 14

         3.    None of the Defendants are Currently Authorized to Use the Mark ....... 17

    C.    Little Tikes Will  Suffer Irreparable Harm if a Temporary Restraining
       Order is not Entered Because Defendants' Use of Its Marks will Damage
       Little Tikes' Reputation and Goodwill ............................................................. 18

    D.    Little Tikes' will Lose Significant Goodwill if a Temporary Restraining
       Order Does Not Issue, and As a Result, the Balance of Hardships Clearly
       Leans in Little Tikes' Favor ............................................................................. 19

    E.    The Grant of a Preliminary Injunction in this Matter is in the Public's
       Interest ............................................................................................................... 19

IV.   CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Abbot Laboratoriess v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ....................................................................... 17

*America's Favorite Chicken Co. v. Mithwani*,
   1994 WL. 66121 (N.D. Ill. March 1, 1994)............................................... 17

*Badger Meter v. Grinnell Corp.*,
   13 F.3d 1145 (7th Cir. 1994) ................................................................... 15

*Bernina of America, Inc. v. Fashion Fabrics International, Inc.*,
   57  U.S.P.Q. 2d 1881 (N.D. Ill. 2001)..................................................... 11

*Burger King Corp. v. Mason*,
   710 F.2d 1480 (11th Cir. 1983), *cert. denied*, 465 U.S. 1102 (1984)....................... 14

*Chrysler Motors Corp. v. Alloy Automotive Co., Inc.*,
   661 F. Supp. 191 (N.D. Ill. 1987) ........................................................... 13

*Digital Equip. Corp. v. Altavista Tech, Inc.*,
   960 F. Supp. 456 (D. Mass. 1997) ........................................................... 14

*Dunkin' Donuts Inc. v. Donuts Realty, Inc.*,
   2000 U.S. Dist. LEXIS 17927 (N.D. Ill. Dec. 6 2000) ............................. 15

*G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*,
   873 F.2d 985 (7th Cir. 1989) ................................................................... 15

*Gorenstein Enterprises, Inc. v. Quality Care-USA*,
   874 F.2d 431 (7th Cir. 1989) ................................................................... 14

*Ideal Industrial, Inc. v. Gardner Bender, Inc.*,
   612 F.2d 1018 (7th Cir. 1979) ................................................................. 18

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
   846 F.2d 1079 (7th Cir. 1988) ........................................................... 15, 17

*James Burroughs Ltd. v. Sign of Beefeater, Inc.*,
   540 F.2d 266 (7th Cir. 1976) ................................................................... 19

*Kinney v. International Union of Operating Engineers*,
   994 F.2d 1271 (7th Cir. 1993) ................................................................. 12

*Munters Corp. v. Matsuri America, Inc.,*
    909 F.2d 250 (7th Cir. 1990), *cert. denied*, 4987 U.S. 1017 (1990) ......................... 12

*Processed Plastic Co. v. Warner Committee,*
    675 F.2d 852 (7th Cir. 1982) ................................................................. 17

*U.S. Structures, Inc. v. J.P. Structures, Inc,*
    130 F.3d 1185 (6th Cir. 1997) ............................................................... 14

*Ty, Inc. v. Jones Group Inc.,*
    237 F.3d 891 (7th Cir. 2001) ....................................................... 11, 12, 18

*Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.,*
    698 F.2d 862 (7th Cir. 1983) ................................................................. 17

## STATUTES

15 U.S.C. §§ 1114 ............................................................................... 14

15 U.S.C. §1115(b) ............................................................................ 13

## I.    **INTRODUCTION**

Plaintiff, The Little Tikes Company ("Little Tikes"), seeks a temporary restraining order to prevent Defendants Kid Station Toys, Ltd., a Florida corporation (hereinafter, "Kids Station (Florida)"), Kids Station Toys, Ltd., a Hong Kong corporation (hereinafter, "Kid Station (HK)"), Kids Station (U.S.) Incorporated, a Florida corporation (hereinafter, "Kids Station (U.S.)"), Kids Station Toys International, Ltd., a Bermuda corporation (hereinafter, "Kids Station (Bermuda)"), Kids Station Toys International Holding, GmbH, a Switzerland corporation (hereinafter, "Kids Station (International)") (collectively, the "Defendants") and Mr. Elliot S. Newman ("Newman") from continuing their infringement of Little Tikes' valuable trademarks, and damaging the goodwill that Little Tikes has established in connection with its LITTLE TIKES trademark and logo.[1]    Specifically, Defendants are manufacturing, distributing and selling various children toys under the LITTLE TIKES trademark and logo without authorization.

On or about December 8, 2003, Little Tikes entered into a license agreement (the "Agreement") with an entity purporting to be Kid Station (Florida) for the use of Little Tikes' well known LITTLE TIKES trademarks on certain categories of electronic products for children. Yet, after conducting business with the entity Little Tikes believed to be Kid Station (Florida) for four years, a different entity, Kids Station (HK), claimed, to Little Tikes' dismay, that it was the intended and actual party to the Agreement and that Kid Station (Florida) does not exist.    It

---

[1] As set forth in the Complaint, notwithstanding a valid forum selection clause mandating that all disputes be litigated in Cook County, Illinois, on February 19, 2008, Kids Station (HK) filed suit in the Southern District of Florida against Little Tikes and its parent MGA Entertainment, Inc.  Compl. ¶¶ 31-33.  That Court dismissed Kids Station (HK)'s case with prejudice to re-filing in Florida because of Agreement's forum selection clause.  Thus, Little Tikes filed the instant lawsuit in this Court pursuant to the valid forum selection clause in the Agreement and based upon Defendants unauthorized distribution and sale of goods bearing the LITTLE TIKES trademarks.

remains unclear to Little Tikes which of the Defendants is the actual party to the Agreement, but it is perfectly clear that Newman, the man overseeing the operations of each of the Defendants, is playing a shell game with these different Kid(s) Station entities to escape liability. At a minimum, Newman, the mastermind behind this shell game, is personally liable for breaches of the Agreement as he executed the Agreement on behalf of Kid Station (Florida), which he now claims never existed.

Regardless, over the course of the past several years, the party to the Agreement, for simplicity's sake referred to herein as "Kid Station (Florida)," has systemically and repeatedly breached the Agreement, including by the continuing sale of products that have been identified by the U. S. Consumer Product Safety Commission (the "CPSC") as potentially unsafe to children. As a result of the sale of these products, among other reasons, Little Tikes terminated the Agreement on February 5, 2008 and instructed Kid Station (Florida) to cease sales of these toys under the LITTLE TIKES trademarks immediately. Defendants' conduct, which constitute an immediately terminable, non-curable, breach of the Agreement, has already caused immeasurable damage to Little Tikes' valuable goodwill in its trademark. Therefore, Defendants' misappropriation of Little Tikes' LITTLE TIKES trademark and blatant disregard of Little Tikes' rights by continuing to sell unauthorized goods to consumers is irreparably damaging Little Tikes' goodwill and reputation, and must be stopped.

## II.    BACKGROUND

### A.    Little Tikes

For nearly 40 years, since being founded in 1970, Little Tikes has been a manufacturer and marketer of high-quality, innovative children's products. Verification of Amended Complaint and Declaration In Support of Plaintiff's Motion for a Temporary Restraining Order (the "Oakes Decl."), attached hereto as Exhibit 1, ¶ 2. Little Tikes products are known

worldwide for providing durable, imaginative and active fun. *Id.* Its products are manufactured under the famous "LITTLE TIKES" mark and Logo. *Id.* The products are produced in a wide variety of categories for young children, including infant toys, popular sports, play trucks, ride-on toys, sandboxes, activity gyms and climbers, slides, pre-school development, role-play toys, creative arts and juvenile furniture. *Id.*

As a result of its worldwide advertising and dedication to quality products, Little Tikes' trademarks are instantly recognizable throughout the world, specifically its famous, federally registered since 1981 LITTLE TIKES and Design mark:



U.S. Reg. No. 1,145,515.

By way of example, Little Tikes' red and yellow Cozy Coupe® Car, an international icon in toys, celebrated its 25th anniversary in 2004, with more than 6 million units sold since its creation. *Id.* at ¶ 3. Because of both Little Tikes' commitment to quality and safety, the company's products have won numerous awards and its trademarks are instantly recognizable throughout the world. *Id.* at ¶ 4. This instant recognition and the exceedingly valuable goodwill associated with Little Tikes' trademarks are among its most valuable assets, and have been developed over numerous years and at great effort and expense by Little Tikes. *Id.*

**B.    The Agreement and Defendants**

On or about December 8, 2003, Little Tikes (then wholly-owned by Newell Rubbermaid, Inc., based near Chicago, Illinois), and an entity purportedly identified as Kid Station (Florida) entered into the Agreement. The Agreement was executed by Newman, the purported President

of Kid Station (Florida). *Id.* at ¶ 5. The Agreement granted Kid Station (Florida) the exclusive right to use the valuable LITTLE TIKES trademark in connection with certain categories of children toys. A copy of the Agreement is attached as Exhibit A to the Oakes Decl. Pursuant to the Agreement, Kid Station (Florida) had no right to sublicense any of the rights licensed under the Agreement, and Kid Station (Florida) agreed that it could not sell, transfer, lease or assign the Agreement or the rights granted under the Agreement, or any part thereof, without the prior written consent of Little Tikes. Ex. A at § 2.2, Article XIX. Little Tikes has never given any such consent to Kid Station (Florida). Oakes Decl. at ¶ 5.

But despite the clear designation in the Agreement of the parties, Kids Station (HK) claims that it, not Kid Station (Florida), has been the sole and exclusive party with whom Little Tikes entered the Agreement, and, that in fact, Kid Station (Florida) does not and never has existed. *See* Amended Complaint attached as Ex. G to Oakes Decl., ¶¶ 4, 14. Kids Station (HK)'s claim is surprising, since throughout the Agreement, the entity with whom Little Tikes interacted never identified itself as a Hong Kong corporation or gave any indication to Little Tikes that it was incorporated in Hong Kong. Oakes Decl. at ¶ 18. In fact, correspondence received by Little Tikes identified a Florida address, not Hong Kong, and the payments received under the Agreement did not identify Kids Station (HK), but rather a bank located in Bermuda with no mention of Kids Station (HK). *Id.* at ¶ 19.

Moreover, the company description on the website located at the domain name <www.kidsstationtoys.com/homepage.php> states, "Kids Station Toys International, Ltd, which started in 1999…has forged relationships with some of the biggest companies in the toy industry, including…Little Tikes…" but yet neither Newman nor any of the other Defendants ever indicated to Little Tikes that Kids Station Toys International, Ltd. is a party to the Agreement.

*Id*. at ¶ 20. In addition, there are various notices on the current packaging used for the products manufactured and sold under the Agreement, including one that states, "Designed and Licensed by Kids Station Toys International Ltd." *Id*. It is uncertain whether this refers to Defendant Kids Station (Bermuda) or Defendant Kids Station (International), but neither is a party to the Agreement, and therefore, neither is authorized to use the Little Tikes marks or distribute and sell products bearing the LITTLE TIKES trademarks. *Id*. Thus, it appears that Kids Station (HK) is one of several corporate entities scattered across the globe under the "Kid(s) Station" umbrella consisting of Kids Station (U.S.), Kids Station (International) and Kids Station (Bermuda). The relationship between these different entities is murky, but each has a principal place of business, or some other connection, in Miami, Florida and fall under the control of Newman. *Id*. at ¶ 21. Thus, it appears that Mr. Newman created these entities as shells to make products and avoid liability. Regardless, for purposes of this Motion, Little Tikes will rely on the designation set forth in the Agreement and ratified in a 2006 Amendment to the Agreement, and, thus, refer to the contracting party to the Agreement as "Kid Station (Florida)."

The 36-page Agreement stressed quality control because of the exclusivity, the risk associated with selling products to small children and the value of the Little Tikes' trademarks. Some of these quality control provisions include:

- Kid Station (Florida) was only licensed to use Little Tikes' trademarks on products that were of at least the same quality as those sold by Little Tikes. Ex. A at § 6.8.

- Kid Station (Florida) was only licensed to manufacture products in accordance to approved designs. *Id*.

- Kid Station (Florida) also represented that its products would be free from defects and would be in compliance with all standards and regulations. *Id*. at § 7.2.

- Kid Station (Florida) was required to provide a toll-free customer support service call-in service, and to provide Little Tikes a report detailing the consumer service activities. *Id*. at §§ 8.1 and 8.2.

- Kid Station (Florida) was required to submit design proposals to Little Tikes for approval. *Id.* at § 9.1

- Kid Station (Florida) agreed "each licensed product and component distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards of … including, but not limited to, regulations of the United States Consumer Product Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UK), and the Canadian Standards Association" and that it was "responsible to assure that all Licensed Products confirm to all applicable safety laws and regulatory standards…." *Id.* at § 11.

Additionally, the Agreement included a provision that required Kid Station (Florida) to use the LITTLE TIKES trademark on products of a certain quality, and permitted Little Tikes, in its sole discretion, to terminate the Agreement if such quality standards were not satisfied. *Id.* at § 6.8. This provision was vital to preserving and protecting the immeasurable goodwill and consumer recognition that Little Tikes had garnered in its trademark among consumers for nearly forty years. Oakes Decl. at ¶ 7.

The Agreement also provided for injunctive relief for Little Tikes if Kid Station (Florida) breached the Agreement. Specifically, Kid Station (Florida) acknowledged that if it published or offered for sale any Licensed Products that were not approved or were disapproved by Little Tikes, that Little Tikes would be "irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes." Ex. A at § 14.2. The Agreement also provides that "Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions thereof." Ex. A at § 9.1.

On or about January 1, 2006, Little Tikes and Kid Station (Florida) entered an amendment to the Agreement ("the Addendum") to expand the types of products that the original license covered. *See* Ex. A at Addendum. Newman executed the Addendum.

In November of 2006, MGA Entertainment, Inc. ("MGA") bought Little Tikes from Newell Rubbermaid, Inc. Oakes Decl. at ¶ 1.

### C.   Defendants' Breaches of the Agreement.

Prior to the sale of Little Tikes to MGA, Little Tikes had begun to discover significant quality problems with the goods manufactured and sold by Kid Station (Florida) under Little Tikes' trademarks. Oakes Decl. at ¶ 8. In fact, Little Tikes had been made aware of numerous consumer complaints over the quality of toys sold under Little Tikes' trademarks that were being sold by Kid Station (Florida). *Id.* Obviously, Little Tikes became increasingly concerned with protecting its trademarks in the face of these numerous quality problems. *Id.*

After MGA acquired Little Tikes, Little Tikes continued to receive numerous complaints about broken or defective Little Tikes products made by Kid Station (Florida), including complaints regarding certain products that posed potential injury hazards to small children. *Id.* at ¶ 9. In addition, Little Tikes found that Kid Station (Florida) was not fulfilling numerous critical obligations required under the Agreement. *Id.* at ¶¶ 9(a) – 9(g). Despite meetings with Newman, the purported president of Kid Station (Florida), as well as his counsel Charles Leuin, and subsequent written correspondence insisting upon compliance by Kid Station (Florida) with its obligations, Kid Station (Florida) continued, and still continues, to ignore such obligations. *Id.* at ¶ 10.

On April 30, 2007, MGA on behalf of Little Tikes received a report from the CPSC describing a possible choking hazard associated with one of the licensed products manufactured by Defendants, the Little Tikes Play Cell Phone, product number KSL8033 (the "Unapproved Cell Phone"). A copy of the report is attached as Ex. B of the Oakes Decl.

Little Tikes, through its parent MGA, met with Newman and his counsel Mr. Leuin in May of 2007 to discuss the April 30 CPSC report, as well as other concerns. As a result, Kid

Station (Florida) agreed to modify the design of the Unapproved Cell Phone.  Oakes Decl. at ¶ 11.

In September 2007, Defendants claimed to have modified the Unapproved Cell Phone, but, unknown to Little Tikes or MGA, failed to remove the prior version from retailers' shelves. *Id.*  Complaints continued.  *Id.*  Consequently, on January 30, 2008, concerned with protecting the goodwill in the LITTLE TIKES trademarks, MGA on behalf of Little Tikes sent a letter to Kid Station (Florida) detailing a further consumer complaint of a potential choking hazard related to the Unapproved Cell Phone, and requesting that Kid Station (Florida) immediately cease selling the Unapproved Cell Phone.  *Id.* at ¶ 12.  A copy of the January 30 letter is attached as Exhibit C of Oakes Decl.  Moreover, despite the CPSC report regarding the Unapproved Cell Phone, and despite assurances by Defendants that a modified Cell Phone had been manufactured since September of 2007, Defendants had still apparently never recalled the Unapproved Cell Phone from the retailers, nor did they ask the retailers to stop selling the Unapproved Cell Phone. Oakes Decl. at ¶ 13.  In fact, once Defendants started selling the modified Cell Phone, they sold both the unapproved and modified versions of the cell phone under the same SKU number, making it impossible for retailers to distinguish the two phones without physically examining the products.  *Id.*

Indeed, upon an investigation by MGA, it was discovered that as of February 2008, consumers could still purchase the Unapproved Cell Phone from retailers, such as Wal-Mart.  *Id.* at ¶ 14.  Specifically, Little Tikes' counsel, David Oakes, purchased an Unapproved Cell Phone from a Wal-Mart store on February 1, 2008.  *Id.*  In fact, there were multiple Unapproved Cell Phones on the shelf, each having stickers with the same date of manufacture.  *Id.*

Because of the danger of grave and irreparable damage to its reputation and goodwill,

and the continuing sale of products that created a potential safety hazard, on February 5, 2008, MGA sent on behalf of Little Tikes a letter to Defendants, terminating the Agreement because, among other reasons, Defendants had continued to sell unapproved products. *Id.* at ¶ 15. A copy of the February 5 letter is attached as Exhibit D of Oakes Decl.

In addition to serving as a notice of termination, Plaintiff's letter of February 5 identified numerous breaches of the Agreement, and served as its written notice of a material breach of the Agreement pursuant to paragraph 14.1 of the Agreement. Oakes Decl. at ¶ 16. According to that Paragraph, Defendants had thirty (30) days from the time of notice (March 6, 2008 in this instance) to cure the breaches. *Id.* Defendants never responded to this letter, and failed to cure the breaches identified in the February 5, 2008 letter by March 6, 2008, and to this date still have not cured the breaches. [2] *Id.*

### D.    Defendants' Behavior Since Termination of the Agreement

Rather than taking action to cure the identified breaches of the Agreement, on February 19, 2008, Kids Station (HK) – not Kid Station (Florida) the purported entity that is the named party in the Agreement – filed suit in the Southern district of Florida against Little Tikes and MGA. Oakes Decl. at ¶ 18. Kid Station (HK)'s amended complaint includes counts for a declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, tortuous interference with contract, and civil conspiracy. See Ex. G. While Little Tikes denies these allegations, Little Tikes filed a Motion to Dismiss the case or transfer it to this Court which was granted on April 2, 2008. See April 2, 2008 Final Order of Dismissal attached as Ex.

---

[2] In its lawsuit in Florida (see below) Kid Station (HK) claimed that Little Tikes improperly terminated the Agreement on February 5, 2008, but if this were true, Kid Station (Florida) would have had until March 6, 2008 to cure the breaches identified by Little Tikes. Defendants have chosen not to take any actions to cure the breaches, further demonstrating that the Agreement was properly terminated and that they lack authorization to continue selling and distributing products under the LITTLE TIKES trademarks.

F of Oakes Decl.

On March 11, 2008, Little Tikes sent another letter to Defendants. See March 11, 2008 letter attached as Ex. E of Oakes Decl. The March 11 letter referenced another recent customer complaint to Kids Station (HK) regarding a battery found on the Unapproved Cell Phone that leaked battery acid. Oakes Decl. at ¶ 17. The March 11 letter once again informed Defendants that the Agreement had been terminated under the immediate termination clause and, as a result, Defendants no longer were permitted to sell products bearing Little Tikes' trademarks. *Id*. Therefore, because of the lack of a license, as well as the potential damage to Little Tikes' valuable goodwill and the potential safety hazard posed by Defendants' products, Little Tikes' further demanded that Defendants remove all of Defendants' products bearing Little Tikes trademarks from retailers' shelves. *Id*. However, Defendants did not respond to the specific demands of the March 11 letter and, have continued to sell products bearing the LITTLE TIKES trademarks to this day.

**III. DEFENDANTS SHOULD BE IMMEDIATELY ENJOINED FROM USING LITTLE TIKES' TRADEMARK IN CONNECTION WITH ELECTRONIC PRODUCTS FOR CHILDREN**

**A. The Standard for Issuance of a Temporary Restraining Order**

A temporary restraining order is proper where, as here, the movant establishes that: (1) its case has a "better than negligible" likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *See Ty, Inc. v. Jones Group Inc*., 237 F.3d 891 (7th Cir. 2001) (listing the showing required to obtain a preliminary injunction); *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc*., 57 U.S.P.Q.2d 1881, 1882 (N.D. Ill. 2001) (granting a temporary restraining order for trademark infringement and noting that the standards for a temporary restraining order are the same as those for a preliminary injunction). Once these conditions have been met, the court considers the

public interest in granting or denying the injunction.  *Ty, Inc.*, 237 F.3d at 895.

The facts in this case exceed the level of proof required to establish a likelihood of success on the merits and strongly support a finding by this Court that Little Tikes will succeed on the merits of its claims.  The facts further demonstrate that Little Tikes has no adequate remedy at law and will suffer irreparable injury to its reputation and goodwill if the restraining order is not granted.  Finally, a balancing of the parties' respective harms and the public interest in avoiding confusion and preventing the sale of hazardous toys to children both support entry of a temporary restraining order.

**B.**     **Little Tikes Will Succeed on the Merits of Its Claims**

In order to demonstrate a likelihood of success on the merits for purposes of a temporary restraining order, Little Tikes need only demonstrate that its chance of prevailing is "better than negligible."  *Kinney v. International Union of Operating Engineers*, 994 F.2d 1271, 1275 (7th Cir. 1993).  As explained below, Little Tikes chance of prevailing on its claims is strong -- far better than negligible -- and, therefore, this Court should grant the Temporary Restraining Order.

To establish a claim for trademark infringement or unfair competition, a claimant must show that (1) it has a valid trademark and (2) the defendant's misuse of the trademark is likely to cause confusion.  *See Munters Corp. v. Matsuri America, Inc.*, 909 F.2d 250, 272 (7th Cir. 1990), *cert. denied*, 4987 U.S. 1017 (1990).  Little Tikes not only has a better than negligible chance of success in this case, but indeed, a strong likelihood it will prevail on its claims that Defendants' unauthorized use of Little Tikes' trademarks constitutes infringement and unfair competition in violation of the Lanham Act.

1.     *Little Tikes Has Valid Trademarks In Its LITTLE TIKES Trademarks.*

Little Tikes began using its LITTLE TIKES mark its LITTLE TIKES logo mark nearly 40 years ago both in connection with toys and furniture for children.  Little Tikes continues to

use its LITTLE TIKES trademarks in connection with a wide variety of products for children. Little Tikes has obtained federal registrations for its LITTLE TIKES mark and LITTLE TIKES logo mark, Registration Nos. 1,055,661 and 1,145,515, respectively, which are now incontestable.  It is well established that a federal registration of an incontestable trademark is conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. 15 U.S.C. §1115(b). Therefore, Little Tikes' federal registration for its LITTLE TIKES trademarks establishes that they are valid and protectable marks.

Furthermore, Defendants are estopped from denying the validity of the marks because Kid Station (Florida) was licensed by Little Tikes to use the LITTLE TIKES marks.  A licensee who takes a license to use a trademark is estopped from denying the validity of the mark during the course of the license and after the license expires based upon facts which arose during the course of the license.  *Chrysler Motors Corp. v. Alloy Automotive Co., Inc.*, 661 F. Supp. 191, 192-193 (N.D. Ill. 1987).  Thus, Little Tikes' trademarks are valid and protectable trademarks.

2.    *Defendants' Use of Little Tikes' Trademarks Creates a Likelihood of Confusion*

The next element of the infringement claim is whether Defendants' conduct is likely to confuse consumers.  Although Little Tikes terminated the Agreement which granted Kid Station (Florida) a license to use its trademarks in connection with electronic products for children in February of 2008, to this day it along with the other Defendants continue to distribute and sell products bearing the LITTLE TIKES mark.  Such blatant unauthorized use of the LITTLE TIKES mark Defendants constitutes trademark infringement pursuant to 15 U.S.C. §§ 1114 and 1125(a*).    Digital Equip. Corp. v. Altavista Tech, Inc*., 960 F. Supp. 456, 473 (D. Mass. 1997) (enjoining defendant whose breach of its license to use the "AltaVista" mark" and continued use

of the mark without authorization constituted trademark infringement).  Moreover, Kids Station (Bermuda) and Kids Station (International) were not, nor could they ever have been, a party to the Agreement, and, so neither ever received a license to use the LITTLE TIKES trademark in connection with the sale and distribution of products.  Therefore, Kids Station (Bermuda) and Kids Station (International) sale and distribution of products bearing the LITTLE TIKES trademarks also constitute infringement.

Many courts have held that there is a near certainty of confusion when a licensee continues to use marks owned by the Licensor after the License Agreement has been terminated. *See, e.g.*, *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983), *cert. denied*, 465 U.S. 1102 (1984) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks.");  *Gorenstein Enterprises, Inc. v. Quality Care-USA*, 874 F.2d 431, 435 (7th Cir. 1989) ("If the owner of the trademark has broken off business relations with a licensee he cannot ensure the continued quality of the (ex-) licensee's operation, whose continued use of the trademark is therefore a violation of trademark law.");  *U.S. Structures, Inc. v. J.P. Structures, Inc*, 130 F.3d 1185, 1189-91 (6th Cir. 1997) (after termination of a franchise agreement, continued use by franchisee of the subject trademark constituted *ipso facto* evidence of a likelihood of confusion with respect to establishing trademark infringement).  Indeed, any consumer that sees a toy manufactured by Defendants but bearing a LITTLE TIKES mark at a store would reasonably – but mistakenly – believe that the toys were made by, approved by or otherwise affiliated with Little Tikes.  *See Dunkin' Donuts Inc. v. Donuts Realty, Inc.*, 2000 U.S. Dist. LEXIS 17927 * 19 (N.D. Ill. Dec. 6 2000) (franchisee's continued operation of Dunkin' Donuts shops after termination of franchisor agreement would likely cause confusion amongst

consumers).

The likelihood of confusion factors further demonstrate that consumers are likely to be confused by Defendants continued unauthorized use of the LITTLE TIKES trademarks. The likelihood of confusion factors include: (1) the similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the similarity of the products on which the respective marks are used; (4) the similarity of the trade channels of distribution; (5) the extent to which the targets of the parties' sales efforts are the same; (6) evidence of actual confusion; and (7) the defendant's intent in adopting the mark. *See G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 999 (7th Cir. 1989) (citing *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988)). These factors are not a mechanical checklist, and the weight given to each factor will vary from case to case. *Badger Meter v. Grinnell Corp.*, 13 F.3d 1145, 1152 (7th Cir. 1994).

Here, the factors clearly prove that confusion is likely based on Defendants' use of the LITTLE TIKES trademarks. First, Defendants are selling and distributing products bearing the exact LITTLE TIKES mark and logo. For example, both the packaging on Defendants' goods and Defendants' website prominently feature the exact well-known LITTLE TIKES mark and logo. Oakes Decl. at ¶ 20. Second, Little Tikes' distinctive trademarks have been used for nearly forty years, and are widely recognized amongst consumers across the globe, and are, therefore, considered to be strong trademarks. Oakes Decl. at ¶ 2. Third, not only is the trademark used on Defendants' products identical to the mark on Little Tikes' products, but the products sold both consist of toys for children. Fourth, the goods offered in connection with these marks are related and marketed in the same channels of trade. Fifth, the degree of care likely to be exercised by customers is low. The products are relatively inexpensive, typically

costing less than $100.00 dollars and, therefore, consumers are not likely to exercise an abnormally high level of care. Sixth, there have been and will continue to be incidents of actual consumer confusion as to the source of the products sold by Defendants under the LITTLE TIKES trademark. Finally, Defendants' intent to continue using the LITTLE TIKES trademarks without authorization is clearly to trade on Little Tikes' goodwill and reputation.

In sum, the overwhelming weight of these factors demonstrates that Defendants' use of the LITTLE TIKES trademarks is likely to cause consumer confusion.

