UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE LITTLE TIKES COMPANY, an Ohio corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KID STATION TOYS, LTD., a Florida corporation, KIDS STATION TOYS, LTD., a Hong Kong corporation, KIDS STATION (U.S.) INC., a Florida corporation, KIDS STATION TOYS INTERNATIONAL, a Bermuda corporation, KIDS STATION TOYS INTERNATIONAL HOLDING, GmbH, a Swiss corporation, and ELLIOT S. NEWMAN, | ) ) ) ) ) ) ) ) ) ) ) | Case No. 08 C 1935<br><br>Judge Joan B. Gottschall |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff The Little Tikes Company ("Little Tikes") has filed suit against defendants Kids Station Toys et al. ("Kids Station") alleging: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1); (2) dilution by tarnishment under 15 U.S.C. § 1125 (c); (3) false representation under 15 U.S.C. § 1125(a); (4) unfair competition; (5) breach of contract; and (6) piercing of the corporate veil. In the motion at bar, Little Tikes seeks a Temporary Restraining Order ("TRO") against Kids Station enjoining it from the marketing or sale of any products produced by Kids Station under license from, and bearing the trademark of, Little Tikes. For the reasons set forth below, Little Tikes' motion seeking a TRO is denied.

1

# I. BACKGROUND

At the heart of this suit is a licensing agreement between Little Tikes and Kids Station. Little Tikes, an Ohio corporation, is a well-established and widely recognized manufacturer, licensor, and distributor of children's toys. Seeking to diversify its product line to include electronic toys for children, Little Tikes, in December 2003, entered into a licensing agreement (the "Agreement") with Kids Station, a Florida corporation with its principal place of business in Miami. Under the terms of the Agreement, Kids Station was licensed to manufacture and distribute children's electronic toys under the Little Tikes trademark, in exchange for "running royalties," which are royalties calculated from net profits. A minimum guaranteed annual royalty schedule was also incorporated into the Agreement; earned "running royalties" were to be credited against the annual minimum until the minimum was exceeded. Kids Station was required to submit annual samples of all toys (including packaging) distributed under the Little Tikes trademark for quality testing and general approval by Little Tikes. Moreover, the products produced by Little Tikes were also required to meet all applicable laws and safety standards. The initial term of the Agreement extended from December 2003 through June 30, 2007, and could be renewed for an additional two year term provided that minimum royalty payment amounts were met in the prior term.

Finally, the Agreement contained a termination clause. Under that clause, the Agreement could be terminated: (1) at any time by mutual agreement of the parties; (2) by either party giving the other 30 days' written notice of a material breach of the Agreement provided that the breach was not cured within the 30 days following notice, or; (3) by Little Tikes, unilaterally and without notice, if Little Tikes determined that Kids Station published or offered for sale any

product, packaging, marketing, advertising, or any other materials under the Little Tikes trademark that was not approved by Little Tikes pursuant to the terms of the Agreement.  In case of termination under the latter conditions, the Agreement required that Kids Station acknowledge that Little Tikes would be irreparably injured and could seek interlocutory or injunctive relief.

At the time that the Agreement was consummated, Little Tikes was owned by Newell-Rubbermaid ("Rubbermaid").  However, at the end of 2006, Little Tikes was acquired by MGA Entertainment, Inc. ("MGA").  In February 2008, MGA notified Kids Station that it was unilaterally and immediately terminating the Agreement.  Kids Station then filed suit against MGA and Little Tikes in the Southern District of Florida, alleging breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contract and civil conspiracy.  The case was dismissed, and the instant case was filed in this court on April 2, 2008.  Little Tikes filed the instant motion for a temporary restraining order on April 9, 2008 to prevent Kids Station from distributing or selling products under the Little Tikes trademark.

