**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE LITTLE TIKES COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 1935 |
| | ) | |
| v. | ) | Hon. Joan B. Gottschall |
| | ) | United States District Judge |
| KID STATION TOYS LTD., et al., | ) | |
| | ) | Hon. Nan Nolan |
| Defendants. | ) | United States Magistrate Judge |
| | ) | |
| KIDS STATION TOYS LTD., | ) | |
| | ) | |
| Counterplaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE LITTLE TIKES COMPANY and MGA | ) | |
| ENTERTAINMENT, INC., | ) | |
| | ) | |
| Counterdefendants. | ) | |

**ANSWER, AFFIRMATIVE DEFENSES, AND**
**COUNTERCLAIM OF KIDS STATION TOYS LTD.**

Defendant Kids Station Toys Ltd. ("Kids Station") submits the following Answer and

Affirmative Defenses to the Complaint of Plaintiff The Little Tikes Company ("Little Tikes").

Kids Station answers only those allegations of the Complaint that are directed against it and does

not intend or purport to answer or respond to any of the allegations made by Little Tikes against

the other purported defendants to this case.  Kids Station denies each and every allegation of the

Complaint that is directed against it and is not specifically admitted.

1.     Plaintiff Little Tikes is a corporation organized under the laws of Ohio, and
maintains its principal place of business at 2180 Barlow, Hudson, Ohio, 44232.

**ANSWER:**

On information and belief, Kids Station admits that Little Tikes is a corporation organized under the laws of Ohio and with its principal place of business in Hudson, Ohio. Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph.

2.     Defendant Kid Station Toys, Ltd. is, on information and belief, a corporation organized under the laws of Florida, and maintains a mailing address at P.O. Box 694660, Miami, Florida 33268-4660 (referred to hereinafter as "Kid Station (Florida)").

**ANSWER:**

Kids Station denies the allegations of this paragraph. Further answering, Kids Station admits that it is a corporation organized under the laws of Hong Kong, China with its principal place of business in Miami, Florida. Kids Station further admits that it has a mailing address of P.O. Box 694660, Miami, Florida 33268-4660.

3.     Defendant Kids Station Toys, Ltd. is, on information and belief, a corporation organized under the laws of Hong Kong, China, has a registered agent at Rm 804 8/F Empire Ctr., 68 Mody Rd., Tsim Sha Tsui East, Kowloon, Hong Kong, and maintains a principal place of business in Miami, Florida (referred to hereinafter as "Kids Station (HK)").

**ANSWER:**

Kids Station admits that it is a corporation organized under the laws of Hong Kong, China with an office at Room 804 8/F Empire Center, 68 Mody Road, Tsim Sha Tsui East, Kowloon, Hong Kong, China, and a principal place of business in Miami, Florida. Kids Station denies the remaining allegations of this paragraph.

4.     Defendant Kids Station (U.S.) Incorporated is, on information and belief, a corporation organized under the laws of Florida, and maintains its principal place of business at 1160 NW 163rd Drive, Miami Gardens, Florida, 33169-5816 (referred to hereinafter as "Kids Station (U.S.)").

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station admits that Kids Station (US) Inc. is a corporation organized under the laws of Florida with its principal place of business in Miami, Florida. Kids Station denies the remaining allegations of this paragraph.

5.    Defendant Kids Station Toys International, Ltd. is, on information and belief, a corporation organized under the laws of Bermuda having a registered agent at c/o Alexander Management, Ltd., 48 Par-La-Ville Road, Suite 1461, Hamilton, Pembroke, Bermuda (referred to hereinafter as "Kids Station (Bermuda)"). It is unknown where Kids Station (Bermuda)'s principal place of business is, but it is believed to be in or near Miami, Florida.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station admits that Kids Station Toys International Ltd. is a corporation organized under the laws of Bermuda with its principal place of business in Hong Kong, China. Kids Station denies the remaining allegations of this paragraph.

6.    Kids Station Toys International Holding, GmbH is, on information and belief, a corporation organized under the laws of Switzerland having a registered agent at c/o Oliver Cornelis Gugelot, Treichlerstrasse 7, 8032 Zurich ZH, Switzerland (referred to hereinafter as "Kids Station (International)"). It is unknown where Kids Station (International)'s principal place of business is, but it is believed to be in or near Miami, Florida.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station admits that Kids Station Toys International Holding, GmbH is a corporation organized under the laws of Switzerland with a principal place of business in Miami, Florida. Kids Station denies the remaining allegations of this paragraph.

7.     Elliot S. Newman is an individual who, on information and belief, resides at 355 Ocean Blvd., Golden Beach, Florida, 33160, and is the owner of each of the Kids Station Entities identified in Paragraphs 2 - 6 (collectively referred to as the "Kids Station Entities") and is responsible for controlling the operation of each Kids Station Entity.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the allegations of this paragraph.

8.     On information and belief, Mr. Newman and each Kids Station Entity identified above has participated, on some level, in the manufacturing, transportation, distribution or sale of products bearing the LITTLE TIKES trademark and will be referred to collectively as "Defendants." There may be additional persons or entities liable for the activities which form the basis for this Complaint. Plaintiffs will explore this on discovery and, if necessary, amend this Complaint to add such persons or entities as parties.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

9.     This is an action seeking remedy for (i) piercing the corporate veil; (ii) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); (iii) dilution by tarnishment under 15 U.S.C. § 1125(c); (iv) false representation under 15 U.S.C. § 1125(a); (v) unfair competition; and (vi) breach of contract.

**ANSWER:**

Kids Station admits that Little Tikes purports to bring this action asserting claims for

piercing the corporate veil, trademark infringement under the Lanham Act, dilution under 15

U.S.C. § 1125(c), false representation under 15 U.S.C. § 1125(a), unfair competition, and breach

of contract, all of which arise out of Little Tikes' purported, but wrongful, termination on

February 5, 2008 of that certain License Agreement which appears to be attached to Little Tikes'

Complaint as Exhibit A.  Kids Station denies that any of Little Tikes' claims have any merit or

that Little Tikes is entitled to any relief.

10.     This Court has jurisdiction over the Trademark infringement, false representation and dilution counts pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 (a) in that they

involve actions arising under the Lanham Act. This Court has jurisdiction and supplemental jurisdiction over the remaining counts pursuant to 28 U.S.C. § 1367, 28 U.S.C. § 1338(b), and 28 U.S.C. § 1332, as there is complete diversity between the parties and the matter in controversy exceeds the sum of $75,000.

**ANSWER:**

Kids Station admits that this Court has subject matter jurisdiction over this case.

11.    Personal jurisdiction and venue are proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) and (c) with respect to Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Mr. Newman as a substantial part of the events giving rise to the claims occurred in this District and these Defendants have, by contract with Little Tikes, agreed to jurisdiction here. Personal jurisdiction and venue are proper in this Court under 28 U.S.C. § 1391 (b), (c) and (d) with respect to all other Defendants because they are alien corporations, have continuous and substantial contacts with this District, are doing business in this District, and are currently selling or marketing products under Plaintiff's trademarks in this District. [confirm]

**ANSWER:**

Kids Station admits that this Court has personal jurisdiction over Kids Station and that

venue is proper in this district with respect to the claims asserted by and against Kids Station.  The

remaining allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the remaining allegations of this paragraph.

12.    Little Tikes bring [sic] this action in response to Defendants' willfully-infringing conduct and to protect and prevent the destruction of the goodwill and consumer recognition Plaintiff has worked hard to secure over the years.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

13.    For nearly 40 years, since being founded in 1970, Little Tikes has been a manufacturer and marketer of high-quality, innovative children's products. Little Tikes products are known worldwide for providing durable, imaginative and active fun. Its products are manufactured and sold under the famous "LITTLE TIKES" trademark. The products are produced in a wide variety of categories for young children, including infant toys, popular sports, play trucks, ride-on toys, sandboxes, activity gyms and climbers, slides, pre-school development, role-play toys, creative arts and juvenile furniture.

**ANSWER:**

Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph, and therefore, denies those allegations.

14. As a result of its long use, worldwide advertising and quality products, Little Tikes' trademarks are famous and instantly recognizable throughout the world, particularly its famous, federally registered LITTLE TIKES and Design mark:



U.S. Reg. No. 1,145,515 (the "LITTLE TIKES mark").

**ANSWER:**

Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph, and therefore, denies those allegations.

15. By way of example, Little Tikes' red and yellow Cozy Coupe® Car, an international icon in toys, celebrated its 25th anniversary in 2004, with more than 6 million units sold since its creation. Little Tikes' goal is to create and supply innovative products to customers and consumers around the world. To reach that goal, Little Tikes' associates' actions are guided by the principles of Customer Satisfaction, Teamwork, Innovation, Marketing and Continuous Improvement.

**ANSWER:**

Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph, and therefore, denies those allegations.

16. Because of and [sic] Little Tikes' innovation and commitment to quality and safety, Plaintiff's products have won numerous awards and its LITTLE TIKES trademark is instantly recognizable throughout the world. This instant recognition and the exceedingly valuable goodwill associated with Little Tikes' trademarks are among Plaintiff's most valuable assets, and have been developed over numerous years and at great effort and expense by Little Tikes.

**ANSWER:**

Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph, and therefore, denies those allegations.

17. On December 8, 2003, Little Tikes, at that time wholly-owned by Newell Rubbermaid, Inc., located near Chicago, Illinois, and Kid Station (Florida), entered into a written License Agreement, (the "Agreement"), which granted Kid Station (Florida) the exclusive right to use the valuable LITTLE TIKES and Design mark in connection with certain categories of children toys. A copy of the Agreement is attached hereto as Exhibit A. The Agreement includes, among other provisions, a specific forum selection clause, designating the present Court as the forum of choice for any court actions, and Illinois law as the controlling law of the Agreement.

**ANSWER:**

Kids Station admits that on or around December 8, 2003, Little Tikes and Kids Station entered into a written License Agreement which granted Kids Station the exclusive right to use the Little Tikes trademark in connection with various products and that, at that time, Little Tikes was owned by Newell Rubbermaid, Inc., which was located in Illinois. Further answering, Kids Station admits that the document attached as Exhibit A to the Complaint appears to be a true and accurate copy of the License Agreement. Kids Station is without sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph relating to Newell Rubbermaid, and therefore, denies those allegations. Kids Station denies the remaining allegations of this paragraph to the extent they are inconsistent with the License Agreement or call for a legal conclusion to which no answer is necessary or required.

18. Under the Agreement, Kid Station (Florida) had no right to sublicense any of the rights licensed to it under the Agreement. Ex. A, § 2.2. Additionally, according to Article XIX, the rights granted to Kid Station (Florida) under the Agreement were personal in nature, and Kid Station (Florida) agreed that it could not sell, transfer, lease or assign the Agreement or the rights granted thereunder, or any part thereof, without the prior written consent of Little Tikes. Little Tikes has never given any such consent.

**ANSWER:**

Kids Station admits that Exhibit A to the Complaint appears to be true and correct copy of the License Agreement. Kids Station denies the allegations of this paragraph to the extent they are inconsistent with the License Agreement or call for a legal conclusion to which no answer is

necessary or required.  Kids Station further denies that Little Tikes did not consent or otherwise

agree to Kids Station's actions under the License Agreement.

19.    Because of the exclusivity of the trademark license granted by the Agreement, the fact that Kid Station (Florida) would be making and selling products to small children and the value of the Little Tikes' trademarks, the 36-page Agreement stressed quality control. Some of its quality control provisions include:

- Kid Station (Florida) was only licensed to use Little Tikes' trademarks on products that were of at least the same quality as those sold by Little Tikes. Ex. A, § 6.8.

- Kid Station (Florida) was only licensed to manufacture products in accordance to approved designs. *Id.*

- Kid Station (Florida) represented that its products would be free from defects and would be in compliance with all standards and regulations. *Id.* at § 7.2.

- Kid Station (Florida) was required to provide a toll-free customer support service call-in service, and to provide Little Tikes regular reports detailing the customer service activities on a quarterly basis. *Id.* at §§ 8.1 and 8.2.

- Kid Station (Florida) was required to submit design proposals to Little Tikes for approval. *Id.* at § 9.1

- Kid Station (Florida) agreed that it would ensure that all of the products complied with the various laws and standards, whether voluntary or mandatory, of the various Federal Agencies, including the U.S. Consumers Products Safety Commission, the Federal Trade Commission, Underwriters Laboratory, and the Canadian Standards Association. *Id.* at § 11.

**ANSWER:**

Kids Station admits that Exhibit A to the Complaint appears to be true and correct copy of

the License Agreement.  Kids Station denies the allegations of this paragraph that refer or relate to

the License Agreement to the extent those allegations are inconsistent with the License

Agreement.  Kids Station denies the remaining allegations of this paragraph.

20.    Additionally, the Agreement included a provision that required Kid Station (Florida) to use the LITTLE TIKES mark on products of a certain quality, and permitted Little Tikes, in its sole discretion, to terminate the Agreement if such quality standards were not satisfied. *Id.* at § 6.8. This provision was vital to preserving and protecting the immeasurable goodwill that Little Tikes had garnered in its trademark among consumers for nearly forty years.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

21.   On January 1, 2006, Little Tikes and an entity again purporting to be Kid Station (Florida) entered an amendment to the Agreement ("the Addendum") to expand the types of products that the original license covered. See Ex. A, Addendum.

**ANSWER:**

Kids Station admits that it entered into an Addendum with Little Tikes on or about January 1, 2006, pursuant to which Little Tikes agreed to expand the exclusive license Little Tikes had granted to Kids Station.  Further answering, Kids Station admits that Exhibit A to the Complaint appears to include a true and correct copy of the Addendum.  Kids Station denies the remaining allegations of this paragraph.

22.   In late 2006, MGA Entertainment, Inc. ("MGA"), a California corporation, bought Little Tikes from Newell Rubbermaid, Inc. Neither MGA nor Newell Rubbermaid, Inc. is a party to the Agreement. However, pursuant to the Agreement's Notice Provision (Ex. A, § 20), Newell Rubbermaid, Inc.'s Legal Department, located in Oak Brook, Illinois, was to receive a copy of all notices.

**ANSWER:**

On information and belief, Kids Station admits that in late 2006, MGA Entertainment, Inc. acquired Little Tikes from Newell Rubbermaid, Inc.  Kids Station further admits that Exhibit A to the Complaint appears to be true and correct copy of the License Agreement.  Kids Station denies the allegations of this paragraph that refer or relate to the License Agreement to the extent those allegations are inconsistent with the License Agreement.   Kids Station denies the remaining allegations of this paragraph.

23.   Prior to the sale of Little Tikes to MGA, Little Tikes had begun to discover quality problems with the goods manufactured and sold by Kid Station (Florida) under Little Tikes' trademarks. In fact, Little Tikes had become aware of several consumer complaints over the quality of toys sold under Little Tikes' trademarks that were being made and sold by Kid Station (Florida). Little Tikes became increasingly concerned with protecting its valuable trademarks in the face of these quality complaints.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

24.    After MGA acquired Little Tikes, MGA and Little Tikes received numerous customer and government complaints about Little Tikes products made by Kid Station (Florida), including complaints that certain products posed serious injury hazards to small children. In addition, MGA found that Kid Station (Florida) was not fulfilling numerous critical obligations required under the Agreement. As a result, MGA held a meeting with Mr. Newman and his legal counsel in May 2007 to address these concerns and other issues of Kid Station (Florida)'s noncompliance with the Agreement. Despite meeting with Mr. Newman, the purported president of Kid Station (Florida), as well as his counsel Charles Leuin, and subsequent written correspondence insisting upon compliance by Kid Station (Florida) with its obligations, Kid Station (Florida) continued, and still continues, to ignore such obligations.

**ANSWER:**

Kids Station admits that in May 2007 there was a meeting between Kids Station and MGA Entertainment Inc. ("MGA") pursuant to which the parties and their representatives discussed matters relating to the License Agreement, including but not limited to, MGA's and Little Tikes' noncompliance with the License Agreement and infringement of Kids Station's rights under the License Agreement.  Kids Station denies the remaining allegations of this paragraph.