3.    *None of the Defendants are Currently Authorized to Use the Mark*

Little Tikes is not currently authorizing any of the Defendants to use its marks. For instance, Little Tikes terminated the Agreement on February 5, 2008, thus, to the extent Kid Station (Florida) had authorization to use the LITTLE TIKES trademarks such authorization ceased months ago. Moreover, any of the other Defendants who claim or may be found to be a party to the Agreement – namely, Kid Station (HK), Kid Station (U.S.), or Newman – lost any authorization to use the LITTLE TIKES mark when Little Tikes terminated the Agreement, to the extent these defendants even had authorization to use the marks in the first place. Finally, Little Tikes (Bermuda) and Little Tikes (International) were not nor could they ever have been a party to the Agreement, and Little Tikes never consented to either entity using the LITTLE TIKES trademarks. Therefore, none of the Defendants have authorization from Little Tikes to use its trademarks, and any use of the LITTLE TIKES marks by the Defendants constitutes trademark infringement.

**C.    Little Tikes Will  Suffer Irreparable Harm if a Temporary Restraining Order is not Entered Because Defendants' Use of Its Marks will Damage Little Tikes' Reputation and Goodwill**

It is well established that the damages resulting from trademark infringement are by their very nature irreparable and not susceptible of adequate measurement or remedy at law. *Int'l*

*Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) (quoting *Processed Plastic Co. v. Warner Comm.*, 675 F.2d 852, 858 (7th Cir. 1982) (damages occasioned by the trademark infringement are by their nature irreparable and not susceptible of an adequate measurement for a remedy at law). "Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods." *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). Further, irreparable harm is presumed in trademark infringement cases because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damages to reputation and loss of goodwill, caused by such violations." *Abbot labs v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992).

Here, the damage caused by Defendants' infringing use of Little Tikes' famous LITTLE TIKES mark and logo on electronic products for children, will, as a matter of law, cause irreparable harm to Little Tikes. *See America's Favorite Chicken Co. v. Mithwani*, 1994 WL 66121 (N.D. Ill. March 1, 1994) (noting that ex-franchisee's poor cleanliness and poor quality of its restaurant that was continuing to use franchisor's mark without authorization was more than a loss of franchisor's good will, but potential legal liability for franchisor as well).

Moreover, Kid Station (Florida) even specifically agreed as a condition of the Agreement that if it sold or offered for sale unapproved products under the LITTLE TIKES trademarks that such conduct constitutes an irreparably injury to Little Tikes that entitles Little Tikes to injunctive judicial relief. Ex. 1 at §§ 9.1 and 14.2.

>    **D.    Little Tikes' will Lose Significant Goodwill if a Temporary Restraining Order Does Not Issue, and As a Result, the Balance of Hardships Clearly Leans in Little Tikes' Favor**

The harm which Little Tikes will suffer to its name and mark if an injunction is not immediately granted is irreparable and greatly outweighs any harm Defendants may potentially

suffer.  Little Tikes has already suffered irreparable harm to its name and mark because of Defendants unauthorized production and sale of products under the LITTLE TIKES trademarks, and will continue to suffer this irreparable harm if a preliminary injunction is not granted. Moreover, Little Tikes' loss of control over its trademarks while this matter is pending, and the subsequent and inevitable loss in goodwill as a result, is an irreparable harm to Little Tikes that more than outweighs any "harm" Defendants may suffer.  Indeed, any harm Defendants may claim is minimal -- namely, having to adopt a new name for these toys and establish its own reputation -- as a consequence of its own wrongful conduct.  *See Ty, Inc*., 237 F.3d at 903 (balance of harms favored issuance of preliminary injunction; defendant "having adopted its course … cannot now complain that having to mend its ways will be too expensive.") (quoting *Ideal Indus., Inc. v. Gardner Bender, Inc*., 612 F.2d 1018, 1026 (7th Cir. 1979)).  In fact, Defendants are free to market and sell their products, provided they do not display the LITTLE TIKES mark or logo.

In sum, entry of a Temporary Restraining Order will prevent Defendants from wrongfully profiting from the goodwill and reputation produced by Little Tikes' substantial time and expense until a trial on the merits takes place.

**E.    The Grant of a Preliminary Injunction in this Matter is in the Public's Interest**

The issuance of a Temporary Restraining Order is necessary not just to protect Little Tikes' rights, but to protect the public interest as well.  In trademark infringement actions, the rights infringed are the right of the public to be free of confusion and the synonymous right of the trademark owner to control his product's reputation.  *See James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976).  These interests will certainly be threatened if Defendants are allowed to continue to infringe and dilute the LITTLE TIKES trademarks.

Furthermore, the termination of the Agreement granting Defendants the right to use the LITTLE TIKES mark and logo was brought about because of Defendants continued sale of the Unapproved Cell phone -- a material breach of their obligations under the Agreement. Regardless, Defendants continue to allow this product to remain on shelves and be sold to consumers under the LITTLE TIKES trademarks to this day.  As such, this factor weighs heavily in favor of the issuance of a preliminary injunction.

**IV.**    <u>**CONCLUSION**</u>

Little Tikes has established each factor necessary for the issuance of a Temporary Restraining Order, enjoining Defendants from further trademark infringement, trademark dilution, unfair competition, false representation and unlawful use of the LITTLE TIKES Marks all in breach of the Agreement.  Little Tikes, therefore, respectfully requests that this Court grant its Motion and enter a Temporary Restraining Order against Defendants.

Dated:  April 9, 2008.

Respectfully submitted,

By:  s/Robert E. Browne
One of the Attorneys for Plaintiff, The Little
Tikes Company

Robert E. Browne (ARDC# 032 1761)
Michael G. Kelber (ARDC# 623 1033)
Lara V. Hirshfeld (ARDC# 627 7477)
Maurice E. Finnegan, III (ARDC# 628
1387)**NEAL, GERBER & EISENBERG
LLP**
Two North LaSalle Street, Suite 2200
Chicago, IL  60602-3801
Telephone:  (312) 269-8000
Facsimile:  (312) 269-1747

*Of Counsel*
Jeanine Pisoni
General Counsel
MGA Entertainment, Inc.
16300 Roscoe Blvd
Suite 150
Van Nuys, California  91406

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE LITTLE TIKES COMPANY,<br>an Ohio corporation, | ) ) | |
| | ) | Case No. 1:08-cv-1935 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KID STATION TOYS, LTD.,<br>a Florida corporation, | ) ) | **Jury Trial Demanded** |
| | ) | |
| KIDS STATION TOYS, LTD.,<br>a Hong Kong corporation, | ) ) | |
| | ) | |
| KIDS STATION (U.S.) INCORPORATED,<br>a Florida corporation, | ) ) | |
| | ) | |
| KIDS STATION TOYS<br>    INTERNATIONAL, LTD.,<br>a Bermuda corporation, | ) ) ) | |
| | ) | |
| KIDS STATION TOYS INTERNATIONAL<br>    HOLDING, GmbH<br>a Switzerland corporation, and | ) ) ) | |
| | ) | |
| MR. ELLIOT S. NEWMAN<br>an individual, | ) ) | |
| | ) | |
| Defendants. | ) | |

**VERIFICATION OF COMPLAINT AND DECLARATION IN SUPPORT OF
PLAINTIFF"S MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to 28 U.S.C. Section 1746, the undersigned declares, under penalty of perjury,

as follows:

1.    My name is David Oakes, and I am senior counsel of MGA Entertainment, Inc.

("MGA") and its wholly-owned subsidiary, The Little Tikes Company ("Little Tikes"), which

was purchased by MGA in November, 2006.  I have served as senior counsel of MGA and have

been involved in the negotiation, finalization, and enforcement of license agreements for MGA

for 4 3/4 years, and for Little Tikes since its acquisition by MGA. I make this declaration based on my position with the corporation, my personal knowledge of matters, my review of pertinent files and information provided to me by others on whom I rely.

2.    For nearly 40 years, since being founded in 1970, Little Tikes has been a manufacturer and marketer of high-quality, innovative children's products. Little Tikes products are known worldwide for providing durable, imaginative and active fun. Its products are manufactured under the famous "LITTLE TIKES" mark and Logo. The products are produced in a wide variety of categories for young children, including infant toys, popular sports, play trucks, ride-on toys, sandboxes, activity gyms and climbers, slides, pre-school development, role-play toys, creative arts and juvenile furniture.

3.    As a result of its worldwide advertising and dedication to quality products, Little Tikes' trademarks are instantly recognizable throughout the world, specifically its famous LITTLE TIKES and Design mark, which was first registered in 1981:



By way of example, Little Tikes' red and yellow Cozy Coupe® Car, an international icon in toys, celebrated its 25th anniversary in 2004, with more than 6 million units sold since its creation. Little Tikes' goal is to create and supply innovative products to customers and consumers around the world. To reach that goal, Little Tikes' associates' actions are guided by the principles of Customer Satisfaction, Teamwork, Innovation, Marketing and Continuous Improvement.

4.    Because of Little Tikes' commitment to quality and safety, the company's products have won numerous awards and their trademarks are instantly recognizable throughout

the world.  This instant recognition and the exceedingly valuable goodwill associated with its trademarks are among Little Tikes' most valuable assets, and have been developed over numerous years and at great effort and expense by Little Tikes.

5.      On or about December 8, 2003, Little Tikes (then wholly-owned by Newell Rubbermaid, Inc., based near Chicago, Illinois) entered into an exclusive license agreement ("Agreement") with a party representing itself in the Agreement to be a Florida corporation by the name Kid Station Toys Ltd. ("Kid Station (Florida)").  A copy of this Agreement is attached to this declaration as Ex. A.  The Agreement was executed by Elliot Newman ("Newman"), the purported President of Kid Station (Florida).  Pursuant to the Agreement, Kid Station (Florida) received an exclusive license to use the LITTLE TIKES trademark in connection with manufacturing and selling certain categories of children toys.  *See* Ex. A, § 2.1.  The Agreement further provided that Kid Station (Florida) had no right to sublicense any of the rights licensed under the Agreement, and Kid Station (Florida) agreed that it could not sell, transfer, lease or assign the Agreement or the rights granted under the Agreement, or any part thereof, without the prior written consent of Little Tikes.  *Id*. at § 2.2, Article XIX.  Little Tikes has never given any such consent to Kid Station (Florida).

6.      Attached to the Agreement is an amendment (the "Addendum"), entered into by Little Tikes and Kid Station (Florida) on or about January 1, 2006.  The Addendum added an extra category of products that Kid Station (Florida) could manufacture and sell.  The Addendum was executed by Newman.

7.      The Agreement contains various quality control provisions intended to preserve and protect the substantial goodwill and consumer recognition that Little Tikes garnered in its famous LITTLE TIKES trademark among consumers by its nearly forty (40) years of use.

8.      Based on a review of the prior files maintained by Little Tikes, it is my understanding that prior to the sale of Little Tikes to MGA in November of 2006, Little Tikes

began to discover significant quality problems with the goods manufactured and sold by Kid Station (Florida) under the LITTLE TIKES trademarks. In fact, Little Tikes had had been made aware of numerous consumer complaints over the quality of toys sold under Little Tikes' trademarks that were being sold by Kid Station (Florida). Therefore, Little Tikes became increasingly concerned with protecting the LITTLE TIKES trademarks in the face of these numerous quality problems.

9.    After MGA acquired Little Tikes, Little Tikes continued to receive numerous customer complaints about broken or defective Little Tikes products made by Kid Station (Florida), including complaints regarding certain products that posed potential injury hazards to small children. In addition, Little Tikes found that Kid Station (Florida) was not fulfilling certain critical obligations required under the Agreement. These failures include:

      a.  Failing to comply with Little Tikes' repeated requests that Kid Station (Florida) comply with its obligations under Section 3.1 of the Agreement, and provide samples of each Licensed Product to Little Tikes. Despite these repeated requests, Kid Station (Florida) has failed to provide samples of each Licensed Product. While Little Tikes has received samples of a few products, Little Tikes has not received samples of all products, nor in the quantities of samples required by the Agreement or within the mandated time frames.

      b.  Failing to provide any of the documents specified under Sections 4.8 or 4.9 of the Agreement. Specifically, Kid Station (Florida) has not provided certain distribution reports, which are required to include, at the very least, Kid Station (Florida)'s product development plans, advertising and merchandising and promotional activities. Kid Station (Florida) has also not provided a report of actual unit sales by individual retail account for

4

the previous calendar year. Finally, Kid Station (Florida) has not provided a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter.

c. Failing to submit new products designs for 2008 pursuant to its obligations under Section 5.3 of the Agreement. Specifically, Kid Station (Florida) has not introduced at least three (3) different SKUs of Licensed Products, the majority of which are required to contain new aesthetic or functional features.

d. Failing to meet its obligations to maintain a telephone support service under Section 8.1 of the Agreement. The reports Little Tikes have received, reviewed and analyzed from Kid Station (Florida) deviate substantially from the standards set forth in the Agreement. For a large portion of the calls, no individual name was filled in and no information about the complaints was filled in, so Little Tikes could not determine the nature of the call. The gaps in information lead to the logical conclusion that Kid Station (Florida) is not providing a comparable level of service offered by Little Tikes, in direct violation of the terms set forth in Section 8.1. Additionally, the calls Little Tikes' own Consumer Service has received regarding the lack of response from Kid Station (Florida)'s customer service, as well as specific complaints that reported to Kid Station (Florida) confirm Kid Station (Florida)'s failure to comply with this provision of the Agreement.

e. Failing to provide testing reports for Kid Station (Florida)'s Little Tikes products pursuant to Section 9.2 of the Agreement as repeatedly requested

by the Quality Assurance divisions of Little Tikes. Given current events and public perceptions of problems in the toy industry, it is of vital importance to Little Tikes that the Licensed Products are safe for children. Kid Station (Florida) has failed to provide any testing reports to date.

f. Failing to provide Little Tikes with its marketing plan for 2008, in direct violation of Kid Station (Florida)'s obligations under Section 12.2 of the Agreement.

g. Failing, under Exhibit A of the Agreement, to provide Little Tikes with written meeting reports following any meeting between Kid Station (Florida) and a buyer at the following retailers: Wal-Mart, Kmart, Target, Toys R Us, Kay Bee Toys or FAO Schwarz. Kid Station (Florida) has repeatedly failed to provide these reports on a consistent basis.

10. Despite meeting with Elliot Newman, the president of Kid Station (Florida), as well as his counsel Charles Leuin, Esq. of Greenberg Traurig - Chicago, in May of 2007, and subsequent written correspondence insisting upon compliance with its obligations, Kid Station (Florida) has continued to ignore its obligations or correct its breaches under the Agreement.

11. Specifically, MGA, acting on behalf of Little Tikes, and Mr. Newman discussed the U.S. Consumer Product Safety Commission (the "CPSC") report dated April 30, 2007, describing a possible choking hazard associated with one of the licensed products manufactured by Defendants, the Little Tikes Play Cell Phone, product number KSL8033 (the "Unapproved Cell Phone"). A copy of this report is attached to this declaration as Ex. B. In the May 2007 meeting, Kid Station (Florida) agreed to implement a modification to the Unapproved Cell Phone. In September 2007, Kid Station (Florida) claimed to have modified the Unapproved Cell Phone, but, unknown to Little Tikes or MGA, failed to remove the prior version from retailers' shelves. As a result, complaints continued.

12.    Consequently, on January 30, 2008, concerned with protecting its goodwill and reputation, MGA on behalf of Little Tikes sent a letter to Kid Station (Florida) stating that Kid Station (Florida) detailing a further consumer complaint of a potential chocking hazard related to the Unapproved Cell Phone, and requesting that Kid Station (Florida) immediately cease selling the Unapproved Cell Phone.  A copy of this January 30 letter is attached to this Declaration as Ex. C.  Kid Station (Florida) has never responded to this letter.

13.    Yet, despite the CPSC report and assurances that a modified Cell Phone had been manufactured since September of 2007, Defendants still never apparently recalled the Unapproved Cell Phone from the retailers, nor did they ask the retailers to stop selling the Unapproved Cell Phone.  In fact, once Defendants started selling the modified Cell Phone, they sold both the unapproved and modified versions of the cell phone under the same SKU number, making it impossible for retailers to distinguish the two phones without physically examining the products.

14.    Concerned that the Unapproved Cell Phone bearing the LITTLE TIKES mark was still being sold and that Kid Station (Florida) had also failed to respond or adequately deal with this serious problem, I went to a Wal-Mart store located in Panorama City, California on February 1, 2008, and found at least ten or more units of the Unapproved Cell Phone for sale.  Each of the Unapproved Cell Phones had stickers stating "Manufactured Sep. 07 KST070900528402."

15.    Consequently, because of the danger of grave and irreparable damage to Little Tikes reputation and goodwill, on February 5, 2008, and in accordance with the terms and conditions of the Agreement, MGA on behalf of Little Tikes sent a termination letter to Kid Station (Florida), terminating the Agreement because, among other reasons, Defendants had continued to sell unapproved products.  A copy of the February 5 termination letter is attached hereto as Ex. D.

16.    The February 5, 2008 letter also served as Little Tikes' written notice of a material breach of the Agreement pursuant to paragraph 14.1 of the Agreement. According to that Paragraph, Defendants had thirty (30) days from the time of notice (March 6, 2008 in this instance) to cure the breaches. Ex. D, ¶ 14.1. Defendants never responded to the February 5, 2008 letter and failed to cure the breaches identified therein by March 6, 2008, and to this date still have not cured the breaches

17.    Consequently, on March 11, 2008, I sent Defendants a letter reminding them that the Agreement had been terminated and demanding that all Kids Station entities cease use of the Little Tikes brand and immediately request its retail customers to remove all such products from their stores shelves. A copy of the March 11, 2008 letter is attached hereto as Ex. E. In addition, the March 11 letter referenced another recent customer complaint to Kids Station (HK) regarding a battery found on the Unapproved Cell Phone that leaked battery acid. *Id*. Defendants did not respond to the specific demands of the March 11 letter and, have continued to sell products bearing the LITTLE TIKES trademarks.

18.    Kids Station (HK) filed a lawsuit in the Southern District of Florida against Little Tikes and MGA on February 19, 2008, which was dismissed on April 2, 2008. A copy of the final Order of Dismissal is attached hereto as Ex. F. In its Amended Complaint, Kids Station (HK) claims that it has been the sole and exclusive party with whom Little Tikes entered the Agreement and that Kid Station (Florida) does not exist. A copy of the Amended Complaint is attached hereto as Ex. G, ¶¶ 4, 14. However, it was and has always been Little Tikes' understanding that the party named to the Agreement was Kid Station (Florida), not any of the other Defendants in this lawsuit. The entity with whom Little Tikes contracted under the Agreement never identified itself as a Hong Kong corporation or gave any indication to Little Tikes that it was incorporated in Hong Kong.

19.    Moreover, correspondence received by Little Tikes only identified a Florida address. For example, the printed letterhead stationery used the names Kids Station, Inc. or Kids Station Toys International with a Miami, Florida address, not the name Kids Station (HK), and did not identify it as a Hong Kong corporation or list a Hong Kong address or phone number. Furthermore, all royalty payments received by Little Tikes under the Agreement were sent via wire transfer from a bank located in Bermuda, not by Kids Station (HK) or a bank located in Hong Kong.

20.    In addition, the company description on the website located at the domain name <www.kidsstationtoys.com/homepage.php> states, "Kids Station Toys International, Ltd, which started in 1999...has forged relationships with some of the biggest companies in the toy industry, including...Little Tikes..." A copy of the homepage is attached hereto as Ex. H.  Also, the current packaging used by Defendants for the products manufactured and sold under the Agreement, includes a notice stating, "Designed and Licensed by Kids Station Toys International Ltd." It is uncertain whether this refers to Defendant Kids Station (Bermuda) or Defendant Kids Station (International), but neither entity is a party to the Agreement, and neither is authorized to use the Little Tikes marks or distribute and sell products bearing the LITTLE TIKES trademarks.

21.    Based on a review of D&B reports for Kids Station (HK), Kids Station (U.S.), Kids Station (International) and Kids Station (Bermuda) each has a principal place of business, or some other connection, in Miami, Florida and fall under the control of Newman. A copy of the D&B Reports is attached hereto as Exhibit I.  It also appears that Newman is the owner of each of the Defendants and is responsible for controlling their operation.

Executed in _LOS ANGELES_____, California this __8th__ day of April, 2008.

_David T. Oakes_
David Øakes

# EXHIBIT A

## LICENSE AGREEMENT

This Agreement is effective as of this 8th day of December, 2003, by and between The Little Tikes Company, an Ohio corporation, having a principal place of business at 29 East Stephenson Street, Freeport, Illinois 61032 (hereinafter referred to as "Little Tikes") and Kid Station Toys Ltd., a Florida corporation, having its principal place of business at P.O. Box 694660, Miami, FL 33268-4660 (hereinafter referred to as "User").

## RECITALS

WHEREAS, Little Tikes has used and is the owner of the famous, distinctive and valuable trademark LITTLE TIKES (with and without an associated logo) (the "Trademarks," as defined below) known throughout the world for high quality consumer and commercial products that are used in a variety of environments; and

WHEREAS, User is desirous of manufacturing and selling Electronic Audio, Video and MusicToys ("Product") in the Territory (as defined below) using the Trademarks, and is desirous of acquiring a license with respect to such rights;

NOW, THEREFORE, the parties hereto, in consideration of the mutual agreements herein contained and promises herein expressed and for other good consideration acknowledged by each of them to be satisfactory and adequate, do hereby agree as follows:

1

## ARTICLE I. DEFINITIONS

The following terms shall have the following meanings when used in this Agreement and the schedules attached hereto:

1.1    "Authorized Channels" means all Mass Market; Electronic Specialty, Discount and Warehouse Clubs, Toy Specialty, Drug, Mid-Tier, Department Stores, Grocery, Internet and Catalog in the Territory.

1.2    "Core Target Market" means the market for Products directed principally to children under the age of ten (10).

1.3    "Licensed Products" means the Products specified in Exhibit A designed for children in the Core Target Market. The Licensed Products shall be designed and made available in accordance with the product specification attached as Exhibit A (as may be amended from time to time by agreement of the parties).

1.4    "Trademarks" means the trademarks owned or controlled by Little Tikes as are specifically detailed in Exhibit B; i.e., "LITTLE TIKES" and the "LITTLE TIKES" logo, and any other trademark specifically designated in writing by Little Tikes for use on or in connection with the Licensed Products.

1.5    "Licensed Rights" means all intellectual property, including titles, personae, places, props, materials, copyrights and derivative works, patents, designs, trademarks, trade dress,

and other intellectual property in and/or relating to the Licensed Products that have been designed or prepared for or by User for use in connection with the Licensed Products, as well as the Trademarks.

1.6    "Term" means the term as defined in Article V.

1.7    "Territory" means the United States, Canada, and Mexico.

1.8    "Net Sales Price" shall mean the gross selling price of Licensed Products sold by User, less a flat twelve percent (12%) deduction to cover any and all of the amount of credits or other terms allowed by User to its customers relating to all freight, insurance, transportation charges, trade discounts, advertising allowances, sales taxes and other usual deductions, charges, discounts, returns, allow

and other intellectual property in and/or relating to the Licensed Products that have been designed or prepared for or by User for use in connection with the Licensed Products, as well as the Trademarks.

1.6    "Term" means the term as defined in Article V.

1.7    "Territory" means the United States, Canada, and Mexico.

1.8    "Net Sales Price" shall mean the gross selling price of Licensed Products sold by User, less a flat twelve percent (12%) deduction to cover any and all of the amount of credits or other terms allowed by User to its customers relating to all freight, insurance, transportation charges, trade discounts, advertising allowances, sales taxes and other usual deductions, charges, discounts, returns, allowances, credits or adjustments to the gross selling price.   The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first.

1.9    "Shipping Date" shall mean the date no earlier than the date of execution of this Agreement and no later than October 1, 2004.

## ARTICLE II. GRANT

2.1    License.  Subject to the terms and conditions hereof, Little Tikes hereby grants to User, for the Term, in the Territory and through the Authorized Channels, an exclusive,

royalty-bearing license to utilize the Licensed Rights solely on or in connection with the manufacture, marketing, sale and distribution of the Licensed Products.

2.2     No Sublicensing.  User shall have no right to sublicense any of the rights which are licensed under this Agreement.

2.3     Limited License.  User agrees that the license granted hereunder applies only to the use of the Licensed Rights in connection with the Licensed Products sold through Authorized Channels in the Territory, and that this license does not extend to any other trade name, trademark, or other intellectual property that Little Tikes or its affiliates may own or use, or to the use of the Licensed Rights on products other than Licensed Products, or outside of the Authorized Channels, or outside of the Territory. Little Tikes does not grant any right to use all or any part of the Trademarks in the name or style of User or of any subsidiary, division or subdivision of User, or of any corporation or other business entity, shop or establishment. User agrees that it will not incorporate or use the Trademarks or similar words thereto in conjunction with its company name or as a trademark or as a generic name during or after the period of this Agreement.  User agrees not to register or use any of the Trademarks or any parts thereof or terms confusingly similar thereto as part of an Internet or website address, a Universal Resource Locator ("URL"), or as a domain name.

2.4     Best Efforts; No Competition.  User shall use its reasonable best efforts to market, sell, and distribute Licensed Products according to the terms and subject to the conditions hereunder.  User shall not develop, manufacture, sell, supply, or market products to be sold

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

4

under major toy brands (e.g., without limitation, Fisher-Price, Playskool, Leap Frog, etc.) that directly compete with the Licensed Products, unless otherwise approved in writing by Little Tikes, which approval shall not be unreasonably withheld

## ARTICLE III. SAMPLES: SALES TO LITTLE TIKES

3.1     User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start. No royalty shall be payable as to these free samples. In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.

3.2     User shall sell Licensed Products to Little Tikes, at the lowest price offered by User to other third parties, for distribution by Little Tikes through Little Tikes-owned retail stores and for sales to Little Tikes and Newell employees. No royalty shall be payable as to these sales.

## ARTICLE IV. REPORTS AND PAYMENTS

4.1     Running Royalties. As consideration for the licenses granted herein, User shall pay during the Term of this Agreement the earned, running royalties ("Running Royalties") at the rate of five percent (5%) of the Net Sales Price for domestic and FOB sales for Category

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

5

I (as set forth in Exhibit A) based upon sales of Licensed Products by User; three percent (3%) of the Net Sales Price for domestic and FOB sales for Category II (as set forth in Exhibit A) based upon sales of Licensed Products by User and for Category III (as set forth in Exhibit A): five percent (5%) of Net Sales for domestic and FOB sales or seven percent (7%) of Net Sales for domestic and FOB sales if a Licensed Product originated from or is designed and/or engineered in whole by Little Tikes. The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first. All sales by User of Licensed Products to any of its affiliates or to any entity or person associated with User, including all inter-company transactions, shall be carried on User's books of account at the full regular wholesale price charged to unrelated third parties, and User shall account for and pay Running Royalties to Little Tikes on all such sales as if they occurred on an arms-length basis to an unrelated wholesale account.

4.2    <u>Guaranteed Annual Royalty Payment</u>. In accordance with the following schedule, User shall pay to Little Tikes in U.S. dollars a minimum guaranteed annual royalty payment (the "Guaranteed Annual Royalty Payment") regardless of the sales levels of the Licensed Products as follows:

| Due Date | Amount Due | Applicable Calendar Year |
|---|---|---|
| Category I and II: | | |
| Upon Signing | $25,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $35,000.00 | October 1, 2003 – June 30, 2005 |
| September 15, 2005 | $20,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $45,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $20,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $55,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $20,000.00 | July 1, 2007 – June 30, 2008 if Renewal Term |

is exercised by User pursuant to paragraph 5.2 hereunder

March 15, 2008       $55,000.00          July 1, 2007 – June 30, 2008 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008   $20,000.00          July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009       $55,000.00          July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder

Category III:

| | | |
|---|---|---|
| Upon Signing | $50,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $25,000.00 | October 1, 2003 – June 30, 2005 |
| September 15, 2005 | $25,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $50,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $25,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $75,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $25,000.00 | July 1, 2007 – June 30, 2008 if |

Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2008       $75,000.00          July 1, 2007 – June 30, 2008 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008   $25,000.00          July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009       $75,000.00          July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder


Running Royalties shall be credited against Guaranteed Annual Royalty Payments, so that

the amount of Guaranteed Annual Royalty Payment due and payable is reduced by the

amount of the Running Royalties paid to Little Tikes.   If Running Royalties in a calendar

year exceed the Guaranteed Annual Royalty Payment for that calendar year, then no payment

is due under Section 4.2.   Guaranteed Annual Royalty Payments may only be applied against

the calendar year that they relate to and may not be applied to any other calendar year.