Little Tikes alleges that, prior to its acquisition by MGA, it had begun to discover significant quality problems with, and consumer complaints concerning, the electronic toys manufactured and distributed by Kids Station.  Specifically, Little Tikes states that in April 2007, it received a report from the Consumer Products Safety Commission ("CPSC") describing a possible choking hazard associated with one of Kids Station's products marketed under the Little Tikes trademark, the Little Tikes Play Cell Phone, product no. KSL8033 (the "Cell Phone").  Little Tikes contends that it met with Kids Station shortly thereafter, and that Kids Station agreed to modify the design of the product to ameliorate the hazard.  However, according to Little Tikes, Kids Station continued to sell the unmodified Cell Phone and did not recall it

from the retailers to which it was distributed, nor did it request that the retailers cease selling the Cell Phone.  Little Tikes further claims that both the unmodified and modified Cell Phone models were sold under the same product (SKU) number and therefore retailers could not distinguish which units still presented the potential choking hazard reported by the CPSC.  According to MGA, the unmodified units could still be purchased by individual consumers as late as February, 2008.  As a result, MGA and Little Tikes notified Kids Station that the Agreement was terminated immediately.

     Kids Station tells a somewhat different tale, although it does not dispute the terms of the Agreement.  According to Kids Station, it had an amicable and mutually satisfactory relationship with Little Tikes until it was purchased by MGA; in fact, Kids Station contends that the relationship between the two was so beneficial that the parties agreed in January, 2006 to extend the agreement.  However, once MGA purchased Little Tikes, alleges Kids Station, the relationship quickly went downhill.  MGA manufactures its own line of children's electronic toys, including some in the same categories as those manufactured and distributed by Kids Station under the exclusive license granted by the Agreement, and Kids Station contends that MGA/Little Tikes wrongfully seeks to abrogate the Agreement in order to eliminate competition from Kids Station.  Kids Station claims that it was warned by a long-time employee at Little Tikes that MGA wanted to terminate the Agreement prematurely and market its own products under the Little Tikes trademark.  Furthermore, Kids Station claims that MGA/Little Tikes sent an audit report to Kids Station falsely claiming that Kids Station owed MGA/Little Tikes in excess of $13.5 million in unpaid royalties; MGA/Little Tikes allegedly later abandoned that claim.  Kids Station alleges further that MGA/Little Tikes began to retract prior approvals of

Kids Station products retroactively and to manufacture bogus safety concerns in order to eliminate competition by Kids Station and manufacture and sell its own similar product lines under the Little Tikes trademark.

The final straw that broke the back of the deteriorating relationship between Little Tikes and Kids Station was the termination letter sent by Little Tikes to Kids Station on February 5, 2008. Kids Station alleges that the problem was based upon the defective design of the Cell Phone, but that particular model had not been sold by Kids Station for some months prior, following the expression of safety concerns by Little Tikes and the CPSC and Little Tike's approval of the modified Cell Phone. Kids Station argues that it had worked closely with Little Tikes and the CPSC to modify and correct the faulty design of the Cell Phone on a going forward basis, and that neither Little Tikes nor the CPSC ever suggested that the prior model be recalled. Moreover, according to Kids Station, Little Tikes approved both the pre- and post-modification designs of the Cell Phone. Kids Station contends that Little Tikes never suggested recall of the Cell Phone until less than a week before it sent the termination letter to Kids Station. Kids Station emphasizes that it was only the unmodified Cell Phone, and no other Kids Station product marketed under the Little Tikes trademark, that was ever mentioned as a cause for safety concerns or as a reason for Little Tikes' termination of the Agreement.

Finally, Kids Station claims that it has voluntarily recalled all of the unmodified Cell Phone models and removed them from the marketplace. However, Kids Station alleges that, if injunctive relief is granted preventing it from selling any of its products licensed under the Little Tikes trademark, it will suffer irreparable injury due its inability to meet its current commitments to retailers, lost contracts, reputation and goodwill.