25.    On April 30, 2007, MGA received a report from the U.S. Consumers Product Safety Commission (the "CPSC"), describing a potential choking hazard associated with one of the licensed products made by Defendants, namely, the Little Tikes Play Cell Phone, product number KSL8033 (the "Unapproved Cell Phone"). A copy of the report is attached hereto as Exhibit B.

**ANSWER:**

Kids Station admits that Exhibit B to the Complaint appears to be a true and correct copy of an April 30, 2007 incident report from the U.S. Consumers Product Safety Commission (the "CPSC").  Kids Station denies the allegations of this paragraph to the extent they are inconsistent with the CPCS's April 30, 2007 incident report.  Kids Station further denies that the KSL8033 was unapproved.  Further answering, Kids Station lacks sufficient knowledge or information to form a belief as to the remaining allegations of this paragraph, and therefore, denies those allegations.

26.    Little Tikes, through its parent MGA, met with Mr. Newman, the president of Kid Station (Florida), as well as his counsel Charles Leuin, Esq. of Greenberg Traurig - Chicago, in Los Angeles

in May of 2007 to discuss the April 30 CPSC report, as well as other concerns. As a result of the meeting, Kid Station (Florida) agreed to modify the design of the Unapproved Cell Phone.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

27.    Defendants finally claimed to have modified the Unapproved Cell Phone in September 2007. However, Defendants failed to remove the prior version of the Unapproved Cell Phone from retailers' shelves, and complaints continued. On January 30, 2008, concerned with protecting the goodwill in the LITTLE TIKES mark, MGA sent a letter to Kid Station (Florida) detailing a new consumer complaint reporting a potential choking hazard related to the Unapproved Cell Phone, and requesting that Kid Station (Florida) immediately cease selling the KSL8033 product. A copy of the January 30 letter is attached as Exhibit C.

**ANSWER:**

Kids Station admits that in September 2007 it decided to modify the Little Tikes Chit N

Chat Cell Phone (the "Approved Cell Phone").  Kids Station further admits that Exhibit C to the

Complaint appears to be a true and correct copy of the letter Kids Station received on or about

January 30, 2008 from Little Tikes.  Kids Station denies the remaining allegations of this

paragraph.

28.    Despite the CPSC report indicating that the Unapproved Cell Phone created a choking hazard, and despite assurances by Defendants that a modified Cell Phone, one with a screw in the hinge, had been manufactured since September of 2007, Little Tikes discovered that Defendants still had never recalled the unmodified KLS8033 product identified in the CPSC report from their retailers, nor had Defendants asked the retailers to stop selling the Unapproved Cell Phone.

**ANSWER:**

Kids Station admits that prior to March 2008 it did not ask retailers to stop selling the

Approved Cell Phone.  Kids Station denies the remaining allegations of this paragraph.

29.    Once Defendants finally started selling the modified cell phone, Defendants sold both the original Unapproved Cell Phone and the modified cell phone under the same SKU number. As such, it would be impossible for retailers to tell the difference between the two phones unless they physically examined each individual product. Indeed, as detailed below, Little Tikes came to learn in February of 2008 that consumers could still purchase the Unapproved Cell Phone from retailers, such as Wal-Mart.

**ANSWER:**

Kids Station admits that the modified and unmodified versions of the Approved Cell Phone are sold under the same product numbers. Kids Station denies the remaining allegations of this paragraph.

30.    On January 31, 2008, Channel KTTC in Rochester, Minnesota reported yet another choking incident involving a mother who had found a broken piece of the Unapproved Cell Phone in her child's mouth, but was able to retrieve the piece before he could swallow it. Detrimentally to Little Tikes, the report only identified the product as "a Little Tikes Toy," thereby leading the general public to believe that Little Tikes, rather than Defendants, was solely responsible for the problem.

**ANSWER:**

Kids Station denies that the Approved Cell Phone was unapproved. Further answering, Kids Station lacks sufficient knowledge or information to form a belief as to the remaining allegations of this paragraph, and therefore, denies those allegations.

31.    Additionally, despite assurances from Kid Station (Florida) that the design of the Unapproved Cell Phone had been modified in September of 2007, MGA purchased a Unapproved Cell Phone from a Wal-Mart store on February 1, 2008. Incredibly, stickers on the purchased phone indicated that the manufacture date of the product was September of 2007. Moreover, there were multiple Unapproved Cell Phones on the shelf, each having stickers with the same date of manufacture.

**ANSWER:**

Kids Station admits the Approved Cell Phone was modified in September 2007, and denies that the Approved Cell Phone was unapproved. Kids Station lacks sufficient knowledge or information to form a belief as to the remaining allegations of this paragraph, and therefore, denies those allegations.

32.    On February 5, 2008, due to the danger of grave and irreparable damage to its reputation and goodwill, and based on the continuing and inexplicable sale of products that were, by definition, unapproved under the Agreement, MGA sent, on behalf of Little Tikes, a letter to Defendants, terminating the Agreement. The February 5 letter is attached hereto as Exhibit C.

**ANSWER:**

Kids Station admits that Exhibit C to the Complaint appears to be a true and correct copy of the letter Little Tikes sent to Kids Station on February 5, 2008 purporting to immediately terminate the License Agreement. Kids Station denies that the Approved Cell Phone was unapproved. Kids Station further denies the remaining allegations of this paragraph.

33.    In addition, Plaintiff's letter of February 5 identified numerous additional breaches of the Agreement, and served as Plaintiff's written notice of those material breaches of the Agreement pursuant to paragraph 14.1 of the Agreement. According to that paragraph, Defendants had thirty (30) days from the time of notice to cure the additional breaches.[1] As of March 6, 2008, Defendants had taken no actions to cure the numerous breaches identified in the February 5 letter. Indeed, Defendants have still taken no actions in an attempt to cure any of the breaches identified in the February 5 letter.

**ANSWER:**

Kids Station admits that Exhibit C to the Complaint appears to be a true and correct copy of the letter Little Tikes sent to Kids Station on February 5, 2008 purporting to immediately terminate the License Agreement. Kids Station denies the remaining allegations of this paragraph.

34.    On February 19, 2008, Defendant, Kids Station (HK), not Kid Station (Florida), the purported Florida corporation that is the named party in the Agreement, filed suit in the Southern District of Florida. On March 17, 2008, Kids Station (HK) amended its complaint, which included counts for a declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, tortuous interference with contract, and civil conspiracy. *See* Amended Complaint, attached hereto as Exhibit E. Kids Station (HK) also filed a motion for Temporary Restraining Order seeking, among other remedies, to enjoin MGA and Little Tikes from terminating the Agreement.

---

[1] According to § 14.2, Little Tikes could immediately terminate the Agreement if Kid Station (Florida), among other events, sold any Licensed Products that had not been approved pursuant to Article IX. According to § 14.1, Little Tikes could terminate the Agreement for other material breaches upon thirty (30) days written notice, and provided the breaches were not cured within that thirty day period.

**ANSWER:**

Kids Station admits that Exhibit A to the Complaint appears to be a true and correct copy of the License Agreement and that Section 14 of the License Agreement provides for termination of the License Agreement in specific circumstances. Kids Station denies the allegations of footnote 1 to the extent they are inconsistent with Section 14 of the License Agreement.

**ANSWER:**

Kids Station admits that on February 14, 2008, it filed suit against Little Tikes and MGA in the Southern District of Florida and that Exhibit E to the Complaint appears to be a true and correct copy of Kids Station's Amended Complaint. Kids Station further admits that it filed a motion for a temporary restraining order to enjoin MGA's and Little Tikes' improper purported termination of the License Agreement. Kids Station denies the remaining allegations of this paragraph.

35.    In its Amended Complaint, Kid Station (HK) alleged that it, not Kid Station (Florida), has been the sole and exclusive party with whom Little Tikes entered the Agreement. Ex. E, ¶¶ 4, 14. This allegation comes despite the fact that the company description on the website located at the domain name <www.kidsstationtoys.com/homepage.php> states, "Kids Station Toys International, Ltd, which started in 1999 . . . has forged relationships with some of the biggest companies in the toy industry, including . . . Little Tikes . . . ." A printout of this website is attached hereto as Exhibit F.

**ANSWER:**

Kids Station admits that Exhibit E to the Complaint appears to be a true and correct copy of the Amended Complaint that Kids Station filed in the Southern District of Florida. Kids Station further admits that it is the intended party under the License Agreement. Kids Station further admits that Exhibit F to the Complaint appears to be a true and correct copy of a printout of Kids Station's website dated as of April 3, 2008. Kids Station denies the remaining allegations of this paragraph.

36.    Based on these statements, and on information and belief, Defendant Newman is playing a shell game with the various entities that he controls. Plaintiff believes that Mr. Newman is a principal officer or shareholder of each of the Kids Station Entities. The Kids Station Entities are scattered across the globe, but each has some role in or responsibility for the actions complained of herein. The relationship between these different entities remains unclear.

**ANSWER:**

The allegations in this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

37.    In response to the original and Amended Complaints, MGA and Little Tikes filed motions to dismiss, or in the alternative, to transfer jurisdiction. On April 2, 2008, the Florida Court dismissed the action with prejudice to re-file in Florida, and denied all pending motions as moot. A copy of the Florida Court's April 2 order is attached hereto as Exhibit G.

**ANSWER:**

Kids Station admits that MGA and Little Tikes filed motions to dismiss, or in the alternative, to transfer jurisdiction of the case pending in the Southern District of Florida after Kids Station filed its Complaint and Amended Complaint. Kids Station further admits that Exhibit G to the Complaint appears to be a true and correct copy of Judge King's April 2, 2008 Order. Kids Station denies the allegations of this paragraph to the extent they are inconsistent with that Order.

38.    On March 11, 2008, while the Florida matter was still pending, Plaintiffs sent a third letter to Defendants, a copy of which is attached hereto as Exhibit H. The March 11 letter referenced a recent customer complaint to Kids Station (HK) regarding a battery found on the Unapproved Cell Phone that leaked battery acid. Additionally, the March 11 letter once again informed Defendants that the Agreement had been terminated under the immediate termination clause and, as a result, Defendants no longer were permitted to sell products bearing Little Tikes' trademarks. Therefore, because of the lack of a license, as well as the potential damage to Plaintiff's valuable goodwill, Plaintiffs further demanded that Defendants remove all of Defendants' products bearing Little Tikes trademarks from retailers' shelves.

**ANSWER:**

Kids Station admits that Exhibit H to the Complaint appears to be a true and correct copy of the letter sent by Little Tikes to Kids Station on or about March 11, 2008, that the March 11, 2008 letter references what is referred to as a customer complaint regarding a Kids Station cell phone, and that the March 11, 2008 letter was sent to Kids Station while the litigation between the

parties was pending in the Southern District of Florida. Kids Station denies the remaining allegations of this paragraph.

39.    Defendants have not responded to the specific demands of the March 11 letter and, on information and belief, are continuing to sell products bearing Plaintiff's marks.

**ANSWER:**

Kids Station admits it continues to sell products under the Little Tikes mark in accordance with Kids Station's rights under the License Agreement and pursuant to this Court's April 18, 2008 Memorandum Opinion and Order. Kids Station denies the remaining allegations of this paragraph.

40.    On March 14, 2008, the CPSC sent a new letter to Little Tikes regarding the Unapproved Cell Phone. A copy of the March 14 letter is attached hereto as Exhibit I. In the March 14 letter, the CPSC referenced the hinge cover of the Unapproved Cell Phone. The March 14 letter states that the Unapproved Cell Phone is "a hazardous substance as defined in section 2(f)(1)(D) of the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261.2(f)(1)(D), and the regulations at 16 C.F.R. § 1501.18(a)(9), and is a banned hazardous substance under section 2(q)(1)(A) of the FHSA...." The report states that the hinge cover is hazardous, and that "[b]ecause of the potential risk of injury to children, the staff requests that you stop sale and withhold distribution of any inventory of the [Unapproved Cell Phone]."

**ANSWER:**

Kids Station admits that Exhibit I to the Complaint appears to be a true and correct copy of a March 14, 2008 letter from the CPSC relating to the Approved Cell Phone sold under Kids Station product number KSL8033. Kids Station denies the allegations of this paragraph to the extent they are inconsistent with the CPSC's March 14, 2008 letter and denies that the Approved Cell Phone or the KSL8033 was unapproved.

41.    Plaintiff received the March 14 letter on March 18, 2008. On March 19, 2008, MGA and Plaintiff sent a copy of this letter to Defendant Newman and again demanded that Defendants immediately cease the sale of this Unapproved Cell Phone, and all other products bearing the LITTLE TIKES mark.

16

**ANSWER:**

Kids Station lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph insofar as they relate to when Little Tikes received the March 14, 2008 CPSC letter, and therefore, denies those allegations.  Kids Station denies the remaining allegations of this paragraph.

42.    The Unapproved Cell Phone contains a legend which states, "Designed and Licensed by *Kids Station Toys International Ltd."* (emphasis added). Plaintiff is uncertain whether this refers to Defendant Kids Station (Bermuda) or Defendant Kids Station (International). Regardless of the Defendant to which the notice refers, neither is a party to the Agreement, neither is authorized to use the LITTLE TIKES mark, and therefore, distribution by either is an infringement of Plaintiff's trademark rights.

**ANSWER:**

Kids Station admits that the Approved Cell Phone is marked "Designed and Licensed by Kids Station Toys International Ltd." and that Little Tikes approved that product and its packaging.  Kids Station denies the remaining allegations of this paragraph.

43.    Because of the apparent interchangeability of the various Defendants, it appears that Mr. Newman is using these various entities in an attempt to avoid liability, and that he, individually, is responsible for the actions of the various Defendants.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

## COUNT I
## PIERCING THE CORPORATE VEIL
### (NEWMAN)

44.    Plaintiff realleges and incorporates herein paragraphs 1 through 43 of this Complaint.

17

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station repeats and incorporates its answers to paragraphs 1 through 43 of the Complaint as if set forth fully herein.

45.   There is a unity of interest between Defendant Newman and each of the Kids Station Entities named as Defendants. On information and belief, Defendant Newman is the president and primary shareholder of each Kids Station Entity and exercises total dominion and control over the finances and business operations of each Kids Station Entity.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

46.   Based on information and belief, since the respective formations of the Kids Station Entities:

    (a)    none of the Kids Station Entities have observed corporate formalities;

    (b)    Newman did not maintain separate finances for the Kids Station Entities and commingled their funds and shifted funds among the various Defendants; and

    (c)    Newman has not maintained separate places of business for each of the Kids Station Entities. Indeed, each lists, at one time or another, a place of business or operation at P.O. Box 694660 in Miami, Florida.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

47.   On information and belief, there is a unity of interest and ownership among the various Kids Station Entities and Newman.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

48.    On information and belief, Kid Station (Florida), Kids Station (HK), Kids Station (U.S.), Kids Station (Bermuda) and Kids Station (International) were and are corporations in name only, and their primary equity holder and principal, Newman, is and has been the real party in interest who used the various Kids Station Entities as his alter ego to shield him from personal liability for the obligations he has incurred.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

49.    The various Kids Station Entities are mere instrumentalities and alter egos of Newman who has defrauded Plaintiff by hiding behind the veil of the alleged separate existence of the various Kids Station Entities. Each of the various Kids Station Entities and Mr. Newman are, therefore, individually and jointly liable for the infringements of Little Tikes' trademarks.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

50.    Allowing Newman to continue to perpetrate these activities permits him to be unjustly enriched and deprives Plaintiffs of the opportunity to defend and control the valuable goodwill associated with its trademarks.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

51.   Unless the corporate identities of the various Kids Station Entities are disregarded, Plaintiff will have no remedy for the breach of contract or trademark infringement stated above. Under the circumstances, observance of the fiction of the separate corporate existence of the various Kids Station Entities would sanction fraud and promote injustice. The purported corporate existence of the various Kids Station Entities should be disregarded, and liability should be imposed on Newman personally.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the allegations of this paragraph.

**COUNT II**
**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(A))**
**(ALL DEFENDANTS)**

52.   Plaintiff realleges and incorporates herein paragraphs 1 through 51 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 51 of the

Complaint as if set forth fully herein.