Guaranteed Annual Royalty Payments for Category I and Category II may not be applied to

Category III and Guaranteed Annual Royalty Payments for Category III may not be applied

to Category I and Category II.

4.3     Advance Payments.  User shall pay to The Beanstalk Group, LLC, 28 East 28th Street, 15th Floor, New York, NY 10016 ("Beanstalk"), on behalf of Little Tikes, a non-refundable advance payment of Twenty Five Thousand Dollars ($25,000.00) for Categories I and II; and Fifty Thousand Dollars ($50,000.00) for Category III (together, the "Advance") upon signing of this Agreement.  This Advance shall be credited against User's Running Royalty Payment for the year commencing October 1, 2003 and ending June 30, 2005.

4.4     Quarterly Report and Payment.  Within thirty (30) days following the end of each calendar quarter, starting with the month following the quarter in which sales of the Licensed Products commence, User shall submit to Beanstalk (with a copy to Little Tikes), a statement, certified by an officer of User to be accurate, showing separately for each of the Licensed Products, on a country-by-country basis, the number, description and sales price for each Stock Keeping Unit ("SKU") of each Licensed Product sold by User during the preceding calendar quarter, and the calculation of Running Royalties due Little Tikes for such calendar quarter.  User shall transmit to Beanstalk, on behalf of Little Tikes, payment of the amounts due under this Agreement concurrently with the rendering of the statement for the period.  If Little Tikes at any time so requests, User's reports shall be made in the form set forth in Exhibit C attached hereto or in another form to be provided by Little Tikes to User in the future.  A copy of the reports and a copy of the check in Little Tikes' favor shall be delivered to The Little Tikes Company, Attention:  Director of Licensing, 2180 Barlow Road, Hudson, Ohio 44236.

4.5     Annual Report and Payment.   Together with the quarterly royalty report provided for sales occurring during the fourth calendar quarter of each calendar year during the Term, User shall provide Beanstalk (with a copy to Little Tikes) with a year end report showing separately for each SKU of each  Licensed Product, on a country-by-country basis, the number, description and sales price for each Licensed Product sold by User during the preceding calendar year, and the calculation of Running Royalties due Little Tikes hereunder. This report shall be accompanied by  payment to Beanstalk, on behalf of Little Tikes, of any Guaranteed Annual Royalty Payment that is due.

4.6     Record Keeping. User shall keep full and accurate books of account, records, data, and memoranda respecting the manufacture and sale of the Licensed Products in sufficient detail to enable the payments hereunder to Little Tikes to be determined. Little Tikes, at its sole cost and expense, shall have the right to conduct examinations of the books and records pertaining to such statement for a period of two (2) years from the date on which such report is furnished to Beanstalk and Little Tikes for the purpose of verifying the reports provided for in this Agreement. Such examinations shall be conducted by an independent auditor or representative of Little Tikes, upon prior written notice of at least seven (7) days and not more often than once in any calendar year (unless Little Tikes discovers a discrepancy requiring additional audits), and in such manner as to not unduly interfere with the business of User. Each examination shall be at the expense of Little Tikes unless the examination discloses a discrepancy in favor of User exceeding by more than five percent (5%) of the total amounts paid to Little Tikes during the period covered  by the examination, in which case, User shall pay Little Tikes for all the direct and verifiable expenses of that

examination. Payments found to be due Little Tikes as a result of an examination and the applicable interest shall be paid immediately as set forth herein.

4.7    Payments and Calculations in U.S. Dollars: Interest on Past Due Payments: Tax Payments.  All Running Royalties shall be paid in U.S. dollars on the day payment is due, except that any past due payment shall be at the rate prevailing when such payment became due.  Sales made in currency other than U.S. Dollars shall be converted to U.S. Dollars, at Licensee's sole expense, as of the date that Running Royalties on those sales are due.  It is further understood and agreed that User shall pay interest to Little Tikes upon any and all Running Royalties that are at any time overdue, said interest to be computed at the rate of two percent (2%) per annum over the prime interest rate charged by Chase Manhattan Bank in New York from the date when such Running Royalties are due and payable as provided herein to the date of payment.

User shall withhold as taxes on all payments to be made to Little Tikes only such amounts as are absolutely required to be withheld by law in the country from which payment is being made.  User shall submit to Little Tikes originals of the remittance voucher and the official receipt evidencing the payment of the corresponding taxes.  User shall fully cooperate with Little Tikes and provide such information and records as Little Tikes may require in connection with any application by Little Tikes to the tax authorities in any country of the Territory and/or the United States of America including but not limited to, the obtaining of a credit for any withholding tax paid in the Territory or any country from which Running Royalties and any other payments are being made by User to Little Tikes pursuant to this Agreement.

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc
10

4.8    Distribution Report.    User agrees to provide to Little Tikes, on or before April 30 of each calendar year during the Term, a distribution and sales plan (including, but not limited to, User's product development plans, advertising, and merchandising and promotional activities) for the remainder of that calendar year.  User also agrees to provide to Little Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit sales by individual retail account for the previous calendar year.

4.9    Forecast Report.    Each calendar quarter, User agrees to provide Little Tikes,  with a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter.  These forecast reports are estimates only and are not binding on User.

ARTICLE V. TERM OF THE AGREEMENT

5.1    Initial Term.  The initial term of the license granted herein shall be from the date of execution of this Agreement until June 30, 2007 (the "Initial Term"), subject to any earlier termination or extension of this Agreement.

5.2.    Renewals.

(a)    User shall have the right to extend the Agreement for Categories I and II only beyond the Initial Term for  an additional two year term  commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as,  User earns and pays at least $200,000.00 in Running Royalties for Categories I and II combined by

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc
11

December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term.

(b)    User shall have the right to extend the Agreement for Category III only beyond the Initial Term for an additional two year term commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $250,000.00 in Running Royalties for Category III by December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term

5.3.    Minimum Number of Product Introductions.  During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain new aesthetic or functional features.

ARTICLE VI. INTELLECTUAL PROPERTY

6.1    Ownership of the Licensed Rights.  User acknowledges that Little Tikes is the sole owner of all right, title and interest in and to the Licensed Rights and Trademarks in any form or embodiment thereof, in the Territory, and is also the sole owner of the goodwill attached or which shall become attached to the Licensed Rights and Trademarks in connection with the business and goods in relation to which the same has been, is, or shall be used.

P:\Legal\Private\Little Tikes\Little Tikes – Kid Station #964598  2003-12-01.doc

12

6.2    Exclusive Rights.  All Licensed Rights developed by User for use in or in connection with the Licensed Products shall be the sole and exclusive property of, and title shall vest in, Little Tikes or its nominee, from and after the time it is created, and User shall cooperate with Little Tikes, at the sole expense of Little Tikes, to secure and perfect such Licensed Rights in the name of Little Tikes as Little Tikes' sole and exclusive property.

6.3    Work Made for Hire.  To the extent that any of the Licensed Rights is specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, the parties agree that the Licensed Rights shall be considered a "work made for hire" under 17 U.S.C. § 101 owned by Little Tikes.  For the avoidance of doubt, User acknowledges that the copyrights and all other proprietary rights in and to the Licensed Rights and any derivatives thereof are exclusively owned and reserved to Little Tikes.  User shall neither acquire nor assert copyright ownership or any other proprietary rights in and to the Licensed Rights or any derivatives thereof.

6.4    Assignment.  With respect to any rights in the Licensed Rights other than the rights described in Section 6.3, above, User agrees to assign and hereby assigns to Little Tikes or its nominee, the sole and exclusive right, title and interest in the United States and all foreign countries, in and to the Licensed Rights, including without limitation any and all related patent, copyright, trade secret, trade dress, trademark, design, and other relevant proprietary

rights of any nature whatsoever, as well as the right of priority, and all applications for trademark registration, copyright registration, mask work protection, design registration, or other protection. Little Tikes has the sole discretion as to when and in which countries to file for intellectual property registrations (including patents, trademarks, and copyrights) relating to any and all Licensed Rights.

6.5    Patent Prosecution and Related Activities. Little Tikes or its nominee, at its sole cost and expense, shall have the sole right to file and prosecute applications for letters patent, trademark registrations, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights. In the event that Little Tikes declines, after notice from User, to file and prosecute applications for letters patent, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights (but excluding the Trademarks), User may, with the prior written approval of Little Tikes, file and prosecute said applications and registrations in the name of User. In the event that User files and prosecutes said applications, User shall bear any and all costs, including reasonable attorney's fees, associated with User's filing and prosecuting said applications. In no event shall User file any applications for trademark registration or any other type of intellectual property protection covering the Trademarks.

6.6    Cooperation. User shall, at Little Tikes' request and at Little Tikes' expense, assist Little Tikes to obtain, maintain and protect the rights of Little Tikes in the Licensed Rights and Trademarks. User warrants and agrees to execute and deliver to Little Tikes, and to cause its employees, its subcontractors and their respective employees to execute and deliver

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc
14

to Little Tikes, any and all documents that Little Tikes may reasonably request to convey to Little Tikes any interest User, its subcontractors or their respective employees may have in any Licensed Rights or Trademarks, or that are otherwise necessary to protect and perfect Little Tikes' interest in such Licensed Rights.  User further warrants and agrees to take and cause its employees, its contractors and their respective employees to take such other actions as Little Tikes may reasonably request to protect and perfect Little Tikes' interest in any Licensed Rights and Trademarks.

6.7     Use Inures to Little Tikes.  Any use of the Trademarks by User shall inure to the benefit of Little Tikes.  On Licensed Products, Licensed Product packaging and advertisements, User will clearly disclose Little Tikes' ownership of the Trademarks in the form prescribed in Exhibit B.  User will not, at any time, do or suffer to be done any act or thing which may in any way adversely affect any rights of Little Tikes in and to the Trademarks or any registrations thereof.

6.8     Use of the Trademarks on Quality Licensed Products .  User may use the Trademarks only on those Licensed Products the quality of which is in all respects at least equal to products sold by Little Tikes.  User shall manufacture the Licensed Products in accordance with the approved designs, materials, tolerances of manufacture and assembly, testing and packaging specifications approved by Little Tikes.  All uses of the Trademarks must be in conformance with Little Tikes' guidelines for the use thereof, which guidelines shall be provided by Little Tikes.  User shall not deviate substantially from such specifications without written approval from Little Tikes.  If at any time Little Tikes, at its sole discretion,

determines that any of the Licensed Products manufactured or sold by User do not conform to the previously approved production sample, then upon written notice by Little Tikes, permission to use the Trademarks as set forth herein may be immediately withdrawn, and User hereby covenants and agrees that it will cease and desist any and all such use, either directly or indirectly, immediately upon such notice until notified in writing by Little Tikes that use may be resumed.  User agrees that Little Tikes may supplement the above identified specifications at any time, and User agrees to manufacture Licensed Products which will conform to any supplemental specifications within agreed upon time tables.

6.9     Protecting the Licensed Rights.  User shall cooperate fully and in good faith with Little Tikes for the purpose of securing, preserving and protecting Little Tikes' rights in and to the Licensed Rights.

6.10    Compliance with Legal Requirements.  User will use the Licensed Rights in the Territory strictly in compliance with the legal requirements applicable therein.  Whenever User uses any of the Licensed Rights which are registered on any Licensed Product, packaging, labeling, or in any advertisement, it must be marked to indicate ownership and registration in accordance with applicable law.  Upon expiration or termination of this Agreement for any reason whatsoever, User will execute and file any and all documents required by Little Tikes terminating any and all ownership rights which User may have acquired in the Trademarks and in the Licensed Rights.

6.11    <u>Notice of Infringement</u>. User shall promptly notify Little Tikes in writing of any third party infringement or imitation of the Licensed Rights or any of them, when the same comes to its attention. Upon receipt of such notice, Little Tikes may, in its sole discretion, take such action against third parties it considers advisable for the protection of the Licensed Rights. In no event may User initiate any action or proceeding against such third parties.

6.12    <u>Enforcement Actions</u>. At Little Tikes' discretion, User may join or be joined as interested parties in any action that may be brought for infringement by others of the Licensed Rights, and participate and share the cost of such suits and any recoveries therein to an equal extent.

6.13    <u>No Transfer of User's Pre-Existing Intellectual Property</u>. Nothing herein shall be construed to transfer ownership of any of User's pre-existing proprietary rights incorporated in Licensed Products. The parties understand and agree that technology that is incorporated into Licensed Products is the sole property of User, and that all other property rights incorporated into Licensed Products are the sole property of Little Tikes, and each party agrees to take such actions as are reasonably required by the other party to secure and perfect these proprietary rights in the respective parties.

## VII. REPRESENTATIONS AND WARRANTIES, INDEMNITY AND INSURANCE

7.1    <u>Representations and Warranties of Little Tikes</u>. Little Tikes represents and warrants to User the following: (a) Little Tikes is the sole and exclusive owner of all rights to the Trademarks and has the right to grant the licenses and rights granted in Article II with

respect to the Trademarks; (b) Little Tikes has full power and authority to enter into and perform this Agreement; (c) there is no claim, action, suit or proceeding relating to this Agreement or the Trademarks pending or threatened before any court that would impair User's right to use the Trademarks; (d) any and all information or materials developed by Little Tikes shall be the original work of Little Tikes (except for materials in the public domain) and Little Tikes shall not use any information or materials which are not original unless it has obtained such information or materials from User or has received specific authorization in writing from the owner of such information and materials to use them; (e) to the best of Little Tikes' knowledge, after due inquiry has been made, no information or materials furnished to User by Little Tikes infringes on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and no such information is defamatory or constitutes a violation of the right of privacy or publicity of any third party; and (f) so long as this Agreement is in effect, Little Tikes shall not commit any act or enter into any agreement which could adversely affect User's entitlement to enjoy the full benefit of the rights, title, and interests herein granted.

7.2  <u>Representations and Warranties of User</u>.  User represents and warrants to Little Tikes the following: (a) User has full power and authority to enter into and perform this Agreement; (b) User shall create the Licensed Products as original works of authorship and shall design, manufacture, and sell them without violating the rights of third parties; and (c) to the best of its knowledge, after due inquiry has been made, the Licensed Products shall not infringe on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation

of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely effect Little Tike's exclusive rights in and to the Licensed Rights, including the Trademarks; and (f)  Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.

7.3   Indemnification by User.  User shall defend, indemnify and hold Little Tikes, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by User of any of the warranties, representations or agreements made by User hereunder, and from actions of User in this Agreement not authorized by Little Tikes, from product liability claims arising from the Licensed Products, including those claims that may be attributable to any defect in the Licensed Products regardless of when such defect shall be discovered, and from intellectual property claims by third parties (except those claims arising from User's approved use of the Licensed Rights) arising from the Licensed Products.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by User of any warranty, undertaking, representation or

7.5     Indemnification by Little Tikes.  Little Tikes shall defend, indemnify and hold User, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by Little Tikes of any of the warranties, representations or agreements made by Little Tikes hereunder.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by Little Tikes of any warranty, undertaking, representation or agreement entered into herein or hereunder, User shall give prompt written notice of such claim to Little Tikes.  Little Tikes shall have the right to assume the defense of such claim at Little Tikes' sole cost and expense by furnishing User with written notice of same.  Little Tikes shall be liable for all losses, costs, expenses, damages, recoveries (including without limitation, amounts paid in settlement and reasonable attorney's fees based on such claim) suffered, made or incurred by either Little Tikes or User.

7.6     Limitation of Liability.  Under no circumstances shall either party be entitled to recover from the other party any consequential, incidental, indirect, special or punitive damages, excluding claims made under Sections 7.3 or 7.5, whether in contract or in tort, including claims for negligence, even if the party has been advised of the possibility of such damages.  Each party acknowledges that the foregoing waiver serves as a material inducement for it to enter into this Agreement.

## ARTICLE VIII. CONSUMER SERVICE

8.1    Telephone Support.  User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products.  The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following:  (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 a.m. to 5 p.m. Monday through Friday, Eastern Standard Time);  (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products;  and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.

8.2    Reporting.  Within thirty (30) days after the end of each calendar quarter, User agrees to provide a report to Little Tikes, attention Director of Marketing – Licensing, detailing the consumer service activities of User for the Licensed Products for the preceding quarter.

8.3    Responsible Persons.  User agrees to provide to Little Tikes, Manager of Consumer Service, the names of at least two (2) employees of User responsible for consumer service activities relating to the Licensed Products and to update Little Tikes Manager of Consumer Service when any changes are made concerning those employees of User that are responsible for such consumer service.

8.4.    Warranty.  All Licensed Products shall be accompanied by a written document that clearly describes the product warranty period (which period shall be no less than ninety (90) days) and the procedure to make a warranty claim.

## ARTICLE IX.  APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES

9.1    Submission for Approval.  User is responsible for the developing, designing and engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products.  Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3.  User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

- Design Concept (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1st annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

- Decorated Prototype Sample, (consisting of, but not limited to, a painted three-dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

- Pre-production Parts Samples (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any case at least two (2) months prior to the intended commercial production of the Licensed Product;

- Pre-Production Product Samples (consisting of Product samples from the pre-production run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product, and

- First Production Run Samples (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes

including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.

9.2    Compliance Samples. User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.

9.3    Modification of Production Units. No modification of an approved production sample of a Licensed Product shall be made without Little Tikes' further prior written approval. If, in Little Tikes' sole judgment, the quality of a previously approved Licensed Product has deteriorated in later production runs, or if the Licensed Product otherwise has been altered, Little Tikes may, in addition to other remedies available to Little Tikes, by written notice require such Licensed Product to be immediately withdrawn from the market.

## ARTICLE X. APPROVAL OF PACKAGING, PROMOTIONAL MATERIALS, AND ADVERTISING.

10.1     All containers, packaging, hang tags, promotional material, catalogs, advertising materials and display material for Licensed Products must be developed and funded by User, and submitted to Little Tikes with a Product Submission Approval Form (Exhibit D) for review and written approval. Little Tikes' approval thereof should be procured when such is still in rough format and in final format. Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Approval or disapproval shall lie in Little Tikes' sole discretion, and the use of unapproved packaging, hang tags and display material is prohibited. The parties agree that Little Tikes may be irreparably harmed by the use of unapproved packaging, hang tags and display material, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provision herein. In addition, User may not place or use any of its own marketing, advertising, catalogs, promotional materials, or any other materials in connection with Licensed Products or their packaging without the prior approval of Little Tikes.

10.2     If Little Tikes has supplied User with forms, such as Exhibit D, for use in applying for approval of artwork, photographs, models, pre-production and production samples of Licensed Products, User shall use such forms when submitting anything for Little Tikes' approval. However, User may use altered forms as User reasonably deems necessary if Little Tikes has pre-approved the altered forms in writing.

10.3    All packaging, display material, promotional material, catalogs and advertising for Licensed Products shall comply with all applicable laws and regulations for each country in the Territory where the Licensed Products are sold or used.  In addition, each Licensed Product and its packaging shall incorporate "date codes" signifying the date of production of each Licensed Product.

10.4    Packaging for Licensed Products to be distributed in the United States shall be printed with English language only.  Packaging for Licensed Products shall be printed in such languages, including multi languages, as are necessary to comply with laws and regulations governing the distribution of Licensed Products in the Territory.

## ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS

Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA).  User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards.  Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped.  User shall follow

reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures. Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.

Notwithstanding anything to the contrary herein, in the event that Little Tikes may, in its sole discretion, allow User to subcontract the manufacture of Licensed Products to third party manufacturers, provided that (a) User has given prior written notice of such proposed subcontract arrangement to Little Tikes, including the name, address and such other information concerning the proposed manufacturer as may be requested by Little Tikes; (b) each such manufacturer shall be otherwise subject to inspection by Little Tikes and the quality control procedures set forth herein; (c) the Licensed Products and/or any elements of any Licensed Products made by such manufacturer meet the quality standards set forth in this Agreement; and (d) each such manufacturer executes an agreement with both User and Little Tikes, such agreement to be in a form approved by Little Tikes.

<u>ARTICLE XII. ADDITIONAL COVENANTS OF USER</u>

12.1    User shall ship the initial Licensed Product to retail stores in the United States for display and for consumer purchase no later than the Shipping Date. The failure to ship the initial Licensed Product by the Shipping Date as required by this paragraph shall be deemed a material breach of this Agreement.

12.2    User agrees to submit an Annual Marketing Plan for review by the Director of Licensing. within sixty (60) days before the start of each calendar year, using the Annual

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

28

Marketing Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.

12.4    If it becomes so, User shall notify Little Tikes that more than three percent (3%) of Licensed Products sold by User during the Initial Term, and two percent (2%) of Licensed Products sold by User during each additional Term, have been returned by consumers to User as defective. User shall provide such notice within ten (10) days of such condition occurring, and shall transmit with that notice a written plan outlining the steps to be taken to reduce the incidence of defects and a schedule for implementing such steps.

12.5    The rights granted hereunder do not permit the sale of "seconds" or "irregulars." All Licensed Products not approved under Article IX or failing subsequently to conform to the approved standard shall be destroyed by User.

## ARTICLE XIII. USER NAME AND ADDRESS ON ARTICLES

User's name and address (at least city and state) will appear on permanently affixed labeling on each Licensed Product, or if that is not practicable, then on approved packaging therefor.

## ARTICLE XIV. TERMINATION

14.1    This Agreement may be terminated prior to the end of the Term:

      (a)    at any time upon mutual agreement of the parties;

(b)    by either party giving the other party thirty (30) days' written notice of a material breach of this Agreement, provided that such breach is not cured within thirty (30) days following notice to the other party.

14.2    Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials that have not been approved, or have been disapproved, pursuant to Article IX.    User acknowledges that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes.

14.3    This Agreement will terminate automatically upon the filing of a voluntary petition in bankruptcy by either party; the execution by either party of an assignment for the benefit of creditors; the filing of a petition to have either party declared bankrupt, provided it is not vacated within sixty (60) days from the date of filing; or the appointment of a receiver or trustee for either party.

14.4    Upon termination of this Agreement other than pursuant to Section 14.2, User shall have the right to complete the manufacture of Licensed Products then on order, and User shall further be permitted to sell such Licensed Products which have been ordered, manufactured or are still in stock on the date of termination for a period of time not to exceed three (3) months in duration, subject to the payment of Royalties specified herein

14.5    Subject to the sale of the Licensed Products on order or in stock pursuant to Section 14.4, upon termination of this Agreement, User shall immediately discontinue use of the Trademarks and shall immediately remove all reference to the Trademarks from any printed or other material distributed or disseminated by User. User shall no longer use the Trademarks in any variation, imitation or simulation thereof, or any marks similar thereto.

14.6.    Upon the termination of this Agreement, User shall promptly provide Little Tikes, at no cost to Little Tikes, with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives to its 800 phone number.

## ARTICLE XV. BENEFIT

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

## ARTICLE XVI. AMENDMENT

This Agreement may not be amended or modified, except by a written document signed by both parties hereto.

## ARTICLE XVII. CONFIDENTIALITY

17.1    General Obligation of Confidence.  Little Tikes and User agree that during the term of this Agreement and for a period of five years after termination of this Agreement not to

reveal to any person (unless authorized in writing by the other party) any confidential or proprietary information regarding the other party's products, developments, processes, and know-how. The parties further agree that they will not disclose to anyone not authorized by the other party to receive same, the contents of any report, record, drawing, data, correspondence, or any other subject, material or information which is not generally available to the trade or public. Little Tikes and User acknowledge recognizing and agreeing that by virtue of this Agreement they may acquire information regarding matters of a confidential business nature regarding the other party, its affiliates, its parent, and its parent's subsidiaries, which it agrees not to disclose to third parties nor use in competition, such as, but not limited to, sales know-how, future plans, costs, prices, profits and losses, markets, suppliers, customers, and other information not generally available to the public. This Section shall survive termination of this Agreement, regardless of the reason for termination.

17.2    Definition of Information Subject to Section 17.1.    The parties agree to treat all information and data furnished by the other party pursuant to this Agreement as confidential and proprietary, and such information and data shall be used solely for the purposes stated herein. The obligations of confidentiality under this Agreement shall not apply to such information and data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can prove was owned by the receiving party prior to the other party's disclosure, or (c) that is derived from any third party having the right to make such disclosure, or (d) the disclosure of which is compelled by a court of

competent jurisdiction and only after notice to the disclosing party and opportunity for the disclosing party to prevent disclosure.

## ARTICLE XVIII. NON-WAIVER

The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. No waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent therein set forth.

## ARTICLE XIX. ASSIGNMENT

The license and rights granted to User hereunder are personal in nature, and User shall not sell, transfer, lease or assign this Agreement or its rights and interests hereunder, or any part hereof, by operation of law or otherwise, without the prior written consent of Little Tikes, which consent shall not be unreasonably withheld.

## ARTICLE XX. NOTICE

Notices to be given under this Agreement shall be deemed sufficiently served when reduced to writing in English and deposited in the mail, postage prepaid for Certified Mail or sent by prepaid overnight express delivery (with a copy simultaneously sent by fax), to:

If to User:

    Kid Station Toys Ltd.
    P.O. Box 694660
    Miami, FL  33268-4660
    Attn:  Elliot Newman

If to Little Tikes:

    The Little Tikes Company
    Director of Licensing
    2180 Barlow Road
    Hudson, Ohio 44236

With a copy to:

    Stuart I. Graff, Esq.
    Newell Rubbermaid Inc.
    Legal Department
    6833 Stalter Drive, Suite 101
    Rockford, IL  61108

## ARTICLE XXI. JURISDICTION

This Agreement shall be interpreted in all respects in accordance with the laws of the State of Illinois.  Any dispute relating to the making or the interpretation of this Agreement, or the performance or nonperformance by any party of its obligations hereunder, shall be litigated only in the state or federal courts located within Cook County, Illinois.  User consents to personal jurisdiction in said courts and shall not seek to transfer or change the venue of any action brought in compliance with this Paragraph.

## ARTICLE XXII. OTHER PROVISIONS

22.1    Pronouns; Gender.  Whenever the pronoun "it", "its" or "his" may be used, it is understood by the parties to this Agreement that such usage shall include both singular and

plural, masculine, feminine and neuter genders and refer in appropriate cases to individuals as well as to corporations and businesses.

22.2    Nature of Relationship.  Nothing herein contained shall be construed to place Little Tikes and User in the relationship of partners, joint ventures, or agents and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

22.3    Force Majeure.  In the event either party to this Agreement is unable to carry out its obligations under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitation, acts of God, fire, flood, strikes, lockouts, war, or civil commotion, then upon giving prompt notice of force majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligations is prevented by circumstances of force majeure.

22.4    Headings.  The headings of the articles and sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

ARTICLE XXIII. ENTIRE AGREEMENT

This Agreement may be executed in duplicate, each of which shall be considered original for all purposes.  This instrument contains the entire Agreement between the parties and neither

it nor any of its provisions may be changed, waived or terminated, except as herein expressly provided, or in a written instrument signed by the parties.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

THE LITTLE TIKES COMPANY

By: _____

Title: *VP Marketing*

Date: *12/16/03*


KID STATION TOYS LTD.

By: *Elliot Neuman*

Title: *President*

Date: *12/8/03*

EXHIBIT A

Category I:  Electronic Youth Audio including:  Cassette players & recorders; Cassette players and recorders; Cassette sing-a-along players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately; Youth designed telephones

Category II:  VCR players; DVD players, 2" – 19" black and white and color TV's with or without DVD and VCR players

Category III:  Electronic Youth "Real Music", including:  Electronic Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone.  "Real Music" shall be defined as musical instruments directed for distribution and merchandising within the "Electronics or Music" section or aisle at retail and not the "Pre-school" section or aisle at retail, if such sections or aisles are separate

User shall use its best efforts to place the Licensed Products within the "Electronics or Music" section or aisle and not within the core Little Tikes or "Pre-school" section or aisle at retail, if such sections or aisles are separate.

P:\Legal\Private\Little Tikes\Little Tikes – Kid Station #964598  2003-12-01.doc

37

Little Tikes acknowledges that User can not dictate retail merchandising and that individual retailers and retail chains maintain the right to merchandise purchased product in the manner they see fit; however, User shall use its best efforts to ensure that the Licensed Products are placed in accordance with this Agreement.

User shall use its best efforts to inform a Little Tikes representative of any meeting with a "pre-school" buyer.

User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers:  Walmart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed.  Such report shall contain the participants attending the meeting, place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.

**EXHIBIT D**



41

### Addendum to License Agreement

This Addendum dated January 1, 2006 (the "Effective Date") is an addendum to the License Agreement dated December 8, 2003 (the "License Agreement") by and between The Little Tikes Company ("Licensor"), an Ohio corporation ("Purchaser"), and Kid Station Toys Ltd., a Florida corporation ("Licensee").