## II. ANALYSIS

The standards for a temporary restraining order are the same as those for a preliminary injunction. *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001). To succeed on a motion for a TRO, a plaintiff must demonstrate: (1) some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that plaintiff will suffer irreparable injury if the TRO is not issued. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If the court is satisfied that these three conditions have been met, it must then consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court must consider the public interest in denying or granting the injunction. *Id.* The court then weighs all of these factors, "sitting as would a chancellor in equity." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The resultant "sliding scale" approach is not mathematical in nature; rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.*

In the motion at bar, Little Tikes argues that its suit alleging, *inter alia*, trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, is likely to succeed on the merits because: (1) Little Tikes has an undisputedly valid trademark, and; (2) the defendant's use of the trademark is likely to cause confusion. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008). According to Little Tikes, Kids Station's continued sale of its products under the Little

Tikes trademark after the Agreement has been validly terminated is likely to cause confusion among consumers. Little Tikes quotes, *inter alia*, *Burger King Corp. v. Mason* in arguing that there is a near certainty of confusion when a licensee continues to use the licensor's trademarks after the licensing agreement has been terminated. 710 F.2d 1480, 1492 (11th Cir. 1983).

Little Tikes' ownership of a valid trademark is undisputed by the parties, but Little Tikes' argument begs the question, because what lies at the core of this case is whether Little Tikes validly terminated the Agreement and thereby denied Kids Station its right to use the trademark. If the Agreement was validly terminated, then there would be a substantial likelihood of confusion arising from Kids Station's continued marketing of its products under the Little Tikes trademark: consumers purchasing products manufactured by Kids Station would believe that they were in fact manufactured or licensed by Little Tikes.

The question therefore turns on whether Little Tikes can demonstrate that it is likely to succeed on the merits of its claim to have validly terminated the agreement. Based on the parties' extensive briefs, it is apparent that Little Tikes' likelihood of success on the merits, while by no means a slam dunk, is "better than negligible," which is all that is required to justify injunctive relief at this stage of the analysis. *Ty*, 237 F.3d at 897. Kids Station has therefore met its requisite burden with respect to this element.

With respect to the necessity for Little Tikes to show the lack of an adequate remedy at law, Little Tikes relies on the law's assumption that trademark infringement or dilution threatens irreparable injury for which there is no adequate remedy at law. *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 805 (7th Cir. 2002). Little Tikes asserts that the damage caused by Kids Station's continued use of the trademark will, as a matter of law, cause

irreparable damage. Moreover, Section 14.2 of the Agreement specifically requires that Kids Station acknowledge that continuing use of the trademark after termination of the Agreement would constitute irreparable damage. Little Tikes has therefore met its burden to show that no adequate remedy at law exists, as well as meeting its burden to demonstrate that, if the Agreement was validly terminated, it has suffered, and will continue to suffer, irreparable damage in the absence of injunctive relief.

Since Little Tikes has successfully met the first three conditions required prior to the issuance of a preliminary injunction, the court must now consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, and balance that harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

Little Tikes contends that the balance of hardships favors the issuance of a TRO. Little Tikes contends that it will lose the goodwill historically generated by the Little Tikes trademark and will also suffer by losing control of its own trademark. Little Tikes claims that this vastly outweighs any harm suffered by Kids Station, which can continue to market its toys under its own name and trademark instead of the Little Tikes trademark. Kids Station, argues Little Tikes, will only be reaping the consequences of its allegedly wrongful conduct.

Kids Station replies that if the TRO is granted it will suffer irreparable harm to its business reputation, goodwill, and existing sales network. Kids Station argues that if it is enjoined from selling its products under the Little Tikes trademark, it will be unable to meet its current contractual obligations to distribute Little Tikes-licensed toys to its retailers, and it will consequently suffer serious and perhaps mortal damage to its business. *See SMC Corp., Ltd. v*

*Lockjaw, LLC*, 481 F. Supp. 2d 918, 927 (N.D. Ill. 2007) (trading company enjoined from terminating sales agreement that allowed distributor exclusive right to sell products under the name of the trading company).  Kids Station maintains that a TRO banning it from distributing *any* approved toy under the Little Tikes' trademark therefore spells potential financial ruin and destruction of its business reputation and goodwill, and is, furthermore, a direct result of Little Tikes wrongful termination of the Agreement.