   A.   *Against Kids Station (Bermuda), Kids Station (International) and Newman*

53.   These Defendants had constructive knowledge of Little Tikes' ownership of and rights in its federally-registered mark pursuant to 15 U.S.C. § 1072, long prior to these Defendants' unauthorized distribution of goods under the Little Tikes mark. Furthermore, because of the lack of corporate formalities and the relatedness of these Defendants to the purported named party of the Agreement, these Defendants and their agents also had actual knowledge of Little Tikes' ownership of and rights in its federally-registered mark long prior to these Defendants' unauthorized conduct complained of herein.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the allegations of this paragraph.

54.    These Defendants have deliberately and willfully distributed and sold products bearing the LITTLE TIKES mark in an attempt to trade upon the enormous goodwill, reputation, and selling power established by Little Tikes under its mark, and to pass their goods off as Little Tikes' goods.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

55.    Little Tikes has not consented to these Defendants' use of the LITTLE TIKES mark on the products distributed by these Defendants.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

56.    These Defendants' unauthorized use of the LITTLE TIKES mark in connection with Defendants' promotion and provision of their goods has caused, is currently causing, and is likely to continue to cause, confusion, mistake or deception as to the affiliation, connection or association of these Defendants with Little Tikes in violation of 15 U.S.C. § 1114.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

57.    The blatantly intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

58.    As a result of these Defendants' aforesaid conduct, Little Tikes has suffered substantial damage and irreparable harm constituting an injury for which Little Tikes has no adequate remedy at law. Unless this Court enjoins these Defendants' conduct, Little Tikes will continue to suffer irreparable harm.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the allegations of this paragraph.

*B.*    *Against Kid Station (Florida), Kids Station (HK), Kids Station (U.S.) and Mr. Newman*

59.    Defendant Kids Station (HK) has alleged in the Florida action that one of these Defendants was a party to the Agreement. Because of the relatedness of the Defendants, it is unclear which Defendant was actually the party to the Agreement. Each of these Defendants had actual knowledge of Little Tikes' ownership of and rights in its federally-registered mark long prior to these Defendants' unauthorized use of the Little Tikes mark.

**ANSWER:**

Kids Station admits that it is the intended party under the License Agreement.  Kids

Station denies the remaining allegations of this paragraph.

60.    These Defendants have deliberately and willfully distributed and sold products bearing the LITTLE TIKES mark after the February 5, 2008 termination of the Agreement, in an attempt to trade upon the enormous goodwill, reputation, and selling power established by Little Tikes under its mark, and to pass their goods off as Little Tikes' goods.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

61.    Little Tikes has not consented to these Defendants' continued use of the LITTLE TIKES mark on the products distributed by these Defendants.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

62.    These Defendants' unauthorized use of the LITTLE TIKES mark in connection with the promotion and provision of their goods has caused, is currently causing, and is likely to continue to cause in the future, confusion, mistake or deception as to the affiliation, connection or association of these Defendants with Little Tikes in violation of 15 U.S.C. § 1114.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

63.    The intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

**ANSWER:**

Kids Station denies the allegations of this paragraph.

64.    As a result of these Defendants' aforesaid conduct, Little Tikes has suffered substantial damage and irreparable harm constituting an injury for which Little Tikes has no adequate remedy at law. Unless this Court enjoins these Defendants' conduct, Little Tikes will continue to suffer irreparable harm.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

## COUNT III
## FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(A))
## (ALL DEFENDANTS)

65.    Plaintiff realleges and incorporates herein paragraphs 1 through 64 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 64 of the

Complaint as if set forth fully herein.

*A.    Against Kids Station (Bermuda), Kids Station (International) and Newman*

66.    Defendants Kids Station (Bermuda), Kids Station (International) and Newman have deliberately and willfully sold, and are currently selling, products under the Little Tikes trademarks, despite the fact that none of Kids Station (Bermuda), Kids Station (International) or Newman was ever a party to the Agreement, in an attempt to trade on the long-standing and hard-earned goodwill, reputation and selling power established by Little Tikes in connection with its products, and in order to confuse consumers as to the origin and sponsorship of the Little Tikes branded products.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

67. The unauthorized and tortious conduct of Kids Station (Bermuda), Kids Station (International) and Newman has also deprived and will continue to deprive Plaintiffs of the ability to control the consumer perception of its goods marketed under the Little Tikes trademarks, placing the valuable reputation and goodwill of Plaintiffs in the hands of Kids Station (Bermuda), Kids Station (International) and Newman, over whom Plaintiffs have no control.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

68. The conduct of Kids Station (Bermuda), Kids Station (International) and Newman constitutes a false representation or description of the goods, which is likely to cause, and indeed, already has caused, confusion, mistake or deception as to the affiliation, connection or association of Kids Station (Bermuda), Kids Station (International) and Newman with Plaintiffs, and as to the origin, sponsorship or approval of Kids Station (Bermuda), Kids Station (International) and Newman and their goods, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

69. The blatantly intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer is necessary or required. To the extent an answer is required by Kids Station, Kids Station denies the allegations of this paragraph.

24

70. As a result of Kids Station (Bermuda)'s, Kids Station (International)'s and Newman's aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting an injury for which it has no adequate remedy at law. Plaintiff will continue to suffer irreparable harm unless this Court enjoins this conduct.

**ANSWER:**

The allegations of this paragraph are not directed to Kids Station, and therefore, no answer

is necessary or required.  To the extent an answer is required by Kids Station, Kids Station denies

the allegations of this paragraph.

B.    *Against Kids Station (Florida), Kids Station (HK), Kids Station (US) and Newman*

71. Defendants Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman have deliberately and willfully sold, and are currently selling, products under the Little Tikes trademarks subsequent to the termination of the Agreement in an attempt to trade on the long-standing and hard-earned goodwill, reputation and selling power established by Little Tikes in connection with its products, and in order to confuse consumers as to the origin and sponsorship of the Little Tikes branded products.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

72. The unauthorized and tortious conduct of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman has also deprived and will continue to deprive Plaintiff of the ability to control the consumer perception of its goods marketed under the Little Tikes trademarks, placing the valuable reputation and goodwill of Plaintiff in the hands of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman, over whom Plaintiff has no control.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

73. The conduct of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman constitutes a false representation or description of the goods, which is likely to cause, and indeed, already has caused, confusion, mistake or deception as to the affiliation, connection or association of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman with Plaintiff, and as to the origin, sponsorship or approval of Kid Station (Florida), Kids Station (U.S.), Kids Station (HK) and Newman and their goods, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

**ANSWER:**

Kids Station denies the allegations of this paragraph.

25

74.    The intentional nature of the aforementioned acts renders this an exceptional case under 15 U.S.C. § 1117(a).

**ANSWER:**

Kids Station denies the allegations of this paragraph.

75.    As a result of Kid Station (Florida)'s, Kids Station (U.S.)'s, Kids Station (HK)'s and Newman's aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting an injury for which it has no adequate remedy at law. Plaintiff will continue to suffer irreparable harm unless this Court enjoins this conduct.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

**COUNT IV**
**VIOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS 510/1 ET SEQ.)**
**(ALL DEFENDANTS)**

76.    Plaintiff realleges and incorporates herein paragraphs 1 through 75 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 75 of the

Complaint as if set forth fully herein.

77.    The actions of each of the Defendants complained of herein constitute deceptive trade practices in violation of 815 ILCS 510/2 in that they are likely to cause confusion or misunderstanding as to source, sponsorship or approval of the Defendants' products sold under the Little Tikes trademark. Defendants' deceptive conduct also creates a likelihood of confusion as to the affiliation, connection or association of its goods with Plaintiffs' well-known marks. Furthermore, Defendants' conduct creates false or misleading representations of fact as to Plaintiff's connection to Defendants' sub-standard products.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

78.    Because Defendants' had notice of Plaintiff's prior use of and rights in the Little Tikes trademarks, Defendants willfully engaged in deceptive trade practices in violation of Illinois law.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

79.    As a result of Defendants' willful and malicious conduct, Plaintiff is likely to suffer, and has in fact already suffered, irreparable harm for which it has no adequate remedy at law. Unless this Court enjoins Defendants' conduct, Plaintiff will continue to suffer irreparable harm.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

## COUNT V
## FEDERAL TRADEMARK DILUTION (15 U.S.C. § 1125(C))
## (ALL DEFENDANTS)

80.    Plaintiff realleges and incorporates herein paragraphs 1 through 79 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 79 of the

Complaint as if set forth fully herein.

81.    Defendants' use of Plaintiff's distinctive and famous "LITTLE TIKES" trademark without Plaintiff's consent is likely to dilute the distinctive quality of the "LITTLE TIKES" mark in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

**ANSWER:**

Kids Station denies the allegations of this paragraph.

82.    Defendants' acts complained of herein, specifically Defendants' use of Plaintiff's "LITTLE TIKES" trademarks, will tarnish, and indeed, already have tarnished, the reputation of Plaintiff's "LITTLE TIKES" mark in the market place. Defendants' acts have greatly damaged Plaintiff and, unless restrained and enjoined, will continue to damage Plaintiff. Plaintiff does not have an adequate remedy at law.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

## COUNT VI
## COMMON LAW UNFAIR COMPETITION
## (ALL DEFENDANTS)

83.    Plaintiff realleges and incorporates herein paragraphs 1 through 82 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 82 of the Complaint as if set forth fully herein.

84.    The aforesaid conduct of each of the Defendants constitutes unfair competition in that such conduct is likely to cause members of the public and trade, and actual or potential customers of Plaintiff, to believe that Defendants and their goods are in some way sponsored by, affiliated with or otherwise connected to Plaintiff, when in fact they are not. These actions enable Defendants to trade on and deprive Plaintiff of the benefit of the goodwill in the "LITTLE TIKES" trademark.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

85.    Defendants' acts described above constitute unfair competition in violation of Illinois common law, as the aforementioned acts amount to an intentional misappropriation of Plaintiff's trademarks, reputation and commercial advantage. As a result of their wrongful actions, Defendants will be unjustly enriched.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

86.    As a result of Defendants' aforesaid conduct, Plaintiff has suffered substantial damage and irreparable harm constituting and injury for which Plaintiff has no adequate remedy at law. Unless this Court enjoins Defendants' conduct, Plaintiff will continue to suffer irreparable harm.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

## COUNT VII
## BREACH OF CONTRACT
## (KID STATION (FLORIDA), KIDS STATION (U.S.), KIDS STATION (HK), NEWMAN)

87.    Plaintiff realleges and incorporates herein paragraphs 1 through 84 of this Complaint.

**ANSWER:**

Kids Station repeats and incorporates its answers to paragraphs 1 through 84 of the Complaint as if set forth fully herein.

88.    Plaintiff Little Tikes entered into the Agreement with Kid Station (Florida). The Agreement was signed and executed on behalf of Kid Station (Florida) by Newman. While it is

unclear if Kid Station (Florida) currently exists, or ever has existed, Little Tikes has, at all times, performed its obligations under the Agreement.

**ANSWER:**

Kids Station admits that it is the intended party to the License Agreement.  Kids Station

denies the remaining allegations of this paragraph.

89.    Newman and Kid Station (Florida), or whatever purported entity actually entered into the Agreement, has, however, knowingly and intentionally breached its obligations under the Agreement by, among other things:

(a)    Continuing to sell, and failing to remove from retailers' shelves, Licensed Products under the Agreement that were, by definition, unapproved because they do not comply with safety standards of the CPSC. Specifically, Defendants sold and are continuing to sell the Unapproved Cell Phone, which was defined by the CPSC as a hazardous substance under the Federal Hazardous Substances Act, 15 U.S.C. § 1261.2(f)(1)(D).

(b)    Failing to comply repeated requests to provide, under Section 3.1 of the Agreement, samples of each Licensed Product to Little Tikes. Despite these repeated requests, Kid Station (Florida) has failed to provide samples of each Licensed Product. While MGA and Little Tikes have received samples of a few products, neither MGA nor Little Tikes has received samples of all products, nor in the quantities of samples required by the Agreement or within the mandated time frames.

(c)    Failing to provide any of the documents specified under Sections 4.8 or 4.9 of the Agreement. Specifically, Kid Station (Florida) has not provided certain distribution reports, which are required to include, at the very least, Kid Station (Florida)'s product development plans, advertising and merchandising and promotional activities. Kid Station (Florida) has also not provided a report of actual unit sales by individual retail account for the previous calendar year. Finally, Kid Station (Florida) has not provided a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter.

(d)    Failing to submit new products designs for 2008 pursuant to its obligations under Section 5.3 of the Agreement. Specifically, Kid Station (Florida) has not introduced at least three (3) different SKUs of Licensed Products, the majority of which are required to contain new aesthetic or functional features.

(e)    Failing to meet its obligations to maintain an adequate telephone support service under Section 8.1 of the Agreement. The reports MGA and Little Tikes have received, reviewed and analyzed from Kid Station (Florida) deviate substantially from the standards set forth in the Agreement. For a large portion of the calls, no individual name was filled in and no information about the complaints was filled in, so MGA and Little Tikes could not determine the nature of the call. The gaps in information lead to the logical conclusion that Kid Station (Florida) is not providing a comparable level of service offered by Little Tikes, in direct violation of the terms set forth in Section 8.1. Additionally, the voluminous amount of calls Little Tikes' own

Consumer Service has received regarding the lack of response from Kid Station (Florida)'s customer service confirm Kid Station (Florida)'s failure to comply with this provision of the Agreement.

(f)     Failing to provide testing reports for Kid Station (Florida)'s Little Tikes products pursuant to Section 9.2 of the Agreement as repeatedly requested by the Quality Assurance divisions of both MGA and Little Tikes. Given current public perceptions of problems in the toy industry, it is of vital importance to both MGA and Little Tikes that the Licensed Products are safe for children. Kid Station (Florida) has failed to consistently provide testing reports.

(g)     Failing to provide either MGA or Little Tikes with its marketing plan for 2008, in direct violation of Kid Station (Florida)'s obligations under Section 12.2 of the Agreement.

(h)     Failing, under Exhibit A of the Agreement, to provide either MGA or Little Tikes with written meeting reports following any meeting between Kid Station (Florida) and a buyer at the following retailers: Wal-Mart, Kmart, Target, Toys R Us, Kay Bee Toys or FAO Schwarz. Kid Station (Florida) has repeatedly failed to provide these reports on a consistent basis.

(i)     Selling Licensed Products outside the Territory as defined in section 1.7 of the Agreement. Specifically, Defendants' sold and marketed the Licensed Products in Puerto Rico.

As a result of Defendants' willful breach of the Agreement, Little Tikes has suffered substantial damage in an amount to be proven at trial.

**ANSWER:**

Kids Station denies the allegations of this paragraph.

WHEREFORE, having fully answered all of the allegations directed against it in the Complaint, Kids Station prays: (1) that Little Tikes' Complaint be dismissed with prejudice, (2) that judgment be entered in favor of Kids Station on the Complaint, (3) that Kids Station be awarded such other and further relief as the nature of this case may require, including but not limited to, an award of attorneys' fees and costs, or such other relief that this Court deemed just and proper.

**AFFIRMATIVE DEFENSES**

Kids Station gives notice that it may rely upon the following affirmative defenses to the extent applicable and supported by facts either presently known or as uncovered during discovery.

Kids Station does not hereby assume the burden of proof on such defenses that would otherwise rest on Little Tikes, the plaintiff in the case.

1.      Little Tikes' claims are barred for failure to state a claim upon which relief can be granted.

2.      Little Tikes' claims are barred based upon the doctrines of laches and estoppel.

3.      Little Tikes' claims are barred based upon the doctrine of waiver or acquiescence.

4.      Little Tikes' claims are barred by the doctrine of unclean hands.

5.      Little Tikes' claims are barred because Kids Station has not infringed or diluted the asserted trademark rights or any other rights of Little Tikes.

6.      Little Tikes' claims are barred because the conduct complained of in the Complaint is permitted by an express and/or implied license and/or is otherwise a justified, permitted, legitimate and fair use.

7.      Little Tikes' claims are barred because Little Tikes has suffered no damages.

8.      Little Tikes' claims are barred because its alleged damages are speculative and because of the impossibility of the ascertainment and allocation of the alleged damages.

9.      Little Tikes' claims are barred to the extent Little Tikes has failed to mitigate its damages, if any.

10.     Little Tikes' claims are barred because Little Tikes had full knowledge of and/or assumed the risk that caused, contributed, or resulted in Little Tikes' damages, if any.