### Recitals

Licensor and Licensee are parties to the License Agreement pursuant to which Licensor grants to Licensee the right to use the LITTLE TIKES trademark as set forth in that agreement. The purpose of this Addendum is to revise the License Agreement to include an additional category of Licensed Products. The Addendum also sets forth the Guaranteed Annual Royalty Payment for this new category of Licensed Products.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1.  The definition of Licensed Products in Exhibit A of the License Agreement is amended to add the following:

    Category IV: Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats.

    Licensee agrees that it shall use its best efforts to cause the retailer of the Licensed Products to display the Licensed Products in the electronics area of the retailer, rather than in toy area of the retailer.

2.  The parties agree that the Term of the license granted under Section 2.1 of the license Agreement with respect to the Category IV products shall commence on the Effective Date and end on December 31, 2008.

3.  Section 4.2 of the License Agreement is amended to add the following language at the end of the Section:

**Category IV:**

| | |
|---|---|
| Period 1: | January 1, 2006 – December 31, 2006 |
| January 1, 2006: | $6,768.00 |
| March 15, 2006: | $6,768.00 |
| June 15, 2006: | $6,768.00 |
| September 15, 2006: | $6,768.00 |
| December 15, 2006: | $6,768.00 |
| | |
| Period 2: | January 1, 2007 – December 31, 2007 |
| January 1, 2007: | $6,768.00 |
| March 15, 2007: | $6,768.00 |
| June 15, 2007: | $6,768.00 |
| September 15, 2007: | $6,768.00 |
| December 15, 2007: | $6,768.00 |
| | |
| Period 3: | January 1, 2008 – December 31, 2008 |
| January 1, 2008: | $6,768.00 |
| March 15, 2008: | $5,768.00 |
| June 15, 2008: | $6,768.00 |

The Guaranteed Annual Royalty Payments shall be made quarterly

Guaranteed Annual Royalty Payments for Category I, Category II, Category III may not be applied to Category IV. Guaranteed Annual Royalty Payments for Category II, Category III, Category IV may not be applied to Category I. Guaranteed Annual Royalty Payments for Category I, Category III, Category IV may not be applied to Category II. Guaranteed Annual Royalty Payments for Category I, Category II, Category IV may not be applied to Category III. The parties acknowledge and agree that the term "annual" as used in the term Guaranteed Annual Royalty Payments with respect to the Products in Category IV shall refer to the "Periods" defined above.

4.    The royalty rate for Category IV Licensed Products is five percent (5%) of the Net Sales Price for domestic and FOB Sales.

5.    Except as expressly set forth in the Addendum, the provisions of the License Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned parties have caused this Addendum to be signed on the day and year above written.

LICENSOR

THE LITTLE TIKES COMPANY

By: _____

Name: _Brian Eisenwohll_

Title: _VP Marketing_


LICENSEE

Kid Station Toys Ltd.

By: _____

Name: _Elia Hum_

Title: _Presdt_

# EXHIBIT B



## U.S. CONSUMER PRODUCT SAFETY COMMISSION
### BETHESDA, MD 20814
April 30, 2007

PRESIDENT                                          RE: 070124CWE5708   070208CNE1940
MGA ENTERTAINMENT                                       I0710301A
16300 ROSCOE BLVD                                       I0710509A
VAN NUYS, CA  91406

Dear PRESIDENT:

Enclosed is information concerning one of your company's products.   Please read this
cover letter carefully because it contains important guidance about your rights and obligations
regarding the enclosed information.

The U.S. Consumer Product Safety Commission (CPSC) provides firms with consumer
complaints and reports of CPSC in-depth investigations concerning injuries or incidents
associated with products within the Commission's jurisdiction that the firms manufacture or
private label. To assure that these firms have access to information CPSC receives, we send
all complaints and investigation reports we receive, whether or not the reported problem appears
to be safety-related or the product appears to be at fault. We provide these reports to
firms because they often provide an early warning of potential safety problems.

I have also enclosed a fact sheet that describes the Commission's information disclosure
procedures under section 6(b) of the Consumer Product Safety Act that apply to the enclosed
report(s). Even though the Commission has not yet received a request for public disclosure of the
report(s), this letter provides you with the opportunity to comment on the information
in the report(s), pursuant to section 6(b). You are not required to comment; however, if you do,
please submit your comments to me within 23 days. If you feel that an extension of time
is needed to respond to the Commission, please e-mail your request to clearinghouse@cpsc.gov.
Include the document number and the name of the product in all correspondence. If, in your
comments, you tell us that:

1) you believe that the information in the enclosed report(s) is inaccurate, or
2) you want to be notified if the Commission receives a request, for example, under
   the Freedom of Information Act, for disclosure of the information,

the Commission will notify you when we receive such a request. In that case, the
Commission will not release the information to the public until at least 10 days after the date
of the notification. We will not, however, provide you with an additional free copy of the
report(s). If, at that time, you want additional copies, please request them from the
Commission's Office of the Secretary. Your request will be treated as a Freedom of Information
Act inquiry and you will be charged fees for the copies in accordance with
16 C.F.R. 1015.9(e).

Page 2

The reports we have provided you may – either alone or with other information you now have or may later receive – reasonably support a conclusion that the product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of death or serious injury. If so, you are required under section 15(b) of the CPSA, 15 U.S.C.2064(b), to notify the Office of Compliance at the CPSC.

For more information on reporting under section 15(b) of the CPSA, please call Marc J. Schoem at (301) 504-7520 or visit CPSC's website at www.cpsc.gov and click on Report Unsafe Products or write to the U.S. Consumer Product Safety Commission, Recalls and Compliance Division, Office of Compliance, 4330 East West Highway, Bethesda, MD 20814.

If you have any questions regarding this letter, please email us at clearinghouse@cpsc.gov. We can process your reply more quickly if we receive it only once. You may write to us at U.S. Consumer Product Safety Commission, National Injury Information Clearinghouse, 4330 East West Hwy., Room 504, Bethesda, MD 20814 or fax your reply to (301) 504-0025. If you want to email your reply, please address it to clearinghouse@cpsc.gov.

It's most helpful if you include the incident or investigation report number(s) with your response. It is not necessary to send a copy of the report itself.

In the interest of improving product safety, we will continue to provide these types of reports to your firm. In addition, if any of the information used to address this letter to you requires updating, please note the necessary changes on the bottom of this letter and return it to me.

Pamela McDonald
Lead, Technical Information Specialist
National Injury Information Clearinghouse
Division of Information Management
Office of Information and Technology Services
301-504-7921

Contact Name: _____ Title: _____

Company Name: _____

Address: _____

City: _____ State: _____ Zip: _____

Phone Number: _____

Fax: _____ Email: _____



# U.S. CONSUMER PRODUCT SAFETY COMMISSION
## 4330 East West Highway
## Bethesda, MD 20814

### CPSA Section 6(b) FACT SHEET

The Consumer Product Safety Commission (Commission) has unique restrictions that govern its public disclosure of information. This fact sheet summarizes these unique restrictions. Our rules, which you can find at 16 C.F.R. § 1101 or § 1015, provide more information. If you have questions about these restrictions, call (301) 504-7923, or facsimile (301) 504-0127.

1. What are the restrictions on the disclosure of information by the Commission?

Section 6(b), 15 U.S.C. § 2055(b), a provision of the Consumer Product Safety Act (CPSA), establishes procedures for and restrictions on the Commission's public disclosure of information. The Commission rule interpreting the requirements of section 6(b) is published in Title 16 of the Code of Federal Regulations in Part 1101 (16 C.F.R. § 1101). In addition, Section 6(a) of the CPSA prohibits the Commission from disclosing confidential business information.

2. To what information does Section 6(b) apply?

Section 6(b) applies to any information from which the public can readily ascertain the identity of a manufacturer or private labeler of a consumer product.

3. What are the requirements and prohibitions of Section 6(b)?

Section 6(b) prohibits the Commission from disclosing information about a consumer product that identifies a manufacturer or private labeler unless the Commission has taken "reasonable steps" to assure 1) that the information is accurate, 2) that disclosure of the information is fair in the circumstances, and 3) that disclosure of the information is reasonably related to effectuating the purposes of the CPSA and of the other laws administered by the Commission. Before disclosure of such information, the Commission must provide the manufacturer or private labeler with an opportunity to comment on the accuracy of the information. The Commission may not disclose such information for at least thirty days after sending it to the company for comment.

4. What happens when a firm submits comments on information that the Commission proposes to disclose?

The Commission must review and analyze the information in light of the comments received. The weight given to the comments and the degree of review by the Commission depends on the specificity, completeness, and credibility of the comments and any supporting documentation. Based on the comments, the Commission will decide whether to release the information.

3-1-07

| 1. Task Number 070208CNE1940 | | 2. Investigator's ID 8577 | | **EPIDEMIOLOGIC INVESTIGATION REPORT** |
|---|---|---|---|---|
| 3. Office Code 810 | 4. Date of Accident YR MO DAY 2007 01 01 | 5. Date Initiated YR MO DAY 2007 02 14 | | |

**6. Synopsis of Accident or Complaint          UPC**

The complainant bought her 1-year-old grandson a toy key chain with a cell phone. The plastic key chain came loose and one of the keys became lodged in his throat. The boy's grandfather removed the key and the 1-year-old boy sustained a scratched throat. The boy has recovered from his injury.

| 7. Location (Home, School, etc) 1 - HOME | 8. City RAVENNA | 9. State OH |
|---|---|---|
| 10A. First Product 5004 - Toys, Not Elsewhere Classifi | 10B. Trade/Brand Name TOY KEY CHAIN WITH CELL PHONE | 10C. Model Number KSL6003 |

**10D. Manufacturer Name and Address**
THE LITTLE TIKES COMPANY
2180 Barlow Road
Hudson, OH  44236

MGA

| 11A. Second Product 0 | 11B. Trade/Brand Name NONE | 11C. Model Number NONE |
|---|---|---|

**11D. Manufacturer Name and Address**
NONE

| 12. Age of Victim 212 | 13. Sex 1 - Male | 14. Disposition 1 - Injured, not Hosp. | 15. Injury Diagnosis 59 - Laceration |
|---|---|---|---|
| 16. Body Part(s) Involved 89 - NECK | 17. Respondent 1 - Victim/Complainant | 18. Type of Investigation 1 - On-Site | 19. Time Spent (Operating) / Travel 11 / 2 |
| 20. Attachment(s) 9 - Multiple Attachments | 21. Case Source 07 - Consumer Complaint | | 22. Sample Collection Number |

**23. Permission to Disclose Name (Non NEISS Cases Only)**
◉ Yes      ○ No      ○ Verbal

| 24. Review Date 02/27/2007 | 25. Reviewed By 9071 | 26. Regional Office Director Eric B. Ault |
|---|---|---|
| 27. Distribution Manley, Carolyn | | 28. Source Document Number H0710275A |

CPSC FORM 182 (12/96) Approved for use through 09/30/2006 OMB NO. 30410029

1

070208CNE1940

The information obtained in this report was provided by the grandmother of the infant. The key became lodged in the infants' mouth and he had a scratch to his throat. He has recovered without any problems.

The grandmother of the 1-year-old male, who weighed 24 lbs and was 32" tall at the time of the incident, stated that her grandson was in his playpen playing that afternoon with the key chain when she noticed that his eyes appeared to be in a state of panic. The grandmother stated that she was sitting at the dining room table and the playpen is about a foot away from her when she noticed there was a problem. The grandmother stated that that one of the three keys was missing from the others that were inside the playpen. She stated that she opened her grandsons' mouth and she saw the plastic top of the key chain and it was lodged inside his mouth. She stated that she called to her husband and that she held her grandson upside down while her husband reached inside his mouth and he grabbed the plastic part of the key and pulled it out. The grandmother of the 1-year-old male infant stated that her husband had a hard time pulling it out because the toy key, which measures 2 ½ "long was tightly lodged in the infants' mouth. She stated that her 1-year-old male grandson had started turning blue in the face. She said he sustained a scratch to his throat, but he was not taken to the hospital or the doctor.

The grandmother of the 1-year-old male stated that she purchased the toy for his birthday which was December 28, 2006. There are three pieces to the toy, a plastic key chain with three keys, a play cell phone and a round toy which makes different noises. She stated that it became his favorite toy because of the keys and the sound of the other toy. She stated that he had played with the toy daily since she gave it to him on his birthday. She stated that half of the key is made of plastic and the other half looks like metal. The plastic key chain loops through a hole found at the top of the key. The grandmother of the 1-year-old male stated that she contacted Little Tykes the next day by phone and spoke with a representative about the incident. The representative who took the complaint stated that she would write up a report and the report would be transferred to their corporate office and that her supervisor would contact her later that day. She stated that she did not receive a call. The complainant stated that she called back a few days later and spoke with another representative who did not know what had happened to the report. She took another report and stated that someone would call her back that afternoon. She stated that she did not receive a call. In January, 2007 the complainant stated that she called back and spoke with someone else and they told her to hold the phone and they would fax the complaint to their corporate office, and send a memo to her supervisor. She was told again that her supervisor would call her back that day and she has not received a phone call.

The toy key chain with cell phone, model # KSL8033, Serial # CT060800120897, date of manufacture 06/2006. The toy was manufactured by Little Tykes, 2180 Barlow Road, Hudson, Ohio 44236-4108, the product was purchased at Toys-R-Us, Akron, Ohio. MADE IN CHINA

2

070208CNE1940

The following is on pack of the phone:

POWER SOURCE
DC 3 V
2x1.5 v size AAA/UAM4

2006 THE LITTLE TIKES COMPANY
DESIGNED & LICENSED BY
KIDS STATION TOYS INTERNATIONAL LTD
ALL RIGHTS RESERVED
MADE IN CHINA

The grandmother of the 1-year-old male did not have any instructions with the toy.

3

070208CNE1940

Exhibits

Exhibit # 1 -- Contact Sheet
Exhibit # 2 -- Photographs - 4
Exhibit # 3 -- Authorization for Release of Name

4

070208CNE1940

Exhibit # 1

Contact Sheet

1.  Cheryl Lash, 5362 Fairhill Drive, Ravenna, Ohio 44266, 330-297-9967

5

070208CNE1940

Exhibit # 2

Photographs



Photograph of toy set

6

070208CNE1940

Exhibit # 2

Photographs



Photograph of key "chain" which came apart

070208CNE1940

Exhibit # 2

Photographs



Photograph of key "chain" and key. Shows how it became loose

8

07028CNE1940

Exhibit # 2

Photographs



Photograph of keys on chain

*Exhibit #3* @ 0208CVE1940 *Pg1*

**U.S. CONSUMER PRODUCT SAFETY COMMISSION**
**WASHINGTON, DC 20207**

---

U. S. CONSUMER PRODUCT SAFETY COMMISSION

---

AUTHORIZATION FOR RELEASE OF NAME

---

Thank you for assisting us in collecting information on a potential product safety problem. The U. S. Consumer Product Safety Commission depends on concerned people to share product safety information with us. We maintain a record of this information, and use it to assist us in identifying and resolving product safety problems.

We routinely forward this information to manufacturers and distributors to inform them of the involvement of their product in an incident situation. We also give the information to others requesting information about specific products or hazards. Manufacturers may need the individual's name so that they can obtain additional information on the product or incident situation.

Would you please indicate on the bottom of this page whether you will allow us to disclose your name. If you request that your name remain confidential, we will of course, honor that request. After you have indicated your preference, please sign your name and date the document on the lines provided.

Ⓧ  YES          O   NO

_____          _____
(Signature)                                    (Date)

CONSUMER PRODUCT INCIDENT REPORT                    Region: EASTERN

| 1. NAME OF RESPONDENT<br>Cheryl Lash | 2. PHONE NO.   (HOME)<br>330-297-9967 | (WORK)<br>unknown | |
|---|---|---|---|
| 3. STREET ADDRESS<br>5362 Fairhill Drive | 4. CITY<br>Ravenna | ST<br>OH | ZIPCODE<br>44266 |
| 4a. EMAIL ADDRESS<br>unknown | 4b. INCIDENT CITY<br>Ravenna | ST<br>OH | ZIPCODE<br>44266 |

5. DESCRIBE INCIDENT OR HAZARD, INCLUDING DATA ON INJURIES
The toy key chain has 5 small push buttons, which each make a
different sound, and holds a set of 3 keys.  Half of the key has
- cont -

| 6. DATE OF INCIDENT(S)<br>01/01/2007 | 7. IF INJURY OR NEAR MISS, OBTAIN AGE/SEX.   1 Y/M<br>AND DESCRIBE INJURY<br>near choking | 8. IF VICTIM DIFFERENT FROM RESPONDENT, PROVIDE NAME<br>Matthew Shuman<br>RELATIONSHIP<br>grandson |
|---|---|---|
| 9. DESCRIPTION OF PRODUCT<br>toy key chain w/cell phone | | 10. BRAND NAME<br>Little Tikes |

| 11. MFR/DISTRIBUTOR NAME, ADDR. & PHONE<br>Little Tikes (made in China)<br>unknown<br>unknown<br>888-321-7191<br>unknown | 12. MODEL, SERIAL #'s, DATE OF MFR<br>M# KSL8033 DOM 06/2006 |
|---|---|
| ISSUE 18<br><br>02/01/2007 | 13. DEALER'S NAME, ADDRESS & PHONE<br>Toys R Us<br>unknown<br>Akron, OH<br>unknown |

| 14. WAS THE PRODUCT DAMAGED, REPAIRED OR MODIFIED? NO<br>IF YES, BEFORE OR AFTER THE INCIDENT?<br>DESCRIBE: | 15. PRODUCT PURCHASED  NEW<br>DATE PURCHASED   12/28/2007   AGE 1 M |
|---|---|
| | 16. DOES PRODUCT HAVE WARNING LABELS?<br>IF SO, NOTE:<br>age recommendation: "6 months to 18 months." |

| 17. HAVE YOU CONTACTED THE MANUFACTURER? YES<br>IF NOT, DO YOU PLAN TO CONTACT THEM? | 18. IS THE PRODUCT STILL AVAILABLE?<br>YES<br>IF NOT, ITS DISPOSITION | 19. MAY WE USE YOUR NAME WITH THIS REPORT?<br>YES |
|---|---|---|

FOR ADMINISTRATION USE

| 20. DATE RECEIVED<br>01/31/2007 | 21. RECEIVED BY (NAME & OFFICE)<br>myg/HL | 22. DOCUMENT NO.<br>H0710276A |
|---|---|---|
| 23. FOLLOW-UP ACTION | | 24. PRODUCT CODE(S)<br>5004 |
| 25. DISTRIBUTION | 26. ENDORSER'S NAME & TITLE<br>myg 01/31/2007 | |

CPSC FORM 175 (03/2004)                                        OMB 3041-0029

CONSUMER PRODUCT INCIDENT REPORT                Region: EASTERN

H0710275A

**Narrative Continued**

plastic and the other half has metal and loops through a hole
found at the top of the key, supported by a plastic ring.

24 lb., 32" tall, (height unknown) Grandson was playing the
keychain inside playpen, when consumer could see his eyes
appeared to be in a state of panic. Consumer noticed 1 out of
the 3 keys were missing. Consumer found 2 of the toy keys was
lying in the playpen. Consumer immediately opened grandson's
mouth, and could see the plastic top part of the key chain was
lodged inside his mouth. As consumer held grandson upside down,
husband reached inside his mouth where he caught a grip of the
plastic part of the toy key. Husband began pulling out the
2-1/2" long, toy key, which was tightly wedged, out of his mouth.
Consumer said grandson had started to turn blue in the face.
Grandson sustained a scratch to his throat. No Rx needed.

The following day, consumer called and explained incident to mfr.
rep. (name unknown) who said she would write up a report and have
the report transferred to their corporate office and her
supervisor. Rep. stated someone will contact consumer later that
day. Consumer did not receive a return call.

(date unknown) Consumer called back and spoke with rep. (name
unknown) who said she did not know what may have happened to the
report. Rep. took another report and also indicated that someone
will contact consumer that same day. Consumer did not receive a
return call.

1/2007 Consumer called back and spoke with mfr. rep. (name
unknown), who requested consumer hold on the phone while they fax
the report to their corporate office, and send a memo to her
supervisor. Rep. also said that someone will contact her back
the same day. Consumer did not receive a return call.

Consumer feels the toy key's can detach from its chain presenting
a choking hazard.

Item# X8T060800120897

**Distributor Phone #:**

**CPSC Source: DIRECTORY**

H0710275A

If you have any changes, additions, or comments you wish to make concerning your attached report, please make them in the space below.

I confirm that the information in the attached report (including any changes, additions, or comments I have made) is accurate to the best of my knowledge and belief.

_Signature_         _2/3/07_
Signature          Date

☐ I request that you do not release my name.

☐ You may release my name to the manufacturer but I request that you not release it to the general public.

☒ You may release my name to the manufacturer and to the public.

# EXHIBIT C



Corporate Office

16380 Roscoe Blvd.
Van Nuys, CA 91406
USA

Phone:  818.894.2525
Fax:     818.895.0771

January 30, 2008

VIA COURIER

Mr. Elliot S. Newman
President
Kids Station Toys
1160 NW 163 Drive
Miami, FL 33169

      Re:    KSL 8033-Little Tikes Play Cell Phone

Dear Mr. Newman:

     Attached please find details of a recent consumer complaint with regard to the above-referenced product, the Little Tikes Play Cell Phone (the "Product"). Please handle this matter promptly and appropriately.

     The nature of the complaint appears to be identical to a complaint made to the Consumer Products Safety Commission ("CPSC") dated June 14, 2007. Paul Bachman, of The Little Tikes Company, informed you of CPSC Incident Report 070523CWE5930 in a letter dated September 17, 2007.  Oscar Radillo responded to the CPSC on behalf of Kids Station and informed the CPSC that the tooling on the Product had been modified to allow a screw to properly secure the hinge cover.

     While you advised MGA that Kids Station would redesign the Product, we are concerned about remaining inventory of the older Product.  We have had MGA's internal Quality Assurance team review the complaint and the Product, and they believe that it should be the subject of a voluntary recall, given the serious nature of the potential harm involved.  The consumer in the instant complaint purchased the Product at a Wal-Mart and it appears that older inventory is still on retail shelves, notwithstanding the design modification for newer models.

     Please note that  Article IX of the Agreement dated December 8, 2003 between Kids Station and Little Tikes (the "Agreement") provides that Licensed

Products that do not comply with all applicable laws shall be deemed unapproved.

Section 14.2 further provides that:

> Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials which have not been approved, or have been disapproved, pursuant to Article IX.

Therefore, please advise us of the total quantity of inventory of the old Product line, along with what steps you have taken to properly dispose of this inventory and replace it with modified Products. If Kids Station continues to sell the old Product line, MGA may exercise its termination rights under Section 14.2 as set forth above.

Very truly yours,

David G. Oakes,
Senior Counsel

2



Little Tikes Intranet: Incident Details

**Customer Information**

| | | | |
|---|---|---|---|
| Customer #: | 541762 | Address 1: | 2108 North Napa Court |
| Customer Type: | Consumer | Suite/Apt #: | -- |
| Company: | -- | City: | Hanford |
| First Name: | Angela | State/Province: | CA |
| Last Name: | Quick | Zip: | 93230 |
| Email: | | Country/Region: | USA |
| Day Phone: | 559-589-1914 | | |

**Incident # 71218**

Type: Injury/Immediate Attention

Product: Discover Sounds Camera Phone (152Y)

Contact Method: Phone

Created By: info17

Status: Closed

Created By/Date: info17 - 01/17/2008

Modified By/Date: lbolanos - 1/22/2008

Resolved By/Date: rgutknecht - 1/18/2008

**Incident Details**

consumer purchased product from walmart 3-4 months ago but it is cell phone w/keys she called to report choking hazard because piece of plastic where phone folds broke off and he choked on it I asked if pk and she said yes she is not sure how it came off as to if he banged it around or just broke off the items she gave me is KSL8033 do we even manufacture? please provide info pcp 01-17-08

**Resolution Details**

Child is 10 months old. Call tag 99739375004709G issued. CS ordered item 1693 Discover Sounds Boom Box as replacement. 1/18/08 rg.

CS spoke with Customer again. This appears to be a licensed product number KSL8033. Customer stated that her son had the piece that broke off the toy in his mouth and he started making a noise. The mother was immediately able to remove the item from his mouth and there were no injuries. No medical attention was required. Customer stated that she is not sure how the piece broke off, but she wanted us to be aware. 1/21/8 lb

# EXHIBIT D



Corporate Office

16380 Roscoe Blvd.
Van Nuys, CA 91406
USA

Phone:  818.894.2525
Fax:    818.895.0771

<u>VIA EMAIL, FAX AND OVERNIGHT EXPRESS DELIVERY</u>

February 5, 2008

Elliot S. Newman, President
Kids Station Toys Ltd.
1160 NW 163 Drive
Miami, FL 33169

     Re:   **Notice of Immediate Termination**

Dear Mr. Newman:

     This letter shall serve as Little Tikes' notice of immediate termination of the Agreement Between Kids Station Toys, Ltd. ("Kids Station") and The Little Tikes Company ("Little Tikes") dated December 8, 2003 and Addendum dated January 1, 2006 (the "Agreement") under Articles IX, XI and XIV, for the following reasons:

<u>KSL8033 Little Tikes Play Cell Phone and Electronic Light N' Sounds Key Ring</u>

     As you are aware a prior version of the KSL 8033, the Little Tikes Play Cell Phone and Electronic Light N' Sounds Key Ring (the "Product"), poses a significant danger to children as the hinge to the phone can easily be broken off and shatter into small sharp pieces.  We have received no response from you to our letter dated January 30, 2008 in which we notified you of a new consumer complaint, raised our concerns that the Product continues to be sold and advised Kids Station that it should implement a voluntary recall of all old units.

     On January 31, 2008, Channel KTTC in Rochester, Minnesota reported another incident about a mother finding a broken piece of the Product in her child's mouth. Fortunately, the mother was able to retrieve the piece before her child could swallow it. (This report is attached for your reference.)  We are extremely concerned that the report only identifies that the Product is a *Little Tikes Toy*, thereby leading the general public to believe that Little Tikes is the manufacturer, not Kids Station.  The damage such misinformation causes the Little Tikes name and brand is immediate and incalculable.

     While Kids Station has led us to believe that the Product was modified in September, 2007 by adding a screw to keep the hinge on the cell phone from breaking, I went to the Wal-Mart store in Panorama City, California on February 1, 2008 and found at least ten (10) or more units of the old unmodified Product on shelf, with stickers stating "Manufactured Sep. 07" "KST070900528402".  It is inconceivable that Kids Station continues to sell old unmodified Product and has made no effort to destroy or recall all old unsafe units.

We have reviewed Kids Station's Customer Service Call log for the time period of 10/01/07-12/31/07, and during that period, Kids Station's call logs note at least thirteen (13) choking hazard or broken pieces complaints reported about the Product. The call log had one-hundred fifty-two (152) complaints about the Product; however the records of those complaints do not have any description at all about the Customer's complaint or any resolution provided by Kids Station. As a result, we cannot begin to assess how many actual reports there were with regard to injuries or potential injuries to children. (As more fully set forth below, this log is not in compliance with the requirements of Article VII.)

In addition, we contacted Kids Station's Customer Service number, posing as a consumer, and were told by your customer service representative that Kids Station had never heard of any issue relating to the Product, nor received any complaints about it. This statement is deliberately false and intentionally misleading if made to concerned costumers.

Kids Station's continuing sales of the Product (which Little Tikes has disapproved), knowingly making false statements to consumers, and failing to notify the CPSC and voluntarily recall all old units of the Product, causes Kids Station to be in breach of the following provisions of the Agreement:

**ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS**

*Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA). User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards. Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped. User shall follow reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures. Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.*

**ARTICLE IX. APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES**

9.1    *Submission for Approval. User is responsible for the developing, designing and*

2

engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products. Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3. User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

> **Design Concept** (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1st annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

> **Decorated Prototype Sample**, (consisting of, but not limited to, a painted three dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

> **Pre-production Parts Samples** (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any case at least two (2) months prior to the intended commercial production of the Licensed Product;

> **Pre-Production Product Samples** (consisting of Product samples from the preproduction run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product; and

> **First Production Rim Samples** (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. **If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.**

3

### ARTICLE XIV. TERMINATION

*14.2 Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials that have not been approved, or have been disapproved, pursuant to Article IX. User acknowledges that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes.*

In addition to the foregoing, following are further *material* breaches of specific provisions of the Agreement:

1.          ### ARTICLE VI. INTELLECTUAL PROPERTY

*6.8 Use of the Trademarks on Quality Licensed Products. User may use the Trademarks only on licensed Products the quality of which is in all respects at least equal to products sold by Little Tikes.*

The quality of KSL8033 is far below the level of quality and safety that consumers expect from Little Tikes.