On the other hand, Kids Station argues, if the TRO is not issued, Kids Station will be able to continue to sell toys with the Little Tikes trademark approved under the Agreement and Little Tikes will continue to receive royalties as per the Agreement.  Kids Station maintains that Little Tikes' arguments concerning confusion and loss of copyright control are groundless, and that the potential injury faced by Little Tikes is minimal by comparison.  Although Little Tikes is losing some royalties due to the fact that the Cell Phone (both pre- and post-modification models) have been recalled, Kids Station asserts that it is working with the CPSC to reintroduce the approved Cell Phone to market, returning it to the revenue stream.  Moreover, even if this does not happen expeditiously, Little Tikes is still entitled to the guaranteed minimum royalties prescribed under Section 4.2 of the Agreement.  Kids Station thus argues that the balance of hardships weighs in its favor and against the issuance of the TRO.

Weighing the irreparable harms asserted by both parties, the court finds the balance tipping strongly towards Kids Station and against issuance of the TRO.  If the TRO is denied, no toys not already approved by Little Tikes, as per the Agreement, will be available on the market, nor is there any assertion that there will be in future.  Moreover, Little Tikes will continue to receive revenues under the terms of the Agreement.  If the court concludes at the end of this litigation

that Little Tikes validly terminated the Agreement, Little Tikes will then be entitled to permanent injunctive relief.  However, if the TRO is granted, Kids Station faces potentially serious damage to, and possible ruination of, both its finances and its reputation.  The court therefore finds that preserving the *status quo ante* will result in substantially less damage to both parties, whereas granting Little Tikes injunctive relief poses potentially devastating consequences to Kids Station. Therefore, the balance of hardship analysis strongly favors denial of the TRO.

Finally, Little Tikes argues that the public interest favors the issuance of a TRO.  Little Tikes claims that the allegedly unauthorized use of its trademark by Kids Station abridges the public's right to be free of brand confusion and the corresponding right of a trademark owner to control his product's reputation.  Furthermore, Little Tikes argues that Kids Station's material breach of the Agreement is what terminated the right of Kids Station to employ the Little Tikes trademark, and thus the public interest favors issuance of a TRO.

Kids Station retorts that the public interest is not served by issuance of a TRO.  It argues that the marketplace is unlikely to be unduly confused by a continuation of the Agreement, and that the only toys sold under the Little Tikes trademark will be those approved by Little Tikes pursuant to the Agreement.  Moreover, according to Kids Station, the public has an interest in preventing the wrongful termination of such licensing agreements, as it alleges Little Tikes has done in the instant case.

The allegedly potentially harmful toy Cell Phones having been withdrawn from the market, the court finds that the public interest is evenly balanced: the public's interest in preventing trademark infringement in general, and Little Tikes' in particular, is balanced by its interest in

preventing a party to a licensing agreement from unilaterally and wrongfully abrogating it to allegedly gain commercial advantage.

In summary, the court finds that Little Tikes has met its initial burden of demonstrating a likelihood of success on the merits, no adequate remedy at law, and irreparable damage. However, although Little Tikes must demonstrate initially only that it has some possibility of success on the merits, at this later balancing stage of the analysis the court must determine how great Little Tikes' likelihood of success on the merits is in order to properly balance the potential harms. *Ty*, 237 F.3d at 896; *see also Storck*, 14 F.3d at 324 n.1. Although it is not possible to be certain at this early stage in the litigation, both parties have briefed this motion extensively, and Little Tikes' argument that it validly terminated the Agreement does not appear to be significantly stronger than Kids Station's argument that the termination was invalid. In short, the case could go either way. Moreover, the public interest appears to be equally balanced between granting and denying the injunction. The dispositive factor in the balancing analysis, then, is the balance of the irreparable harms suffered by the plaintiff and the defendant should the TRO be granted. As described above, that analysis strongly favors denying the injunction and maintaining the parties at the *status quo ante*. Little Tikes' motion for a TRO is consequently denied.

### III. CONCLUSION

For the reasons set forth above, Little Tikes motion seeking a TRO is denied

ENTER:

    \_\_/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: April 18, 2008