Kids Station reserves the right to add to or delete from its affirmative defenses as discovery proceeds.

31

## COUNTERCLAIM OF KIDS STATION TOYS LTD.

Defendant/Counterplaintiff Kids Station Toys Ltd. ("Kids Station") for its Counterclaim against Plaintiff/Counterdefendant The Little Tikes Company ("Little Tikes") and Counterdefendant MGA Entertainment, Inc. ("MGA") states as follows:

## NATURE OF THE CASE

1.      This action arises out of a wrongful scheme devised and carried out by Little Tikes and its parent company, MGA, to prematurely and improperly terminate an exclusive license that was granted to Kids Station for the production, marketing, and sale of electronic children's toys. The objective of that scheme, devised principally by MGA, was to illegally eliminate Kids Station as a Little Tikes licensee and misappropriate all of the profits generated from the sale of Little Tikes products subject to the License Agreement.  MGA's and Little Tikes' improper motives are evidenced in part by the fact that they have repeatedly manufactured and sold toys in violation of Kids Station's exclusive license agreement.  When challenged on their improper sale of those products, MGA and Little Tikes have given bogus justifications and made meaningless distinctions, all as part of their attempt to infringe upon the valuable rights granted to Kids Station under the parties' agreement.

2.      At the time the License Agreement was executed, Little Tikes was owned by Newell Rubbermaid, Inc. ("Rubbermaid"), which had extensive experience designing and manufacturing the molded plastic toys for which Little Tikes had become known.  However, Rubbermaid did not have similar experience producing electronic toys.  Kids Station had extensive experience with electronic toys.  Consequently, Rubbermaid licensed to Kids Station the exclusive right to manufacture and sell electronic toys bearing the Little Tikes name, including

audio, video, music and roleplay[2] toys.  During the time Little Tikes was owned by Rubbermaid, Kids Station and Little Tikes operated under the license agreement profitably and without any material disputes.

3.     In early 2007, MGA assumed control of Little Tikes after having purchased the company from Rubbermaid.  Unlike Rubbermaid, MGA has significant experience producing electronic toys.  Rather than viewing Kids Station as a valued partner, as Rubbermaid had, MGA viewed Kids Station as an unwanted competitor and immediately took steps, described more fully below, to improperly remove Kids Station as an exclusive licensee.

4.     The efforts of MGA and its captive subsidiary, Little Tikes, to improperly abrogate the exclusive license of Kids Station culminated in the wrongful and wholly improper purported immediate termination of the License Agreement on February 5, 2008.  By this counterclaim, Kids Station seeks a determination that Little Tikes has breached the License Agreement in numerous material respects, including by selling products exclusively licensed to Kids Station and obtaining millions of dollars in improper profits through the sale of such products, a declaration that Little Tikes' purported termination of the License Agreement is invalid and of no effect, and an injunction against any attempts to enforce the termination.

## THE PARTIES

5.     Plaintiff Kids Station is a Hong Kong corporation with its principal place of business in Miami, Florida and, as such, is a citizen of both Hong Kong and Florida for the purposes of diversity of citizenship.  As set forth in greater detail herein, Kids Station is the party that has been injured as a result of Little Tikes' and MGA's wrongful conduct.

---

[2] Roleplay toys are toys which resemble electronic devices used by adults, but do not function like the adult devices they resemble. The KSL8033 toy cell phone is an example of a roleplay toy.

6.    Kids Station is engaged in the business of designing, manufacturing, marketing, selling, and distributing a wide variety of electronic children's toys.

7.    Defendant Little Tikes is an Ohio corporation which, on information and belief, has its principal place of business in Hudson, Ohio and, as such, is a citizen of Ohio for diversity of citizenship purposes.

8.    Little Tikes is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers to produce toys under the Little Tikes name.

9.    Defendant MGA is a California corporation with its principal place of business in Van Nuys, California and, as such, is a citizen of California for diversity of citizenship purposes. MGA owns and operates Little Tikes and has done so since at least February 2007.

10.    MGA is a manufacturer and distributor of children's toys and also licenses its trademarks to other toy manufacturers.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1332 and has supplemental jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1367.  There is complete diversity of citizenship between Kids Station, on the one hand, and MGA and Little Tikes, on the other hand, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Little Tikes and MGA are subject to personal jurisdiction in this district and because the federal district court in the Southern District of Florida determined by Court Order that the disputes

between these same parties should be resolved in the Northern District of Illinois, not in the Southern District of Florida where this matter was originally filed.[3]

### THE PARTIES' LICENSE AGREEMENT

13.     On or about December 8, 2003, Little Tikes and Kids Station entered into that certain License Agreement (the "License Agreement").  A true and correct copy of the License Agreement is attached hereto as Exhibit 1 and incorporated by reference herein.  The License Agreement was drafted by or on behalf of Little Tikes and provided to Kids Station for execution.

14.     The parties to the License Agreement are Little Tikes and Kids Station.  In the version of the License Agreement prepared by or on behalf of Little Tikes and provided to Kids Station for its signature, Little Tikes and/or its representative erroneously identified Kids Station as "Kid Station Toys Ltd., a Florida corporation."  There is no corporation affiliated with Kids Station named "Kid Station Toys Ltd." and Kids Station is aware of no Florida corporation by that name.  Kids Station, as defined herein, is a Hong Kong corporation with its principal place of business in Miami, Florida, and is the party that executed the License Agreement, along with Little Tikes.  For over four years, since the execution of the License Agreement in 2003, Kids Station has performed obligations of the "User," as defined in the License Agreement, including

---

[3] While the License Agreement provides that disputes between Kids Station and Little Tikes are to be resolved in state or federal courts located in Cook County, Illinois, as Kids Station explained in the prior action pending in the Southern District of Florida, that location no longer bears any relationship to any of the parties to this dispute and none of the facts in dispute in this matter are connected to Illinois.  That provision was included in the License Agreement because at the time the License Agreement was executed, Rubbermaid, Little Tikes' owner, was headquartered in Illinois.  As referenced herein, in 2007, Little Tikes was sold to MGA.  When that occurred, any connection between the License Agreement and Illinois was extinguished, thereby making the Southern District of Florida an appropriate venue for the resolution of these disputes.  *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988) ("The forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration [] nor no consideration [], but rather the consideration for which Congress provided in § 1404(a)."). *See also Standard Office Systems of Fort Smith, Inc. v. Ricoh Corporation, Inc.*, 742 F. Supp. 534 (W.D. Ark. 1990) (refusing to enforce exclusive forum selection clause where the parties' only connection to the contractual forum was the clause itself).  In accordance with the Florida court's order of April 2, 2008, Kids Station is proceeding with the resolution of the parties' disputes in the Northern District of Illinois.

but not limited to, paying royalties to Little Tikes. For over four years, Little Tikes has accepted the benefit of Kids Station's performance under the License Agreement.

15.    Under the License Agreement, Little Tikes granted Kids Station an **_exclusive_** license to design, manufacture, market, sell and distribute certain electronic audio, video and music toys directed principally to children under the age of ten (10). *See* Ex. 1, § 2.1. Under the terms of the License Agreement, Little Tikes is excluded from the manufacture and sale of Little Tikes products that have been licensed to Kids Station.

16.    Rubbermaid, the parent company of Little Tikes at the time the License Agreement was signed, was well known for its molded plastic products and had significant experience producing such products for the toy market (as did Little Tikes itself). However, neither Rubbermaid nor Little Tikes had expertise in designing or producing consumer electronics. Kids Station possessed substantial expertise in developing and producing consumer electronic toys. For that reason, Little Tikes granted Kids Station an exclusive license for a broad variety of consumer electronic toys.

17.    The specific "Licensed Products" covered by the License Agreement are described in Exhibit A to the License Agreement. As set forth therein, the License Agreement grants Kids Station the exclusive right to manufacture, market, sell and distribute products falling into any of the following descriptive categories:

> **Category I:**   Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-long players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately, Youth designed telephones;

> **Category II:**   VCR players; DVD players, 2" - 19" black and white and color TV's with or without DVD and VCR players; and

> **Category III:** Electronic Youth "Real Music," including: Electric Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone.

Ex. 1 at Ex. A.

18.     On or about January 1, 2006, the Little Tikes and Kids Station entered into an Addendum to the License Agreement (the "Addendum") adding a fourth category of products to the exclusive license. That fourth category of products is defined as:

> **Category IV:** Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats.

Ex. 1 at Addendum.

19.     "Roleplay" electronic toys are designed for young children and do not actually function as the electronic device after which they are styled. For example, a roleplay cell phone is a toy that looks like a cell phone but that does not actually function as one. Instead, the keys of the roleplay cell phone would produce various sounds and entertainment functions when depressed to entertain and educate a small child.

### THE PARTIES' MUTUAL SATISFACTION UNDER THE AGREEMENT PRIOR TO MGA'S PURCHASE OF LITTLE TIKES

20.     Throughout 2004 and 2005, Kids Station operated as Little Tikes' licensee under the License Agreement to the mutual satisfaction of the parties. Kids Station developed a successful line of electronic toys that were sold in major retailers, including Wal-Mart and Toys "R" Us. Little Tikes and Kids Station operated without any material disputes for the benefit of both companies. In fact, Kids Station was recognized as an outstanding Little Tikes licensee on more than one occasion. In 2004, Kids Station received both the Little Tikes' Licensee of the Year Award and the Toys "R" Us Vendor of the Year Award. Kids Station also has been nominated for the Licensing Industry Merchandisers Association award for Best Corporate Brand

Licensee of the Year as a licensee of Little Tikes.  More recently, in March 2008, Kids Station was selected as Wal-Mart's 2007 Global Procurement Supplier of the Year, a highly coveted award that recognizes suppliers of high quality products who demonstrate a related commitment to ethical standards and service.

21.    Kids Station's success under the License Agreement and Little Tikes' satisfaction with Kids Station's performance is further demonstrated by their agreement to the Addendum in January 2006, which broadened the scope of electronic products licensed to Kids Station.  The 2006 selling season was a successful one, just like the seasons which had preceded it.

22.    Each year, Kids Station markets its line of products to retailers in order to generate sales.  The critical part of that process begins in the final months of the preceding calendar year and continues through beginning of the year.  In January and February, Toy Fairs take place in various locations around the world.  Each year during which the License Agreement has been in effect, Kids Station has attended one or more of those Toy Fairs and marketed its products to major retailers.   These efforts are critical to generating sales for the products subject to the license.

23.    During Rubbermaid's ownership of Little Tikes, Kids Station and Little Tikes developed an effective, agreed upon, and mutually satisfactory course of performance under the License Agreement to implement its provisions relating to matters such as product approval and reporting.

**MGA PURCHASES LITTLE TIKES**

24.    On or about September 11, 2006, MGA announced it had entered into an agreement to purchase Little Tikes from Rubbermaid.  Unlike Rubbermaid, MGA is directly and significantly involved in the design and manufacture of consumer electronic products, including toys, a fact acknowledged in the press release announcing MGA's acquisition of Little Tikes.

25.     MGA acquired Little Tikes in early 2007, following the completion of the holiday selling season in 2006.  As with every prior year that the License Agreement had been in effect, Little Tikes and Kids Station had a cooperative and mutually successful year in 2006.

## LITTLE TIKES' SALE OF PRODUCTS IN VIOLATION
## OF KIDS STATION'S EXCLUSIVE LICENSE

26.     Since MGA's acquisition of Little Tikes, MGA and Little Tikes have violated the exclusivity of the License Agreement in an effort both to undermine Kids Station's sales under the Agreement and to begin reaping the profits from sale of products covered by the License Agreement while MGA and Little Tikes implemented their broader plot to eliminate entirely Kids Station as a licensee.

27.     In one particularly egregious breach of Kids Station's exclusive rights, Little Tikes gave approval for a digital camera designed by Kids Station, but then retracted it, a wrongful act in itself.  Little Tikes initially approved the digital camera for inclusion in Kids Station's 2007 product line.  However, after granting product approval, Little Tikes retracted its approval and prohibited Kids Station from selling the digital camera, claiming that it did not fall within the electronic audio, video and music toys licensed under the License Agreement.  After retracting its approval, Little Tikes developed and sold a similar digital camera, in violation of the exclusive rights granted to Kids Station under the License Agreement.  Upon information and belief, Little Tikes targeted Kids Station's customers for purchase of the digital camera -- customers that Little Tikes knew were interested in purchasing that camera based on Kids Station's marketing efforts in developing the concept.  The digital camera was an extremely successful product for Little Tikes and, upon information and belief, encouraged Little Tikes and MGA to more aggressively breach the exclusive rights granted to Kids Station under the License Agreement as part of their continuing efforts to eliminate Kids Station as a licensee.

28.    Little Tikes also has sold one or more models of electronic roleplay laptops and "boom boxes" that violate the exclusive license of Kids Station.  Again, Kids Station objected to this conduct, only to have its objections disregarded by Little Tikes.

29.    Similarly, Little Tikes has marketed and sold electronic keyboard products that breach the exclusive license of Kids Station of products in that category.

30.    When challenged on conduct that clearly violates the plain terms of the License Agreement, Little Tikes has unsuccessfully sought to distinguish products that plainly fall within the product categories exclusively licensed to Kids Station, when it is perfectly clear those products fall within Kids Station's exclusive license.  All the while, Little Tikes has expanded the products it has sold in violation of Kids Station's exclusive license and the group of retailers to whom it sells those products.

## MGA'S WRONGFUL EFFORTS TO TERMINATE THE AGREEMENT

31.    Immediately following the transfer of control of Little Tikes to MGA, Kids Station was warned by at least one former Little Tikes' employee that MGA intended to subvert Kids Station's rights under the License Agreement by any means necessary.

32.    MGA did not wait long to implement its wrongful scheme.  On March 13, 2007, just weeks after Kids Station learned that MGA had completed its acquisition of Little Tikes, Kids Station was presented with a royalty audit report claiming that Kids Station owed Little Tikes in excess of $13.5 million in unpaid royalties.  Despite the fact that Little Tikes had possessed the audit report (which was prepared by a third party) since July 24, 2006, it never had been mentioned previously to Kids Station, upon information and belief because Little Tikes knew the contents of the audit report were without merit.

33.    Kids Station responded point-by-point to the issues raised in the audit report, showing each to be completely baseless.  Little Tikes eventually acknowledged that the vast

majority of the claims in the audit report were without merit, but continued to assert that more than $2 million in additional royalties were owed.  When presented with irrefutable evidence showing that Little Tikes was owed nothing, Little Tikes completely abandoned its unsupportable claim that Kids Station had failed to pay royalties due under the Agreement.  The reason for that outcome is simple:  throughout the term of the License Agreement, Kids Station has paid Little Tikes every cent of royalties owed.

34.    Little Tikes, through its new owner MGA, also adopted other tactics to interfere with Kids Station's rights under the License Agreement.  One such tactic involved the product approval process provided for in the License Agreement.  Little Tikes retracted approvals for several previously approved products and demanded significant modifications to numerous others, threatening disapproval of the products, despite the fact that once a product is approved by Little Tikes, the License Agreement contemplates that it remain approved throughout the term of the License Agreement.

35.    Since its acquisition by MGA, Little Tikes has acted in bad faith to unreasonably withhold approval of Kids Station products and packaging in an attempt to force Kids Station to incur unnecessary expense redesigning previously approved products and packaging.  Little Tikes even interfered with Kids Station's publication of a catalog of its 2008 products, claiming that previously approved products had to be redesigned in order to be included in the catalog.

36.    Little Tikes also has invoked phony "product quality" issues in improper attempts to terminate the License Agreement.

37.    Since MGA took control, Little Tikes has asserted that Kids Station products suffer from quality problems, generally without providing specific information to enable Kids Station to meaningfully address those concerns.  With respect to two products, Little Tikes attempted to retract previous approvals based on alleged quality concerns, although Little Tikes refused to

specifically identify those concerns and failed to identify any problems, even after being provided samples to test and review.

38.    In claiming Kids Station product suffered from quality problems, Little Tikes frequently has focused on either isolated and anecdotal customer product reviews on websites such as Amazon.com or customer service calls to either Little Tikes' or Kids Station's customer service centers.  Little Tikes ignores that fact that Kids Station has millions of satisfied customers of its Little Tikes products.  There will always be a small number of complaints about any product, even one that conforms to all specifications and requirements.