2.          ### ARTICLE VII. REPRESENATATIONS AND WARRANTIES, INDEMNITY AND INSURANCE

*7.2 Representations and Warranties of Use. User represents and warrants to Little Tikes the following: (a) User has full power and authority to enter into and perform this Agreement; (b) User shall create the Licensed Products as original works of authorship and shall design, manufacture, and sell them without violating the rights of third parties; and (c) to the best of its knowledge, after due inquiry has been made, the Licensed Products shall not infringe on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely affect Little Tike's exclusive rights in and to the*

4

*Licensed Rights, including the Trademarks; and (f) Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.*

Kids Station's continued sale of the unmodified and unapproved Product is a material breach of its representations and warranties that Licensed Products shall be free from defects.

3.          ARTICLE III. SAMPLES; SALES TO LITTLE TIKES

*3.1 User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start. No royalty shall be payable as to these free samples. In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.*

Despite our repeated requests, Kids Station has failed to provide samples of each Licensed Product to Little Tikes. While we have received samples of a few products, we have not received samples of all products and not in the quantities required by the Agreement or within the mandated time frames.

4.          ARTICLE IV. REPORTS AND PAYMENTS

*4.8     Distribution Report. User agrees to provide to Little Tikes, on or before April 30 of each calendar year during the Term, a distribution and sales plan (including, but not limited to, User's product development plans, advertising, and merchandising and promotional activities) for the remainder of that calendar year. User also agrees to provide to Little Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit sales by individual retail account for the previous calendar year.*

*4.9 Forecast Report. Each calendar quarter, User agrees to provide Little Tikes with a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter. These forecast reports are estimates only and are not binding on User.*

Kids Station has failed to provide any of these documents.

5.          **ARTICLE V. TERM OF THE AGREEMENT**

5.3     *Minimum Number of product introductions. During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain **new aesthetic or functional features**.*

Kids Station has failed to submit new product designs for 2008. The Agreement calls for "new" products, not old products with nothing more than a color change. We have seen very little from Kids Station overall which contains **new aesthetic or functional features**.

6.          **ARTICLE VIII. CONSUMER SERVICE**

8.1     *Telephone Support. User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products. The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following: (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 a.m. to 5 p.m. Monday through Friday, Eastern Standard Time); (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products; and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.*

The reports we have received, reviewed and analyzed from Kids Station, deviate substantially from the standards set forth above. For a large portion of the calls, no individual name was filled in and no information about these complaints was filled in so we could determine their nature. How can we properly evaluate the calls if the information is incomplete? These gaps in information lead us to conclude that Kids Station is not providing a comparable level of service offered by Little Tikes. Furthermore, the number of calls Little Tikes Consumer Service receives at its own customer service call center about lack of response from Kids Station customer service, as well as specific complaints we have previously reported to you, confirms Kids Station's failure to comply with this provision.

7.          9.2          *Compliance Samples. User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with*

6

> applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.

MGA/Little Tikes Quality assurance has repeatedly requested testing reports for Kids Station's Little Tikes products. Given current events in the toy industry it is vital that we have documentation that products bearing the Little Tikes' name are safe for children. Kids Station has failed to provide any testing reports to date.

8.          *12.2 User agrees to submit an Annual Marketing Plan for review by the Director of Licensing, within sixty (60) days before the start of each calendar year, using the Annual Marketing , Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.*

To date, we have not received Kids Stations' Marketing Plan for 2008.

9.          *Exhibit A*

> *User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers: Wal-Mart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed. Such report shall contain the participants attending the meeting, the place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.*

Kids Station has failed to provide these reports on a consistent basis.

For the foregoing breaches, Little Tikes must terminate the Agreement with immediate effect without waiving any of Kids Stations' obligations following termination as provided therein. If Kids Station fails to comply with the provisions and mandates of termination, Little Tikes will pursue all remedies available to it, both legal and equitable and with the appropriate State and Federal regulatory agencies.

The foregoing is not intended to be, nor may be construed to be, a full and complete statement of Little Tikes' legal or equitable rights and remedies in this matter, all of which are hereby expressly reserved.

Very truly yours,

David G. Oakes
Senior Counsel

7

attachment

cc:    Janet Han
       Spencer Woodman
       Ninette Pembleton
       Ed Gonzalez
       Charles Leuin, Esq.

8

News::Never Too Careful







**Never Too Careful**

Crystal Oko
KTTC-TV

ROCHESTER, MN – It was a close call for one Rochester parent. Her child almost choked on a small piece that popped off her toy.

No matter how hard parents try to watch their kids, they're bound to get into something they shouldn't be into. And with recent toy recalls, parents not only have keep their eyes on their playing children but the toys they're buying.

Mother Heidi Luther knows this too well. "I know every time I hear stuff about a recall I check the toys, check the numbers on them just to be sure. I'm very careful about that kind of thing."

Luther, mother of Paige, had the scare of her life when she found Paige with a small plastic part in her mouth.

"I took it out before she swallowed it. And then realized it was part of the toy she had gotten for Christmas, which was age-appropriate for her. So it really surprised me that it was such a tiny part that came off of my toy", says Luther.

The toy was the Little Tikes cell phone.

"It's about the size of a Tootsie Roll, kind of cut in half, and it just pops right off. She was able to get it off with no trouble at all."

Heidi immediately emailed the manufacturing company, explaining to them what happened. She hasn't heard anything back from them but wants parents to heed her warning.

"If they have a toy similar to the one she's got or other toys that may have small pieces that could come off, just to be extra careful and check them, and check them again before you give them to them and always watch them when they're playing."

The cell phone and key ring set were manufactured by Little Tikes last July.

Heidi hopes to get a reply back from the company soon.

Updated: January 31, 2008 3:02 pm

✉ E-mail This Story   🖨 Print This Story

More Headlines

Contact Us | NewsTeam | Sales Team | Advertise With Us | Privacy Policy | Terms of Use | FCC Info | Job Opportunities | Viewer Survey
Content Copyright KTTC TV 2008 ©
Digital Isx CW
6301 Bandel Road NW
Rochester, MN 55901-8924
Phone: (507) 288-4444
Fax: (507) 288-6291
Email: kttc@kttc.com





# Exhibit E



**Corporate Office:**

16300 Roscoe Boulevard
Van Nuys, CA 91406
Phone: 818/894-2525 (main)
Phone: 818/221-4571 (direct)
Fax:    818/895-0771
Writer's E-mail:
doakes@mgae.com

**VIA FEDERAL EXPRESS AND EMAIL**

March 11, 2008

Kid Station Toys Ltd.
1160 NW 163 Drive
Miami, Florida 33169
Attn: Elliot Newman

Re:    Little Tikes Products

Dear Mr. Newman:

We are addressing this letter to you pursuant to the notice provision in Article XX of the December 8, 2003 License Agreement between The Little Tikes Company and Kid Station Toys Ltd. (the "Agreement"), this is the address required for all notices. In view of the pending litigation between Kids Station Toys Ltd. of Hong Kong and Little Tikes and MGA Entertainment, Inc., Mr. Charles Leuin is, as a courtesy, being copied on this letter.

As you are aware, The Little Tikes Company, has received numerous reports related to the safety of a toy cell phone, model number KSL8033, manufactured by Kid Station under the Agreement. In addition to the reports set forth in my January 30 and February 5, 2008 letters, Little Tikes and its parent, MGA Entertainment, Inc., have recently become aware of a complaint brought by Mr. James Ferris related to the battery pack sold with the KSL8033 model number cell phone, which apparently leaked battery acid. Enclosed are email correspondences between Mr. Ferris and Oscar Radillo and Nicole Spain, both of Kid Station, regarding this subject.

Kid Station was aware of the potential choking hazard described above at least as early as May of 2007. Kid Station was also aware of the potential leaking battery issue as early as January 15, 2008. As you are also aware, MGA's investigation has confirmed that this product is still being offered for sale.

On February 5, 2008, Little Tikes terminated the Agreement pursuant to Section 14.2. Termination under Section 14.2 does not allow for any continued use of the LITTLE TIKES trademarks. The continuing sale of any products manufactured by Kid Station bearing the LITTLE TIKES trademarks, particularly the KSL8033 model toy cell phone, is causing, and is

likely to continue to cause, irreparable injury to the Little Tikes brand name under both the Trademark law and Section 14.2 of the Agreement.

Therefore, we demand that Kid Station immediately cease the sale or offering for sale of all products manufactured under the Agreement. Additionally, we demand that Kid Station immediately request all retailers stocking Kid Station's Little Tikes products to remove from their shelves all products manufactured by Kid Station, or any of its affiliates, bearing the LITTLE TIKES trademarks. Immediate termination of the Agreement under Section 14.2, as in the present situation, precludes any right of Kid Station to sell off products under Section 14.4. We likewise demand that Kid Station comply with its remaining obligations under the Agreement that survive termination, including, but not limited to, Kid Station's obligation under Section 14.6 to provide Little Tikes with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives, as well as Kid Station's obligations of confidentiality under Section 17.1.

Please confirm by March 14, 2008 that Kid Station has requested the immediate removal of its products bearing the LITTLE TIKES trademarks from all retail shelves, and that it will comply with its remaining obligations under the Agreement. If we do not hear from you by that date, we will assume that Kid Station does not intend to comply with its obligations, and we will be forced to seek removal of these products by other lawful means.

Very truly yours,

David G. Oakes

Enc.

cc:     Charles B. Leuin, Esq. (all w/e)
        Robert E. Browne, Esq.
        Jeanine Pisoni

## David Oakes

| | |
|---|---|
| **From:** | Ninette Pembleton |
| **Sent:** | Friday, March 07, 2008 11:25 AM |
| **To:** | David Oakes |
| **Subject:** | Kid Station |
| **Attachments:** | DSC_1957.JPG; DSC_1955.JPG; DSC_1956.JPG |

**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, March 07, 2008 11:15 AM
**To:** Ninette Pembleton
**Subject:** Fw: Replacements?

FYI    Ms Pembleton and thanks again for your quick response
I included pics of the toy phone I had sent to Ms Spain and Mr Radillo

—— Original Message ——
**From:** Oscar Radillo
**To:** 'Jim Ferris'
**Cc:** nspain@kidsstationtoys.com
**Sent:** Friday, February 15, 2008 9:47 AM
**Subject:** RE: Replacements?

Mr. Ferris:
I am sorry for the experience you had with Kids Station.
Under FedEx ground with tracking number 236269310094595, we are shipping today one KSL8033 and one KSL2021.
Also, we have addressed your safety concerns.

Oscar Radillo

> -----Original Message-----
> **From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
> **Sent:** Thursday, February 14, 2008 8:48 PM
> **To:** oradillo@craigelectronics.com
> **Cc:** nspain@kidsstationtoys.com
> **Subject:** Fw: Replacements?
>
> Mr Radillo
>
> I forward this series of emails for the purpose of alerting you to processes and personnel within your organization that need your attention. My first contact with Ms Spain was on January 15.
>
> I have received two phone calls from Ms Spain and both were very unprofessional. I was made to feel as if I was a liar and that customer satisfaction and **safety** was of absolutely no concern to her.

3/11/2008

This whole "mess" revolves around two inexpensive toys that were found to be defective and presented a hazard to children. Ms Spain's callous disregard and complete lack of empathy astounded me. The disappointment of two grandchildren having toys taken away on Christmas day ...... at least someone could have said "I'm sorry that happened" or "I sure am glad the acid didn't hurt your grandchildren". Any competent, caring person would have said I'm sorry but not Ms Spain. Contempt was more her style.

Based on Ms Spain's latest email, the toys have yet to be replaced. Should it take this long to replace two inexpensive toys? Is this what your company endorses as customer satisfaction?

I have complied immediately with her every directive.  I submitted pictures of the defective toys on January 16. I received absolutely no response.

Upon sending a followup email on January 30th requesting an update, all I received was excuses about how busy she was and how many defective toys Kids Station Toys was replacing.  She issued a FedEx pickup request for the next day. I packaged and labeled it for FedEx. Her emails below speak for themselves..... Excuses!

Mr. Radillo, I didn't threaten law suits, I didn't ask for medical assistance, I didn't go to the Better Business Bureau – I only asked for replacement of defective toys and for Kids Stations Toys / Little Tykes to address the safety issue.

Would you please replace my defective toys immediately?

More importantly, what assurances do I have that the safety issue is being addressed and is not just sitting in Ms Spain's inbox?

I do not wish and I will not accept any future calls from Ms Spain! I'm not interested in hearing any more about the internal issues within your organization or her tremendous workload. I want my toys immediately and I want assurance your quality control has addressed these safety issues.

Sincerely
James Ferris

----- Original Message -----
**From:** Nicole Spain
**To:** 'Jim Ferris'
**Sent:** Tuesday, February 12, 2008 8:44 AM
**Subject:** RE: Replacements?

Mr. Ferris: I processed your information on yesterday. Next step it goes to the warehouse. Once it get package it take 2-3weeks to ship. Or within that time frame.


Nicole Spain
Kids Station
Tel : 305-622-9505 ext 226
Fax: 305-622-9641

-----Original Message-----
**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, February 08, 2008 5:48 PM
**To:** Nicole Spain
**Cc:** oradillo@craigelectronics.com
**Subject:** Re: Replacements?

Thanks for the quick response – I did just as YOU ADVISED – I packaged it, labeled it with the address you gave me and put it outside my door.  FEDEX called to confirm, picked it up and left the following "call tag receipt" 9973302  50082462

For something that began as a email from me reporting a safety issue with your manufacturing/distribution process and a request for replacements for inexpensive defective toys, this has become a very troublesome matter to me. As I explained, these were Christmas presents and it is now February.


Please replace the defective toys as soon as possible.


----- Original Message -----
**From:** Nicole Spain
**To:** 'Jim Ferris'
**Sent:** Friday, February 08, 2008 3:25 PM
**Subject:** RE: Replacements?

Mr. Ferris: It was a mis-understanding on your behalf. In order for to send out a replacement part. we must receive the defective unit back from fedex. Normally when fedex deliver's returned unit's. It goes directly to the warehouse. ANd the warehouse manager will send me the paper work inside of the box. So that i can processed the inform,ation. Or contact the consumer about a replacement option. I have not sill received anything. Do you have that tracking # so that I can track it down.

Please be advised.

Nicole Spain
Kids Station
Tel : 305-622-9505 ext 226
Fax: 305-622-9641

-----Original Message-----
**From:** Jim Ferris [mailto:jamesferris@bellsouth.net]
**Sent:** Friday, February 08, 2008 11:02 AM
**To:** nspain@kidsstationtoys.com
**Cc:** oradillo@craigelectronics.com
**Subject:** Replacements?

Good morning Ms Spain

Upon your directions, I returned the defective toy phone to you.
During our last conversation I thought I understood that you would
send out replacement toys as soon as that day - easily could have been
a misunderstanding on my part and if so, I apologize.

I have yet to receive a confirmation  from you about your receipt of
the defective toy and have not received the replacements.

Could you please update me?

Jim Ferris
770-487-3234





# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

08-20393-CIV-KING

KIDS STATION TOYS, LTD.
A Hong Kong corporation,

        Plaintiff,

v.

THE LITTLE TIKES COMPANY,
an Ohio corporation,
MGA ENTERTAINMENT, INC.,
A California corporation,

        Defendants.
_____/

## ORDER CANCELLING PRELIMINARY INJUNCTION HEARING

On March 10, 2008, the Court set a Preliminary Injunction Hearing for the two-week trial calendar commencing May 12, 2008.

On April 2, 2008, the Court entered a Final Order of Dismissal which dismissed the above-styled action and directed the Clerk of Court to close the case.

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that the Preliminary Injunction Hearing scheduled for the two-week calendar of May 12, 2008 be, and the same is hereby **CANCELLED.**

1

DONE and ORDERED in chambers at the James Lawrence King Federal Justice

Building and United States Courthouse, Miami, Florida, this 2nd day of April, 2008.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

2

Copies furnished to:

**Counsel for Plaintiff:**
Charles B. Leuin, Esq.
Jason B. Elster, Esq.
Lori Anne Sochin, Esq.
Marlene K. Silverman, Esq.
Frank J. Ferak, Esq.
Paul T. Fox, Esq.
GREENBERG TRAURIG LLP
77 West Wacker Drive
Suite 2400
Chicago, IL 60601-1732
Facsimile: (312) 456-8400


**Counsel for Defendants:**
Judith M. Korchin, Esq.
HOLLAND & KNIGHT
701 Brickell Avenue
Suite 3000
Miami, Florida 33131

Lara Hirshfeld, Esq.
Michael G. Kelber, Esq.
Robert E. Brown, Esq.
NEIL GERBER & EISENBERGLLP
2 N. LaSalle Street
Suite 2200
Chicago, IL 6062

3

**Exhibit G**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-20393-CIV-KING/GARBER

| | |
|---|---|
| KIDS STATION TOYS LTD., <br> a Hong Kong corporation, <br><br> Plaintiff, <br><br> v. <br><br> THE LITTLE TIKES COMPANY, <br> an Ohio corporation, and MGA <br> ENTERTAINMENT, INC., a <br> California corporation, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff KIDS STATION TOYS LTD. ("Kids Station"), through its undersigned

attorneys, and for its Amended Verified Complaint against defendants THE LITTLE TIKES

COMPANY ("Little Tikes") and MGA ENTERTAINMENT, INC. ("MGA" and, along with

Little Tikes and Kids Station, the "Parties"), states as follows:

### Nature of the Case

1.      This action arises out of a wrongful scheme devised and carried out by Little

Tikes and its parent company, MGA, to attempt to improperly terminate an exclusive license

agreement between Kids Station and Little Tikes in order to eliminate Kids Station as a Little

Tikes licensee and retain all of the profits generated from the sale of Little Tikes products subject

to the license agreement rather than having to share those profits with Kids Station.

2.      At the time the license agreement was executed, Little Tikes was owned by

Newell Rubbermaid Inc. ("Rubbermaid"), which had extensive experience designing and

manufacturing the molded plastic toys for which Little Tikes had become known. However, Rubbermaid did not have similar experience producing electronic toys. Kids Station had extensive experience with electronic toys. Consequently, Rubbermaid licensed to Kids Station the exclusive right to manufacture and sell electronic toys bearing the Little Tikes name, including audio, video, music and roleplay toys. Kids Station and Little Tikes operated under the license agreement profitably and without any material disputes.

3.      In early 2007, MGA assumed control of Little Tikes after having purchased the company from Rubbermaid. Unlike Rubbermaid, MGA has significant experience producing electronic toys. Rather than viewing Kids Station as a valued partner, as Rubbermaid had, MGA viewed Kids Station as an unwanted competitor. From the moment that MGA took over management of Little Tikes, MGA manufactured a series of baseless complaints about Kids Station and its Little Tikes products in an attempt to justify early termination of the exclusive license that Kids Station possesses to produce Little Tikes electronic toys. MGA's first baseless attack occurred in March 2007 and involved a royalty audit report claiming that Kids Station owed Little Tikes $13.5 million in unpaid royalties. In fact, Kids Station had promptly and fully paid those royalties, owed nothing, and MGA abandoned its efforts to use the audit report as a means to terminate the license. Undaunted, MGA continued to manufacture issues regarding Kids Station's performance under the license agreement throughout the remainder of 2007 and 2008, culminating with MGA's purported termination of the license agreement on February 5, 2008. There are no legitimate grounds for termination of the license and this action challenges the wrongful and ineffective attempt to terminate the license and other misconduct perpetrated by Little Tikes/MGA pursuant to its scheme. It is upon those facts, as described in more detail below, that Kids Station seeks a declaration that Little Tikes' purported termination of the

CASE NO. 08-20393-CIV-KING/GARBER

license agreement is invalid and of no effect, an injunction against any attempts to enforce the termination, and a determination that Little Tikes has breached the Parties' agreement in numerous material respects.

## The Parties

4.      Plaintiff Kids Station, although erroneously identified by Little Tikes in the parties' agreement as a Florida corporation, is a Hong Kong corporation with its principal place of business in Miami, Florida and, as such, is a citizen of Hong Kong and Florida for diversity of citizenship purposes. As set forth in greater detail herein, plaintiff Kids Station has been the sole and exclusive party with whom Little Tikes contracted and with whom it has done business throughout the parties' agreement, is the party that has suffered injury as a result of defendants' wrongful conduct and is the party whose injury will be redressed by a favorable outcome in this suit.

5.      Kids Station is engaged in the business of designing, manufacturing and distributing a wide variety of electronic children's toys.

6.      Defendant Little Tikes is an Ohio corporation with its principal place of business, upon information and belief, in Hudson, Ohio and, as such, is a citizen of Ohio for diversity of citizenship purposes.

7.      Little Tikes is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers to produce toys under the Little Tikes name.

8.      Defendant MGA is a California corporation with its principal place of business in Van Nuys, California and, as such, is a citizen of California for diversity of citizenship purposes. MGA owns and operates Little Tikes and has done so since at least February 2007.

3

CASE NO. 08-20393-CIV-KING/GARBER

9.    MGA is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers.

### Jurisdiction and Venue

10.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c) because Little Tikes and MGA are subject to personal jurisdiction in this district, because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district and/or because a substantial part of the property that is the subject of the action is situated in this district. While the Agreement (as defined below) provides that disputes between Kids Station and Little Tikes are to be resolved in state or federal courts located in Cook County, Illinois, that location no longer bears any relationship to any of the Parties and none of the facts in dispute in this matter are connected to Illinois. That provision was included in the Agreement because, at the time the Agreement was executed, Rubbermaid, Little Tikes' owner, was headquartered in Illinois. As referenced herein, in 2007, Little Tikes was sold to MGA. When that occurred, any connection between the Agreement and Illinois was extinguished and no basis for litigation in that forum currently exists either with respect to the Parties or the claims here involved. In addition, MGA is not a party to the Agreement, had no relationship to Little Tikes at the time of entry into the Agreement and has no rights under the Agreement relating to any designated forum.

12.    Little Tikes and MGA are engaged in substantial and not isolated activity within the state of Florida or otherwise have submitted themselves to the jurisdiction of the courts of the

4

state of Florida and have sufficient contacts with the state to satisfy due process standards for being amenable to jurisdiction in this state.

<div align="center">**The Parties' License Agreement**</div>

13.    On or about December 8, 2003, Little Tikes and Kids Station entered into a License Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 1 and incorporated by reference herein. The Agreement was drafted by Little Tikes and provided to Kids Station to execute.

14.    The parties to the Agreement are Little Tikes and Kids Station. In the version of the Agreement prepared by or on behalf of Little Tikes and provided to Kids Station for its signature, Little Tikes erroneously identified Kids Station as "Kid Station Toys Ltd., a Florida corporation." There is no corporation affiliated with Kids Station named "Kid Station Toys Ltd." and Kids Station is aware of no Florida corporation by that name. Kids Station, as defined herein, was incorporated in Hong Kong and has its principal place of business in Miami, Florida. Kids Station is the party with whom Little Tikes entered into the Agreement. For over four years, since the execution of the Agreement in 2003, plaintiff Kids Station has performed all obligations of the "User," as defined in the Agreement, including but not limited to paying royalties to Little Tikes. For over four years, Little Tikes has accepted the benefit of Kids Station's performance under the Agreement.

15.    Under the Agreement, Little Tikes granted Kids Station an *exclusive* license to manufacture, market, sell and distribute certain electronic audio, video and music toys directed principally to children under the age of ten (10). *See* Ex. 1, § 2.1. Under the terms of the Agreement, Little Tikes is excluded from the manufacture and sale of Little Tikes products that have been licensed to Kids Station.

<div align="center">5</div>

16.     Rubbermaid, the parent company of Little Tikes at the time the Agreement was signed, was well known for its molded plastic products and had significant experience producing such products for the toy market (as did Little Tikes itself). However, neither Rubbermaid nor Little Tikes had expertise in designing or producing consumer electronics. Kids Station possesses substantial expertise in developing and producing consumer electronic toys. For that reason, Little Tikes granted Kids Station an exclusive license for a broad variety of consumer electronic toys.

17.     The specific "Licensed Products" covered by the Agreement are described in Exhibit A to the Agreement. As set forth therein, the Agreement grants Kids Station the exclusive right to manufacture, market, sell and distribute products falling into any of the following descriptive categories:

> **Category I:**  Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-long players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately, Youth designed telephones;
>
> **Category II:**  VCR players; DVD players, 2" - 19" black and white and color TV's with or without DVD and VCR players; and
>
> **Category III:** Electronic Youth "Real Music," including:   Electric Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone.

Ex. 1 at Ex. A.

18.     On or about January 1, 2006, the Parties entered into an Addendum to the License Agreement (the "Addendum") adding a fourth category of products to the exclusive license. That fourth category of products is defined as:

CASE NO. 08-20393-CIV-KING/GARBER

**Category IV:** Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats

Ex. 1 at Addendum.

19.    "Roleplay" electronic toys are designed for young children and do not actually function as the electronic device after which they are styled. For example, a roleplay cell phone is a toy that looks like a cell phone but that does not actually function as one. Instead, the keys of the roleplay cell phone would produce various sounds and entertainment functions when depressed to entertain and educate a small child.

<div align="center">

**The Parties' Mutual Satisfaction Under the Agreement
Prior to MGA's Purchase of Little Tikes**

</div>

20.    Throughout 2004 and 2005, Kids Station operated as Little Tikes' licensee under the Agreement to the mutual satisfaction of the Parties. Kids Station developed a successful line of electronic toys that were sold in major retailers, including Wal-mart and Toys "R" Us. Little Tikes and Kids Station operated without any material disputes for the benefit of both companies. In fact, Kids Station was recognized as an outstanding Little Tikes licensee on more than one occasion. In 2004, Kids Station received the Little Tikes Licensee of the Year Award. Kids Station also has been nominated for the Licensing Industry Merchandisers Association award for Best Corporate Brand Licensee of the Year for its efforts as a licensee of Little Tikes.

21.    Kids Station's success under the Agreement and Little Tikes' satisfaction with Kids Station's performance is further demonstrated by their agreement to the Addendum in January 2006, which broadened the scope of electronic products licensed to Kids Station. The 2006 selling season was a successful one, just like the seasons which had preceded it.

<div align="center">

7

</div>

22.    Each year, Kids Station markets its line of products to retailers in order to generate sales. The critical part of that process begins in the final months of the preceding calendar year and continues through beginning of the year. In January and February, Toy Fairs take place in various locations around the world. Each year during which the Agreement has been in effect, Kids Station has attended one or more of those Toy Fairs and marketed its products to major retailers. These efforts are critical to generating sales for the products subject to the license.

23.    During Rubbermaid's ownership of Little Tikes, Kids Station and Little Tikes developed an effective, agreed upon, and mutually satisfactory course of performance under the Agreement to implement its provisions relating to matters such as product approval and reporting.

## MGA Purchases Little Tikes and Begins
## Its Wrongful Efforts to Terminate the Agreement

24.    On or about September 11, 2006, MGA announced it had entered into an agreement to purchase Little Tikes from Rubbermaid. Unlike Rubbermaid, MGA is directly and significantly involved in the design and manufacture of consumer electronic products, including toys, a fact acknowledged in the press release announcing MGA's acquisition of Little Tikes.

25.    MGA acquired Little Tikes in early 2007, following the completion of the holiday selling season in 2006. As with every prior year that the Agreement had been in effect, Little Tikes and Kids Station had a cooperative and mutually successful year in 2006.

26.    Immediately upon the transfer of control of Little Tikes to MGA, Kids Station was warned by at least one former Little Tikes' employee that MGA intended to take back the electronic toy license represented by the Agreement by any means necessary.

8

27. MGA did not wait long to implement its wrongful scheme. On March 13, 2007, just weeks after Kids Station learned that MGA had completed its acquisition of Little Tikes, Kids Station was presented with a royalty audit report claiming that Kids Station owed Little Tikes in excess of $13.5 million in unpaid royalties. Despite the fact that Little Tikes had possessed the audit report (which was prepared by a third party) since July 24, 2006, it never had been mentioned previously to Kids Station, upon information and belief because Little Tikes knew the contents of the audit report were without merit.

28. Kids Station responded point by point to the issues raised in the audit report, showing each to be completely baseless. Little Tikes eventually acknowledged that the vast majority of the claims in the audit report were without merit, but continued to assert that more than $2 million in additional royalties were owed. When presented with irrefutable evidence showing that Little Tikes' "fallback" position was equally untenable, Little Tikes completely abandoned its unsupportable claim that Kids Station had failed to pay royalties due under the Agreement. The reason for that outcome is simple: throughout the term of the Agreement, Kids Station has paid Little Tikes every cent of royalties owed.