**LITTLE TIKES' WRONGFUL PURPORTED TERMINATION OF THE AGREEMENT**

39.    On February 5, 2008, Little Tikes sent a letter to Kids Station purporting to immediately terminate the License Agreement (the "Purported Termination Letter").  The grounds articulated in the Purported Termination Letter are not supported by the facts and, even if they were, afford no basis for immediate termination.

40.    The main issue Little Tikes raises in the Purported Termination Letter relates to a cellphone product known as the KSL8033 (the "8033").  The 8033 was originally approved by Little Tikes in 2006 and was approved again in 2007.  It also was tested and approved by various independent third party testing laboratories prior to the shipment of the products.  There is no factual basis for Little Tikes' assertion that quality concerns with the 8033 justified the Purported Termination Letter.

41.    In late September 2007, in response to a consumer communication with the CPSC regarding the product, Kids Station voluntarily proposed certain modifications to the 8033.  Those proposed modifications were communicated to both the CPSC and to MGA and Kids Station implemented them in October 2007.  After the modifications, Little Tikes approved the 8033, as did Bureau Veritas, a well-respected independent testing agency.

42.     At no time prior to January 30, 2008 had either Little Tikes or MGA ever indicated they believed it was necessary for Kids Station to take any action with respect to the 8033 other than the September 2007 modifications. By October 2007, all 8033s shipped by Kids Station included those modifications. Kids Station has not sold the unmodified version of the 8033 since approximately October 5, 2007.   Moreover, in cooperation with the CPSC, and out of an abundance of caution after receiving a letter from the CPSC dated March 14, 2008[4] indicating that the unmodified version of the 8033 could pose a potential safety hazard, Kids Station decided to propose a voluntary corrective action plan to the CPSC that would result in the recall of the unmodified version of the 8033.   This decision was made notwithstanding the fact that additional third party testing done on March 28, 2007 was unable to replicate the CPSC's findings.

43.     The other issues Little Tikes raises in the Purported Termination Letter are similarly pretextual and none constitutes a basis for immediate termination.   In fact, the Agreement only permits immediate termination in one circumstance clearly not found here: the sale by Kids Station of disapproved products.

## LITTLE TIKES' AND MGA'S CONTINUED ATTEMPTS TO INTERFERE WITH KIDS STATION'S OPERATION UNDER THE AGREEMENT PRIOR TO THE COURT'S DENIAL OF LITTLE TIKES' REQUEST FOR INJUNCTIVE RELIEF

44.     Since sending the Purported Termination Letter and prior to April 18, 2008, Little Tikes and MGA continued to interfere with Kids Station's exercise of its rights under the License Agreement.

45.     On March 11, 2008, MGA and Little Tikes sent a letter to Kids Station improperly demanding that Kids Station cease using its exclusive license.   In that letter, MGA and Little

---

[4] This CPSC communication was not transmitted until approximately six weeks following the February 5, 2008 termination letter, and therefore cannot support that purported termination.

Tikes also improperly demanded that Kids Station cause all of its Little Tikes branded products to be removed from retailers' shelves.

46.    There is no basis in the License Agreement for the demands found in the March 11, 2008 letter of MGA and Little Tikes, and none is identified by the Counterdefendants

47.    MGA and Little Tikes also demanded that Kids Station provide Little Tikes one hundred units of each licensed item under the License Agreement.  However, because the License Agreement had not been effectively terminated, there was no justification for that demand nor is Kids Station required to comply.

48.    On April 18, 2008, this Court ruled that Little Tikes was not entitled to temporary injunctive relief based on its purported termination of February 5, 2008, and instead maintained the *status quo ante* to MGA's and Little Tikes' purported February 5, 2008 termination.  While Kids Station continues to operate as a Little Tikes licensee pursuant to its rights under the License Agreement, and Little Tikes is required to act in compliance with its obligations under the License Agreement prior to a final hearing on the merits, Kids Station reserves its right to add additional claims and seek additional relief from the Court to the extent either Little Tikes or MGA takes any further action to infringe upon Kids Station's exclusive license and its valuable rights under the License Agreement.  Should Little Tikes or MGA take any such actions, Kids Station will seek additional immediate relief from the Court.

**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST LITTLE TIKES)**

49.    Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

50.    The License Agreement is a valid and enforceable contract.

44

51.     Kids Station has performed all of its obligations to Little Tikes under the terms of the License Agreement.

52.     Little Tikes has materially breached the License Agreement by selling numerous products in violation of the exclusive license granted to Kids Station in the License Agreement.

53.     Products sold by Little Tikes in violation of Kids Station's rights under its exclusive license include, but are not limited to, products sold by Little Tikes under the following names:

> My Real Digital Camera
> Animal Sounds Play Phone
> Discover Sounds Camera Phone
> Chat n Play Phone
> Learning Letters Laptop
> Rock & Twist Music Machine
> DiscoverSounds Boom Box

54.     In addition, and without limitation, Little Tikes has materially breached the License Agreement by:

- Improperly refusing to approve products subject to the exclusive license granted in the License Agreement;

- Improperly purporting to retract approval for previously approved products; and,

- Interfering with Kids Station's operation under the terms of the License Agreement.

55.     Kids Station has sustained damages as a result of Little Tikes' breaches of the License Agreement.

56.     Kids Station will be irreparably harmed by Little Tikes' continued violation of the License Agreement, including through lost sales and injury to its goodwill.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (AGAINST LITTLE TIKES)

57.     Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

58.     In addition to its express terms, Little Tikes and Kids Station are bound by an implied covenant of good faith and fair dealing under the License Agreement.

59.     Little Tikes' conduct as described herein violates the implied covenant of good faith and fair dealing.

60.     More specifically, Little Tikes has materially breached the implied covenant of good faith and fair dealing by selling numerous products in violation of the exclusive license granted to Kids Station in the License Agreement.

61.     Those infringing products include, but are not limited to, the following products impermissibly sold by Little Tikes under the following Little Tikes' model names:

> My Real Digital Camera
> Animal Sounds Play Phone
> Discover Sounds Camera Phone
> Chat n Play Phone
> Learning Letters Laptop
> Rock & Twist Music Machine
> DiscoverSounds Boom Box

62.     In addition, and without limitation, Little Tikes has materially breached the implied covenant of good faith and fair dealing by:

- Unreasonably refusing to approve products subject to the exclusive license granted in the License Agreement;

- Improperly purporting to retract approval for previously approved products; and,

- Interfering with Kids Station's rights under the terms of the License Agreement.

46

63.     Little Tikes also violated the covenant of good faith and fair dealing by purporting to act under the terms of the License Agreement arbitrarily and for pretextual reasons.

64.     Little Tikes also violated the covenant of good faith and fair dealing by improperly and wrongfully purporting to terminate the License Agreement in violation of its terms and without just cause.

65.     Kids Station has sustained damages as a result of Little Tikes' breaches of the covenant of good faith and fair dealing between the Parties.

## COUNT III
## DECLARATORY JUDGMENT
## (AGAINST LITTLE TIKES)

66.     Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

67.     In the Purported Termination Letter, Little Tikes claims that grounds exist for immediate termination of the License Agreement.

68.     Kids Station denies that it has committed any material breach of the Agreement and denies that Little Tikes possessed valid grounds for the immediate termination of the License Agreement.  Little Tikes' purported termination is the culmination of Little Tikes' and MGA's campaign to manufacture a basis to terminate the License Agreement so that Little Tikes and MGA can themselves sell the products subject to the exclusive license.  Upon information and belief, the timing of Little Tikes' purported termination was intended both to cause Kids Station maximum harm and to allow Little Tikes to appropriate for itself the right to sell classes of Little Tikes products which are subject to Kids Station's exclusive license for the balance of this calendar year.

69.     There is a real, substantial and immediate controversy regarding Kids Station's exclusive license that requires adjudication by the Court.

70.    Kids Station seeks a declaration that there is no lawful basis for Little Tikes' purported termination of the License Agreement and that the License Agreement remains in effect as a binding and enforceable contract according to its terms.

71.    Kids Station will be irreparably harmed if the purported termination is permitted to take effect.  That irreparable harm will include Kids Station's loss of business and the total destruction of the significant goodwill Kids Station has created with its customers through years of work and investment of substantial monies.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(AGAINST LITTLE TIKES AND MGA)**

72.    Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

73.    On March 11, 2008, MGA and Little Tikes sent a letter to Kids Station containing certain unjustified demands, including:

- that Kids Station cease the sale or offering for sale of all products manufactured under the Agreement;

- that Kids Station seek to have all retailers remove from their shelves all products manufactured by Kids Station under the Agreement; and

- that Kids Station provide Little Tikes one hundred units of each licensed item under the Agreement.

74.    Kids Station denies that MGA or Little Tikes possesses any valid grounds for the demands set forth in MGA and Little Tikes' March 11, 2008 letter.

75.    There is a real, substantial and immediate controversy regarding the demands made by MGA and Little Tikes purportedly pursuant to the License Agreement.

76.     Kids Station seeks a declaration that there is no lawful basis for MGA's or Little Tikes' demands under the License Agreement as referred to in this Count and that Kids Station need not comply with such groundless demands.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST MGA)

77.     Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

78.     The License Agreement represents a valid and enforceable contract between Kids Station and Little Tikes.

79.     Since its acquisition of Little Tikes, MGA always has been aware of the License Agreement.

80.     MGA has intentionally and unjustifiably through the conduct described herein induced Little Tikes to materially breach the License Agreement by:

- Unreasonably refusing to approve products subject to the exclusive license granted in the License Agreement;

- Improperly purporting to retract approval for previously approved products;

- Unlawfully selling products in violation of the exclusive license granted in the License Agreement; and

- Interfering with Kids Station's operation under the terms of the License Agreement.

81.     Kids Station has sustained damages as a result of MGA's actions and Little Tikes' breaches of the License Agreement.

82.     Kids Station will be irreparably harmed by MGA's continued actions and Little Tikes' continued violation of the License Agreement, including through lost sales and injury to its goodwill.

## COUNT VI
## CIVIL CONSPIRACY
## (AGAINST LITTLE TIKES AND MGA)

83.    Kids Station repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

84.    As alleged above, MGA and Little Tikes have acted in concert and in consultation with each other for the purpose of interfering with and violating Kids Station's rights and entitlements under the License Agreement.

85.    Specifically, MGA and Little Tikes, acting in concert, have intentionally and unjustifiably through the conduct described herein interfered with and violated Kids Station's rights by:

- Unreasonably refusing to approve products subject to the exclusive license granted in the License Agreement;

- Improperly purporting to retract approval for previously approved products;

- Unlawfully selling products in violation of the exclusive license granted in the License Agreement; and

- Interfering with Kids Station's operation under the terms of the License Agreement.

86.    As a result of the foregoing, Kids Station has sustained damages, and MGA and Little Tikes are jointly and severally liable for those damages, resulting from MGA's actions and Little Tikes' breaches of the License Agreement.

87.    Kids Station will be irreparably harmed by MGA's and Little Tikes continued course of conduct and violation of the License Agreement, including through lost sales and injury to its goodwill.

## COUNT VII
## UNJUST ENRICHMENT
## (IN THE ALTERNATIVE)
## (AGAINST LITTLE TIKES AND MGA)

88.    In the alternative to Kids Station's breach of contract claims, Little Tikes and MGA

received benefits in amounts greater than they would otherwise be entitled to receive to the

detriment of Kids Station.

89.    Little Tikes and MGA's retention of these benefits is improper and unjust given

that they had no right to produce and sell the products covered under Kids Station's exclusive

license.

WHEREFORE, Plaintiff Kids Station Toys Ltd. respectfully requests that this Court enter

judgment in its favor and against Defendants The Little Tikes Company and MGA Entertainment,

Inc. and respectfully requests the following relief:

(a)    A declaration that no grounds exist for Little Tikes' purported termination of the
Agreement and that the License Agreement remains in effect as a binding and
enforceable contract according to its terms;

(b)    A declaration that no grounds exist for MGA's and Little Tikes' demands that Kids
Station cease the sale or offering for sale of all products manufactured under the
Agreement, that Kids Station seek to have all retailers remove from their shelves all
products manufactured by Kids Station under the License Agreement, and that Kids
Station provide to Little Tikes one hundred units of each licensed item under the
License Agreement.

(c)    An injunction against Little Tikes and MGA requiring Little Tikes to continue
operating under the terms of the License Agreement until its conclusion and
prohibiting Little Tikes from claiming that the License Agreement has been
terminated;

(d)    An award of all damages sustained by Kids Station as a result of Little Tikes' and
MGA's wrongful conduct, including but not limited to, the disgorgement of all
profits obtained by Little Tikes and MGA through the sales of products covered
under the exclusive license granted to Kids Station; and,

(e)     An award of any and all further relief that the Court deems necessary and just.


Dated: May 22, 2008                           Respectfully submitted,


                                              /s/ *Charles B. Leuin*
                                              Paul T. Fox
                                              Charles B. Leuin
                                              Paul J. Ferak
                                              Jason B. Elster
                                              Greenberg Traurig, LLP
                                              77 West Wacker Drive, Suite 2500
                                              Chicago, Illinois 60601
                                              Tel: (312) 456-8400
                                              Fax: (312) 456-8435

                                              Attorneys for Kids Station Toys Ltd.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a copy of the foregoing *Answer, Affirmative Defenses, And Counterclaim Of Kids Station Toys Ltd.* has been served upon the individuals listed below via the CM/ECF electronic filing service system on this 22nd day of May 2008:

> Robert E. Browne
> Lara V. Hirshfeld
> Maurice Edward Finnegan, III
> Michael Gary Kelber
> **NEAL, GERBER & EISENBERG LLP**
> Two N. LaSalle Street, Suite 2200
> Chicago, IL  60602-3801
>
> *Counsel for Plaintiff/Counterdefendant*

                                                 _____ /s/ *Charles B. Leuin* _____

# EXHIBIT 1

ORIGINAL

## LICENSE AGREEMENT

This Agreement is effective as of this 8th day of December, 2003, by and between The Little Tikes Company, an Ohio corporation, having a principal place of business at 29 East Stephenson Street, Freeport, Illinois 61032 (hereinafter referred to as "Little Tikes") and Kid Station Toys Ltd., a Florida corporation, having its principal place of business at P.O. Box 694660, Miami, FL 33268-4660 (hereinafter referred to as "User").

## RECITALS

WHEREAS, Little Tikes has used and is the owner of the famous, distinctive and valuable trademark LITTLE TIKES (with and without an associated logo) (the "Trademarks," as defined below) known throughout the world for high quality consumer and commercial products that are used in a variety of environments; and

WHEREAS, User is desirous of manufacturing and selling Electronic Audio, Video and MusicToys ("Product") in the Territory (as defined below) using the Trademarks, and is desirous of acquiring a license with respect to such rights;

NOW, THEREFORE, the parties hereto, in consideration of the mutual agreements herein contained and promises herein expressed and for other good consideration acknowledged by each of them to be satisfactory and adequate, do hereby agree as follows:

1

## ARTICLE I. DEFINITIONS

The following terms shall have the following meanings when used in this Agreement and the schedules attached hereto:

1.1    "Authorized Channels" means all Mass Market, Electronic Specialty, Discount and Warehouse Clubs, Toy Specialty, Drug, Mid-Tier, Department Stores, Grocery, Internet and Catalog in the Territory.

1.2    "Core Target Market" means the market for Products directed principally to children under the age of ten (10).

1.3    "Licensed Products" means the Products specified in Exhibit A designed for children in the Core Target Market. The Licensed Products shall be designed and made available in accordance with the product specification attached as Exhibit A (as may be amended from time to time by agreement of the parties).

1.4    "Trademarks" means the trademarks owned or controlled by Little Tikes as are specifically detailed in Exhibit B; i.e., "LITTLE TIKES" and the "LITTLE TIKES" logo, and any other trademark specifically designated in writing by Little Tikes for use on or in connection with the Licensed Products.