29. Little Tikes, through its new owner MGA, also adopted other tactics to interfere with Kids Station's operation under the Agreement. One such tactic involved the product approval process provided for in the Agreement. Little Tikes retracted approvals for several previously approved products and demanded modifications to numerous others, threatening disapproval of the products, despite the fact that once a product was approved by Little Tikes, the Agreement contemplates that it remains approved throughout the term of the Agreement.

30. In one particularly egregious case, Little Tikes gave approval for a digital camera designed by Kids Station, but then retracted it. Little Tikes initially approved that product for

inclusion in Kids Station's 2007 product line. However, after granting product approval, Little Tikes retracted its approval and prohibited Kids Station from selling the digital camera, claiming that it did not fall within the electronic audio, video and music toys licensed under the Agreement. After retracting its approval, Little Tikes developed and sold a similar digital camera. Upon information and belief, Little Tikes targeted Kids Station's customers for purchase of the digital camera. The digital camera was a successful product for Little Tikes and, upon information and belief, encouraged Little Tikes and MGA to more aggressively seek to eliminate Kids Station as a licensee.

31.     Since MGA's acquisition, Little Tikes has acted in bad faith to unreasonably withhold approval of Kids Station products and packaging in an attempt to force Kids Station to incur unnecessary expense redesigning previously approved products and packaging. Little Tikes even interfered with Kids Station's publication of a catalog of its 2008 products, claiming that previously approved products had to be redesigned in order to be included in the catalog.

32.     Little Tikes also has invoked phony "product quality" issues in improper attempts to terminate the Agreement.

33.     Since MGA took control, Little Tikes has asserted that Kids Station products suffer from quality problems, generally without providing specific information to enable Kids Station to meaningfully address those concerns. With respect to two products, Little Tikes attempted to retract previous approvals based on alleged quality concerns, although Little Tikes refused to specifically identify those concerns and failed to identify any problems, even after sample testing and review.

34.     In claiming Kids Station product quality problems, Little Tikes frequently has focused on either isolated and anecdotal customer product reviews on websites such as

Amazon.com or customer service calls to either Little Tikes' or Kids Station's customer service centers. Little Tikes ignores that fact that Kids Station has millions of satisfied customers of its Little Tikes products. There will always be a small number of complaints about any product, even one that conforms to all specifications and requirements.

### Little Tikes' Sale of Products in Violation of Kids Station's Exclusive License

35.    Little Tikes has repeatedly sold products in violation of Kids Station's rights under its exclusive license.

36.    For example, while roleplay cellphones are expressly within Kids Station's exclusive license, Little Tikes has sold several lines of roleplay cell phones in direct competition with Kids Station. Kids Station has objected to those sales, only to be told that Little Tikes would continue to sell the products.

37.    Little Tikes also has sold one or more models of electronic roleplay laptops and "boom boxes" that infringe on the exclusive license to Kids Station of products in that category. Again, Kids Station objected to this conduct, only to have its objections disregarded by Little Tikes. Similarly, Little Tikes has marketed and sold electronic keyboard products that infringe on the exclusive license to Kids Station of products in that category.

### Little Tikes' Wrongful Purported Termination of the Agreement

38.    On February 5, 2008, Little Tikes sent a letter to Kids Station purporting to immediately terminate the Agreement (the "Purported Termination Letter"). The grounds articulated in the Purported Termination Letter are not supported by the facts and, even if they were, are not a basis for immediate termination.

39.    The main issue Little Tikes raises in the Purported Termination Letter relates to a cellphone product known as the KSL8033 (the "8033"). The 8033 was originally approved by

11

Little Tikes in 2006 and also approved by Little Tikes in 2007. It also was tested and approved by Bureau Veritas, one of the foremost toy safety testing agencies. There is no factual basis for Little Tikes' assertion that any issue with respect to the 8033 justifies the Purported Termination Letter.

40.    In late September 2007, in response to a consumer contact with the CPSC regarding the product, Kids Station voluntarily proposed certain modifications to the 8033. Those proposed modifications were communicated to both the CPSC and to MGA and Kids Station implemented them in October 2007. After the modifications, Little Tikes approved the 8033, as did Bureau Veritas.

41.    The CPSC never has indicated that it believed it necessary or appropriate for Kids Station to take any action to prevent retailers from selling 8033s purchased prior to the modifications implemented in October 2007. In addition, prior to January 30, 2008, when Little Tikes sent a self-serving letter to lay the groundwork for its purported termination, neither Little Tikes nor MGA ever had indicated they believed it was necessary for Kids Station to take any action with respect to the 8033 other than the modifications that Kids Station had communicated to Little Tikes. Once the tooling was created to implement the modifications to the 8033, which occurred in October 2007, all 8033s shipped by Kids Station included those modifications.

42.    The other issues Little Tikes raises in the Purported Termination Letter are similarly pretextual and none of them constitutes grounds for immediate termination. In fact, the Agreement only permits immediate termination in one circumstance clearly not found here: the sale by Kids Station of disapproved products.

CASE NO. 08-20393-CIV-KING/GARBER

**Little Tikes' and MGA's Continued Attempts to Interfere
with Kids Station's Operation Under the Agreement**

43.    Since sending the Purported Termination Letter, Little Tikes and MGA continue to interfere with Kids Station's exercise of its rights under the Agreement.

44.    On March 11, 2008, MGA and Little Tikes improperly and unjustifiably demanded that Kids Station cease selling or offering to sell all products manufactured under the Agreement. MGA and Little Tikes also improperly and unjustifiably demanded that Kids Station cause all of its retailer-customers to remove from the retailer-customers' shelves all Little Tikes-branded products purchased from Kids Station.

45.    MGA and Little Tikes identified no provision of the Agreement that permits them to make the demands contained in their March 11, 2008 letter or that would require Kids Station to comply with any such demands, including but not limited to the commercially unreasonable demand that Kids Station seek to have retailers remove from their shelves all Little Tikes-branded products that those retailers purchased from Kids Station.

46.    MGA and Little Tikes also demanded that Kids Station provide Little Tikes one hundred units of each licensed item under the Agreement. However, because the Agreement has not been effectively terminated, there is no justification for that demand nor is Kids Station required to comply.

**COUNT I**
**Declaratory Judgment**
**(Against Little Tikes)**

47.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

48.    In the Purported Termination Letter, Little Tikes claims that grounds exist for immediate termination of the Agreement.

13

49.    Kids Station denies that it has committed any material breach of the Agreement and denies that Little Tikes possesses valid grounds for immediate termination of the Agreement. Little Tikes' purported termination is the culmination of Little Tikes' and MGA's campaign to manufacture a basis to terminate the Agreement so that Little Tikes can itself sell the products subject to the exclusive license.  Upon information and belief, the timing of Little Tikes' purported termination is intended both to cause Kids Station maximum harm and to allow Little Tikes to appropriate for itself the right to sell classes of Little Tikes products which are subject to Kids Station's exclusive license for the balance of this calendar year.

50.    There is a real, substantial and immediate controversy regarding Kids Station's exclusive license that requires adjudication by the Court.

51.    Kids Station seeks a declaration that there is no lawful basis for Little Tikes' purported termination of the Agreement and that the Agreement remains in effect as a binding and enforceable contract according to its terms.

52.    Kids Station will be irreparably harmed if the purported termination is permitted to take effect.  That irreparable harm will include Kids Station's loss of business and the total destruction of the significant goodwill Kids Station has created with its customers through years of work and investment of substantial monies.

## COUNT II
### Declaratory Judgment
### (Against Little Tikes and MGA)

53.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

14

54.    On March 11, 2008, MGA and Little Tikes sent a letter to Kids Station containing demands which were factually unsupported and in derogation of Kids Station's rights under the Agreement. Those demands included:

- that Kids Station cease selling or offering for sale all products manufactured under the Agreement;

- that Kids Station cause all retailers remove from their shelves all Little Tikes-branded products manufactured by Kids Station under the Agreement; and

- that Kids Station provide Little Tikes one hundred units of each licensed item under the Agreement.

55.    Kids Station denies that MGA or Little Tikes possesses any valid grounds for the demands set forth in MGA and Little Tikes' March 11, 2008 letter.

56.    There is a real, substantial and immediate controversy regarding the demands made by MGA and Little Tikes purportedly pursuant to the Agreement.

57.    Kids Station seeks a declaration that there is no lawful basis under the Agreement for MGA's or Little Tikes' demands as referred to in this Count and that Kids Station need not comply with such groundless demands.

## COUNT III
### Breach of Contract
### (Against Little Tikes)

58.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

59.    The Agreement is a valid and enforceable contract.

60.    Kids Station has performed all of its obligations to Little Tikes under the terms of the Agreement.

61.    Little Tikes has materially breached the Agreement by:

15

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

62.    Kids Station has sustained damages as a result of Little Tikes' breaches of the Agreement.

63.    Kids Station will be irreparably harmed by Little Tikes' continued violation of the Agreement, including through lost sales and injury to its goodwill.

## COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Little Tikes)

64.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

65.    In addition to its express terms, the Agreement includes an implied covenant of good faith and fair dealing between Little Tikes and Kids Station.

66.    Little Tikes' conduct as described herein violates the implied covenant of good faith and fair dealing. The conduct of Little Tikes which violates the covenant of good faith and fair dealing includes:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

16

67. Little Tikes also violated the covenant of good faith and fair dealing by purporting to act under the terms of the Agreement arbitrarily and for pretextual reasons.

68. Little Tikes also violated the covenant of good faith and fair dealing by improperly and wrongfully purporting to terminate the Agreement in violation of its terms and without just cause.

69. Kids Station has sustained damages as a result of Little Tikes' breaches of the covenant of good faith and fair dealing between the Parties.

## COUNT V
## Tortious Interference with Contract
### (Against MGA)

70. Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

71. The Agreement represents a valid and enforceable contract between Kids Station and Little Tikes.

72. Since its acquisition of Little Tikes, MGA always has been aware of the Agreement.

73. MGA has intentionally and unjustifiably through the conduct described herein induced Little Tikes to materially breach the Agreement by:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

74.    Kids Station has sustained damages as a result of MGA's actions and Little Tikes' breaches of the Agreement.

75.    Kids Station will be irreparably harmed by MGA's continued actions and Little Tikes' continued violation of the Agreement, including through lost sales and injury to its goodwill.

### COUNT VI
### Civil Conspiracy
### (Against Little Tikes and MGA)

76.    Kids Station repeats and realleges Paragraphs 1 through 46 as if fully set forth herein.

77.    As alleged in the foregoing paragraphs, MGA and Little Tikes have acted in concert and in consultation with each other for the purpose of interfering with and violating Kids Station's rights and entitlements under the Agreement.

78.    Specifically, MGA and Little Tikes, acting in concert, have intentionally and unjustifiably through the conduct described herein interfered with and violated Kids Station's rights by:

- Improperly refusing to approve products subject to the exclusive license granted in the Agreement;

- Improperly purporting to retract approval for previously approved products;

- Selling products in violation of the exclusive license granted in the Agreement; and

- Interfering with Kids Station's operation under the terms of the Agreement.

79.    As a result of the foregoing, Kids Station has sustained damages, and MGA and Little Tikes are jointly and severally liable for those damages, resulting from MGA's actions and Little Tikes' breaches of the Agreement.

18

CASE NO. 08-20393-CIV-KING/GARBER

80.    Kids Station will be irreparably harmed by MGA's and Little Tikes continued course of conduct and violation of the Agreement, including through lost sales and injury to its goodwill.

WHEREFORE, Plaintiff Kids Station Toys Ltd. respectfully requests that this Court enter judgment in its favor and against Defendants The Little Tikes Company and MGA Entertainment, Inc. and respectfully requests the following relief:

i)    A declaration that no grounds exist for Little Tikes' purported termination of the Agreement and that the Agreement remains in effect as a binding and enforceable contract according to its terms;

ii)    A declaration that no grounds exist for MGA's and Little Tikes' demands, including those set forth in their March 11, 2008 letter, that Kids Station cease selling or offering for sale all products manufactured under the Agreement, that Kids Station cause all retailers to remove from their shelves all products manufactured by Kids Station under the Agreement, and that Kids Station provide to Little Tikes one hundred units of each licensed item under the Agreement;

iii)    A temporary restraining order and preliminary and permanent injunction against Little Tikes and MGA preserving the status quo by requiring Little Tikes to continue operating under the terms of the Agreement until its conclusion and prohibiting Little Tikes from claiming that the Agreement has been terminated;

iv)    An award of all damages sustained by Kids Station as a result of Little Tikes' and MGA's wrongful conduct; and,

CASE NO. 08-20393-CIV-KING/GARBER

v)    An award of any and all further relief that the Court deems necessary and just.

Respectfully submitted,

MARLENE K. SILVERMAN
Florida Bar No. 0226947
LORI A. SOCHIN
Florida Bar No. 0013048
**GREENBERG TRAURIG, P.A.**
*Counsel for Kids Station Toys Ltd.*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
E-mail: silvermanm@gtlaw.com
E-mail: sochinl@gtlaw.com

_____/s/ Marlene K. Silverman_____
MARLENE K. SILVERMAN

Of Counsel:
Paul T. Fox (ARDC No. 3121741)
Charles B. Leuin (ARDC No. 6225447)
Paul J. Ferak (ARDC No. 6272208)
Jason B. Elster (ARDC No. 6289434)
GREENBERG TRAURIG LLP
77 W. Wacker Drive, Suite 2500
Chicago, IL 60601
(312) 456-8400
*Attorneys for Plaintiff*
*Kids Station Toys Ltd.*

Dated:   March 14, 2008

## <u>VERIFICATION</u>

I verify under penalty of perjury under the laws of the United States of America that the factual allegations contained in the foregoing are true and correct to the best of my knowledge, except as to those allegations made on information and belief, all of which allegations I believe to be true. Executed on March 14, 2008.

Elliot S. Newman

CASE NO. 08-20393-CIV-KING/GARBER

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 14th day of March, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties listed on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                              /s/ Marlene K. Silverman
                              MARLENE K. SILVERMAN

# EXHIBIT 1

ORIGINAL

## LICENSE AGREEMENT

This Agreement is effective as of this 8th day of December, 2003, by and between The Little Tikes Company, an Ohio corporation, having a principal place of business at 29 East Stephenson Street, Freeport, Illinois 61032   (hereinafter referred to as "Little Tikes") and Kid Station Toys Ltd., a Florida corporation, having its principal place of business at P.O. Box 694660, Miami, FL 33268-4660 (hereinafter referred to as "User").

## RECITALS

WHEREAS, Little Tikes has used and is the owner of the famous, distinctive and valuable trademark LITTLE TIKES (with and without an associated logo) (the "Trademarks," as defined below) known throughout the world for high quality consumer and commercial products that are used in a variety of environments; and

WHEREAS, User is desirous of manufacturing and selling Electronic Audio, Video and MusicToys ("Product") in the Territory (as defined below) using the Trademarks, and is desirous of acquiring a license with respect to such rights:

NOW, THEREFORE, the parties hereto, in consideration of the mutual agreements herein contained and promises herein expressed and for other good consideration acknowledged by each of them to be satisfactory and adequate, do hereby agree as follows:

1

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

ARTICLE I. DEFINITIONS

The following terms shall have the following meanings when used in this Agreement and the schedules attached hereto:

1.1    "Authorized Channels" means all Mass Market, Electronic Specialty, Discount and Warehouse Clubs, Toy Specialty, Drug, Mid-Tier, Department Stores, Grocery, Internet and Catalog in the Territory.

1.2    "Core Target Market" means the market for Products directed principally to children under the age of ten (10).

1.3    "Licensed Products" means the Products specified in Exhibit A designed for children in the Core Target Market. The Licensed Products shall be designed and made available in accordance with the product specification attached as Exhibit A (as may be amended from time to time by agreement of the parties).

1.4    "Trademarks" means the trademarks owned or controlled by Little Tikes as are specifically detailed in Exhibit B; i.e., "LITTLE TIKES" and the "LITTLE TIKES" logo, and any other trademark specifically designated in writing by Little Tikes for use on or in connection with the Licensed Products.

1.5    "Licensed Rights" means all intellectual property, including titles, personae, places, props, materials, copyrights and derivative works, patents, designs, trademarks, trade dress,

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc
2

and other intellectual property in and/or relating to the Licensed Products that have been designed or prepared for or by User for use in connection with the Licensed Products, as well as the Trademarks.

1.6    "Term" means the term as defined in Article V.

1.7    "Territory" means the United States, Canada, and Mexico.

1.8    "Net Sales Price" shall mean the gross selling price of Licensed Products sold by User, less a flat twelve percent (12%) deduction to cover any and all of the amount of credits or other terms allowed by User to its customers relating to all freight, insurance, transportation charges, trade discounts, advertising allowances, sales taxes and other usual deductions, charges, discounts, returns, allowances, credits or adjustments to the gross selling price.  The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first.

1.9    "Shipping Date" shall mean the date no earlier than the date of execution of this Agreement and no later than October 1, 2004.

ARTICLE II. GRANT

2.1    License.  Subject to the terms and conditions hereof, Little Tikes hereby grants to User, for the Term, in the Territory and through the Authorized Channels, an exclusive,

royalty-bearing license to utilize the Licensed Rights solely on or in connection with the manufacture, marketing, sale and distribution of the Licensed Products.

2.2    No Sublicensing.    User shall have no right to sublicense any of the rights which are licensed under this Agreement.

2.3    Limited License.    User agrees that the license granted hereunder applies only to the use of the Licensed Rights in connection with the Licensed Products sold through Authorized Channels in the Territory, and that this license does not extend to any other trade name, trademark, or other intellectual property that Little Tikes or its affiliates may own or use, or to the use of the Licensed Rights on products other than Licensed Products, or outside of the Authorized Channels, or outside of the Territory. Little Tikes does not grant any right to use all or any part of the Trademarks in the name or style of User or of any subsidiary, division or subdivision of User, or of any corporation or other business entity, shop or establishment. User agrees that it will not incorporate or use the Trademarks or similar words thereto in conjunction with its company name or as a trademark or as a generic name during or after the period of this Agreement.  User agrees not to register or use any of the Trademarks or any parts thereof or terms confusingly similar thereto as part of an Internet or website address, a Universal Resource Locator ("URL"), or as a domain name.

2.4    Best Efforts; No Competition.    User shall use its reasonable best efforts to market, sell, and distribute Licensed Products according to the terms and subject to the conditions hereunder. User shall not develop, manufacture, sell, supply, or market products to be sold

under major toy brands (e.g., without limitation, Fisher-Price, Playskool, Leap Frog, etc.) that directly compete with the Licensed Products, unless otherwise approved in writing by Little Tikes, which approval shall not be unreasonably withheld

## ARTICLE III. SAMPLES; SALES TO LITTLE TIKES

3.1    User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start.  No royalty shall be payable as to these free samples.  In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.

3.2    User shall sell Licensed Products to Little Tikes, at the lowest price offered by User to other third parties, for distribution by Little Tikes through Little Tikes-owned retail stores and for sales to Little Tikes and Newell employees.  No royalty shall be payable as to these sales.

## ARTICLE IV. REPORTS AND PAYMENTS

4.1    Running Royalties.  As consideration for the licenses granted herein, User shall pay during the Term of this Agreement the earned, running royalties ("Running Royalties") at the rate of five percent (5%) of the Net Sales Price for domestic and FOB sales  for Category

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

I (as set forth in Exhibit A) based upon sales of Licensed Products by User; three percent (3%) of the Net Sales Price for domestic and FOB sales for Category II (as set forth in Exhibit A) based upon sales of Licensed Products by User and for Category III (as set forth in Exhibit A): five percent (5%) of Net Sales for domestic and FOB sales or seven percent (7%) of Net Sales for domestic and FOB sales if a Licensed Product originated from or is designed and/or engineered in whole by Little Tikes. The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first. All sales by User of Licensed Products to any of its affiliates or to any entity or person associated with User, including all inter-company transactions, shall be carried on User's books of account at the full regular wholesale price charged to unrelated third parties, and User shall account for and pay Running Royalties to Little Tikes on all such sales as if they occurred on an arms-length basis to an unrelated wholesale account.

4.2    _Guaranteed Annual Royalty Payment_. In accordance with the following schedule, User shall pay to Little Tikes in U.S. dollars a minimum guaranteed annual royalty payment (the "Guaranteed Annual Royalty Payment") regardless of the sales levels of the Licensed Products as follows:

| Due Date | Amount Due | Applicable Calendar Year |
|---|---|---|
| Category I and II: | | |
| Upon Signing | $25,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $35,000.00 | October 1, 2003 – June 30, 2005 |
| September15, 2005 | $20,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $45,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $20,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $55,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $20,000.00 | July 1, 2007 – June 30, 2008 if Renewal Term |

is exercised by User pursuant to paragraph 5.2 hereunder

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

6

March 15, 2008        $55,000.00        July 1, 2007 — June 30, 2008 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008    $20,000.00        July 1, 2008 — June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009        $55,000.00        July 1, 2008 — June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder

Category III:

| | | |
|---|---|---|
| Upon Signing | $50,000.00 | October 1, 2003 — June 30, 2005 |
| December 15, 2004 | $25,000.00 | October 1, 2003 — June 30, 2005 |
| September 15, 2005 | $25,000.00 | July 1, 2005 — June 30, 2006 |
| March 15, 2006 | $50,000.00 | July 1, 2005 — June 30, 2006 |
| September 15, 2006 | $25,000.00 | July 1, 2006 — June 30, 2007 |
| March 15, 2007 | $75,000.00 | July 1, 2006 — June 30, 2007 |
| September 15, 2007 | $25,000.00 | July 1, 2007 — June 30, 2008 if |

Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2008        $75,000.00        July 1, 2007 — June 30, 2008 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008    $25,000.00        July 1, 2008 — June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009        $75,000.00        July 1, 2008 — June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder

Running Royalties shall be credited against Guaranteed Annual Royalty Payments, so that

the amount of Guaranteed Annual Royalty Payment due and payable is reduced by the

amount of the Running Royalties paid to Little Tikes.   If Running Royalties in a calendar

year exceed the Guaranteed Annual Royalty Payment for that calendar year, then no payment

is due under Section 4.2.   Guaranteed Annual Royalty Payments may only be applied against

the calendar year that they relate to and may not be applied to any other calendar year.

Guaranteed Annual Royalty Payments for Category I and Category II may not be applied to

Category III and Guaranteed Annual Royalty Payments for Category III may not be applied

to Category I and Category II.

4.3    Advance Payments.  User shall pay to The Beanstalk Group, LLC, 28 East 28th Street, 15th Floor, New York, NY 10016 ("Beanstalk"), on behalf of Little Tikes, a non-refundable advance payment of  Twenty Five Thousand Dollars ($25,000.00)  for Categories I and II; and Fifty Thousand Dollars ($50,000.00) for Category III (together, the "Advance") upon signing of this Agreement.  This Advance shall be credited against User's Running Royalty Payment for the year commencing October 1, 2003 and ending June 30, 2005.

4.4    Quarterly Report and Payment.  Within thirty (30) days following the end of each calendar quarter, starting with the month following the quarter in which sales of the Licensed Products commence, User shall submit to Beanstalk (with a copy to Little Tikes), a statement, certified by an officer of User to be accurate, showing separately for each of the Licensed Products, on a country-by-country basis, the number, description and sales price for each Stock Keeping Unit ("SKU") of each Licensed Product sold by User during the preceding calendar quarter, and the calculation of Running Royalties due Little Tikes for such calendar quarter.  User shall transmit to Beanstalk, on behalf of Little Tikes, payment of the amounts due under this Agreement concurrently with the rendering of the statement for the period.  If Little Tikes at any time so requests, User's reports shall be made in the form set forth in Exhibit C attached hereto or in another form to be provided by Little Tikes to User in the future.  A copy of the reports and a copy of the check in Little Tikes' favor shall be delivered to The Little Tikes Company, Attention:  Director of Licensing, 2180 Barlow Road, Hudson, Ohio 44236.

4.5    Annual Report and Payment.  Together with the quarterly royalty report provided for

sales occurring during the fourth calendar quarter of each calendar year during the Term,

User shall provide Beanstalk (with a copy to Little Tikes) with a year end report showing

separately for each SKU of each  Licensed Product, on a country-by-country basis, the

number, description and sales price for each Licensed Product sold by User during the

preceding calendar year, and the calculation of Running Royalties due Little Tikes

hereunder. This report shall be accompanied by  payment to Beanstalk, on behalf of Little

Tikes, of any Guaranteed Annual Royalty Payment that is due.


4.6    Record Keeping. User shall keep full and accurate books of account, records, data,

and memoranda respecting the manufacture and sale of the Licensed Products in sufficient

detail to enable the payments hereunder to Little Tikes to be determined. Little Tikes, at its

sole cost and expense, shall have the right to conduct examinations of the books and records

pertaining to such statement for a period of two (2) years from the date on which such report

is furnished to Beanstalk and Little Tikes for the purpose of verifying the reports provided

for in this Agreement. Such examinations shall be conducted by an independent auditor or

representative of Little Tikes, upon prior written notice of at least seven (7) days and not

more often than once in any calendar year (unless Little Tikes discovers a discrepancy

requiring additional audits), and in such manner as to not unduly interfere with the business

of User. Each examination shall be at the expense of Little Tikes unless the examination

discloses a discrepancy in favor of User exceeding by more than five percent (5%) of the

total amounts paid to Little Tikes during the period covered  by the examination, in which

case, User shall pay Little Tikes for all the direct and verifiable expenses of that

examination. Payments found to be due Little Tikes as a result of an examination and the applicable interest shall be paid immediately as set forth herein.

4.7     Payments and Calculations in U.S. Dollars; Interest on Past Due Payments; Tax Payments.  All Running Royalties shall be paid in U.S. dollars on the day payment is due, except that any past due payment shall be at the rate prevailing when such payment became due.  Sales made in currency other than U.S. Dollars shall be converted to U.S. Dollars, at Licensee's sole expense, as of the date that Running Royalties on those sales are due.  It is further understood and agreed that User shall pay interest to Little Tikes upon any and all Running Royalties that are at any time overdue, said interest to be computed at the rate of two percent (2%) per annum over the prime interest rate charged by Chase Manhattan Bank in New York from the date when such Running Royalties are due and payable as provided herein to the date of payment.

User shall withhold as taxes on all payments to be made to Little Tikes only such amounts as are absolutely required to be withheld by law in the country from which payment is being made.  User shall submit to Little Tikes originals of the remittance voucher and the official receipt evidencing the payment of the corresponding taxes.  User shall fully cooperate with Little Tikes and provide such information and records as Little Tikes may require in connection with any application by Little Tikes to the tax authorities in any country of the Territory and/or the United States of America including but not limited to, the obtaining of a credit for any withholding tax paid in the Territory or any country from which Running Royalties and any other payments are being made by User to Little Tikes pursuant to this Agreement.

4.8     Distribution Report.   User agrees to provide to Little Tikes, on or before April 30 of
each calendar year during the Term, a distribution and sales plan (including, but not limited
to, User's product development plans, advertising, and merchandising and promotional
activities) for the remainder of that calendar year.   User also agrees to provide to Little
Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit
sales by individual retail account for the previous calendar year.

4.9     Forecast Report.   Each calendar quarter, User agrees to provide Little Tikes,  with a
forecast report containing an estimate of units sales of Licensed Products and gross dollar
volume sales of Licensed Product for that calendar quarter.  These forecast reports are
estimates only and are not binding on User.

## ARTICLE V. TERM OF THE AGREEMENT

5.1     Initial Term.   The initial term of the license granted herein shall be from the date of
execution of this Agreement until June 30, 2007 (the "Initial Term"), subject to any earlier
termination or extension of this Agreement.

5.2.    Renewals.

    (a)     User shall have the right to extend the Agreement for Categories I and II only
            beyond the Initial Term for  an additional two year term  commencing July 1,
            2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at
            least $200,000.00 in Running Royalties for Categories I and II combined by

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc
11

December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term.

(b)   User shall have the right to extend the Agreement for Category III only beyond the Initial Term for an additional two year term commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $250,000.00 in Running Royalties for Category III by December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term

5.3.   Minimum Number of Product Introductions.   During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain new aesthetic or functional features.

ARTICLE VI. INTELLECTUAL PROPERTY

6.1   Ownership of the Licensed Rights.   User acknowledges that Little Tikes is the sole owner of all right, title and interest in and to the Licensed Rights and Trademarks in any form or embodiment thereof, in the Territory, and is also the sole owner of the goodwill attached or which shall become attached to the Licensed Rights and Trademarks in connection with the business and goods in relation to which the same has been, is, or shall be used.