1.5    "Licensed Rights" means all intellectual property, including titles, personae, places, props, materials, copyrights and derivative works, patents, designs, trademarks, trade dress,

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

2

and other intellectual property in and/or relating to the Licensed Products that have been designed or prepared for or by User for use in connection with the Licensed Products, as well as the Trademarks.

1.6    "Term" means the term as defined in Article V.

1.7    "Territory" means the United States, Canada, and Mexico.

1.8    "Net Sales Price" shall mean the gross selling price of Licensed Products sold by User, less a flat twelve percent (12%) deduction to cover any and all of the amount of credits or other terms allowed by User to its customers relating to all freight, insurance, transportation charges, trade discounts, advertising allowances, sales taxes and other usual deductions, charges, discounts, returns, allowances, credits or adjustments to the gross selling price.   The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first.

1.9    "Shipping Date" shall mean the date no earlier than the date of execution of this Agreement and no later than October 1, 2004.

ARTICLE II. GRANT

2.1    License.  Subject to the terms and conditions hereof, Little Tikes hereby grants to User, for the Term, in the Territory and through the Authorized Channels, an exclusive,

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598  2003-12-01.doc

3

royalty-bearing license to utilize the Licensed Rights solely on or in connection with the manufacture, marketing, sale and distribution of the Licensed Products.

2.2   No Sublicensing.   User shall have no right to sublicense any of the rights which are licensed under this Agreement.

2.3   Limited License.   User agrees that the license granted hereunder applies only to the use of the Licensed Rights in connection with the Licensed Products sold through Authorized Channels in the Territory, and that this license does not extend to any other trade name, trademark, or other intellectual property that Little Tikes or its affiliates may own or use, or to the use of the Licensed Rights on products other than Licensed Products, or outside of the Authorized Channels, or outside of the Territory. Little Tikes does not grant any right to use all or any part of the Trademarks in the name or style of User or of any subsidiary, division or subdivision of User, or of any corporation or other business entity, shop or establishment. User agrees that it will not incorporate or use the Trademarks or similar words thereto in conjunction with its company name or as a trademark or as a generic name during or after the period of this Agreement.  User agrees not to register or use any of the Trademarks or any parts thereof or terms confusingly similar thereto as part of an Internet or website address, a Universal Resource Locator ("URL"), or as a domain name.

2.4   Best Efforts; No Competition.   User shall use its reasonable best efforts to market, sell, and distribute Licensed Products according to the terms and subject to the conditions hereunder.  User shall not develop, manufacture, sell, supply, or market products to be sold

under major toy brands (e.g., without limitation, Fisher-Price, Playskool, Leap Frog, etc.) that directly compete with the Licensed Products, unless otherwise approved in writing by Little Tikes, which approval shall not be unreasonably withheld

## ARTICLE III. SAMPLES; SALES TO LITTLE TIKES

3.1     User shall provide to Little Tikes twelve (12) free samples of each Licensed Product each year within 30 days after production start. No royalty shall be payable as to these free samples. In addition, each year within a reasonable time prior to both Toy Fair and Little Tikes' customer meetings, User shall make available to Little Tikes at least one (1) production model (or if such production model is not yet available then a quality three-dimensional model) of each Licensed Product (along with all existing related packaging) for the purpose of displaying the same at Little Tikes showrooms during Toy Fair (traditionally held in New York City in February) and during Little Tikes' customer meetings.

3.2     User shall sell Licensed Products to Little Tikes, at the lowest price offered by User to other third parties, for distribution by Little Tikes through Little Tikes-owned retail stores and for sales to Little Tikes and Newell employees. No royalty shall be payable as to these sales.

## ARTICLE IV. REPORTS AND PAYMENTS

4.1     Running Royalties. As consideration for the licenses granted herein, User shall pay during the Term of this Agreement the earned, running royalties ("Running Royalties") at the rate of five percent (5%) of the Net Sales Price for domestic and FOB sales for Category

I (as set forth in Exhibit A) based upon sales of Licensed Products by User; three percent (3%) of the Net Sales Price for domestic and FOB sales for Category II (as set forth in Exhibit A) based upon sales of Licensed Products by User and for Category III (as set forth in Exhibit A): five percent (5%) of Net Sales for domestic and FOB sales or seven percent (7%) of Net Sales for domestic and FOB sales if a Licensed Product originated from or is designed and/or engineered in whole by Little Tikes. The Licensed Products shall be deemed to have been "sold" when billed out, or when shipped, or when paid for, whichever shall occur first. All sales by User of Licensed Products to any of its affiliates or to any entity or person associated with User, including all inter-company transactions, shall be carried on User's books of account at the full regular wholesale price charged to unrelated third parties, and User shall account for and pay Running Royalties to Little Tikes on all such sales as if they occurred on an arms-length basis to an unrelated wholesale account.

4.2   <u>Guaranteed Annual Royalty Payment</u>. In accordance with the following schedule, User shall pay to Little Tikes in U.S. dollars a minimum guaranteed annual royalty payment (the "Guaranteed Annual Royalty Payment") regardless of the sales levels of the Licensed Products as follows:

| Due Date | Amount Due | Applicable Calendar Year |
|---|---|---|
| Category I and II: | | |
| Upon Signing | $25,000.00 | October 1, 2003 – June 30, 2005 |
| December 15, 2004 | $35,000.00 | October 1, 2003 – June 30, 2005 |
| September15, 2005 | $20,000.00 | July 1, 2005 – June 30, 2006 |
| March 15, 2006 | $45,000.00 | July 1, 2005 – June 30, 2006 |
| September 15, 2006 | $20,000.00 | July 1, 2006 – June 30, 2007 |
| March 15, 2007 | $55,000.00 | July 1, 2006 – June 30, 2007 |
| September 15, 2007 | $20,000.00 | July 1, 2007 – June 30, 2008 if Renewal Term |

is exercised by User pursuant to paragraph 5.2 hereunder

March 15, 2008         $55,000.00              July 1, 2007 – June 30, 2008 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008    $20,000.00              July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009         $55,000.00              July 1, 2008 – June 30, 2009 if Renewal Term
is exercised by User pursuant to paragraph 5.2 hereunder

<u>Category III:</u>

Upon Signing              $50,000.00              October 1, 2003 – June 30, 2005
December 15, 2004      $25,000.00              October 1, 2003 – June 30, 2005
September 15, 2005     $25,000.00              July 1, 2005 – June 30, 2006
March 15, 2006          $50,000.00              July 1, 2005 – June 30, 2006
September 15, 2006     $25,000.00              July 1, 2006 – June 30, 2007
March 15, 2007          $75,000.00              July 1, 2006 – June 30, 2007
September 15, 2007     $25,000.00              July 1, 2007 – June 30, 2008 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2008          $75,000.00              July 1, 2007 – June 30, 2008 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
September 15, 2008     $25,000.00              July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder
March 15, 2009          $75,000.00              July 1, 2008 – June 30, 2009 if
Renewal Term is exercised by User pursuant to paragraph 5.2 hereunder

Running Royalties shall be credited against Guaranteed Annual Royalty Payments, so that

the amount of Guaranteed Annual Royalty Payment due and payable is reduced by the

amount of the Running Royalties paid to Little Tikes.   If Running Royalties in a calendar

year exceed the Guaranteed Annual Royalty Payment for that calendar year, then no payment

is due under Section 4.2.  Guaranteed Annual Royalty Payments may only be applied against

the calendar year that they relate to and may not be applied to any other calendar year.

Guaranteed Annual Royalty Payments for Category I and Category II may not be applied to

Category III and Guaranteed Annual Royalty Payments for Category III may not be applied

to Category I and Category II.

4.3    Advance Payments.  User shall pay to The Beanstalk Group, LLC, 28 East 28th

Street, 15th Floor, New York, NY 10016 ("Beanstalk"), on behalf of Little Tikes, a non-

refundable advance payment of Twenty Five Thousand Dollars ($25,000.00) for Categories

I and II; and Fifty Thousand Dollars ($50,000.00) for Category III (together, the "Advance")

upon signing of this Agreement.  This Advance shall be credited against User's Running

Royalty Payment for the year commencing October 1, 2003 and ending June 30, 2005.


4.4    Quarterly Report and Payment.  Within thirty (30) days following the end of each

calendar quarter, starting with the month following the quarter in which sales of the Licensed

Products commence, User shall submit to Beanstalk (with a copy to Little Tikes), a

statement, certified by an officer of User to be accurate, showing separately for each of the

Licensed Products, on a country-by-country basis, the number, description and sales price for

each Stock Keeping Unit ("SKU") of each Licensed Product sold by User during the

preceding calendar quarter, and the calculation of Running Royalties due Little Tikes for

such calendar quarter.  User shall transmit to Beanstalk, on behalf of Little Tikes, payment

of the amounts due under this Agreement concurrently with the rendering of the statement

for the period.  If Little Tikes at any time so requests, User's reports shall be made in the

form set forth in Exhibit C attached hereto or in another form to be provided by Little Tikes

to User in the future.  A copy of the reports and a copy of the check in Little Tikes' favor

shall be delivered to The Little Tikes Company, Attention: Director of Licensing, 2180

Barlow Road, Hudson, Ohio 44236.

4.5    <u>Annual Report and Payment.</u>  Together with the quarterly royalty report provided for sales occurring during the fourth calendar quarter of each calendar year during the Term, User shall provide Beanstalk (with a copy to Little Tikes) with a year end report showing separately for each SKU of each  Licensed Product, on a country-by-country basis, the number, description and sales price for each Licensed Product sold by User during the preceding calendar year, and the calculation of Running Royalties due Little Tikes hereunder. This report shall be accompanied by  payment to Beanstalk, on behalf of Little Tikes, of any Guaranteed Annual Royalty Payment that is due.

4.6    <u>Record Keeping.</u> User shall keep full and accurate books of account, records, data, and memoranda respecting the manufacture and sale of the Licensed Products in sufficient detail to enable the payments hereunder to Little Tikes to be determined. Little Tikes, at its sole cost and expense, shall have the right to conduct examinations of the books and records pertaining to such statement for a period of two (2) years from the date on which such report is furnished to Beanstalk and Little Tikes for the purpose of verifying the reports provided for in this Agreement. Such examinations shall be conducted by an independent auditor or representative of Little Tikes, upon prior written notice of at least seven (7) days and not more often than once in any calendar year (unless Little Tikes discovers a discrepancy requiring additional audits), and in such manner as to not unduly interfere with the business of User. Each examination shall be at the expense of Little Tikes unless the examination discloses a discrepancy in favor of User exceeding by more than five percent (5%) of the total amounts paid to Little Tikes during the period covered  by the examination, in which case, User shall pay Little Tikes for all the direct and verifiable expenses of that

examination. Payments found to be due Little Tikes as a result of an examination and the applicable interest shall be paid immediately as set forth herein.

4.7    Payments and Calculations in U.S. Dollars; Interest on Past Due Payments; Tax Payments. All Running Royalties shall be paid in U.S. dollars on the day payment is due, except that any past due payment shall be at the rate prevailing when such payment became due. Sales made in currency other than U.S. Dollars shall be converted to U.S. Dollars, at Licensee's sole expense, as of the date that Running Royalties on those sales are due. It is further understood and agreed that User shall pay interest to Little Tikes upon any and all Running Royalties that are at any time overdue, said interest to be computed at the rate of two percent (2%) per annum over the prime interest rate charged by Chase Manhattan Bank in New York from the date when such Running Royalties are due and payable as provided herein to the date of payment.

User shall withhold as taxes on all payments to be made to Little Tikes only such amounts as are absolutely required to be withheld by law in the country from which payment is being made. User shall submit to Little Tikes originals of the remittance voucher and the official receipt evidencing the payment of the corresponding taxes. User shall fully cooperate with Little Tikes and provide such information and records as Little Tikes may require in connection with any application by Little Tikes to the tax authorities in any country of the Territory and/or the United States of America including but not limited to, the obtaining of a credit for any withholding tax paid in the Territory or any country from which Running Royalties and any other payments are being made by User to Little Tikes pursuant to this Agreement.

P:\Legal\Private\Little Tikes\Little Tikes - Kid Station #964598   2003-12-01.doc

10

4.8    <u>Distribution Report.</u>  User agrees to provide to Little Tikes, on or before April 30 of each calendar year during the Term, a distribution and sales plan (including, but not limited to, User's product development plans, advertising, and merchandising and promotional activities) for the remainder of that calendar year.  User also agrees to provide to Little Tikes, on or before March 1 of each calendar year during the Term, a report of actual unit sales by individual retail account for the previous calendar year.

4.9    <u>Forecast Report.</u>  Each calendar quarter, User agrees to provide Little Tikes,  with a forecast report containing an estimate of units sales of Licensed Products and gross dollar volume sales of Licensed Product for that calendar quarter.  These forecast reports are estimates only and are not binding on User.

## ARTICLE V. TERM OF THE AGREEMENT

5.1    <u>Initial Term.</u>  The initial term of the license granted herein shall be from the date of execution of this Agreement until June 30, 2007 (the "Initial Term"), subject to any earlier termination or extension of this Agreement.

5.2.    <u>Renewals.</u>

(a)    User shall have the right to extend the Agreement for Categories I and II only beyond the Initial Term for  an additional two year term  commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $200,000.00 in Running Royalties for Categories I and II combined by

December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term.

(b)　　User shall have the right to extend the Agreement for Category III only beyond the Initial Term for an additional two year term commencing July 1, 2007 through June 30, 2009 ("Renewal Term") so long as, User earns and pays at least $250,000.00 in Running Royalties for Category III by December 31, 2006. User shall notify Little Tikes of its intention to extend the Term for an additional year by providing written notice of its intention to extend no later than ninety (90) days prior to the expiration of the then-current term

5.3.　　<u>Minimum Number of Product Introductions.</u>　During each year of this Agreement, subject to Little Tikes' approval rights hereunder, User shall introduce at least three (3) different SKUs of Licensed Products, the majority of which shall contain new aesthetic or functional features.

## ARTICLE VI. INTELLECTUAL PROPERTY

6.1　　<u>Ownership of the Licensed Rights.</u>　User acknowledges that Little Tikes is the sole owner of all right, title and interest in and to the Licensed Rights and Trademarks in any form or embodiment thereof, in the Territory, and is also the sole owner of the goodwill attached or which shall become attached to the Licensed Rights and Trademarks in connection with the business and goods in relation to which the same has been, is, or shall be used.

6.2    Exclusive Rights.  All Licensed Rights developed by User for use in or in connection with the Licensed Products shall be the sole and exclusive property of, and title shall vest in, Little Tikes or its nominee, from and after the time it is created, and User shall cooperate with Little Tikes, at the sole expense of Little Tikes, to secure and perfect such Licensed Rights in the name of Little Tikes as Little Tikes' sole and exclusive property.

6.3    Work Made for Hire.  To the extent that any of the Licensed Rights is specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, the parties agree that the Licensed Rights shall be considered a "work made for hire" under 17 U.S.C. § 101 owned by Little Tikes.  For the avoidance of doubt, User acknowledges that the copyrights and all other proprietary rights in and to the Licensed Rights and any derivatives thereof are exclusively owned and reserved to Little Tikes.  User shall neither acquire nor assert copyright ownership or any other proprietary rights in and to the Licensed Rights or any derivatives thereof.

6.4    Assignment.  With respect to any rights in the Licensed Rights other than the rights described in Section 6.3, above, User agrees to assign and hereby assigns to Little Tikes or its nominee, the sole and exclusive right, title and interest in the United States and all foreign countries, in and to the Licensed Rights, including without limitation any and all related patent, copyright, trade secret, trade dress, trademark, design, and other relevant proprietary

rights of any nature whatsoever, as well as the right of priority, and all applications for trademark registration, copyright registration, mask work protection, design registration, or other protection. Little Tikes has the sole discretion as to when and in which countries to file for intellectual property registrations (including patents, trademarks, and copyrights) relating to any and all Licensed Rights.

6.5     Patent Prosecution and Related Activities. Little Tikes or its nominee, at its sole cost and expense, shall have the sole right to file and prosecute applications for letters patent, trademark registrations, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights. In the event that Little Tikes declines, after notice from User, to file and prosecute applications for letters patent, copyright registrations, mask work protection, design registrations or other protection with respect to the Licensed Rights (but excluding the Trademarks), User may, with the prior written approval of Little Tikes, file and prosecute said applications and registrations in the name of User. In the event that User files and prosecutes said applications, User shall bear any and all costs, including reasonable attorney's fees, associated with User's filing and prosecuting said applications. In no event shall User file any applications for trademark registration or any other type of intellectual property protection covering the Trademarks.