6.2    Exclusive Rights.  All Licensed Rights developed by User for use in or in connection with the Licensed Products shall be the sole and exclusive property of, and title shall vest in, Little Tikes or its nominee, from and after the time it is created, and User shall cooperate with Little Tikes, at the sole expense of Little Tikes, to secure and perfect such Licensed Rights in the name of Little Tikes as Little Tikes' sole and exclusive property.

6.3    Work Made for Hire.  To the extent that any of the Licensed Rights is specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, the parties agree that the Licensed Rights shall be considered a "work made for hire" under 17 U.S.C. § 101 owned by Little Tikes.   For the avoidance of doubt, User acknowledges that the copyrights and all other proprietary rights in and to the Licensed Rights and any derivatives thereof are exclusively owned and reserved to Little Tikes.  User shall neither acquire nor assert copyright ownership or any other proprietary rights in and to the Licensed Rights or any derivatives thereof.

6.4    Assignment.  With respect to any rights in the Licensed Rights other than the rights described in Section 6.3, above, User agrees to assign and hereby assigns to Little Tikes or its nominee, the sole and exclusive right, title and interest in the United States and all foreign countries, in and to the Licensed Rights, including without limitation any and all related patent, copyright, trade secret, trade dress, trademark, design, and other relevant proprietary

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc
13

rights of any nature whatsoever, as well as the right of priority, and all applications for trademark registration, copyright registration, mask work protection, design registration, or other protection. Little Tikes has the sole discretion as to when and in which countries to file for intellectual property registrations (including patents, trademarks, and copyrights) relating to any and all Licensed Rights.

6.5    <u>Patent Prosecution and Related Activities.</u> Little Tikes or its nominee, at its sole cost and expense, shall have the sole right to file and prosecute applications for letters patent, trademark registrations, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights. In the event that Little Tikes declines, after notice from User, to file and prosecute applications for letters patent, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights (but excluding the Trademarks), User may, with the prior written approval of Little Tikes, file and prosecute said applications and registrations in the name of User. In the event that User files and prosecutes said applications, User shall bear any and all costs, including reasonable attorney's fees, associated with User's filing and prosecuting said applications. In no event shall User file any applications for trademark registration or any other type of intellectual property protection covering the Trademarks.

6.6    <u>Cooperation.</u> User shall, at Little Tikes' request and at Little Tikes' expense, assist Little Tikes to obtain, maintain and protect the rights of Little Tikes in the Licensed Rights and Trademarks. User warrants and agrees to execute and deliver to Little Tikes, and to cause its employees, its subcontractors and their respective employees to execute and deliver

to Little Tikes, any and all documents that Little Tikes may reasonably request to convey to

Little Tikes any interest User, its subcontractors or their respective employees may have in

any Licensed Rights or Trademarks, or that are otherwise necessary to protect and perfect

Little Tikes' interest in such Licensed Rights. User further warrants and agrees to take and

cause its employees, its contractors and their respective employees to take such other actions

as Little Tikes may reasonably request to protect and perfect Little Tikes' interest in any

Licensed Rights and Trademarks.


6.7    Use Inures to Little Tikes. Any use of the Trademarks by User shall inure to the

benefit of Little Tikes. On Licensed Products, Licensed Product packaging and

advertisements, User will clearly disclose Little Tikes' ownership of the Trademarks in the

form prescribed in Exhibit B. User will not, at any time, do or suffer to be done any act or

thing which may in any way adversely affect any rights of Little Tikes in and to the

Trademarks or any registrations thereof.


6.8    Use of the Trademarks on Quality Licensed Products . User may use the Trademarks

only on those Licensed Products the quality of which is in all respects at least equal to

products sold by Little Tikes. User shall manufacture the Licensed Products in accordance

with the approved designs, materials, tolerances of manufacture and assembly, testing and

packaging specifications approved by Little Tikes. All uses of the Trademarks must be in

conformance with Little Tikes' guidelines for the use thereof, which guidelines shall be

provided by Little Tikes. User shall not deviate substantially from such specifications

without written approval from Little Tikes. If at any time Little Tikes, at its sole discretion,

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

15

determines that any of the Licensed Products manufactured or sold by User do not conform

to the previously approved production sample, then upon written notice by Little Tikes,

permission to use the Trademarks as set forth herein may be immediately withdrawn, and

User hereby covenants and agrees that it will cease and desist any and all such use, either

directly or indirectly, immediately upon such notice until notified in writing by Little Tikes

that use may be resumed. User agrees that Little Tikes may supplement the above identified

specifications at any time, and User agrees to manufacture Licensed Products which will

conform to any supplemental specifications within agreed upon time tables.


6.9    Protecting the Licensed Rights. User shall cooperate fully and in good faith with

Little Tikes for the purpose of securing, preserving and protecting Little Tikes' rights in and

to the Licensed Rights.


6.10    Compliance with Legal Requirements. User will use the Licensed Rights in the

Territory strictly in compliance with the legal requirements applicable therein. Whenever

User uses any of the Licensed Rights which are registered on any Licensed Product,

packaging, labeling, or in any advertisement, it must be marked to indicate ownership and

registration in accordance with applicable law. Upon expiration or termination of this

Agreement for any reason whatsoever, User will execute and file any and all documents

required by Little Tikes terminating any and all ownership rights which User may have

acquired in the Trademarks and in the Licensed Rights.

6.11    Notice of Infringement. User shall promptly notify Little Tikes in writing of any third party infringement or imitation of the Licensed Rights or any of them, when the same comes to its attention. Upon receipt of such notice, Little Tikes may, in its sole discretion, take such action against third parties it considers advisable for the protection of the Licensed Rights.  In no event may User initiate any action or proceeding against such third parties.

6.12    Enforcement Actions. At Little Tikes' discretion, User may join or be joined as interested parties in any action that may be brought for infringement by others of the Licensed Rights, and participate and share the cost of such suits and any recoveries therein to an equal extent.

6.13    No Transfer of User's Pre-Existing Intellectual Property. Nothing herein shall be construed to transfer ownership of any of User's pre-existing proprietary rights incorporated in Licensed Products.   The parties understand and agree that technology that is incorporated into Licensed Products is the sole property of User, and that all other property rights incorporated into Licensed Products are the sole property of Little Tikes, and each party agrees to take such actions as are reasonably required by the other party to secure and perfect these proprietary rights in the respective parties.

## VII. REPRESENTATIONS AND WARRANTIES, INDEMNITY AND INSURANCE

7.1    Representations and Warranties of Little Tikes. Little Tikes represents and warrants to User the following: (a) Little Tikes is the sole and exclusive owner of all rights to the Trademarks and has the right to grant the licenses and rights granted in Article II with

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

17

respect to the Trademarks; (b) Little Tikes has full power and authority to enter into and

perform this Agreement; (c) there is no claim, action, suit or proceeding relating to this

Agreement or the Trademarks pending or threatened before any court that would impair

User's right to use the Trademarks; (d) any and all information or materials developed by

Little Tikes shall be the original work of Little Tikes (except for materials in the public

domain) and Little Tikes shall not use any information or materials which are not original

unless it has obtained such information or materials from User or has received specific

authorization in writing from the owner of such information and materials to use them; (e) to

the best of Little Tikes' knowledge, after due inquiry has been made, no information or

materials furnished to User by Little Tikes infringes on any third party intellectual property

rights including, without limitation, patents, copyrights and trademarks, and no such

information is defamatory or constitutes a violation of the right of privacy or publicity of any

third party; and (f) so long as this Agreement is in effect, Little Tikes shall not commit any

act or enter into any agreement which could adversely affect User's entitlement to enjoy the

full benefit of the rights, title, and interests herein granted.


7.2    Representations and Warranties of User.  User represents and warrants to Little Tikes

the following: (a) User has full power and authority to enter into and perform this

Agreement; (b) User shall create the Licensed Products as original works of authorship and

shall design, manufacture, and sell them without violating the rights of third parties; and (c)

to the best of its knowledge, after due inquiry has been made, the Licensed Products shall

not infringe on any third party intellectual property rights including, without limitation,

patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

18

of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely affect Little Tike's exclusive rights in and to the Licensed Rights, including the Trademarks; and (f) Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.

7.3    Indemnification by User.  User shall defend, indemnify and hold Little Tikes, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by User of any of the warranties, representations or agreements made by User hereunder, and from actions of User in this Agreement not authorized by Little Tikes, from product liability claims arising from the Licensed Products, including those claims that may be attributable to any defect in the Licensed Products regardless of when such defect shall be discovered, and from intellectual property claims by third parties (except those claims arising from User's approved use of the Licensed Rights) arising from the Licensed Products.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by User of any warranty, undertaking, representation or

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

19

agreement entered into herein or hereunder, or any other such claim as specified in this

Section, Little Tikes shall give prompt written notice of such claim to User. User shall have

the right to assume the defense of such claim at User' sole cost and expense by furnishing

Little Tikes with written notice of same. User shall be liable for all losses, costs, expenses,

damages, or recoveries (including without limitation, amounts paid in settlement and

reasonable attorney's fees based on such claim) suffered, made or incurred by either User or

Little Tikes. User shall not, in settlement or otherwise, admit liability or otherwise prejudice

Little Tikes without first receiving the written consent of Little Tikes.


7.4    User's Insurance. User shall maintain in full force and effect at all times while this

Agreement is in effect and for three (3) years thereafter, comprehensive general and

commercial liability insurance, including broad form advertising, contractual, property

damage, and product liability coverage waiving subrogation with combined single limits of

no less than $2 million. User shall include Little Tikes as an additional insured on User's

insurance policy, and said insurance shall always be the primary coverage for the Licensed

Products shipped by User hereunder, notwithstanding any other provision herein including

Little Tikes' contribution, if any, to product development, design and/or engineering. User

shall deliver to Little Tikes a certificate or certificates of insurance evidencing satisfactory

coverage and indicating that Little Tikes shall receive written notice of cancellation, non-

renewal or of any material change in coverage at least 30 days prior to the effective date

thereof. User shall carry insurance with an insurance company having a BEST rating of A-

V.

7.5    Indemnification by Little Tikes.  Little Tikes shall defend, indemnify and hold User, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by Little Tikes of any of the warranties, representations or agreements made by Little Tikes hereunder.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by Little Tikes of any warranty, undertaking, representation or agreement entered into herein or hereunder, User shall give prompt written notice of such claim to Little Tikes.  Little Tikes shall have the right to assume the defense of such claim at Little Tikes' sole cost and expense by furnishing User with written notice of same.  Little Tikes shall be liable for all losses, costs, expenses, damages, recoveries (including without limitation, amounts paid in settlement and reasonable attorney's fees based on such claim) suffered, made or incurred by either Little Tikes or User.

7.6    Limitation of Liability.  Under no circumstances shall either party be entitled to recover from the other party any consequential, incidental, indirect, special or punitive damages, excluding claims made under Sections 7.3 or 7.5, whether in contract or in tort, including claims for negligence, even if the party has been advised of the possibility of such damages.  Each party acknowledges that the foregoing waiver serves as a material inducement for it to enter into this Agreement.

ARTICLE VIII. CONSUMER SERVICE

8.1     Telephone Support.  User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products.  The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following: (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 a.m. to 5 p.m. Monday through Friday, Eastern Standard Time);  (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products;  and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.

8.2     Reporting.  Within thirty (30) days after the end of each calendar quarter, User agrees to provide a report to Little Tikes, attention Director of Marketing – Licensing, detailing the consumer service activities of User for the Licensed Products for the preceding quarter.

8.3     Responsible Persons.  User agrees to provide to Little Tikes, Manager of Consumer Service, the names of at least two (2) employees of User responsible for consumer service activities relating to the Licensed Products and to update Little Tikes Manager of Consumer Service when any changes are made concerning those employees of User that are responsible for such consumer service.

8.4.  Warranty.  All Licensed Products shall be accompanied by a written document that clearly describes the product warranty period (which period shall be no less than ninety (90) days) and the procedure to make a warranty claim.

## ARTICLE IX. APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES

9.1  Submission for Approval.  User is responsible for the developing, designing and engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products.  Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3.  User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

- **Design Concept** (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1st annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

- **Decorated Prototype Sample,** (consisting of, but not limited to, a painted three-dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

- **Pre-production Parts Samples** (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any case at least two (2) months prior to the intended commercial production of the Licensed Product;

- **Pre-Production Product Samples** (consisting of Product samples from the pre-production run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product, and

- **First Production Run Samples** (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes

including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.

9.2     Compliance Samples. User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.

9.3     Modification of Production Units. No modification of an approved production sample of a Licensed Product shall be made without Little Tikes' further prior written approval. If, in Little Tikes' sole judgment, the quality of a previously approved Licensed Product has deteriorated in later production runs, or if the Licensed Product otherwise has been altered, Little Tikes may, in addition to other remedies available to Little Tikes, by written notice require such Licensed Product to be immediately withdrawn from the market.

## ARTICLE X. APPROVAL OF PACKAGING, PROMOTIONAL MATERIALS, AND ADVERTISING.

10.1    All containers, packaging, hang tags, promotional material, catalogs, advertising materials and display material for Licensed Products must be developed and funded by User, and submitted to Little Tikes with a Product Submission Approval Form (Exhibit D) for review and written approval. Little Tikes' approval thereof should be procured when such is still in rough format and in final format. Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Approval or disapproval shall lie in Little Tikes' sole discretion, and the use of unapproved packaging, hang tags and display material is prohibited. The parties agree that Little Tikes may be irreparably harmed by the use of unapproved packaging, hang tags and display material, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provision herein. In addition, User may not place or use any of its own marketing, advertising, catalogs, promotional materials, or any other materials in connection with Licensed Products or their packaging without the prior approval of Little Tikes.

10.2    If Little Tikes has supplied User with forms, such as Exhibit D, for use in applying for approval of artwork, photographs, models, pre-production and production samples of Licensed Products, User shall use such forms when submitting anything for Little Tikes' approval. However, User may use altered forms as User reasonably deems necessary if Little Tikes has pre-approved the altered forms in writing.

10.3   All packaging, display material, promotional material, catalogs and advertising for Licensed Products shall comply with all applicable laws and regulations for each country in the Territory where the Licensed Products are sold or used.  In addition, each Licensed Product and its packaging shall incorporate "date codes" signifying the date of production of each Licensed Product.

10.4   Packaging for Licensed Products to be distributed in the United States shall be printed with English language only.  Packaging for Licensed Products shall be printed in such languages, including multi languages, as are necessary to comply with laws and regulations governing the distribution of Licensed Products in the Territory.

## ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS

Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA).  User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards.  Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped.  User shall follow

reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures. Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.

Notwithstanding anything to the contrary herein, in the event that Little Tikes may, in its sole discretion, allow User to subcontract the manufacture of Licensed Products to third party manufacturers, provided that (a) User has given prior written notice of such proposed subcontract arrangement to Little Tikes, including the name, address and such other information concerning the proposed manufacturer as may be requested by Little Tikes; (b) each such manufacturer shall be otherwise subject to inspection by Little Tikes and the quality control procedures set forth herein;  (c) the Licensed Products and/or any elements of any Licensed Products made by such manufacturer meet the quality standards set forth in this Agreement; and (d) each such manufacturer executes an agreement with both User and Little Tikes, such agreement to be in a form approved by Little Tikes.

## ARTICLE XII. ADDITIONAL COVENANTS OF USER

12.1    User shall ship the initial Licensed Product to retail stores in the United States for display and for consumer purchase no later than the Shipping Date. The failure to ship the initial Licensed Product by the Shipping Date as required by this paragraph shall be deemed a material breach of this Agreement.

12.2    User agrees to submit an Annual Marketing Plan for review by the Director of Licensing, within sixty (60) days before the start of each calendar year, using the Annual

Marketing Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.

12.4    If it becomes so, User shall notify Little Tikes that more than three percent (3%) of Licensed Products sold by User during the Initial Term, and two percent (2%) of Licensed Products sold by User during each additional Term, have been returned by consumers to User as defective.  User shall provide such notice within ten (10) days of such condition occurring, and shall transmit with that notice a written plan outlining the steps to be taken to reduce the incidence of defects and a schedule for implementing such steps.

12.5    The rights granted hereunder do not permit the sale of "seconds" or "irregulars." All Licensed Products not approved under Article IX or failing subsequently to conform to the approved standard shall be destroyed by User.

## ARTICLE XIII. USER NAME AND ADDRESS ON ARTICLES

User's name and address (at least city and state) will appear on permanently affixed labeling on each Licensed Product, or if that is not practicable, then on approved packaging therefor.

## ARTICLE XIV. TERMINATION

14.1    This Agreement may be terminated prior to the end of the Term:

   (a)    at any time upon mutual agreement of the parties;

(b)    by either party giving the other party thirty (30) days' written notice of a

material breach of this Agreement, provided that such breach is not cured

within thirty (30) days following notice to the other party.

14.2    Little Tikes may terminate this Agreement immediately and without prior notice to

User if Little Tikes determines that User has published or offered for sale any Licensed

Products or any related packaging, marketing, advertising or any other materials that have

not been approved, or have been disapproved, pursuant to Article IX.   User acknowledges

that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory

injunctive relief, with or without notice to User, to prevent the publication and distribution

of such materials, in addition to any other remedies available to Little Tikes.

14.3    This Agreement will terminate automatically upon the filing of a voluntary petition

in bankruptcy by either party; the execution by either party of an assignment for the benefit

of creditors; the filing of a petition to have either party declared bankrupt, provided it is not

vacated within sixty (60) days from the date of filing; or the appointment of a receiver or

trustee for either party.

14.4    Upon termination of this Agreement other than pursuant to Section 14.2, User shall

have the right to complete the manufacture of Licensed Products then on order, and User

shall further be permitted to sell such Licensed Products which have been ordered,

manufactured or are still in stock on the date of termination for a period of time not to

exceed three (3) months in duration, subject to the payment of Royalties specified herein

14.5    Subject to the sale of the Licensed Products on order or in stock pursuant to Section 14.4, upon termination of this Agreement, User shall immediately discontinue use of the Trademarks and shall immediately remove all reference to the Trademarks from any printed or other material distributed or disseminated by User. User shall no longer use the Trademarks in any variation, imitation or simulation thereof, or any marks similar thereto.

14.6.    Upon the termination of this Agreement, User shall promptly provide Little Tikes, at no cost to Little Tikes, with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives to its 800 phone number.

## ARTICLE XV. BENEFIT

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

## ARTICLE XVI. AMENDMENT

This Agreement may not be amended or modified, except by a written document signed by both parties hereto.

## ARTICLE XVII. CONFIDENTIALITY

17.1    General Obligation of Confidence.  Little Tikes and User agree that during the term of this Agreement and for a period of five years after termination of this Agreement not to

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

31

reveal to any person (unless authorized in writing by the other party) any confidential or proprietary information regarding the other party's products, developments, processes, and know-how. The parties further agree that they will not disclose to anyone not authorized by the other party to receive same, the contents of any report, record, drawing, data, correspondence, or any other subject, material or information which is not generally available to the trade or public. Little Tikes and User acknowledge recognizing and agreeing that by virtue of this Agreement they may acquire information regarding matters of a confidential business nature regarding the other party, its affiliates, its parent, and its parent's subsidiaries, which it agrees not to disclose to third parties nor use in competition, such as, but not limited to, sales know-how, future plans, costs, prices, profits and losses, markets, suppliers, customers, and other information not generally available to the public. This Section shall survive termination of this Agreement, regardless of the reason for termination.

17.2    Definition of Information Subject to Section 17.1. The parties agree to treat all information and data furnished by the other party pursuant to this Agreement as confidential and proprietary, and such information and data shall be used solely for the purposes stated herein. The obligations of confidentiality under this Agreement shall not apply to such information and data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can prove was owned by the receiving party prior to the other party's disclosure, or (c) that is derived from any third party having the right to make such disclosure, or (d) the disclosure of which is compelled by a court of

competent jurisdiction and only after notice to the disclosing party and opportunity for the disclosing party to prevent disclosure.

## ARTICLE XVIII. NON-WAIVER

The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein.  No waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent therein set forth.

## ARTICLE XIX. ASSIGNMENT

The license and rights granted to User hereunder are personal in nature, and User shall not sell, transfer, lease or assign this Agreement or its rights and interests hereunder, or any part hereof, by operation of law or otherwise, without the prior written consent of Little Tikes, which consent shall not be unreasonably withheld.

## ARTICLE XX. NOTICE

Notices to be given under this Agreement shall be deemed sufficiently served when reduced to writing in English and deposited in the mail, postage prepaid for Certified Mail or sent by prepaid overnight express delivery (with a copy simultaneously sent by fax), to:

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

33

If to User:

    Kid Station Toys Ltd.
    P.O. Box 694660
    Miami, FL 33268-4660
    Attn: Elliot Newman

If to Little Tikes:

    The Little Tikes Company
    Director of Licensing
    2180 Barlow Road
    Hudson, Ohio 44236

With a copy to:

    Stuart I. Graff, Esq.
    Newell Rubbermaid Inc.
    Legal Department
    6833 Stalter Drive, Suite 101
    Rockford, IL  61108

## ARTICLE XXI. JURISDICTION

This Agreement shall be interpreted in all respects in accordance with the laws of the State of Illinois. Any dispute relating to the making or the interpretation of this Agreement, or the performance or nonperformance by any party of its obligations hereunder, shall be litigated only in the state or federal courts located within Cook County, Illinois. User consents to personal jurisdiction in said courts and shall not seek to transfer or change the venue of any action brought in compliance with this Paragraph.

## ARTICLE XXII. OTHER PROVISIONS

22.1   Pronouns; Gender.  Whenever the pronoun "it", "its" or "his" may be used, it is understood by the parties to this Agreement that such usage shall include both singular and

plural, masculine, feminine and neuter genders and refer in appropriate cases to individuals as well as to corporations and businesses.

22.2   Nature of Relationship.  Nothing herein contained shall be construed to place Little Tikes and User in the relationship of partners, joint ventures, or agents and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

22.3   Force Majeure.  In the event either party to this Agreement is unable to carry out its obligations under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitation, acts of God, fire, flood, strikes, lockouts, war, or civil commotion, then upon giving prompt notice of force majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligations is prevented by circumstances of force majeure.

22.4   Headings.  The headings of the articles and sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

ARTICLE XXIII. ENTIRE AGREEMENT

This Agreement may be executed in duplicate, each of which shall be considered original for all purposes.  This instrument contains the entire Agreement between the parties and neither

it nor any of its provisions may be changed, waived or terminated, except as herein expressly provided, or in a written instrument signed by the parties.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

THE LITTLE TIKES COMPANY

By: _____

Title: _UP Marketing_____

Date: _12/16/03_____

KID STATION TOYS LTD.

By: _Elliot Neuman_____

Title: _President_____

Date: _12/8/03_____

EXHIBIT A

**Category I:** Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-along players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately; Youth designed telephones

**Category II:** VCR players; DVD players, 2" – 19" black and white and color TV's with or without DVD and VCR players

**Category III:** Electronic Youth "Real Music", including: Electronic Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone. "Real Music" shall be defined as musical instruments directed for distribution and merchandising within the "Electronics or Music" section or aisle at retail and not the "Pre-school" section or aisle at retail, if such sections or aisles are separate

User shall use its best efforts to place the Licensed Products within the "Electronics or Music" section or aisle and not within the core Little Tikes or "Pre-school" section or aisle at retail, if such sections or aisles are separate.

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

37

Little Tikes acknowledges that User can not dictate retail merchandising and that individual retailers and retail chains maintain the right to merchandise purchased product in the manner they see fit; however, User shall use its best efforts to ensure that the Licensed Products are placed in accordance with this Agreement.

User shall use its best efforts to inform a Little Tikes representative of any meeting with a "pre-school" buyer.

User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers: Walmart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed. Such report shall contain the participants attending the meeting, place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.

EXHIBIT B

1. The Property: "LITTLE TIKES", and the "LITTLE TIKES" logo as shown below:



2. ®/™ The Little Tikes Company.

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

## EXHIBIT C

### Royalty Report Form

_____ QUARTER – YEAR _____

| SKU # | Description | Price/Unit | Units Sold | Total Sales | Less Returns | Less Allowances | Net Sales |
|-------|-------------|------------|------------|-------------|--------------|-----------------|-----------|
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |

Total Net Sales _____
x Royalty Rate _____ %
Gross Royalties _____
Less Advance paid and which have not
      been credited against previous
ROYALTY PAYMENTS otherwise due
under the Agreement (_____)

Total Royalties Due  $_____

_____
Signature of Authorized Officer Certifying foregoing to be accurate

Name: _____
Title: _____
Date: _____

40

EXHIBIT D



### Addendum to License Agreement

This Addendum dated January 1, 2006 (the "Effective Date") is an addendum to the License Agreement dated December 8, 2003 (the "License Agreement") by and between The Little Tikes Company ("Licensor"), an Ohio corporation ("Purchaser"), and Kid Station Toys Ltd., a Florida corporation ("Licensee").

### Recitals

Licensor and Licensee are parties to the License Agreement pursuant to which Licensor grants to Licensee the right to use the LITTLE TIKES trademark as set forth in that agreement. The purpose of this Addendum is to revise the License Agreement to include an additional category of Licensed Products. The Addendum also sets forth the Guaranteed Annual Royalty Payment for this new category of Licensed Products.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1.    The definition of Licensed Products in Exhibit A of the License Agreement is amended to add the following:

Category IV: Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats.

Licensee agrees that it shall use its best efforts to cause the retailer of the Licensed Products to display the Licensed Products in the electronics area of the retailer, rather than in toy area of the retailer.

2.    The parties agree that the Term of the license granted under Section 2.1 of the license Agreement with respect to the Category IV products shall commence on the Effective Date and end on December 31, 2008.

3.    Section 4.2 of the License Agreement is amended to add the following language at the end of the Section:

## Category IV:

| | |
|---|---|
| Period 1: | January 1, 2006 – December 31, 2006 |
| January 1, 2006: | $6,768.00 |
| March 15, 2006: | $6,768.00 |
| June 15, 2006: | $6,768.00 |
| September 15, 2006: | $6,768.00 |
| December 15, 2006: | $6,768.00 |
| | |
| Period 2: | January 1, 2007 – December 31, 2007 |
| January 1, 2007: | $6,768.00 |
| March 15, 2007: | $6,768.00 |
| June 15, 2007: | $6,768.00 |
| September 15, 2007: | $6,768.00 |
| December 15, 2007: | $6,768.00 |
| | |
| Period 3: | January 1, 2008 – December 31, 2008 |
| January 1, 2008: | $6,768.00 |
| March 15, 2008: | $6,768.00 |
| June 15, 2008: | $6,768.00 |

The Guaranteed Annual Royalty Payments shall be made quarterly

Guaranteed Annual Royalty Payments for Category I, Category II, Category III may not be applied to Category IV. Guaranteed Annual Royalty Payments for Category II, Category III, Category IV may not be applied to Category I. Guaranteed Annual Royalty Payments for Category I, Category III, Category IV may not be applied to Category II. Guaranteed Annual Royalty Payments for Category I, Category II, Category IV may not be applied to Category III. The parties acknowledge and agree that the term "annual" as used in the term Guaranteed Annual Royalty Payments with respect to the Products in Category IV shall refer to the "Periods" defined above.

4.     The royalty rate for Category IV Licensed Products is five percent (5%) of the Net Sales Price for domestic and FOB Sales.

5.     Except as expressly set forth in the Addendum, the provisions of the License Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned parties have caused this Addendum to be signed on the day and year above written.

**LICENSOR**

THE LITTLE TIKES COMPANY

By: _____

Name: _Brian Kirkendall_

Title: _VP Marketing_


**LICENSEE**

Kid Station Toys Ltd.

By: _____

Name: _Elliot Mnum_

Title: _President_

# Exhibit H



Welcome to KidsStationToys.com - Microsoft Internet Explorer

File   Edit   View   Favorites   Tools   Help

Address http://www.kidsstationtoys.com/homepage.php

Thursday, April 3, 2008

ABOUT US  |  PRODUCTS  |

EXPERIENCE THE FUTURE

PRODUCT SEARCH

[ Search ]

OUR PRODUCTS

Table Alarm Clock Radio
More Info
KSL-3012

KSS-0005   Spider-Man Hot Rock Guitar
More Info

Designer Grand Piano with bench
More Info
KSS-3000

Address: 1100 NW 163rd Drive
Miami, Florida 33169
Fax: (305) 628-3900

You will not receive any merchandise and please do not send us any merchandise before

Kids Station Toys International Ltd, which started in 1999, is one of the fastest growing companies in the toy industry. Specializing in the Musical Instruments and Youth Electronics categories, in 2003, the company signed its first license, the Reality TV Phenomenon, American Idol, to produce a wide range of Musical Instruments and accessories. In the End of 2003, the company continued to rise and has forged relationships with some of the biggest companies in the toy industry. Little Tikes and Mattel. For Fall 04, the company will be producing and distributing a line of Little Tikes branded Youth Electronics and Musical Instruments as well as a line of Barbie branded Musical Instruments for girls. Our final license agreement in 04 with Sony Consumer Products, will be bringing Spiderman 2, electronics and musical instruments to boys.