6.6     Cooperation. User shall, at Little Tikes' request and at Little Tikes' expense, assist Little Tikes to obtain, maintain and protect the rights of Little Tikes in the Licensed Rights and Trademarks. User warrants and agrees to execute and deliver to Little Tikes, and to cause its employees, its subcontractors and their respective employees to execute and deliver

to Little Tikes, any and all documents that Little Tikes may reasonably request to convey to Little Tikes any interest User, its subcontractors or their respective employees may have in any Licensed Rights or Trademarks, or that are otherwise necessary to protect and perfect Little Tikes' interest in such Licensed Rights. User further warrants and agrees to take and cause its employees, its contractors and their respective employees to take such other actions as Little Tikes may reasonably request to protect and perfect Little Tikes' interest in any Licensed Rights and Trademarks.

6.7    Use Inures to Little Tikes.  Any use of the Trademarks by User shall inure to the benefit of Little Tikes.  On Licensed Products, Licensed Product packaging and advertisements, User will clearly disclose Little Tikes' ownership of the Trademarks in the form prescribed in Exhibit B.  User will not, at any time, do or suffer to be done any act or thing which may in any way adversely affect any rights of Little Tikes in and to the Trademarks or any registrations thereof.

6.8    Use of the Trademarks on Quality Licensed Products .  User may use the Trademarks only on those Licensed Products the quality of which is in all respects at least equal to products sold by Little Tikes.  User shall manufacture the Licensed Products in accordance with the approved designs, materials, tolerances of manufacture and assembly, testing and packaging specifications approved by Little Tikes.  All uses of the Trademarks must be in conformance with Little Tikes' guidelines for the use thereof, which guidelines shall be provided by Little Tikes.  User shall not deviate substantially from such specifications without written approval from Little Tikes.  If at any time Little Tikes, at its sole discretion,

determines that any of the Licensed Products manufactured or sold by User do not conform to the previously approved production sample, then upon written notice by Little Tikes, permission to use the Trademarks as set forth herein may be immediately withdrawn, and User hereby covenants and agrees that it will cease and desist any and all such use, either directly or indirectly, immediately upon such notice until notified in writing by Little Tikes that use may be resumed.  User agrees that Little Tikes may supplement the above identified specifications at any time, and User agrees to manufacture Licensed Products which will conform to any supplemental specifications within agreed upon time tables.

6.9     Protecting the Licensed Rights.  User shall cooperate fully and in good faith with Little Tikes for the purpose of securing, preserving and protecting Little Tikes' rights in and to the Licensed Rights.

6.10    Compliance with Legal Requirements.  User will use the Licensed Rights in the Territory strictly in compliance with the legal requirements applicable therein.  Whenever User uses any of the Licensed Rights which are registered on any Licensed Product, packaging, labeling, or in any advertisement, it must be marked to indicate ownership and registration in accordance with applicable law.  Upon expiration or termination of this Agreement for any reason whatsoever, User will execute and file any and all documents required by Little Tikes terminating any and all ownership rights which User may have acquired in the Trademarks and in the Licensed Rights.

6.11    Notice of Infringement. User shall promptly notify Little Tikes in writing of any third party infringement or imitation of the Licensed Rights or any of them, when the same comes to its attention. Upon receipt of such notice, Little Tikes may, in its sole discretion, take such action against third parties it considers advisable for the protection of the Licensed Rights.  In no event may User initiate any action or proceeding against such third parties.

6.12    Enforcement Actions.  At Little Tikes' discretion, User may join or be joined as interested parties in any action that may be brought for infringement by others of the Licensed Rights, and participate and share the cost of such suits and any recoveries therein to an equal extent.

6.13    No Transfer of User's Pre-Existing Intellectual Property. Nothing herein shall be construed to transfer ownership of any of User's pre-existing proprietary rights incorporated in Licensed Products.   The parties understand and agree that technology that is incorporated into Licensed Products is the sole property of User, and that all other property rights incorporated into Licensed Products are the sole property of Little Tikes, and each party agrees to take such actions as are reasonably required by the other party to secure and perfect these proprietary rights in the respective parties.

## VII. REPRESENTATIONS AND WARRANTIES. INDEMNITY AND INSURANCE

7.1    Representations and Warranties of Little Tikes. Little Tikes represents and warrants to User the following: (a) Little Tikes is the sole and exclusive owner of all rights to the Trademarks and has the right to grant the licenses and rights granted in Article II with

respect to the Trademarks; (b) Little Tikes has full power and authority to enter into and perform this Agreement; (c) there is no claim, action, suit or proceeding relating to this Agreement or the Trademarks pending or threatened before any court that would impair User's right to use the Trademarks; (d) any and all information or materials developed by Little Tikes shall be the original work of Little Tikes (except for materials in the public domain) and Little Tikes shall not use any information or materials which are not original unless it has obtained such information or materials from User or has received specific authorization in writing from the owner of such information and materials to use them; (e) to the best of Little Tikes' knowledge, after due inquiry has been made, no information or materials furnished to User by Little Tikes infringes on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and no such information is defamatory or constitutes a violation of the right of privacy or publicity of any third party; and (f) so long as this Agreement is in effect, Little Tikes shall not commit any act or enter into any agreement which could adversely affect User's entitlement to enjoy the full benefit of the rights, title, and interests herein granted.

7.2     Representations and Warranties of User. User represents and warrants to Little Tikes the following: (a) User has full power and authority to enter into and perform this Agreement; (b) User shall create the Licensed Products as original works of authorship and shall design, manufacture, and sell them without violating the rights of third parties; and (c) to the best of its knowledge, after due inquiry has been made, the Licensed Products shall not infringe on any third party intellectual property rights including, without limitation, patents, copyrights and trademarks, and shall neither be defamatory nor constitute a violation

of the right of privacy or publicity of any third party; (d) any and all information or materials developed by User shall be the original work of User (except for materials in the public domain) and User shall not use any information or materials which are not original unless it has obtained such information or materials from Little Tikes or has received specific authorization in writing from the owner of such information and materials to use them; (e) so long as this Agreement is in effect, User shall not commit any act or enter into any agreement which could adversely affect Little Tike's exclusive rights in and to the Licensed Rights, including the Trademarks; and (f) Licensed Product made by or on behalf of User shall be free from defects in workmanship and shall be made in compliance with all applicable labor laws, standards, regulations, and safe practices, and shall not involve child or prison labor.

7.3    <u>Indemnification by User</u>.  User shall defend, indemnify and hold Little Tikes, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by User of any of the warranties, representations or agreements made by User hereunder, and from actions of User in this Agreement not authorized by Little Tikes, from product liability claims arising from the Licensed Products, including those claims that may be attributable to any defect in the Licensed Products regardless of when such defect shall be discovered, and from intellectual property claims by third parties (except those claims arising from User's approved use of the Licensed Rights) arising from the Licensed Products.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by User of any warranty, undertaking, representation or

agreement entered into herein or hereunder, or any other such claim as specified in this Section, Little Tikes shall give prompt written notice of such claim to User. User shall have the right to assume the defense of such claim at User' sole cost and expense by furnishing Little Tikes with written notice of same. User shall be liable for all losses, costs, expenses, damages, or recoveries (including without limitation, amounts paid in settlement and reasonable attorney's fees based on such claim) suffered, made or incurred by either User or Little Tikes. User shall not, in settlement or otherwise, admit liability or otherwise prejudice Little Tikes without first receiving the written consent of Little Tikes.

7.4    User's Insurance. User shall maintain in full force and effect at all times while this Agreement is in effect and for three (3) years thereafter, comprehensive general and commercial liability insurance, including broad form advertising, contractual, property damage, and product liability coverage waiving subrogation with combined single limits of no less than $2 million. User shall include Little Tikes as an additional insured on User's insurance policy, and said insurance shall always be the primary coverage for the Licensed Products shipped by User hereunder, notwithstanding any other provision herein including Little Tikes' contribution, if any, to product development, design and/or engineering. User shall deliver to Little Tikes a certificate or certificates of insurance evidencing satisfactory coverage and indicating that Little Tikes shall receive written notice of cancellation, non-renewal or of any material change in coverage at least 30 days prior to the effective date thereof. User shall carry insurance with an insurance company having a BEST rating of A-V.

7.5   Indemnification by Little Tikes.  Little Tikes shall defend, indemnify and hold User, its agents, parent, subsidiary and related entities and their respective officers, agents, directors and employees harmless from and against any and all claims relating to or arising out of any violation or alleged violations by Little Tikes of any of the warranties, representations or agreements made by Little Tikes hereunder.  Upon receipt of notice of a third party claim that, if true, would constitute a breach by Little Tikes of any warranty, undertaking, representation or agreement entered into herein or hereunder, User shall give prompt written notice of such claim to Little Tikes.  Little Tikes shall have the right to assume the defense of such claim at Little Tikes' sole cost and expense by furnishing User with written notice of same.  Little Tikes shall be liable for all losses, costs, expenses, damages, recoveries (including without limitation, amounts paid in settlement and reasonable attorney's fees based on such claim) suffered, made or incurred by either Little Tikes or User.

7.6   Limitation of Liability.  Under no circumstances shall either party be entitled to recover from the other party any consequential, incidental, indirect, special or punitive damages, excluding claims made under Sections 7.3 or 7.5, whether in contract or in tort, including claims for negligence, even if the party has been advised of the possibility of such damages.  Each party acknowledges that the foregoing waiver serves as a material inducement for it to enter into this Agreement.

## ARTICLE VIII. CONSUMER SERVICE

8.1     Telephone Support.  User agrees to provide quality customer support service via a toll-free 800 telephone service to all consumers of the Licensed Products.  The level of customer support service shall be comparable to the level of quality of customer support service offered by Little Tikes in the United States by providing no less than the following: (a) User will provide a toll-free "800" number telephone service for consumers to be in operation during normal business hours (minimum of 9 a.m. to 5 p.m. Monday through Friday, Eastern Standard Time);  (b) This service shall include, but not be limited to, providing assistance in locating the Licensed Products at retail stores, and handling all reasonable questions regarding technical support of Licensed Products and replacement of Licensed Products;  and, (c) User agrees to include the toll-free number on Licensed Product packaging and instruction sheets relating to the Licensed Products.

8.2     Reporting.  Within thirty (30) days after the end of each calendar quarter, User agrees to provide a report to Little Tikes, attention Director of Marketing - Licensing, detailing the consumer service activities of User for the Licensed Products for the preceding quarter.

8.3     Responsible Persons.  User agrees to provide to Little Tikes, Manager of Consumer Service, the names of at least two (2) employees of User responsible for consumer service activities relating to the Licensed Products and to update Little Tikes Manager of Consumer Service when any changes are made concerning those employees of User that are responsible for such consumer service.

8.4.    Warranty. All Licensed Products shall be accompanied by a written document that clearly describes the product warranty period (which period shall be no less than ninety (90) days) and the procedure to make a warranty claim.

## ARTICLE IX. APPROVAL OF DESIGN CONCEPT, PROTOTYPE, PRE-PRODUCTION AND PRODUCTION SAMPLES

9.1    Submission for Approval. User is responsible for the developing, designing and engineering of the Licensed Products, and is responsible for all tooling, manufacturing and packaging for all Licensed Products. Approval of Licensed Products, shall not affect User's indemnification obligations under Paragraph 7.3. User agrees to submit the Licensed Products with a Product Submission Approval Form (Exhibit D) to Little Tikes for review and written approval at the following intervals of development:

- **Design Concept** (consisting of, but not limited to, a rendering and written description of the Licensed Product and Marketing Strategy), on or before August 1st annually, to submit a minimum of three (3) new product concepts to Little Tikes for fall product introductions;

- **Decorated Prototype Sample**, (consisting of, but not limited to, a painted three-dimensional model of the Product plus preliminary art work), as early as possible, and in any case at least four (4) months prior to the intended commercial production of any Licensed Products;

- **Pre-production Parts Samples** (including all the actual molded and sourced components plus proposed final art work), as early as possible, and in any case at least two (2) months prior to the intended commercial production of the Licensed Product;

- **Pre-Production Product Samples** (consisting of Product samples from the pre-production run of the finished Licensed Products in a sufficient number, which in no event shall be less than two (2) units), as early as possible, and in any case at least two (2) weeks prior to the intended commercial production of the Licensed Product, and

- **First Production Run Samples** (consisting of Product samples from the first production run of each supplier of each of the Licensed Products in a sufficient number, which in no event shall be less than six (6) units.)

Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Little Tikes shall furnish User with the name of the Little Tikes employee to whom all approval submissions shall be addressed and provide User with specific guidelines governing the manner and format in which all approval submissions shall be delivered to Little Tikes. Little Tikes shall have complete and sole discretion to approve or disapprove of the Licensed Products, and disapproval may be based upon such factors as (without limitation) unacceptable quality of the artwork or photograph or of the Licensed Product as manufactured, or improper use of the Trademark. Any Licensed Product not so approved shall be deemed unlicensed, shall not be sold and shall, unless otherwise agreed by Little Tikes in writing, be destroyed. Such destruction shall be attested to in a certificate signed by an officer of User. If any unapproved Licensed Product is being sold, Little Tikes may, together with other remedies available to Little Tikes

including, but not limited to, the immediate termination of this Agreement by written notice, require such Licensed Product to be immediately withdrawn from the market. The parties agree that Little Tikes may be irreparably harmed by the introduction or continued sale of unapproved Licensed Products, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provisions hereof.

9.2    Compliance Samples. User agrees to make available at no charge such additional samples of each Licensed Product as Little Tikes may from time to time reasonably request for the purpose of comparison with earlier samples or to test for compliance with applicable laws and standards and to permit Little Tikes upon reasonable request to inspect User's manufacturing operations and testing records (and those of User's suppliers) for the Licensed Products, subject to Little Tikes' obligation to treat all information obtained in such inspection as confidential and proprietary pursuant to the terms of this Agreement.

9.3    Modification of Production Units. No modification of an approved production sample of a Licensed Product shall be made without Little Tikes' further prior written approval. If, in Little Tikes' sole judgment, the quality of a previously approved Licensed Product has deteriorated in later production runs, or if the Licensed Product otherwise has been altered, Little Tikes may, in addition to other remedies available to Little Tikes, by written notice require such Licensed Product to be immediately withdrawn from the market.

## ARTICLE X. APPROVAL OF PACKAGING, PROMOTIONAL MATERIALS, AND ADVERTISING.

10.1    All containers, packaging, hang tags, promotional material, catalogs, advertising materials and display material for Licensed Products must be developed and funded by User, and submitted to Little Tikes with a Product Submission Approval Form (Exhibit D) for review and written approval. Little Tikes' approval thereof should be procured when such is still in rough format and in final format. Little Tikes' approval in each instance shall be deemed withheld if Little Tikes does not respond in writing within ten (10) business days after Little Tikes' receipt of User's submission of materials for approval. Approval or disapproval shall lie in Little Tikes' sole discretion, and the use of unapproved packaging, hang tags and display material is prohibited. The parties agree that Little Tikes may be irreparably harmed by the use of unapproved packaging, hang tags and display material, and Little Tikes shall be entitled to injunctive judicial relief to enforce the provision herein. In addition, User may not place or use any of its own marketing, advertising, catalogs, promotional materials, or any other materials in connection with Licensed Products or their packaging without the prior approval of Little Tikes.

10.2    If Little Tikes has supplied User with forms, such as Exhibit D, for use in applying for approval of artwork, photographs, models, pre-production and production samples of Licensed Products, User shall use such forms when submitting anything for Little Tikes' approval. However, User may use altered forms as User reasonably deems necessary if Little Tikes has pre-approved the altered forms in writing.

10.3    All packaging, display material, promotional material, catalogs and advertising for Licensed Products shall comply with all applicable laws and regulations for each country in the Territory where the Licensed Products are sold or used. In addition, each Licensed Product and its packaging shall incorporate "date codes" signifying the date of production of each Licensed Product.