Through our expertise in our industry, we are able to offer a complete line of Youth Electronic and Musical Instrument products featuring a brand portfolio which combines Hit Shows, Movies and Evergreen Brands for todays children.

# Exhibit I

Case 1:08-cv-01935     Document 11-5     Filed 04/09/2008     Page 76 of 93
Case 1:08-cv-20393-JLK     Document 53     Entered on FLSD Docket 03/27/2008     Page 7 of 30
02/29/08 18:11 ET     2-DNNQ3309     FR:DUN AND BRADSTREET 9086666079 TO: 3127506538     Pg 1/7

Dun & Bradstreet

# Business Information Report™

Page 1 of 7

For: **CHARLES FREY**                                    February 29, 2008
     **NEAL, GERBER & EISENBERG LLP**                          6:10 pm

## *BUSINESS SUMMARY*

KIDS STATION TOYS LIMITED

Subsidiary of KIDS STATION TOYS INTERNATIONAL LIMITED, BERMUDA

| | |
|---|---|
| D-U-N-S | 66-793-8414 |
| Incorporation No. | 730577 |
| BRC No. | 31236737 |
| Legal Status | Private Limited Company |

Address          RM 804 8/F EMPIRE CTR
                 68 MODY RD
                 TSIM SHA TSUI EAST, KOWLOON
                 HONG KONG

| | | | | |
|---|---|---|---|---|
| Tel | 852 – 27233308 | Started | 2000 |
| Fax | 852 – 27238110 | Registered | 2000 |
| URL | WWW.KIDSSTATION.CC | Import | Yes |
| E-Mail Address | KATHY@KIDSSTATIONTOYS.COM | Export | Yes |
| Chief Executive | NEWMAN, ELLIOT SETH | Employs | 30 |
| | DIRECTOR | History | CLEAR |
| | | Reg Charge | NO |
| | | Court | No |

Parent Company     KIDS STATION TOYS INTERNATIONAL LIMITED
                   BERMUDA

Line of Business   WHOL OF TOYS
SIC                5092-0000

                                                    D&B Rating  - -
Paid Up Capital    100,000                          Prev Rating - -

CURRENCY: All monetary amounts shown in HONG KONG DOLLARS unless otherwise
stated.

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.     Copyright 2002 D&B Inc. VIR1.2

02/29/08 18:11 ET       2-DNHQ3309       FR:DUN AND BRADSTREET 9086656079 TO: 3127505538              Pg 2/7
D&B Business Information Report 7                                                          Page 2 of 7

| For: CHARLES FREY | February 29, 2008 |
|---|---|
| NEAL, GERBER & EISENBERG LLP | 6:10 pm |

### EXECUTIVE SUMMARY

\* The Risk Predictor for the company is 5.00 which indicates below average risk. The likelihood of a company having financial distress over the next 12 months is 0.38%.

\* Company has been established for 7 year(s)

\* Nothing detrimental found against D&B Hong Kong court files in past five years.

\* No record found against the company in D&B Small Claim Tribunal file on/after 19/7/2004

\* Nothing detrimental found in our Debt Collection Database.

\* Subject company rents captioned premises.

\* Kids Station Toys International Limited (D-U-N-S 87-566-2483) based in Bermuda is the parent company of subject.

### RISK PREDICTOR SCORE                                              As of MAR 1,

Risk Predictor uses a statistically valid model derived from D&B database to predict the likelihood of a company having financial distress over the next 12 months period.

The Company
------------
Predictor Score      : 5.00
Financial Stress
Score Equivalent     : 1,421

The Industry
------------
Industry Median      : 5.00
Based On             : 2943 firms
Industry             : WHOL TOYS/HOBBY GOODS

Key Influencing Factors: 1. No record of High Court litigation within 2 years is found against the subject in D&B database. <P> 2. No record of District Court litigation within 2 years is found against the subject in D&B database. <p> 3. No registered charge is reported for the subject. <P>

Notes:  1. The Risk Predictor indicates that this company shares some

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.   Copyright 2002 D&B Inc. VIR1.2

02/29/08 18:11 ET        2-DNHQ3309      FR:DUN AND BRADSTREET 9086666079 TO: 3127506638                    Pg 3/7
D&B Business Information Report 7                                                                  Page 3 of 7

| For: CHARLES FREY | February 29, 2008 |
| NEAL, GERBER & EISENBERG LLP | 6:10 pm |

### RISK PREDICTOR SCORE                                        As of MAR 1,

of the same business and financial characteristics of other
companies with this classification.  It does not mean the firm
will necessarily experience financial distress.

2. Risk Predictors are updated the day new information enters
the company's file.

3. Both Risk Predictors and Financial Stress Scores are derived
from D&B's new Failure Scoring System.  Each of them cater differ
needs in risk assessment.  Please visit http://www.dnbasia.com/hk
/english/services/credit/prod_cr.asp#score to learn more about
the new D&B Failure Scoring System and the applications of differ
measurements.

### COURT ACTIONS

A search of the Court File did not show any record of civil suit against the
company from High Court, District Court and Government Gazette for the past
five years and Small Claim Tribunal since 19/7/2004.

This section of the report was compiled after a search was conducted on the
D&B Court File which contains commercial cases filed in the High Court,
District Court and Government Gazette (for bankruptcy orders, petitions for
winding-up, compulsory and voluntary liquidation orders) or heard in Small
Claim Tribunal. It is for information purposes only and is not the official
record. Certified copies can only be obtained from the official source.

### COLLECTION

A search revealed that the company maintains no record in the Debt Collection
database.

This section of the report was compiled after a search was conducted on the
D&B Collection Record Database. The Collections items contained may have been
paid, terminated, vacated, settled or released prior to the date this report
was printed.

### CURRENT INVESTIGATION

On 29/2/2008, Ms. Leung, Kendy, Accountant, confirmed operational and
historical information but declined financial information in this report.

Fiscal year end date of subject is 31 Dec.

Ms. Leung declined to provide financial information as the source of inquiry
was not made known.

Subject has no name change since establishment.

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.    Copyright 2002 D&B Inc. VIR1.2

02/29/08 18:11 ET      2-DNHQ3309      FR:DUN AND BRADSTREET 9086656079 TO: 3127506538      Pg 4/7
D&B Business Information Report ?                                                  Page 4 of 7

```
For: CHARLES FREY                                          February 29, 2008
     NEAL, GERBER & EISENBERG LLP                                  6:10 pm
```

**BANK**

Banking relations are maintained principally with :-

HANG SENG BANK LTD

Comment : Subject maintains no credit facility from its banker.

**HISTORY**

This section was compiled after a company search from the

Companies Registry on 27/2/2008, and includes capital structure,
shareholdings, registered charges and director details.

As of the date of the search, the latest annual return filed by the company
was dated 8/9/2007.

```
Legal Status                      Private Limited Company
Date of Registration              8 Sep 2000
Incorporation No.                 730577
Business Registration No.         31236737
```

```
Authorized Capital                     100,000
Divided into:-
```

| Type of Shares | No. of Shares | Par Value |
|---|---|---|
| --------------- | -------------- | ---------- |
| Ordinary Shares | 100,000 | 1.000 |

```
Fully Paid Up Capital                        100,000
(as of 8 Sep 2007)
```

Shares are shown to be held by:-

Ordinary Shares

| Name of Shareholder | Location | Shares Held | % |
|---|---|---|---|
| --------------------- | -------- | ----------- | - |
| Kids Station Toys International LimitBermuda | | 100,000 | 100.00 |
| | | 100,000.00 | 100.00 |
| | | ========== | ====== |

```
Registered Charges
--------------------
```

Total Indebtedness: Nil

The above charges do not represent the full history of all transactions
relating to the registered charges of the company. Some of the charges may

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.   Copyright 2002 D&B Inc. VIR1.2

Case 1:08-cv-01935    Document 11-5    Filed 04/09/2008    Page 80 of 93
Case 1:08-cv-20393-JLK    Document 53    Entered on FLSD Docket 03/27/2008    Page 11 of 30
02/29/08 18:11 ET    2-DNHQ3309    FR:DUN AND BRADSTREET 9086656079 TO: 3127506538    Pg 5/7
D&B Business Information Report 7    Page 5 of 7

For: **CHARLES FREY**
     **NEAL, GERBER & EISENBERG LLP**

February 29, 2008
6:10 pm

### *HISTORY*                                      *(continued)*

have been released or there could be mortgages charges not reflected in this
report.

For complete mortgage details, please subscribe to our Full Mortgage Search
Copy.

Registered Address
--------------------

Address        Rm 804 8/F Empire Ctr
               68 Mody Rd
               Tsim Sha Tsui East, Kowloon
               Hong Kong

Company Secretary
--------------------

Name           B C S Limited
Address        8/F The Landmark Gloucester Twr
               15 Queen's Rd C
               Hong Kong Island
               Hong Kong

Search conducted on 27/2/2008 confirmed the above details. As of the date of
the search, latest Annual Return filed by the company was dated 8/9/2007.

Principals
----------

| Name/Address | ID/PP NO. | Nationality |
| --- | --- | --- |
| NEWMAN, Elliot Seth<br>1160 NW 163 Drive<br>Miami Fla 33169<br>USA | PP: 045691170 | American |

Principals' Background
------------------------

Name               : NEWMAN, Elliot Seth
Title              : Director
Nationality        : American
Other Directorship : Kids Station (Hong Kong) Limited
NOTHING DETRIMENTAL AGAINST THE ABOVE STATED PRINCIPAL.

### *OPERATION*

Subject is engaged in:-

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.    Copyright 2002 D&B Inc. VIR1.2

02/29/08 18:11 ET        2-DNHQ3309      FR:DUN AND BRADSTREET 9086666079 TO: 3127606638        Pg 6/7
D&B Business Information Report 7                                                    Page 6 of 7

| For: CHARLES FREY | February 29, 2008 |
| NEAL, GERBER & EISENBERG LLP | 6:10 pm |

## OPERATION

| Wholesaling of Toys | 100.00% |

Major Customer(s)
------------------
1) Walt Mart
2) Toys R Us
3) Family Dollars
4) COVS

Sales Territory & Terms
-----------------------
International                100%
   USA
   Europe

Selling Terms
-------------
L/C (Letter of Credit) at sight days

Number of Customer Accounts: 4

Purchase Territory & Terms - Raw Materials
------------------------------------------
International:              100%
   PR China                100%

Purchasing Terms
----------------
T/T (Telegraph Transfer)
Net Terms 30 days

Employees
---------
Total: 30

Location
--------
Premises are located in a commercial area. Subject rents 4,000.00 square feet
on the 8/F of a multi-storey building.

Previous Address : RM315, Mirror Twr, 61 Mody Rd, Tsim Sha Tsui, Hong Kong
   Date of relocation: 2001

## PARENT

| DUNS | 87-566-2483 |
| Name | KIDS STATION TOYS INTERNATIONAL LIMITED |
| Address | Corner Hse |

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.    Copyright 2002 D&B Inc. VIR1.2

02/29/08 18:11 ET      2-DNHQ3309      FR:DUN AND BRADSTREET 9086656079 TO: 3127506538          Pg 7/7
D&B Business Information Report 7                                                                Page 7 of 7

For: CHARLES FREY                                                       February 29, 2008
     NEAL, GERBER & EISENBERG LLP                                              6:10 pm

---

*PARENT*                          *(continued)*

                                  20 Parliament St Hamilton HM 12
                                  Bermuda
     % Shares Held                100%

---

## *AFFILIATED COMPANY*

DUNS                          66-793-5282
Name                          KIDS STATION (HONG KONG) LIMITED
Location                      Hong Kong
Line of Business              Whol of Toys
Relationship with Subject     Common director(s)

(--/PS2/CL2)

This report, which is licensed under contract solely for use by D&B's customer
as one factor in its business decisions, contains information compiled from
sources D&B does not control and which, unless otherwise indicated in this
report, has not been verified. D&B does not assume any of user's business
risk; does not guarantee the accuracy, completeness, and timeliness of the
information; and shall not be liable in tort, contract or otherwise for any
loss, damage, and injury resulting from use of this information, even if
caused by D&B's negligence.

Copyright 2008 Dun & Bradstreet
All Rights Reserved

-- END OF REPORT --

Provided under contract for the exclusive use of NEAL, GERBER & EISENBERG LLP.    Copyright 2002 D&B Inc. VIR1.2



**Decide with Confidence**

🅞 My Report Archive                                                          ✉ E-mail Report

# International Business Information Report: Kids Station Toys International Ltd

**Country Conditions can Impact Company Risk**

**Now that you know about this business, stay on top of the latest developments in its country with ... D&B COUNTRY RISK SERVICES**          Click here to learn more

---

```
                                     ↵
        COPYRIGHT 2008 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
              FOR THE EXCLUSIVE USE OF SUBSCRIBER 002-008608L.

                   ATTN: 000000.0000-chf

              *** This is a preliminary report ***

This report contains the information D&B presently possesses on this
company.  D&B has not, however, received any recent updates to this
information and it may not be current.  An investigation will be conducted
on this file and updated information will be provided to you, upon receipt
by D&B, at no additional cost.


     DATE PRINTED                            February 22, 2008

     FULL REVISION
     D-U-N-S: 87-566-2483                    RATING: O S
     EXEMPT COMPANY REPORT

     Kids Station Toys International Ltd

     Physical Address:
     -----------------
     C/O Alexander Management Ltd
     48 Par-La-Ville Road Suite 1461


     Hamilton  Pembroke
     Bermuda


     Telephone Number(s):                    Fax Number(s):
     --------------------                    --------------
     (1) (441) 2929332                       (1) (441) 2922024
     () ()



     Chief Executive  Mr. Steven Morris
     Title:           Representative
```

L.O.B Investment & Holding Company.
S.I.C 67199901

...................... SUMMARY ........................

| | | | | |
|---|---|---|---|---|
| STARTED | : 2003 | CAPITAL | : Ber $ | 12,000 |
| HISTORY | : Incomplete | | | |
| TERRITORY | : International | | | |
| STATUS | : Active | IMP/EXP/AG : Undetermined | | |

..... CONTROL TYPE : Exempt/OffShore Company .....

The subject is an exempt company registered in Bermuda.

Exempt companies, also known as Offshore companies, are prohibited by
regulation from buying or selling goods or transacting business in the country
where they are registered.

Exempt/Offshore companies are not subject to taxation at normal levels. They
are required to pay an annual registration fee, and are taxed at a very low
rate.

Exempt/Offshore Companies are only registered in the country, they have no
physical facilities there. They are represented by a Care Of Agent, who is
usually a Law or Accounting Firm. Care Of Agents are prohibited by the
prevailing laws of secrecy from releasing any details about the company, such
as directors, shareholders, financial information and parent, subsidiary or
affiliate locations.

Due to the Exempt/Offshore nature of the business, we were not able to obtain
any interview with the company. Information in the report was obtained from
the Public, Mercantile or Commercial Registry.

All monetary amounts quoted in this Business Information Report are shown in
LOCAL CURRENCY, unless otherwise stated.

D&B'S RATING: O S

The O portion of the Rating indicates the Estimated Financial
Strength. The S on the right indicates the Composite Credit
Appraisal.
(See Table Below)

Estimated Financial Strength
------------------------------
| Net Worth | Capital | Range in U.S. Dollars | |
|---|---|---|---|
| 5A | 5AA | 50,000,000 | AND ABOVE |
| 4A | 4AA | 10,000,000 | 49,999,999 |
| 3A | 3AA | 1,500,000 | 9,999,999 |
| 2A | 2AA | 750,000 | 1,499,999 |
| 1A | 1AA | 375,000 | 749,999 |

| A  | AA | 188,000 | 374,999 |
| B  | BB | 94,000  | 187,999 |
| C  | CC | 47,000  | 93,999  |
| D  | DD | 24,000  | 46,999  |
| E  | EE | 12,000  | 23,999  |
| F  | FF | 6,000   | 11,999  |
| G  | GG | UP TO   | 5,999   |
| N  |    | Negative Net Worth |
| NB |    | New Business |
| NQ |    | Out of Business |
| O  |    | Net Worth Undetermined |
| BR |    | Branch Location |
| FB |    | Foreign Branch |
| -  |    | Undetermined |

Composite Credit Appraisal
-----------------------------

| Rating | Condition | Interpretation |
|--------|-----------|----------------|
| 1 | Strong | Minimal Risk Expected |
| 2 | Good | Low Risk Expected |
| 3 | Fair | Slightly Above Average Risk - Monitor |
| 4 | Unbalanced | Significant Risk - Review Carefully |
| S | Service | Not Applicable - No Condition Assigned |
| - | Undetermined | Unknown - Insufficient Information |

GENERAL INFORMATION
December 13, 2006

Information processed in this report is from a previous investigation. Subject
maintains its legal domicile in Kids Station Toys International Ltd, Bermuda,
does not operate in this country. The subject maintain a contact office at
captioned address for handling of correspondence. Subject does not actively
seek credit in this country.

FINANCE:
Dec 13, 2006

Due to a lack of Financial Statements, we assigned a Credit Rating based on
the information available in this report..

PAYMENTS: 13/Dec/2006

Due to the nature of its operations, subject is not regarded as a seeker of
commercial credit

BANKING:
Dec 13, 2006

Local source could provide no details about subject banking.

Banking references were not obtained.

PRINCIPALS -------------------------------------------------------
13/Dec/2006


Information on principals was not available.

    Representative
Mr. Steven Morris


HISTORY:
Dec 13, 2006


Registration No #: 34711.

Limited Liability Company, chartered with the Commercial Registry of Hamilton,
under Registry # 34711, constituted under local laws, on December 31, 2003.
Duration: undefined.
Authorized Capital: Bermuda Dollar 12,000.00.


Information about shareholders/partners was declined

    Shareholder(s)                          %        Share(s)


This business was founded in 2003. Status Active.


.......................... UPDATE   ...........................


During the recent investigation ending December 13, 2006, we were unable to
obtain an interview. However, information was confirmed by Registry provided
ownership and operation details in this report.

OPERATIONS:
Dec 13, 2006

Line(s) of Business: Investment & Holding Company.

SIC #.: 67199901 Operates as Investment holding companies, except banks.

EMPLOYEES: Employees not known.


TERRITORY: Operates principally in foreign countries

LOCATION:

Dec 13, 2006

At this address, the company maintains a representative office.  The business
occupies  premises  of adequate size. Building Type: adapted for the company's
purposes.

BRANCHES: Subject does not have any other locations in this country.

    Additional Telephone Number(s):
    --------------------------------
    (1) (441) 2929332


    Additional Fax Number(s):
    --------------------------
    (1) (441) 2922024




Dec 13, 2006     C-005

This report, which is licensed under contract solely for use by D&B's customer
as one factor in its business decisions, contains information compiled from
sources D&B does not control and which, unless otherwise indicated in this
report, has not been verified. D&B does not assume any of user's business
risk; does not guarantee the accuracy, completeness, and timeliness of the
information; and shall not be liable in tort, contract or otherwise for any
loss, damage, and injury resulting from use of this information, even if
caused by D&B's negligence.

Copyright 2008 Dun & Bradstreet
All Rights Reserved

*** REPORT COMPLETE ***

FOREIGN BIR DISPLAY COMPLETE


New Search | Order an Investigation |

| Company Reports | Basic Marketing Lookups | U.S. Public Records Search | Country Risk Services | ZapData |

Main Menu | DUNSRight™ | FAQs | Customer Assistance | Samples & Descriptions | Price Guide | About Privacy

© 2006 Dun & Bradstreet, Inc.
January 14, 2006 - GTO



**Decide with Confidence**

● My Report Archive                                                    ☒ E-mail Report

# International Business Information Report: Kids Station Toys International Holding

**Country Conditions can Impact Company Risk**

Now that you know about this business, stay on top of the latest
developments in its country with ... D&B COUNTRY RISK SERVICES                Click here to learn more

COPYRIGHT 2008 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
FOR THE EXCLUSIVE USE OF SUBSCRIBER 002-008608L.

ATTN: 000000.0000-chf

IDENTIFICATION

NAME:                     Kids Station Toys International Holding
                          GmbH

DOMIZILADRESSE:           c/o Oliver Cornelis Gugelot
                          Treichlerstrasse 7
                          8032 Zurich ZH
                          Switzerland

LEGAL SEAT:               8000 Zurich ZH
                          Switzerland

PHONE:                    044 251 96 80

D-U-N-S NUMBER:           48-324-8923

Registration number:     CH-020.4.032.368-7

CURRENCY:                 Shown in Swiss francs (CHF), unless otherwise
                          stated


RISK APPRAISAL

          D&B RATING:              CC2
          CREDIT RECOMMENDATION: 45.000
          D&B SCORE:               61


The D&B Rating of CC2 indicates:
A Financial Strength of 250.000 - 500.000 (based on paid-up
capital)

Risk indicator 2 means a low level of risk.*
According to Dun & Bradstreet's investigations subject's financial
situation is considered to be good.

**Date filed:** 10/08/2002
**Latest Info Received:** 12/09/2002

**Type:** Continuation
**Sec. party:** THE INTERNATIONAL BANK OF MIAMI, N.A., CORAL GABLES, FL
**Debtor:** KIDS STATION (U.S.) INCORPORATED and OTHERS
**Filing number:** 200705541531
**Filed with:** SECRETARY OF STATE/UCC DIVISION, TALLAHASSEE, FL

**Date filed:** 05/15/2007
**Latest Info Received:** 06/05/2007
**Original UCC filed date:** 10/08/2002
**Original filing no.:** 200202355002

**Type:** Termination
**Sec. party:** THE INTERNATIONAL BANK OF MIAMI, N.A., CORAL GABLES, FL
**Debtor:** KIDS STATION (U.S.) INCORPORATED and OTHERS
**Filing number:** 200706149155
**Filed with:** SECRETARY OF STATE/UCC DIVISION, TALLAHASSEE, FL

**Date filed:** 07/30/2007
**Latest Info Received:** 08/18/2007
**Original UCC filed date:** 10/08/2002
**Original filing no.:** 200202355002

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 002008608L

The analysis is based on various criteria which include :
- Subject's financial strength is average.
- The company's tax figures are not known or too old.
- The business belongs to a group and enjoys the support of its parent
  company, or can benefit of the group's structure.
- According to the information available, the company has no
  participations.
- The company's field of activity is considered stable and low-risk.

The D&B credit recommendation for this business is: 45.000

* The different risk indicators are :
1 = ... minimum level of risk
2 = ... low level of risk
3 = ... slightly above-average level of risk
4 = ... high level of risk
- = ... undetermined (insufficient information available)

D&B SCORE COMPARISON

The D&B Score is an indicator based on a scale from 1 to 100, where
"1" corresponds to a high risk of insolvency and "100" corresponds to
a moderate risk.
The D&B Score is based on an analysis of information held in D&B
Swiss Database.

The D&B Score for this company is 61 .
The average D&B Score for businesses in the D&B Swiss database within
the same industry sector is 38 .
The probability of failure for this business is lower than the industry
average in this country, as calculated by D&B.

FINANCIAL STRENGTH COMPARISON

The comparison of this company against the other businesses on the D&B
Swiss database within the same industry sector reveals that:

27 % of businesses have a stronger financial strength
 9 % of businesses have the same financial strength
54 % of businesses have a weaker financial strength
10 % of businesses have an undetermined financial strength.

OVERVIEW

YEAR OF FOUNDATION:      2006
YEAR OF INCORPORATION:   2006
LEGAL TYPE:              Limited liability company
CAPITAL:                 250.000
LINE OF BUSINESS:        HOLDING COMPANY
SIC-CODE(S):             6711

MANAGEMENT

PARTNERS:

- KIDS STATION (U.S.) INCORPORATED, in Miami (USA), capital invested

CHF250'000.--
Partner, since 12.01.2006

CHANGES IN PARTNERSHIP:

- Elliot Seth Newmann, of United States, in Aventura (Vereinigte Staaten)
  07.04.2006 Retired Partner, since 12.01.2006

SENIOR MANAGEMENT:

- Elliot Seth Newmann, of United States, in Aventura (Vereinigte Staaten)
  Managing Director authorized signatory (with one other), since
  12.01.2006
- Oliver Cornelis Gugelot, of Arbon, in Zurich (Schweiz)
  Managing Director with sole signature, since 12.01.2006


CORPORATE STRUCTURE

Parent Company:                                    D-U-N-S
  Kids Station US Incorporated                     06-542-9677
  Miami, United States
  Share     99,6%


PAYMENT REFERENCES

MODE OF PAYMENTS:

We have no knowledge about any complaints regarding the payment
manners.


FINANCIALS

ORIGINAL CAPITAL:              250.000


HISTORY

This limited liability company was founded in January 2006 (date
of statutes 27.12.05).


Registered as a Limited liability company since 12 January 2006.

TAKE-OVER

Sachubernahme:
SOGC Publ. of: 12.01.2006
  Die Gesellschaft ubernimmt bei der Grundung gemass
  Sacheinlage-/Sachubernahmevertrag vom 16.12.2005 12'000
  Namenaktien zu je USD 1.-- der Kids Station Toys International
  Ltd.,Bermuda, wofur· CHF 250'000.-- auf das Stammkapital
  angerechnet und CHF 18'000'000.-- als Forderung gutgeschrieben

werden


ACTIVITY

LINE OF BUSINESS:

- HOLDING COMPANY

SIC-CODE(S):              6711

ACTIVITY AS DESCRIBED IN THE TRADE REGISTER:

Die Gesellschaft bezweckt den Erwerb, die dauernde Verwaltung und
die Verausserung von Beteiligungen an in- und auslandischen
Unternehmen aller Art, insbesondere an Gesellschaften der Kids
Station Gruppe sowie auf dem Gebiet der Herstellung, Beschaffung,
Lieferung und Prasentation in Ausstellungsraumen von
elektronischen Produkten im Audio- und Videobreich, die
insbesondere fur Kinderspielzeuge hergestellt werden. Die
Gesellschaft kann Immaterialguterrechte erwerben und verwerten.
Die Gesellschaft kann alle kommerziellen, finanziellen und
anderen Tatigkeiten ausuben, welche mit dem Zweck der
Gesellschaft im Zusammenhang stehen. Sie kann zugunsten von
verbundenen Gesellschaften Finanzierungen gewahren sowie
Garantien und andere Sicherheiten leisten. Die Gesellschaft kann
Zweigniederlassungen und Tochtergesellschaften im In- und Ausland
errichten und sich an anderen Unternehmen im In- und Ausland
beteiligen. Die Gesellschaft kann Grundstucke erwerben, halten
oder veraussern.


END OF REPORT

FOREIGN BIR DISPLAY COMPLETE


New Search  |  Order an Investigation

| Company Reports | Basic Marketing Lookups | U.S. Public Records Search | Country Risk Services | ZapData |

Main Menu | DUNSRight™ | FAQs | Customer Assistance | Samples & Descriptions | Price Guide | About Privacy

© 2006 Dun & Bradstreet, Inc.
January 14, 2006 - GTO



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | H |

Previous on List    Next on List    Return To List

No Events    No Name History

Entity Name S

# Detail by Entity Name

## Florida Profit Corporation

KIDS STATION (U.S.) INCORPORATED

## Filing Information

| | |
|---|---|
| Document Number | P00000088456 |
| FEI Number | 651058876 |
| Date Filed | 09/19/2000 |
| State | FL |
| Status | ACTIVE |

## Principal Address

1160 NW 163RD DRIVE
MIAMI GARDENS FL 33169-5816 US

Changed 04/15/2005

## Mailing Address

P.O. BOX 694660
MIAMI FL 33269-1660 US

Changed 04/25/2006

## Registered Agent Name & Address

NEWMAN, ELLIOT S
355 OCEAN BLVD.
GOLDEN BEACH FL 33160-2211

Address Changed: 04/15/2005

## Officer/Director Detail

Name & Address

Title PSTD

NEWMAN, ELLIOT S
355 OCEAN BLVD.
GOLDEN BEACH FL 33160-2211 US

## Annual Reports