10.4    Packaging for Licensed Products to be distributed in the United States shall be printed with English language only. Packaging for Licensed Products shall be printed in such languages, including multi languages, as are necessary to comply with laws and regulations governing the distribution of Licensed Products in the Territory.

## ARTICLE XI. COMPLIANCE WITH APPROVED SAMPLES AND APPLICABLE LAWS AND STANDARDS

Each Licensed Product and component thereof distributed hereunder shall be of good quality and shall comply with all applicable and the most current laws, health, safety and regulatory standards, whether voluntary or mandatory, of all countries in the Territory where the Licensed Product is sold including, but not limited to, regulations of the United States Consumer Products Safety Commission (CPSC), the Federal Trade Commission (FTC), Underwriters Laboratory (UL), and the Canadian Standards Association (CSA). User shall be responsible to assure that all Licensed Products conform to all applicable safety laws and regulatory standards. Prior to shipment, User shall provide Little Tikes with written confirmation of compliance with the foregoing, along with a list of the countries in the Territory where each of the Licensed Products hereunder is to be shipped. User shall follow

reasonable and proper procedures for testing so that Licensed Products comply with such laws and standards and shall upon reasonable notice permit Little Tikes to inspect or receive copies of testing records and procedures.  Licensed Products that do not comply with applicable laws and regulatory standards shall be deemed unapproved under Article IX.

Notwithstanding anything to the contrary herein, in the event that Little Tikes may, in its sole discretion, allow User to subcontract the manufacture of Licensed Products to third party manufacturers, provided that (a) User has given prior written notice of such proposed subcontract arrangement to Little Tikes, including the name, address and such other information concerning the proposed manufacturer as may be requested by Little Tikes; (b) each such manufacturer shall be otherwise subject to inspection by Little Tikes and the quality control procedures set forth herein;  (c) the Licensed Products and/or any elements of any Licensed Products made by such manufacturer meet the quality standards set forth in this Agreement; and (d) each such manufacturer executes an agreement with both User and Little Tikes, such agreement to be in a form approved by Little Tikes.

## ARTICLE XII. ADDITIONAL COVENANTS OF USER

12.1    User shall ship the initial Licensed Product to retail stores in the United States for display and for consumer purchase no later than the Shipping Date.  The failure to ship the initial Licensed Product by the Shipping Date as required by this paragraph shall be deemed a material breach of this Agreement.

12.2    User agrees to submit an Annual Marketing Plan for review by the Director of Licensing, within sixty (60) days before the start of each calendar year, using the Annual

Marketing Plan format prescribed by Little Tikes, receipt of which User herewith acknowledges or another report format as approved by Little Tikes.

12.4    If it becomes so, User shall notify Little Tikes that more than three percent (3%) of Licensed Products sold by User during the Initial Term, and two percent (2%) of Licensed Products sold by User during each additional Term, have been returned by consumers to User as defective.  User shall provide such notice within ten (10) days of such condition occurring, and shall transmit with that notice a written plan outlining the steps to be taken to reduce the incidence of defects and a schedule for implementing such steps.

12.5    The rights granted hereunder do not permit the sale of "seconds" or "irregulars."  All Licensed Products not approved under Article IX or failing subsequently to conform to the approved standard shall be destroyed by User.

## ARTICLE XIII. USER NAME AND ADDRESS ON ARTICLES

User's name and address (at least city and state) will appear on permanently affixed labeling on each Licensed Product, or if that is not practicable, then on approved packaging therefor.

## ARTICLE XIV. TERMINATION

14.1    This Agreement may be terminated prior to the end of the Term:

    (a)      at any time upon mutual agreement of the parties;

(b)    by either party giving the other party thirty (30) days' written notice of a material breach of this Agreement, provided that such breach is not cured within thirty (30) days following notice to the other party.

14.2    Little Tikes may terminate this Agreement immediately and without prior notice to User if Little Tikes determines that User has published or offered for sale any Licensed Products or any related packaging, marketing, advertising or any other materials that have not been approved, or have been disapproved, pursuant to Article IX.   User acknowledges that in such circumstance, Little Tikes will be irreparably injured, and may seek interlocutory injunctive relief, with or without notice to User, to prevent the publication and distribution of such materials, in addition to any other remedies available to Little Tikes.

14.3    This Agreement will terminate automatically upon the filing of a voluntary petition in bankruptcy by either party; the execution by either party of an assignment for the benefit of creditors; the filing of a petition to have either party declared bankrupt, provided it is not vacated within sixty (60) days from the date of filing; or the appointment of a receiver or trustee for either party.

14.4    Upon termination of this Agreement other than pursuant to Section 14.2, User shall have the right to complete the manufacture of Licensed Products then on order, and User shall further be permitted to sell such Licensed Products which have been ordered, manufactured or are still in stock on the date of termination for a period of time not to exceed three (3) months in duration, subject to the payment of Royalties specified herein

14.5     Subject to the sale of the Licensed Products on order or in stock pursuant to Section 14.4, upon termination of this Agreement, User shall immediately discontinue use of the Trademarks and shall immediately remove all reference to the Trademarks from any printed or other material distributed or disseminated by User. User shall no longer use the Trademarks in any variation, imitation or simulation thereof, or any marks similar thereto.

14.6.    Upon the termination of this Agreement, User shall promptly provide Little Tikes, at no cost to Little Tikes, with no less than One Hundred (100) units of each Licensed Product for the purposes of satisfying any consumer complaints Little Tikes receives to its 800 phone number.

## ARTICLE XV. BENEFIT

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

## ARTICLE XVI. AMENDMENT

This Agreement may not be amended or modified, except by a written document signed by both parties hereto.

## ARTICLE XVII. CONFIDENTIALITY

17.1     General Obligation of Confidence.  Little Tikes and User agree that during the term of this Agreement and for a period of five years after termination of this Agreement not to

reveal to any person (unless authorized in writing by the other party) any confidential or proprietary information regarding the other party's products, developments, processes, and know-how. The parties further agree that they will not disclose to anyone not authorized by the other party to receive same, the contents of any report, record, drawing, data, correspondence, or any other subject, material or information which is not generally available to the trade or public. Little Tikes and User acknowledge recognizing and agreeing that by virtue of this Agreement they may acquire information regarding matters of a confidential business nature regarding the other party, its affiliates, its parent, and its parent's subsidiaries, which it agrees not to disclose to third parties nor use in competition, such as, but not limited to, sales know-how, future plans, costs, prices, profits and losses, markets, suppliers, customers, and other information not generally available to the public. This Section shall survive termination of this Agreement, regardless of the reason for termination.

17.2   <u>Definition of Information Subject to Section 17.1</u>. The parties agree to treat all information and data furnished by the other party pursuant to this Agreement as confidential and proprietary, and such information and data shall be used solely for the purposes stated herein. The obligations of confidentiality under this Agreement shall not apply to such information and data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can prove was owned by the receiving party prior to the other party's disclosure, or (c) that is derived from any third party having the right to make such disclosure, or (d) the disclosure of which is compelled by a court of

competent jurisdiction and only after notice to the disclosing party and opportunity for the disclosing party to prevent disclosure.

## ARTICLE XVIII. NON-WAIVER

The failure of either party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. No waiver whatsoever shall be valid unless in writing, signed by the waiving party, and only to the extent therein set forth.

## ARTICLE XIX. ASSIGNMENT

The license and rights granted to User hereunder are personal in nature, and User shall not sell, transfer, lease or assign this Agreement or its rights and interests hereunder, or any part hereof, by operation of law or otherwise, without the prior written consent of Little Tikes, which consent shall not be unreasonably withheld.

## ARTICLE XX. NOTICE

Notices to be given under this Agreement shall be deemed sufficiently served when reduced to writing in English and deposited in the mail, postage prepaid for Certified Mail or sent by prepaid overnight express delivery (with a copy simultaneously sent by fax), to:

<u>If to User:</u>

      Kid Station Toys Ltd.
      P.O. Box 694660
      Miami, FL 33268-4660
      Attn: Elliot Newman

<u>If to Little Tikes:</u>

      The Little Tikes Company
      Director of Licensing
      2180 Barlow Road
      Hudson, Ohio 44236

With a copy to:

      Stuart I. Graff, Esq.
      Newell Rubbermaid Inc.
      Legal Department
      6833 Stalter Drive, Suite 101
      Rockford, IL 61108

## ARTICLE XXI. JURISDICTION

This Agreement shall be interpreted in all respects in accordance with the laws of the State of Illinois. Any dispute relating to the making or the interpretation of this Agreement, or the performance or nonperformance by any party of its obligations hereunder, shall be litigated only in the state or federal courts located within Cook County, Illinois. User consents to personal jurisdiction in said courts and shall not seek to transfer or change the venue of any action brought in compliance with this Paragraph.

## ARTICLE XXII. OTHER PROVISIONS

22.1    <u>Pronouns; Gender.</u>  Whenever the pronoun "it", "its" or "his" may be used, it is understood by the parties to this Agreement that such usage shall include both singular and

plural, masculine, feminine and neuter genders and refer in appropriate cases to individuals as well as to corporations and businesses.

22.2    Nature of Relationship.  Nothing herein contained shall be construed to place Little Tikes and User in the relationship of partners, joint ventures, or agents and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

22.3    Force Majeure.  In the event either party to this Agreement is unable to carry out its obligations under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitation, acts of God, fire, flood, strikes, lockouts, war, or civil commotion, then upon giving prompt notice of force majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligations is prevented by circumstances of force majeure.

22.4    Headings.  The headings of the articles and sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

## ARTICLE XXIII. ENTIRE AGREEMENT

This Agreement may be executed in duplicate, each of which shall be considered original for all purposes.  This instrument contains the entire Agreement between the parties and neither

it nor any of its provisions may be changed, waived or terminated, except as herein expressly provided, or in a written instrument signed by the parties.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

THE LITTLE TIKES COMPANY

By: _____

Title: UP marketing _____

Date: 12/16/03 _____

KID STATION TOYS LTD.

By: Elliot Newman _____

Title: President _____

Date: 12/8/03 _____

EXHIBIT A

**Category I:** Electronic Youth Audio including: Cassette players & recorders; Cassette players and recorders; Cassette sing-a-along players and recorders; CD players and sing-a-longs; CDG, CD and/or cassette karaoke machines; wireless and hard-wired microphones with or without built-in speaker, AM/FM radios; Walkie talkies; 35MM cameras; Clocks with AM/FM radios and/or CD or cassette player, Multi-colored flashing light mechanisms (i.e., balls or spot lights); Karaoke software, including cassettes, CD's, DVD's and CDG sold separately; Youth designed telephones

**Category II:** VCR players; DVD players, 2" – 19" black and white and color TV's with or without DVD and VCR players

**Category III:** Electronic Youth "Real Music", including: Electronic Guitars, Electronic Keyboards, Electronic Drum Sets, and Electronic Kazoo-phone. "Real Music" shall be defined as musical instruments directed for distribution and merchandising within the "Electronics or Music" section or aisle at retail and not the "Pre-school" section or aisle at retail, if such sections or aisles are separate

User shall use its best efforts to place the Licensed Products within the "Electronics or Music" section or aisle and not within the core Little Tikes or "Pre-school" section or aisle at retail, if such sections or aisles are separate.

Little Tikes acknowledges that User can not dictate retail merchandising and that individual retailers and retail chains maintain the right to merchandise purchased product in the manner they see fit; however, User shall use its best efforts to ensure that the Licensed Products are placed in accordance with this Agreement.

User shall use its best efforts to inform a Little Tikes representative of any meeting with a "pre-school" buyer.

User shall provide to Little Tikes a written meeting report no later than three (3) business days following a meeting between User and a buyer at the following retailers: Walmart, Kmart, Target, Toys R Us, Kay Bee Toys, FAO Schwarz during which the Licensed Products are shown or discussed. Such report shall contain the participants attending the meeting, place of meeting, date of meeting, products discussed and actions taken and/or need to be taken.

EXHIBIT B

1. The Property: "LITTLE TIKES", and the "LITTLE TIKES" logo as shown below:



2. ®/™ The Little Tikes Company.

EXHIBIT C

Royalty Report Form

_____ QUARTER – YEAR _____

| SKU # | Description | Price/Unit | Units Sold | Total Sales | Less Returns | Less Allowances | Net Sales |
|-------|-------------|------------|------------|-------------|--------------|-----------------|-----------|
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |
|       |             |            |            |             |              |                 |           |

Total Net Sales _____
x Royalty Rate _____ %
Gross Royalties _____
Less Advance paid and which have not
    been credited against previous
ROYALTY PAYMENTS otherwise due
under the Agreement (_____)

Total Royalties Due  $_____


_____
Signature of Authorized Officer Certifying foregoing to be accurate


Name: _____
Title: _____
Date: _____

EXHIBIT D



### Addendum to License Agreement

This Addendum dated January 1, 2006 (the "Effective Date") is an addendum to the License Agreement dated December 8, 2003 (the "License Agreement") by and between The Little Tikes Company ("Licensor"), an Ohio corporation ("Purchaser"), and Kid Station Toys Ltd., a Florida corporation ("Licensee").

### Recitals

Licensor and Licensee are parties to the License Agreement pursuant to which Licensor grants to Licensee the right to use the LITTLE TIKES trademark as set forth in that agreement. The purpose of this Addendum is to revise the License Agreement to include an additional category of Licensed Products. The Addendum also sets forth the Guaranteed Annual Royalty Payment for this new category of Licensed Products.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1.  The definition of Licensed Products in Exhibit A of the License Agreement is amended to add the following:

    **Category IV:** Electronic Youth "roleplay" items (with and without lights, sounds or voice features), namely cameras, CD players, DVD players, boom boxes, laptops, car keys, cell phones. Single musical mats, Dual musical mats, deluxe musical mats, Plug N Play musical mats, and Plug N Play Deluxe/Dual musical mats.

    Licensee agrees that it shall use its best efforts to cause the retailer of the Licensed Products to display the Licensed Products in the electronics area of the retailer, rather than in toy area of the retailer.

2.  The parties agree that the Term of the license granted under Section 2.1 of the license Agreement with respect to the Category IV products shall commence on the Effective Date and end on December 31, 2008.

3.  Section 4.2 of the License Agreement is amended to add the following language at the end of the Section:

<u>Category IV:</u>

| | |
|---|---|
| Period 1: | January 1, 2006 – December 31, 2006 |
| January 1, 2006: | $6,768.00 |
| March 15, 2006: | $6,768.00 |
| June 15, 2006: | $6,768.00 |
| September 15, 2006: | $6,768.00 |
| December 15, 2006: | $6,768.00 |
| | |
| Period 2: | January 1, 2007 – December 31, 2007 |
| January 1, 2007: | $6,768.00 |
| March 15, 2007: | $6,768.00 |
| June 15, 2007: | $6,768.00 |
| September 15, 2007: | $6,768.00 |
| December 15, 2007: | $6,768.00 |
| | |
| Period 3: | January 1, 2008 – December 31, 2008 |
| January 1, 2008: | $6,768.00 |
| March 15, 2008: | $6,768.00 |
| June 15, 2008: | $6,768.00 |

The Guaranteed Annual Royalty Payments shall be made quarterly

Guaranteed Annual Royalty Payments for Category I, Category II, Category III may not be applied to Category IV. Guaranteed Annual Royalty Payments for Category II, Category III, Category IV may not be applied to Category I. Guaranteed Annual Royalty Payments for Category I, Category III, Category IV may not be applied to Category II. Guaranteed Annual Royalty Payments for Category I, Category II, Category IV may not be applied to Category III. The parties acknowledge and agree that the term "annual" as used in the term Guaranteed Annual Royalty Payments with respect to the Products in Category IV shall refer to the "Periods" defined above.

4.    The royalty rate for Category IV Licensed Products is five percent (5%) of the Net Sales Price for domestic and FOB Sales.

5.    Except as expressly set forth in the Addendum, the provisions of the License Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned parties have caused this Addendum to be signed on the day and year above written.

**LICENSOR**

**THE LITTLE TIKES COMPANY**

By: _____

Name: _Brian Kirkendall_____

Title: _VP Marketing_____


**LICENSEE**

Kid Station Toys Ltd.

By: _____

Name: _____Elld Num_____

Title: _____Prsdnt_____